Jennifer Towle (SBN 225095)
**DICKINSON WRIGHT PLLC**
607 W. 3rd Street, Suite 2500
Austin, TX 78701
Tel: (512) 770-4200
JTowle@dickinson-wright.com

Lael D. Andara (SBN 215416)
**DICKINSON WRIGHT RLLP**
615 National Avenue, Suite 220
Mountain View CA 94043
Tel: (408) 701-6152
LAndara@dickinson-wright.com

*Attorneys for Defendant*
*MyFirst USA Inc.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WOBBLEWORKS, INC.,<br>Plaintiff,<br>v.<br>GUANGZHOU JER EDUCATION TECHNOLOGY (d/b/a JER; GUANGZHOU JER; JER EDUCATION TECHNOLOGY CO, LTD.; GUANGZHOU ELECTRONICS CO., LTD) and MYFIRST USA INC.,<br>Defendants. | NO.: 2:26-cv-01592-MEMF-PVC<br><br>**DECLARATION OF DR. TIM OSSWALD IN SUPPORT OF MYFIRST USA INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Tim Osswald, hereby declare as follows:

## I. Introduction

1. On behalf of co-defendant MyFirst USA Inc. ("MyFirst") I am submitting this declaration concerning technical subject matter relevant to claim construction, invalidity, and non-infringement in the above captioned case. I am offering opinions regarding the following patents asserted by plaintiff WobbleWorks Inc. ("WobbleWorks"): U.S. Patent Nos. 9,731,444 (the "'444 Patent"), 10,792,850 (the "'850 Patent"), 11,446,852 (the "'852 Patent"), 11,766,819 (the "'819 Patent"), and 12,280,529 (the "'529 Patent") (collectively, the "Asserted Patents").

2. In forming my opinions expressed in this declaration, I have reviewed various materials, including the Asserted Patents, their prosecution histories, Mr. Bressler's Declaration and accompanying exhibits, and materials Mr. Bressler has considered (e.g., Bressler Decl. ¶ 18), among others. A list of exhibits is provided below.

3. I am being compensated at my standard rate of $700 per hour for my time spent in connection with this proceeding. My compensation is not dependent on and in no way affects my opinion. Nor does my compensation depend on the outcome of this proceeding. My opinions are based on my education, experience, and background in the fields discussed below.

## II. Summary of Noninfringement and Invalidity Opinions

4. It is my opinion that the products JERLP03 (3D Pen Make) and JER RP800A (3D Pen Artist) do not infringe at least Claim 1 of U.S. Patent No. 9,731,444 (the "'444 patent").

5. It is my opinion that the products JERLP03 (3D Pen Make) and JER RP800A (3D Pen Artist) do not infringe at least Claim 1 of U.S. Patent No. 10,792,850 (the "'850 patent").

6. It is my opinion that the products JER LP03 (3D Pen Make), and JER RP800A (3D Pen Artist) do not infringe at least Claim 1 of U.S. Patent No. 11,446,852 (the "'852 patent").

7. It is my opinion that the products JERLP03 (3D Pen Make) and JER RP800A (3D Pen Artist) do not infringe at least Claim 1 of U.S. Patent No. 11,766,819 (the "'819 patent").

8. It is my opinion that the products JERLP03 (3D Pen Make) and JER RP800A (3D Pen Artist) do not infringe at least Claim 1 of U.S. Patent No. 12,280,529 (the "'529 patent").

9. It is my opinion that U.S. Patent No. 7,950,549 entitled Powered Dispenser with Interchangeable Cartridges ("Harris") anticipates at least Claim 1 of the '444 patent.

10. It is my opinion that Harris anticipates at least Claim 1 of the '850 patent.

11. It is my opinion that Harris anticipates at least Claim 1 of the '852 patent.

12. It is my opinion that Harris anticipates at least Claim 1 of the '819 patent.

13. It is my opinion that Harris anticipates at least Claim 1 of the '529 patent.

14. It is my opinion that Harris in view of U.S. Patent No. 8,663,533 entitled Method of Using Print Head Assembly in Fused Deposition Modeling Systems ("Swanson") renders obvious at least Claim 1 of the '444 patent.

15. It is my opinion that Harris in view of Swanson renders obvious at least Claim 1 of the '850 patent.

16. It is my opinion that Harris in view of Swanson renders obvious at least Claim 1 of the '852 patent.

17. It is my opinion that Harris in view of Swanson renders obvious at least Claim 1 of the ’819 patent.

18. It is my opinion that the following term is indefinite: “to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object” as found in Claim 1 of the ’850 patent, Claim 1 of the ’819 patent, and Claim 1 of the ’529 patent.

19. It is my opinion that the following terms are indefinite: (1) “permitting the user to draw in free space to form a three-dimensional object” as found in Claim 1 of the ’444 patent, (2) “to permit drawing in 3D space” as found in Claim 1 of the ’850 patent, (3) “to permit the user to draw in free space to form a 3D object” as found in Claim 1 of the ’852 patent, (4) “to permit drawing in 3D space” as found in Claim 1 of the ’819 patent, and (5) “to draw a 3D object” as found in Claim 1 of the ’529 patent.

20. Support for this summary is found below.

## III. Background and Qualifications

21. I am a Professor Emeritus at the University of Wisconsin-Madison in the Department of Mechanical Engineering, where I was the Co-Director of the Polymer Engineering Center. I am also an Honorary Professor of Plastics Technology at the University of Erlangen-Nuremberg in Germany and the National University of Colombia.

22. I earned both a Bachelor of Science degree (1981) and a Master of Science degree (1982) in Mechanical Engineering from the South Dakota School of Mines & Technology. I also earned a Ph.D. (1987) in Mechanical Engineering from the University of Illinois at Urbana-Champaign. My Ph.D. research was in the field of polymer processing.

23. From 1987 to the present, I have held a variety of professional and academic positions. I was a consultant for the Dynamit Nobel Research Center in Leverkusen, Germany, as well as a Humboldt Fellow at the Institute for Plastics

Processing at the Technical University of Aachen, Germany between 1987 and 1989. In 1989, I joined the Mechanical Engineering Department at the University of Wisconsin-Madison as an Assistant Professor. I became a Full Professor in 1999.

24. I have extensive experience with polymer part manufacturing processes and extensive experience with behavior and characterization of polymeric materials, including thermoplastics, thermosets, and rubber. I have in-depth knowledge in various polymer processing techniques, such as extrusion and molding processes, as well as composites manufacturing and additive manufacturing (also known as 3-D printing). I have in-depth knowledge of additive manufacturing and additive manufacturing patent history.

25. I am a member of numerous professional societies and organizations. For example, I am a member of the Society of Plastics Engineers, the Scientific Alliance of the University Professors of Polymer Technology, the Polymer Processing Society (where I currently serve as Treasurer), and the German Technical Journalists Organization (DFJV).

26. For over 30 years, I have conducted research and taught classes in the field of mechanical engineering, and more specifically regarding polymer and composite materials and polymer and composite processing. My research has focused on polymer and polymer composites processing, polymer and polymer composites materials science, and engineering design with polymers and polymer composites. Furthermore, I regularly serve as a consultant to the plastics industry and have extensive experience dealing with additive manufacturing and design and manufacture of additive manufacturing equipment. I am currently part of the Scientific Advisory Board for SABIC Specialties, and the Scientific Advisory Council of SABIC, a large chemical company. I also served on the Technical Advisory Board of Teel Plastics, a pipe extrusion company, and the Madison Group, a plastics consulting firm.

27. Since February of 2019, I have served as an Advisory to the Colombian President on matters regarding science and technology, and the creation of a new Ministry of Science, Technology, and Innovation.

28. At the University of Wisconsin-Madison, I developed and taught a variety of courses, including Polymer Manufacturing Processes, Introduction to Transport Phenomena in Polymer Engineering, Engineering Design with Polymers, Modeling and Simulation in Polymer Processing, Introduction to Polymer Additive Manufacturing and Introduction to Polymer Composites Processing. My courses include units on fundamental aspects of polymer engineering, such as melting, solidification, and flow, as well as processing techniques such as injection molding, extrusion processes, additive manufacturing, composites processes and secondary operations such as thermoforming, blow molding, film casting, film blowing, joining, and welding. In my additive manufacturing course, I teach a whole unit on intellectual property in additive manufacturing, as well as the underlying physics that govern the various additive manufacturing processes.

29. In addition to my teaching and research duties at the University of Wisconsin-Madison, twice a year I taught a Modeling and Simulation in Polymer Processing course at the University of Nuremberg-Erlangen in Germany. Since 2020 I teach the course Simulation of Polymer Additive Manufacturing Processes at the University of Nuremberg-Erlangen in Germany. I have also taught the Materials Science of Polymers for Engineers and Polymer Processing courses at the EAFIT University and the National University in Colombia, and the course Polymer Additive Manufacturing at the Universidad de Los Andes in Bogotá, Colombia.

30. Over the years, my research and teaching have led to the issuance of seven patents, including patents in the field of additive manufacturing, as well as several honors, and awards. For example, in 2001 I was the recipient of the VDI-K (German Engineering Society – Plastics) Dr. Richard Escales Prize; in 2006, I was named Honorary Professor at the University of Erlangen-Nuremberg in Germany,

and in 2010 I was name Honorary Professor at the National University of Colombia; in 2016, I was named Educator of the Year by the Society of Plastics Engineers (SPE); and in 2017, the same organization named me Educator of the Year in the Field of Composites.

31. I have also published over 400 papers in the field of polymer engineering and have authored 11 books in the area: *Polymer Materials Science for Engineers* (Hanser Publishers, 1st Edition 1996, 2nd Edition 2003, 3rd Edition 2012), *Polymer Processing Fundamentals* (Hanser Publishers, 1998), *Injection Molding Handbook* (Hanser Publishers, 1stEdition 2001, 2nd Edition 2006), *Compression Molding* (Hanser Publishers, 2003), *Polymer Processing – Modeling and Simulation* (Hanser Publishers, 2006), *Plastics Handbook* (Hanser Publishers 2006, 2019), *Kunststoff-Taschenbuch* (Hanser Publishers 2006, 2013, 2022), *Plastics Testing and Characterization* (Hanser Publishers, 2007), *Understanding Polymer Processing* (Hanser Publishers, 1st Edition 2010, 2nd Edition 2017, 3rd Edition 2025), and D*iscontinuous Fiber-Reinforced Composites – Fundamentals and Applications* (Hanser Publishers, 2020). Some of my books have been translated into Chinese, Japanese, Spanish, Italian, Farsi, and Russian. I am also the series editor for the Plastics Pocket Power Series of Hanser Publishers.

32. I am one of the authors of the “Plastics Handbook – The Resource for Plastics Engineers,” (“Plastics Handbook”) published by Hanser Publishers, which will be published in its 6th edition in 2026. I am also one of the co-authors of the German version of the Plastics Handbook, which was published in its 32nd edition in 2022. The Plastics Handbook is a complete compendium of polymer materials, polymer processes and polymer characterization techniques. The processing chapter presents the major additive manufacturing techniques.

33. While the Plastics Handbook is a book for practitioners and engineers, some of my other books are polymer engineering textbooks that are used in courses taken by undergraduate and graduate students throughout the world. One such book

is Understanding Polymer Processing, which contains a chapter on additive manufacturing. Other books are more advanced, and are used by researchers at universities and in the industry to acquire in-depth knowledge in polymer engineering.

34. I have also conducted collaborative research at the interface of polymer engineering and biomaterials/biosystems, resulting in publications in journals such as Acta Biomaterialia and AIMS Bioengineering, and presentations at bioengineering-focused conferences

35. My academic and professional background and qualifications are further elaborated in my *curriculum vitae* available as Exhibit 1.

36. Over the years, I have served as an expert witness in cases in which I have testified at trial or by deposition. A listing of those cases is available as the Addendum to my *curriculum vitae* available as Exhibit 1.

## IV. Basis of Opinion and Materials Considered

37. I have been asked to provide technical review, analysis, insights, and opinions regarding the Asserted Patents, including claim construction, invalidity and non-infringement.

38. In formulating my opinions, I have relied upon my training, knowledge, and experience relevant to the Asserted Patents. My opinions are not only based on the documents listed below but also based on years of experience as a professor and educator. My analysis is particularly focused on the state of the art in December 2012. Furthermore, I have considered specifically the following documents listed below in addition to any other documents cited in this expert declaration. I understand that the documents are true and accurate copies of what they appear to be.

| Doc. Id | Exhibit |
| --- | --- |
| Ex. 1 | Dr. Tim Osswald's *Curriculum Vitae* |
| Ex. 2 | U.S. Pat. No. 9,731,444 (the "'444 patent") |

| **Doc. Id** | **Exhibit** |
|---|---|
| Ex. 3 | Prosecution History of the ’444 patent |
| Ex. 4 | U.S. Pat. No. 10,792,850 (the “’850 patent”) |
| Ex. 5 | Prosecution History of the ’850 patent |
| Ex. 6 | U.S. Pat. No. 11,446,852 (the “’852 patent”) |
| Ex. 7 | Prosecution History of the ’852 patent |
| Ex. 8 | U.S. Pat. No. 11,766,819 (the “’819 patent”) |
| Ex. 9 | Prosecution History of the ’819 patent |
| Ex. 10 | U.S. Pat. No. 12,280,529 (the “’529 patent”) |
| Ex. 11 | Prosecution History of the ’529 patent |
| Ex. 12 | Osswald, T.A., *Polymer Processing Fundamentals, Hanser Publishers*, 1998 (“Osswald 1998”) |
| Ex. 13 | Osswald, T.A., Understanding Polymer Processing, Hanser Publishers, 2017 (“Osswald 2017”) |
| Ex. 14 | Osswald, T.A., and Menges G., *Materials Science of Polymers for Engineers*, Hanser Publishers, 2010 (“Osswald 2010”) |
| Ex. 15 | https://www.youtube.com/watch?v=q47CzPQLroQ |
| Ex. 16 | U.S. Pat. No. 7,950,549 (“Harris”) |
| Ex. 17 | U.S. Pat. No. 8,663,533 (“Swanson”) |
| Ex. 18 | *Ditec Solutions, LLC v. WobbleWorks, Inc.*, IPR 2018-01414, Paper No. 12 (PTAB 2019) (“*Ditec* IPR”) |
| Ex. 19 | U.S. Pat. Pub. No. 2010/0147465 (“Di Miceli”) |
| ECF18-3 | Declaration of Peter Bressler in support of WobbleWorks, Inc.’s Motion for a Preliminary Injunction (“Bressler Decl.”) |
| ECF18-82 through ECF18-91 | Infringement charts prepared by Peter Bressler |

39. This declaration presents the opinions I have formed to date. I may consider additional documents as they become available or other documents that are necessary to form my opinions. I reserve the right to revise, supplement, or amend my opinions based on new information.

## V. Relevant Legal Standard

40. When considering the Asserted Patents and stating my opinions, I am relying on legal principles that have been explained to me by counsel.

41. I understand that applications giving rise to the Asserted Patents were examined under Title 35 of the United States Code as it existed before the America Invents Act passed by Congress ("pre-AIA"). All citation to 35 U.S.C. sections in this declaration are to pre-AIA sections.

42. I understand that an assessment of a patent's claims should be undertaken from the perspective of a person of ordinary skill in the art ("POSITA") as of the "effective filing date" of the patent claims. In performing my analysis, I have been asked to assume that the "effective filing date" of the Asserted Patents is December 5, 2012—the same date used by Mr. Bressler. Bressler Decl., ¶ 63.

43. I understand that a person of ordinary skill in the art is determined by looking at (1) the type of problems encountered in the art; (2) the prior art solutions to those problems; (3) the rapidity with which innovations are made; (4) the sophistication of the technology; and (5) the educational level of active workers in the field.

44. I have been informed that, in patent infringement proceedings such as this one, the patentee bears the burden of proving infringement.

45. I also understand that to obtain a preliminary injunction, a patentee must establish a likelihood of success on the merits, which requires showing both that it will likely prove infringement and that its asserted claims will likely withstand any invalidity challenges.

46. I understand that if the accused infringer raises a "substantial question" concerning validity—meaning they present an invalidity defense that the patentee cannot prove lacks substantial merit—a preliminary injunction is not appropriate. I understand that the standard is not whether the patent is invalid by clear and convincing evidence, but rather, vulnerability is the issue.

47. I understand that before a determination of either infringement or validity can be made, the patent claims must be construed. I understand patent claims are intended to define, in words, the boundaries of the inventor's rights and that the same boundary applies to infringement and invalidity.

48. I understand that claim construction is a question of law.

49. I understand that the words of a claim are generally given their ordinary and customary meaning at the time of the invention in the context of the entire patent, including the specification.

50. I also understand that because the meaning of claim terms as understood by a person of ordinary skill in the art is not often immediately apparent, that courts look to the works of the claims themselves, the remainder of the specifications, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

51. With respect to the prosecution history, I understand that the doctrine of prosecution disclaimer serves the public notice function of a patent by requiring that a patentee be held to what he declares during the prosecution of his patent. I also understand that this doctrine also applies to statements made during reexamination or IPR proceedings.

52. I also understand that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

53. Only when a claim is definite and properly understood can a determination be made whether a claim "reads on" an accused device or whether the prior art anticipate and/or render obvious the claimed invention.

54. I understand that a patent claim is invalid as anticipated if before the effective filing date it was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, in public use, on sale, or made without late abandonment, suppression, or concealment ("prior art"). I understand that to anticipate a claim, each element in the claim must be present in a single item of prior art and arranged or combined in the same way as recited in the claim.

55. In determining whether the single item of prior art anticipates a patent claim, I understand that I should consider not only what is expressly disclosed in the particular prior art reference but also what is inherently present or disclosed in that prior art or inherently results from its practice.

56. I understand that a patent claim is invalid if it would have been obvious to a person of ordinary skill in the art as of the effective filing date. Unlike anticipation, which allows consideration of only one item of prior art, obviousness may be shown by considering one or more than one item of prior art. In deciding obviousness, I must avoid using hindsight; that is, I must not consider what is known today or what was learned from the teachings of the patent. I understand that assessing obviousness entails considering: (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention, (3) the level of ordinary skill in the art, and (4) any secondary considerations of non-obviousness.

57. I understand that a prior art reference may be considered if it discloses information designed to solve any problem or need addressed by the patent. A prior art reference may also be considered if it discloses information that has obvious uses beyond its main purpose and if a person of ordinary skill in the art would

reasonably examine that reference when trying to solve any problem or need addressed by the patent.

58. I understand that I should analyze whether there are any relevant differences between the prior art and the claimed invention from the view of a person of ordinary skill in the art as of the Cutoff Date. I understand that my analysis must determine the impact, if any, of such differences on the obviousness or nonobviousness of the claimed invention as a whole, and not merely some portion of it.

59. I understand that the person of ordinary skill is presumed to know all prior art determined to be reasonably relevant and is also a person of ordinary creativity that can use common sense to solve problems.

60. I understand that a claim may be obvious based on a combination of multiple prior art references, as well as based on the knowledge and skill of a person of ordinary skill in the art as of the effective filing date. I also understand that to combine prior art references, there must have been a motivation that would have prompted a person of ordinary skill in the art to do so. In other words, obviousness requires a motivation to combine the features of the prior art. I further understand that a person of ordinary skill in the art must have had a reasonable expectation that the combination would work. That is, obviousness requires a reasonable expectation of success in combining the prior art to achieve the claimed subject matter. I also understand that, while obviousness requires a reasonable expectation of success, it does not require absolute predictability of success in achieving the claimed subject matter.

61. I understand that a motivation to combine prior art references may arise from a variety of sources, including: (i) common knowledge in the art; (ii) improvement of processing and security of the principal reference; (iii) combining prior art elements according to known methods to yield predictable results; (iv) simple substitution of one known element for another one; (v) use of a known

technique to improve the operation of this technology; (vi) obvious to try; (vii) known work in the field of endeavor; (viii) the promotion of interoperability of systems through the use of accepted standards in the community; and (ix) explicit or inherent reference to certain references as being relevant or necessary to the operation of the principal reference.

62. I also understand that a claim may be obvious if a person of ordinary skill in the art would have found it obvious to try combining a finite number of predictable solutions known in the art. For example, if one technique had been used to improve a method of using a device, and a person of ordinary skill in the art would have recognized that the same technique was one of a limited number of solutions and would improve similar devices in the same way, a person of ordinary skill in the art may have found it obvious to try that same technique on similar devices.

63. I understand that, when present, evidence of "secondary considerations" must be considered along with the other factual evidence relevant to obviousness. Such secondary considerations could include unexpected results, commercial success of products or processes using the invention, long-felt but unmet need for the invention, failure of others to make the invention, industry acceptance of the invention, or copying of the invention by others. I understand that, in order for such evidence to support nonobviousness, it must have a "nexus" to the features of the invention as claimed.

64. I understand that the question of whether a patent's claims would have been obvious to a person of ordinary skill in the art as of the effective filing date is a different inquiry from the question of whether the claims are enabled. To be enabled, the patent's written description must permit a person of ordinary skill in the art as of the effective filing date to practice the full scope of the claims without undue experimentation. I understand that a patent claim may be both invalid as obvious and, at the same time, not enabled by the patent's written description.

65. I understand that to be enabled, a patent must disclose sufficient information to enable or teach persons of ordinary skill in the field of the invention, as of the effective filing date of the claimed invention, to make and use the full scope of the claimed invention without undue experimentation.

66. I understand that in considering whether a patent complies with the enablement requirement, I must keep in mind that patents are written for persons of ordinary skill in the field of the invention. Thus, a patent need not expressly state information that persons of ordinary skill would be likely to know or could obtain. The fact that some experimentation may be required for a person of ordinary skill to practice the claimed invention does not mean that a patent does not meet the enablement requirement.

67. Factors that I may consider in determining whether persons of ordinary skill in the field of the invention would require undue experimentation to make and use the full scope of the claimed invention include: (1) the quantity of experimentation necessary and whether that experimentation involves only known or commonly used techniques; (2) the amount of direction or guidance disclosed in the patent; (3) the presence or absence of working examples in the patent; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability of the art; and (8) the breadth of the claims.

68. I also understand that WobbleWorks claims that certain 3D printing pen products by MyFirst and JER Education directly infringe the Asserted Patents. A patent claim is literally infringed only if an accused product includes each and every element recited in the patent claim. If the accused product does not contain one or more elements recited in the patent claim, it does not literally infringe the claim.

69. I understand that the words of a claim are generally given their ordinary and customary meaning at the time of the invention in the context of the entire patent, including the specification.

70. I also understand that because the meaning of claim terms as understood by a person of ordinary skill in the art is not often immediately apparent, that courts look to the works of the claims themselves, the remainder of the specifications, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

71. With respect to the prosecution history, I understand that the doctrine of prosecution disclaimer serves the public notice function of a patent by requiring that a patentee be held to what he declares during the prosecution of his patent. I also understand that this doctrine also applies to statements made during reexamination or IPR proceedings.

## VI. State of the Art and Relation to the Asserted Patents

72. At the time of the alleged invention, material extrusion additive manufacturing, commonly referred to as fused filament fabrication (FFF), was a well-established technology. As defined in ISO/ASTM 52900, material extrusion processes involve the selective deposition of material through a heated nozzle or orifice. In FFF systems, a solid thermoplastic filament is fed into an extruder, melted, and forced through a nozzle, where it is deposited as a continuous bead along a predefined toolpath. Critically, the extruded material exits the nozzle in a molten state and subsequently cools and solidifies after deposition. The figures below show a schematic of the FFF process (Figure 1) and the FFF printing head or nozzle (Figure 2). [Ex. 13, Osswald, *Understanding Polymer Processing*, (Hansler Publications 2017), Chapter 7]




Figure 1. Schematic diagram of Fused Filament Fabrication (FFF)




Figure 2. Schematic diagram of the fused filament fabrication printing head or nozzle.

73. The operation of FFF systems is inherently dependent on a digital workflow. A three-dimensional object is first created as a CAD model, which is then converted into a continuous surface representation, typically in STL format. This representation approximates the geometry using a mesh of triangular facets, which is subsequently sliced into a series of two-dimensional layers. The printer executes

these layers under computer control, with precise coordination of motion (via a gantry system) and material deposition. This process ensures that each deposited strand is placed onto previously deposited material or a build surface, where it can adhere, cool, and solidify in a controlled manner.

74. A fundamental characteristic of FFF, and material extrusion processes more broadly, is that the extruded thermoplastic material cannot retain its shape in free space immediately upon exiting the nozzle. Because the material is deposited in a molten, viscoelastic state, it requires either a supporting substrate or previously deposited layers to maintain geometric stability during cooling. For this reason, unsupported features such as overhangs require support structures, and deposition is performed in a layer-by-layer manner. A POSITA would therefore understand that the ability of an extruded strand to "retain its shape against gravity in free space" is inconsistent with the known physics of thermoplastic extrusion processes at the time.

75. The asserted patents depart from this established framework by effectively removing the defining elements of FFF systems. Specifically, the patents describe a handheld device in which the extrusion nozzle is detached from a computer-controlled gantry and instead manipulated directly by the user's hand. At the same time, the digital workflow—comprising CAD modeling, STL conversion, slicing, and toolpath generation—is eliminated and replaced by real-time human control. In essence, the asserted device substitutes the user's hand and perception for the motion system and computational infrastructure of a conventional additive manufacturing system.

76. Mr. Peter Dilworth of WobbleWorks has publicly explained that the 3Doodler was conceived by essentially "taking the nozzle off" a conventional 3D printer and using it by hand. This description confirms that the asserted device is a manual adaptation of known fused filament fabrication (FFF) technology, in which

the gantry motion and computer control are replaced by the user's hand. [https://www.youtube.com/watch?v=q47CzPQLroQ (last viewed March 22, 2026)]

77. Consistent with this explanation, the device continues to operate according to the same underlying physics as FFF—namely, extrusion of a molten thermoplastic that cools and solidifies after deposition. A POSITA would therefore understand that the material does not retain its shape in free space upon extrusion, but instead relies on adhesion and subsequent cooling, as in conventional thermoplastic extrusion processes.

78. Despite this change in form factor, the underlying material behavior remains unchanged. The extruded thermoplastic still exits the nozzle as a molten strand that must cool before it can support its own weight or maintain its geometry. Accordingly, any apparent ability to form three-dimensional structures is not the result of extrusion into "free space," but rather the result of adhesion to previously deposited material, nearby surfaces, or the nozzle itself, in a manner analogous to thermoplastic welding. A POSITA would recognize that such behavior is fully consistent with the known operation of thermoplastic extrusion and does not represent the formation of a self-supporting "solid form" at the point of extrusion as WobbleWorks' patents claim.

79. In view of the state of the art, the asserted patents can therefore be understood as a manual adaptation of known material extrusion technology, in which the automated, model-driven aspects of FFF are replaced by human control, but without altering the fundamental physical constraints governing the extrusion and solidification of thermoplastic materials or the core electrical and mechanical configuration of existing extruders.

## VII. The Person of Ordinary Skill in the Art

80. Mr. Bressler provides a definition of the Person of Ordinary Skill in the Art. [Ex. 19 ("Bressler Decl."), ¶ 63] I disagree with his definition.

81. In my opinion, a POSA at the time of the Asserted Patents would have a bachelor's degree in engineering, such as mechanical engineering, biomedical engineering, chemical engineering, materials science, or other similar degree, and have completed courses in polymer engineering, such as polymer processing and rheology and polymer materials science. Additionally, the POSITA would have had at least two years of industrial experience in design, prototyping and 3D printing, and manufacture of polymer parts. More relevant experience could compensate for less education, and more relevant education could likewise compensate for less experience.

82. My conclusion of non-infringement and invalidity analyses stands under either definition.

## VIII. The Asserted Patents

83. I understand that during prosecution of the application giving rise to the '444 patent, the applicant amended the claims to traverse a rejection under 35 U.S.C. § 103(a) in view of U.S. Patent Application Publication No. 2008/0213419 to Skubic et al. ("Skubic") in view of U.S. Patent Application Publication No. 2004/0232165 to Lee ("Lee") and U.S. Patent No. 6,460,481 to Young ("Young") and further in view of U.S. Patent No. 3,604,597 to Pohl et al. ("Pohl"). [Ex. 3 p. 311-324]

84. I understand that the applicant argued that "Skubic does not teach … 'a three-dimensional (3D) drawing device,' that is 'configured to accepts a strand of feed stock to be held in a user's hand and shaped to allow manipulation of the housing like a pen' to permit 'the user to draw in free space to form a three-dimensional object.'" [Ex. 3 p. 317-318]

85. I understand that the applicant further argued that "Lee does not teach or otherwise suggest a 'three-dimensional (3D) drawing device' that permits 'the user to draw in free space to form a three-dimensional object'" as claimed. [Ex. 3 p. 319]

86. I further understand that in distinguishing Lee, the applicant argued as follows:

> The glue applicator of Lee cannot be considered a 3D drawing device any more than a bottle of craft glue, a caulking gun, a mechanical pencil, or a paintbrush. These prior art devices, after numerous repeated applications of glue, caulk, pencil lead, or paint, and with significant curing or drying time, may deposit material in layers over time. However, these prior art devices are not in and of themselves 3D drawing devices; unlike the claimed 3D drawing device, none of these prior art devices or materials will immediately produce a freestanding 3D drawing or structure in a single, vertical stroke. Indeed, there is no external factor, including curing or drying time, that can be manipulated to enable these prior art devices to easily and immediately create a 3D drawing or structure in the manner made possible by using the claimed 3D drawing device. There is no manner of using the glue applicator of Lee (or any of the other prior art devices of the applied references) that allows an artist to create a complex, intricately detailed 3D drawing or structure with the speed and facility made possible by using the presently claimed 3D drawing device.
>
> Applicant submits that glue applicators, such as the glue applicator described by Lee, simply provide a manner of applying an adhesive or sealant in a molten, low-viscosity state that eventually cools and hardens to join or seal two parts together. These types of glue applicators are an alternative to using other glues, staples, tacks, or nails to join two parts together. When applied, the glue is runny, separates easily, and does not form a solid or semi-solid form when extruded from the glue applicator. Thus, Lee, whether considered alone or in

combination, fails to teach or otherwise suggest a "three-dimensional (3D) drawing device" that permits "the user to draw in free space to form a three-dimensional object," as recited in Claim [1].

[Ex. 3 p. 319-320]

87. I further understand that the applicant submitted a video to the USPTO during prosecution to "illustrate the substantial differences between Applicant's claimed 3D drawing device and the glue applicators" presented by the Examiner. [Ex. 3 p. 322]. However, said video is not available to the public. Via footnote, the applicant provides that additional videos are available at http://the3doodler.com/videos/.

88. That link directs users to https://learn.the3doodler.com/getting-started/videos/ (last viewed March 22, 2026), which provides additional links to 115 videos.

89. It is unclear from this link and the numerous videos contained therein which video demonstrate the alleged ability to "immediately produce a freestanding 3D drawing or structure in a single, vertical stroke" that "substantial[ly]" differentiates Plaintiff's claimed 3D drawing device from the Examiner's prior art. It is my opinion that none of them actually does.

90. I also understand that the '444 Patent's validity was challenged via *inter partes* review ("IPR") by Ditec. [Ex. 18]

91. I also understand that the Patent Owner, Plaintiff WobbleWorks, argued that the recitation "'[a] three-dimensional (3D) drawing device' appearing in the preamble of independent claims 1 and 18 is indeed a limitation." [Ex. 18 p 15]

92. I also understand that the PTAB agreed, finding that "each independent claim recites that the 'three-dimensional (3D) drawing device' is configured so as to 'permit[] the user to draw in free space to form a three-dimensional object.'" [Ex. 18 p 15]

93. I further understand that this decision was supported by an analysis of the specification and the prosecution history "distinguish[ing] between the claimed 'three-dimensional (3D) drawing device' and a device that 'deposit[s] material in layers over time.'" [Ex. 18 p 15]

94. I further understand that other Asserted Patents each include some iteration of the '444 Patent claim terms "three-dimensional (3D) drawing device" and "permitting the user to draw in free space to form a three-dimensional object."

95. For example, claim 1 of the '850 Patent includes the terms: "a three-dimensional (3D) drawing pen;" "to permit drawing in 3D space;" and "to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object." [Ex. 4 ("'850 patent") at 9:65-67 & 10:25-27]

96. Claim 1 of the '852 Patent includes the terms: "a three-dimensional (3D) drawing pen," "to permit the user to draw in free space to form a 3D object," and "to permit the material to be extruded out of the exit nozzle forming a 3D object." [Ex. 6 ("'852 patent") at 10:2-5 & 10:18-19]

97. Claim 1 of the '819 Patent includes the terms: "a three-dimensional (3D) drawing pen," "to permit drawing in 3D space," and "to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object." [Ex. 8 ("'819 patent") at 10:3-5 & 17-19]

98. Claim 1 of the '529 Patent includes the terms: "a three-dimensional (3D) drawing pen" and "permitting the material to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object." [Ex. 10 ("'529 patent") at 10:5 & 10:13-16]

99. Considering the similarities between the identified claim 1 terms of the '444 Patent and the claim 1 terms of the other Asserted Patent, a person of ordinary skill in the art would understand that the identified claim 1 terms of the other Asserted Patents are equally influenced by the prosecution history of and the *Ditect* IPR proceedings involving the '444 patent as discussed above.

100. Based upon the prosecution history of the ’444 Patent, the IPR proceedings, and the similarity of claim terms found in claim 1 of each Asserted Patent, if we accept the patentee’s argument to the patent office, then the terms from the other Asserted Patents would also include “immediately produce a freestanding 3D drawing or structure in a single, vertical stroke” as argued during the prosecution of the ’444 Patent.

## IX. General Critique of Mr. Bressler’s Opinions

101. Mr. Bressler’s background is primarily in industrial and product design, rather than in the underlying scientific and engineering disciplines relevant to the asserted patents. [Ex. 19 (“Bressler Decl.”) ¶¶ 4-14] The issues presented by Asserted Patents are not just matters of industrial design or user-interface considerations, but instead require specialized knowledge in polymer science, thermoplastic processing, extrusion physics, and 3D printing. This is especially true given that the patentee has traversed various rejections from the Patent Office solely on material properties rather than any part of the claimed apparatus.

102. A person of ordinary skill in the art for these patents would be expected to have formal training and experience in polymer engineering, mechanical engineering, or materials science, with a working understanding of thermoplastic phase transitions, such as glass transition and crystallization, melt rheology and viscoelastic behavior, extrusion and filament feeding mechanisms, heat transfer and cooling during deposition, and the mechanics of free-space material deposition.

103. Mr. Bressler does not appear to possess such qualifications. [Bressler Decl. ¶¶ 4-14] There is no indication that he has formal education or training in polymer science or rheology, experience in thermoplastic extrusion or filament-based additive manufacturing, experience designing or analyzing extrusion systems involving melting and re-solidification of polymers, or experience with the physical constraints governing whether an extruded strand can retain its shape in free space.

104. At most, his experience reflects familiarity with product form factors and user interaction, and possibly general exposure to 3D printing as a user. [Bressler Decl. ¶¶ 4-14] However, mere use of a 3D printer does not qualify one to opine on the underlying physics and engineering principles governing extrusion, melt behavior, and structural stability of thermoplastics. These are technical issues that require domain-specific expertise.

105. Importantly, several of Mr. Bressler's opinions rely on assumptions about how thermoplastic strands behave immediately after extrusion, whether such strands can "retain shape in free space," and how deposition occurs during operation. [*E.g.*, Bressler Decl. ¶¶ 37, 49]

106. These are fundamentally materials and process engineering questions, not design questions. Without the requisite technical background, Mr. Bressler is not in a position to reliably evaluate these phenomena or to offer opinions that would assist the trier of fact.

107. Accordingly, his opinions extend beyond the scope of his expertise and should be given limited, if any, weight with respect to the technical issues central to infringement and validity of the asserted patents.

## X. Non-Infringement of the Asserted Patents

108. I have reviewed Mr. Bressler's declaration and the accompanying claim charts. [ECF 18-77 - ECF 18-91 (Exs. 74-88 of the Motion for Preliminary Injunciton)] In Mr. Bressler's purported infringement analysis, he analyzed only three products which he calls "Analyzed Defendant Pens": JER LP06, JER LP03 / 3D Pen Make, and JER RP800A / 3d Pen Artist. [Bressler Decl. ¶¶ 74-78] It is my understanding that MyFirst has sold and sells JER LP03 / 3D Pen Make and JER RP800A / 3d Pen Artist. Mr. Bressler fails to provide any analysis in his claim charts, especially with regard to claim limitations that have been amended or narrowed during prosecution. It is my opinion that Mr. Bressler fails to show

MyFirst's 3dPen Make and 3dPen Artist infringe at least Claim 1 of each the five Asserted Patents.

109. Mr. Bressler includes 15 claim charts in his declaration organized by five asserted patents per each of the three products. [Bressler Decl. ¶ 78] To minimize repetition, I have organized my responsive analysis by three groups of identical or nearly identical limitations and explain how Mr. Bressler fails to prove each accused product practices these limitations.

110. Mr. Bressler fails to show that the accused products practice at least the following claim limitations:

- "A three-dimensional (3D) drawing device" ('444 patent, claim 1),
- "permitting the user to draw in free space to form a three-dimensional object" ('444 patent, claim 1),
- "a three-dimensional (3D) drawing pen" ('850 patent, claim 1),
- "to permit drawing in 3D space" ('850 patent, claim 1),
- "to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object" ('850 patent, claim 1),
- "a three-dimensional (3D) drawing pen" ('852 patent, claim 1),
- "to permit the user to draw in free space to form a 3D object" ('852 patent, claim 1),
- "a three-dimensional (3D) drawing pen" ('819 patent, claim 1),
- "to permit drawing in 3D space" ('819 patent, claim 1),
- "to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object" ('819 patent, claim 1),
- "a three-dimensional (3D) drawing pen" ('529 patent, claim 1), and

- "to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object" ('529 patent, claim 1).

111. The limitation "A three-dimensional (3D) drawing device" or "a three-dimensional (3D) drawing pen" appear in claim 1 of all the asserted patents. In the '444 patent, this limitation appears in the preamble which the patentee has argued to the PTAB that it is limiting in order to over an IPR challenge. [Ex. 18 p 15] In the other patents, this limitation appears in the body of claim.

112. Mr. Bressler fails to show that "myFirst 3D Pen Make" practices this limitation. Patentee argued during the patent's prosecution history, that "a three-dimensional (3D) drawing pen" means a device that will "immediately produce a freestanding 3D drawing or structure in a single, vertical stroke." [Ex. 3 p 264-265] But Mr. Bressler cites no evidence that shows the 3D Pen Make to "immediately produce a freestanding 3D drawing or structure in a single, vertical stroke." The only evidence Mr. Bressler relies on is an image reproduced below. [ECF 18-82, p. 1 (Ex. 79 of the Motion for Preliminary Injunction, p. 1)]



113. On the contrary, a POSITA would understand that the bird-looking object shown in the image does not show any freestanding structure that is a result of a single, vertical stroke.



114. Similarly, Mr. Bressler fails to show that 3D Pen Artist practices this limitation. The only evidence Mr. Bressler relies on is an image reproduced above. [ECF 18-87, p. 1 (Ex. 84 of Motion for Preliminary Injunction, p. 1)] A POSITA would understand that the lion-looking object shown in the image does not show any freestanding structure that is a result of a single, vertical stroke.

115. The same analysis apply to the limitations "permitting the user to draw in free space to form a three-dimensional object," "to permit drawing in 3D space," "to permit the user to draw in free space to form a 3D object," and "to permit drawing in 3D space." I, therefore, group below my discussion of how Mr. Bressler fails to show the accused products practice these limitations.

116. These limitations in its various forms were added at the suggestion of the examiner to overcome prior art during the prosecution history of the '444 patent. During an applicant-initiated interview, "Examiner suggested to Applicant to add a limitation to the independent claim that the instant 3D drawing device can draw in free space, and that will differentiate the instant device from prior art that can only draw in 2D space or on a substrate." [Ex. 3 p. 329] The patentee then added to the

independent claim the limitation "such that rotation of the motor causes the strand to be extruded out of the exit nozzle for permitting the user to draw in free space to form a three-dimensional object." [Ex. 3 p. 312].



117. In Mr. Bressler's claim chart for 3D Pen Make, the only evidence he provides for this limitation is the image shown above with no additional analysis. A POSITA would understand that the image Mr. Bressler relies on for this limitation shows 3d Pen Make extruding plastic onto 2D space on a pink table surface and not the claimed "draw in free space."



118. Similarly, Mr. Bressler fails to show that 3D Pen Artist practices this limitation. The only evidence Mr. Bressler relies on is an image reproduced above. [ECF 18-87, p. 1 (Ex. 84 of the Motion for Preliminary Injunction, p. 1)] A POSITA

would understand that the lion-looking object shown in the image does not show any freestanding structure that is a result of a single, vertical stroke. Even the strands forming the lion's mane are curved and maintained in place by melt strength. Because these strands are relatively short, their lower weight allows the viscoelastic properties of the melt to temporarily support them, though not in a vertical orientation.

119. The limitation "to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object" is in Claim 1 of each of the '850, '819, and '529 patents. During the prosecution history of the '850 patent, the examiner based his allowance on this limitation distinguishing the alleged invention from the Di Miceli prior art. [Ex. 5 p 96 ¶12] Di Miceli teaches "a hand welding extruder for welding thermoplastic materials by means of a plasticized plastic strand having a plasticization worm unit connected to a drive motor by a gearbox, and having a hot air generation device with an external air supply, the plasticizer worm unit, the gearbox, the drive motor, and the hot air generation device being disposed in a common housing." [Ex. 19 p.5 (Di Miceli, Technical Field of the Invention]



120. Mr. Bressler fails to show that 3d Pen Make practices this limitation. A POSITA looking at the image Mr. Bressler relies on for this limitation would understand that no claimed "solid form that retains its shape against gravity in free space" is being extruded. Rather, the extruded material is deposited in a molten or

semi-molten state and remains supported either by the nozzle or by immediate contact with previously deposited material. As such, it does not exist as a self-supporting solid in free space at the time of extrusion. Instead, the material adheres to the underlying plastic through mechanisms consistent with thermoplastic welding, wherein bonding occurs via interdiffusion and entanglement of polymer chains across the interface while the material is still above its glass transition or crystallization temperature. This behavior is analogous to the thermoplastic welding process described in Di Miceli and does not reflect the formation of a freestanding solid structure upon extrusion.




121. Similarly, Mr. Bressler fails to show that 3d Pen Artist practices this limitation. The only evidence Mr. Bressler relies on is the image shown above, the same image that he relies on for limitations such as “permitting the user to draw in free space to form a three-dimensional object.” Just like the 3d Pen Make example above, here, the exuded materials adhere to the existing plastic materials in the same manner as the thermoplastic welding process disclosed in Di Miceli, and discussed above. No claimed “solid form that retains its shape against gravity in free space” is being extruded.

## XI. Invalidity of the Asserted Patents

122. It is my opinion that the claims of the Asserted Patents are invalid because they are anticipated and obvious. Further, the claims are invalid because they include terms that are indefinite for failing to inform a person of ordinary skill in the art as to the scope of the claims.

### A. The Asserted Claims Are Indefinite

123. It is my opinion that '444 Patent, at least Claim 1 and its dependent claims, '850 patent, at least Claim 1 and its dependent claims, '852 patent, at least Claim 1 and its dependent claims, '819 patent, at least Claim 1 and its dependent claims, and '529 patent, at least Claim 1 and its dependent claims are invalid due to indefiniteness

124. The Asserted Patents include numerous terms which are indefinite. The terms are indefinite because they are inconsistent with the fundamental behavior of thermoplastic polymers and, therefore, make the scope of the invention vary with unclaimed elements, such as type of polymer materials used, the size of the strand of the polymer materials, and the ambient temperature, among other things. As a result, a POSITA would not know when the claimed invention was or was not infringed.

125. The following term is indefinite.

- "to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object" ('850 patent, claim 1, '819 patent, claim 1, and '529 patent, claim 1).

126. The term "to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object" is inconsistent with the fundamental behavior of thermoplastic polymers, which exit the nozzle in a molten viscoelastic state and only achieve shape stability over time as they cool and, in the case of semicrystalline materials such as PLA, crystallize. *See supra*, Section V. State of the Art and Relation to the Asserted Patents.

127. Cooling and crystallization are processes that take time and whose duration depends strongly on strand diameter (scaling with the square of the diameter) and extrusion speed, such that larger or faster-deposited beads will take longer to retain their shape against gravity after extrusion [Ex. 12, Osswald 1998, p.119]. In fact, a thermoplastic strand cannot retain its shape immediately upon extrusion, regardless of how small its diameter is or how slowly it is extruded.

128. A person of ordinary skill in the art would have understood at the time of the alleged invention that thermoplastic polymers transition from a molten state to a solid upon cooling—below the glass transition temperature in the case of amorphous polymers such as ABS, and below the crystallization temperature for semi-crystalline polymers such as PLA [Ex. 14, Osswald 2010, pp.295-307]. This means that how long it takes for extruded polymer "to retains its shape against gravity in free space" can depend on factors as capricious as where and when the user is using the 3D pen. A person using the same 3D pen with the same polymer material on hot summer's day in Arizona would see something very different from a person doing the same outside in Chicago in the winter. A POSITA, therefore, is unable to ascertain when this claim limitation is met and the term is therefore indefinite.

129. The following terms are also indefinite.

- "permitting the user to draw in free space to form a three-dimensional object" ('444 patent, claim 1),
- "to permit drawing in 3D space" ('850 patent, claim 1),
- "to permit the user to draw in free space to form a 3D object" ('852 patent, claim 1),
- "to permit drawing in 3D space" ('819 patent, claim 1), and
- "to draw a 3D object" ('529 patent, claim 1).

130. These terms are indefinite for essentially the same reason as the "retains its shape against gravity in free space" term discussed above. How long it

takes for extruded polymer "to permit drawing in 3D space" can vary greatly depending on various unspecified and uncontrolled factors. A POSITA, therefore, is unable to ascertain when this claim limitation is met and these terms are therefore indefinite.

131. Moreover, A POSITA's uncertainty regarding the claim scope is not cured by the intrinsic record. The prosecution history of the '444 Patent introduces an explanation for the terms discussed above. The applicant argues that the claimed invention has the ability to "immediately produce a freestanding 3D drawing or structure in a single, vertical stroke." Even assuming that "freestanding" implies attachment to some foundation or support structure, "immediately produc[ing] a freestanding 3D drawing or structure in a single, vertical stroke" is a result that depends upon a balance of the thermoplastic variables discussed above, *supra* Section V. State of the Art and Relation to the Asserted Patents and ¶¶ 126-128, among other variables. However, the specification does not detail how soon is "immediate" or what constitutes a "a single, vertical stroke."

132. Additionally, the results oriented description "immediately produce a freestanding 3D drawing or structure in a single, vertical stroke" is a thermoplastic characteristic subject to numerous variables that are neither defined nor discussed in the specification. For example, variables affecting the structural stability of extruded plastic, *e.g.*, its ability to be "freestanding," include among other variables the following: (i) the type of plastic, (ii) the temperature of the plastic at extrusion, (iii) the thickness or radius of the extruded plastic, (iv) the volumetric rate over time of plastic extruded, (v) the ambient temperature around and convection currents available to cool the extruded plastic, and (vi) the amount of plastic deposited per unit of length resulting from the speed of a "stroke" in relation to the volumetric rate over time of plastic extruded.

**B. The Asserted Claims Are Anticipated**

133. It is my opinion that at least Claim 1 of each Asserted Patent is anticipated by U.S. Patent No. 7,950,549 entitled "Powered Dispenser with Interchangeable Cartridges" issued to ("Harris") an effective filing date of December 19, 2007. Ex. 16 ("Harris"). Harris is therefore prior art to all the Asserted Patents. At the time of the alleged invention, there are numerous handheld, battery-power devices capable extruding soft materials, such as melted polymer. Harris is one such example.

134. Harris is directed to an electronic or battery powered handheld tool for dispensing a semi-soft materials that is held in one hand and dispenses material by pressing a pressure sensitive flow control button. Harris, Abstract. The dispenser taught in Harris is adaptable for a wide range of applications including craft applications, woodworking, and construction. Harris, Abstract.

135. Harris teaches, explicitly or inherently, each and every limitation of claim 1 of each Asserted Patent.

136. I have provided limitation-by-limitation claim charts attached as Exhibits 21-25 to demonstrate how Harris teaches each and every limitation of claim 1 of each Asserted Patent.

**C. The Asserted Claims Are Obvious**

137. It is my opinion that at least Claim 1 of each of the '444 patent, the '850 Patent, the '852 Patent, and the '819 Patent is also rendered obvious in view of Harris in combination with U.S. Patent No. 8,663,533 entitled "Method of Using Print Head Assembly in Fused Deposition Modeling Systems" issued to Swanson with an effective filing date of December 22, 2010. ("Swanson"). Ex. 17 ("Swanson"). Swanson is therefore prior art to all the Asserted Patents.

138. Swanson is directed to a method of using a print head assembly that includes a print head carriage and multiple, replaceable print heads that are configured to be removably retained in receptacles of the print head carriage. Swanson, Abstract.

139. A person of ordinary skill in the art at the time of the invention would have been motivated to combine the teachings of Harris with the teachings of Swanson because there is explicit teaching in Harris to heat a mass of thermoplastics in solid state and to extrude thermoplastic in flowable state out of an opening. Swanson teaches an extruder that heats thermoplastics and other materials and to extrude them out of an opening. Harris teaches that its handheld decorator can be used in many applications such as cake decorating, **craft applications**, woodworking and construction. Craft application is a common application for three-dimensional printing. This combination requires no undue experimentation because the extrusion mechanism and property would be well known to a POSITA at the time of invention. Further, the combination would have yielded predictable results in light of what was known to the person or ordinary skill in the art at the time of the alleged invention claimed in the Asserted Patents.

140. I have provided limitation-by-limitation claim charts attached as Exhibits 26-29 to demonstrate how Harris in combination with Swanson teaches each and every limitation of at least Claim 1 of each of the ’444 Patent, the ’850 Patent, the ’852 Patent, and the ’819 Patent.

## XII. Conclusion

141. As discussed above, none of the asserted claims are infringed by JERLP03 (3D Pen Make) or JER RP800A (3D Pen Artist). All of the asserted claims are invalid for being indefinite, anticipated, and obvious. I reserve the right to supplement, modify, or revise my opinions based on additional information that is provided to me in this litigation.

142. I currently hold the opinions that I have expressed in this declaration. However, my analysis may continue, and I may acquire or receive additional information or insights that may result in revised or supplemental observations or opinions.

143. I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true, and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 or Title 18 of the United State Code.

Executed on March 23, 2026.



Tim Osswald, Ph.D.