# Exhibit 18

Trials@uspto.gov
571.272.7822

Paper No. 12
Entered: January 15, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

DITEC SOLUTIONS, LLC,
Petitioner,

v.

WOBBLEWORKS, INC.,
Patent Owner.

---

Case IPR2018-01414
Patent 9,731,444 B2

---

Before GEORGIANNA W. BRADEN, KRISTINA M. KALAN, and SHELDON M. McGEE, *Administrative Patent Judges*.

McGEE, *Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review
*35 U.S.C. § 314(a)*

Ditec Solutions, LLC ("Petitioner") filed a Petition (Paper 1, "Pet.") seeking *inter partes* review of claims 1–20 of U.S. Patent No. 9,731,444 B2 (Ex. 1001, "the '444 patent"). WobbleWorks, Inc. ("Patent Owner") filed a Preliminary Response. Paper 7 ("Prelim. Resp.").

We have authority to determine whether to institute an *inter partes* review. 37 C.F.R. § 42.4(a). An *inter partes* review may not be instituted "unless . . . there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). Applying this standard to the information presented in the Petition, the Preliminary Response, and the supporting evidence, we determine Petitioner has not satisfied this standard with respect to at least one of the challenged claims. We, therefore, decline to institute *inter partes* review of the '444 patent.

## I. BACKGROUND

### *A. Related Matters*

The parties identify the following civil action as involving the '444 patent: *WobbleWorks, Inc. v. Ditec Solutions, LLC*, No. 8:17-cv-2147 (C.D. Cal.). Pet. 1; Paper 4, 2.

### *B. Asserted Ground of Unpatentability*

| **Reference** | **Basis** | **Claims Challenged** |
|---|---|---|
| Di Miceli[1] | § 103(a) | 1–20 |

[1] Ex. 1005, US 2010/0147465 A1, published June 17, 2010.

*C. The ’444 Patent (Ex. 1001)*

The ’444 patent, entitled “Hand-Held Three-Dimensional Drawing Device,” issued on August 15, 2017. Ex. 1001, at (54), (45). The ’444 patent relates to a “device having a housing configured for manipulation by a user’s hand and to accept a feed stock [such as] a strand of thermoplastic.” *Id.* at (57). Such “drawing device has a nozzle assembly with an exit nozzle and a motor connected to a gear train that engages the strand of thermoplastic feed stock such that rotation of the motor causes the feed stock to be extruded out of the exit nozzle to form a three-dimensional object.” *Id.*

Figure 1 of the ’444 patent is illustrative and is copied below:




FIG. 1

Figure 1 of the ’444 patent depicts “a perspective view of an exemplary 3D drawing device **100**” including “a housing **110** in which a

control assembly **120**, a nozzle assembly **130**, [and] a fan assembly **140**." Ex. 1001, 2:65–3:2.

The '444 patent indicates that "[a] column **22** of the feed stock **20** is extruded from the nozzle assembly while the button **122** is depressed." *Id.* at 3:32–34. The feed stock **20**, upon exiting the nozzle assembly **130**, may create an extruded column **22** that "retains its shape," thus allowing a three-dimensional structure to be formed, e.g., "by drawing a line across to [and] onto a previously drawn column **22**." *Id.* at 3:39–44. Thus, "the user can 'write' with the 3D drawing device **100** in much the same manner as they would with a pen except they can do so in three dimensions since the extruded material is three-dimensional. The user can create free-form lines, shapes or other objects as desired." *Id.* at 3:63–4:1.

### *D. Illustrative Claim*

The '444 patent contains two independent claims 1 and 18, each of which recites "[a] three-dimensional (3D) drawing device." Ex. 1001, 9:60–10:27, 12:5–23.

Claim 1 is illustrative of the challenged claims and is reproduced below:

> 1. A three-dimensional (3D) drawing device comprising:
>
> a housing configured to fit in a user's hand and shaped to allow manipulation of the housing like a pen, the housing having a first end, a second end, and a port configured for introduction of a strand of feed stock into an internal volume of the housing, the housing having at least one cooling port extending between the internal volume and an ambient atmosphere;
>
> a first actuator and a second actuator each coupled to the housing and positioned to be actuated by the user's hand while holding the housing;

> a motor disposed within the internal volume and controlled in response to operation of the first actuator and the second actuator;
>
> a gear train operatively coupled with the motor to drive the gear train, disposed within the internal volume to receive the strand of feed stock, and configured to move the strand of feed stock when engaged with the gear train; and
>
> a nozzle assembly disposed at the first end of the housing and at least partially within the housing, the nozzle assembly comprising an extruder, an exit nozzle, and a guide tube, the extruder having a heating element surrounded by an insulator, the guide tube extending between the gear train and the extruder, a first end of the guide tube positioned to receive the strand of feed stock from the gear train, a second end of the guide tube aligned with a chamber of the extruder such that the strand of feed stock is directed into the chamber, the extruder being disposed between the guide tube and the exit nozzle such that rotation of the motor causes the strand to be extruded out of the exit nozzle for permitting the user to draw in free space to form a three-dimensional object.

*Id.* at 9:60–10:27.

## II. ANALYSIS

### A. *Claim Construction*[2]

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable constructions in light of the Specification of the patent in which they appear. *See* 37 C.F.R.

---

[2] The revised claim construction standard for interpreting claims in *inter partes* review proceedings as set forth in the final rule published October 11, 2018 does not apply to this proceeding because the new "rule is effective on November 13, 2018 and applies to all IPR, PGR and CBM petitions filed on or after the effective date." Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51340 (Oct. 11, 2018) (to be codified at 37 C.F.R. pt. 42).

§ 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016). "In claim construction, [our reviewing] court gives primacy to the language of the claims, followed by the specification. Additionally, the prosecution history, while not literally within the patent document, serves as intrinsic evidence for purposes of claim construction." *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014). Otherwise, under the broadest reasonable construction standard, claim terms are presumed to have their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

Only terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). Petitioner offers proposed constructions for two recited limitations, namely, "upper housing" and "lower housing" appearing in dependent claims 3 and 4. Pet. 11–14. Based on the record before us, however, we determine that only the limitation "[a] three-dimensional (3D) drawing device" — present in the preamble of each independent claim — needs to be construed.

"Whether to treat a preamble term as a claim limitation is determined on the facts of each case in light of the claim as a whole and the invention described in the patent." *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010) (internal quotation marks omitted). "Absent clear reliance on the preamble in the prosecution history, or in situations where it is necessary to provide antecedent basis for the body of the claim, the preamble generally is not limiting." *Symantec Corp. v. Computer Assoc. Int'l, Inc.*, 522 F.3d 1279, 1288 (Fed. Cir. 2008). Additionally, preamble

language that merely states the purpose or intended use of an invention generally is not treated as limiting the scope of a claim. *See Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1345 (Fed. Cir. 2003); *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997).

Yet, when the limitations in the body of the claim rely upon or derive essential structure from the preamble, then the preamble acts as a necessary component of the claimed invention and is limiting. *See Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003). Moreover, if the preamble recites a specific characteristic for a component of an invention recited in the body of the claim, then the preamble must be given patentable weight. *See, e.g., Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995) (noting the "general principle" "that a claim preamble has the import that the claim as a whole suggests for it," and "when the claim drafter chooses to use *both* the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects.")

Furthermore, the issue can be "resolved only on review of the entire[] . . . patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Poly–Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1309 (Fed. Cir. 2004). When reciting additional structure or steps underscored as important by the specification, the preamble may operate as a claim limitation. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989) (limiting claim scope to "optical waveguides" rather than all optical fibers in light of specification); *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1361–62 (Fed. Cir. 1999) (limiting claim scope to a "raster scanned display device"

rather than all display systems in view of specification's focus on the prior art problem of displaying binary data on a raster scan display device); *Rowe*, 112 F.3d at 479–80; *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1572–73 (Fed. Cir. 1996) ("Whether a preamble stating the purpose and context of the invention constitutes a limitation of the claimed process is determined on the facts of each case in light of the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history."). As explained below, based on the language of the claim, the specification, and the prosecution history, we find the preamble limiting.

Beginning with the body of both independent claims 1 and 18, each claim recites that the nozzle assembly is configured so as to "permit[] the user to draw in free space to form a three-dimensional object." Ex. 1001, 10:12–27; 12:16–22. Thus, the recitation of "[a] three-dimensional (3D) drawing device" in the preamble of each independent claim sets forth the three-dimensional nature of the object that is extruded from the nozzle assembly component. Such recitation of "three-dimensional" in both the body and the preamble weighs in favor of finding the preamble limiting. *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d at 620.

Furthermore, while the Specification provides no express definition of the phrase "[a] three-dimensional (3D) drawing device," it is nevertheless informative regarding the appropriate construction to be afforded. In particular, the Specification states that the claimed invention "relates to extrusion devices [including] a hand-held implement configured to extrude a material so as to construct three-dimensional (3D) objects." Ex. 1001, 1:17–19. The Specification distinguishes between items formed in two

dimensions (2D) and those in three dimensions (3D), and discloses that the "3D drawing device is . . . configured such that the rotation of the motor causes the feed stock to be extruded out of the exit nozzle to form a three-dimensional object." *Id.* at 1:49–63; *see also id.* at 3:32–4:1 (explaining the three-dimensional nature of the objects drawn via "extruded columns 22," and how "the user can 'write' with the 3D drawing device 100 in much the same manner as they would with a pen except they can do so in three dimensions since the extruded material is three-dimensional."); *see also id.* at 8:13–19 (explaining how the 3D drawing device is constructed to allow the extruded feed stock to "quickly solidify" thus allowing "the user to work in three dimensions, rather than being forced to rely on a support surface to hold the still-fluid extruded material in place while it hardens").

Even further, the prosecution history of the '444 patent serves as intrinsic evidence as to the proper construction of this limitation. *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d at 977; *Symantec Corp. v. Computer Assoc. Int'l, Inc.*, 522 F.3d at 1288. In the Response dated March 16, 2017 (Ex. 1002, 311–324) — responsive to the Non-Final Office Action dated December 16, 2016 — Patent Owner argued for a specific construction of the phrase "three-dimensional (3D) drawing device" when distinguishing the recited device over the hot glue applicator of Lee[3] and similar prior art devices. In particular, Patent Owner stated that

> [t]he glue applicator of Lee cannot be considered a *3D drawing device* any more than a bottle of craft glue, a caulking gun, a mechanical pencil, or a paintbrush. These *prior art devices*, after *numerous repeated applications* of glue, caulk, pencil lead, or paint *and with significant curing or drying time, may deposit*

[3] US 2004/0232165 A1, published November 25, 2004. We observe that the Non-Final Office Action erroneously refers to Lee as US 2004/0232164 A1.

> *material in layers over time*. However, these *prior art devices are not in and of themselves 3D drawing devices*; unlike the *claimed 3D drawing device*, none of these prior art devices or materials will *immediately produce a freestanding 3D drawing or structure in a single, vertical stroke*. Indeed, there is no external factor, including curing or drying time, that can be manipulated to enable these prior art devices to easily and *immediately create a 3D drawing or structure* in the manner made possible by using the *claimed 3D drawing device*. There is no manner of using the glue applicator of Lee (or any of the other prior art devices of the applied references) that allows an artist to create a complex, intricately detailed 3D drawing or structure with the speed and facility made possible by using the presently *claimed 3D drawing device*.

*Id.* at 319–320 (emphases added); *see also id.* at 318 n.3 (stating "the glue applicators of Lee and Pohl[4] are not 'three-dimensional (3D) drawing devices' for at least the reason that none of these prior art devices or materials will immediately produce a freestanding 3D drawing or structure in a single, vertical stroke").

Thus, during prosecution of the '444 patent, Patent Owner argued for a specific construction of the "three-dimensional (3D) drawing device" limitation — i.e., a device that will "immediately produce a freestanding 3D drawing or structure in a single, vertical stroke." *Id.* at 319–320. Such construction distinguished the claimed "three-dimensional (3D) drawing devices" from those devices that "deposit material in layers over time." *Id.* The construction that Patent Owner argued for during prosecution is consistent with the use of this phrase throughout the Specification. *See, e.g.*, Ex. 1001, at (57), 1:51–63, 2:1–10, 3:63–4:1, and 8:13–19.

---

[4] US 3,604,597, issued September 14, 1971, directed to a "Plastic Extrusion Device" which is described as "[a] dispensing gun for melting and extruding a thermoplastic rod material in a molten state." *See* Abstract.

Thus, for purposes of this proceeding, we find the preamble limiting, and thus construe the phrase "three-dimensional (3D) drawing device" to be consistent with Patent Owner's proposed construction during prosecution, which is supported by the Specification — that is, the recited "three-dimensional (3D) drawing device" is a device that will "immediately produce a freestanding 3D drawing or structure in a single, vertical stroke."

No other claim terms require an explicit construction for us to reach our determination not to institute trial.

### *B. Asserted Obviousness Ground based on Di Miceli*

Petitioner asserts that claims 1–20 of the '444 patent are unpatentable as obvious under 35 U.S.C. § 103(a) over Di Miceli. Pet. 15–64; Ex. 1005. Petitioner relies on the Declaration of David L. Trumper, Ph.D. (Ex. 1003) to support its obviousness challenge. Pet. 3, 18–19, 22–24, 27, 29, 34–37, 39–41, 43, 44, 46–49, 51, 53, 57, and 60–64.

#### *i. Overview of Di Miceli (Ex. 1005)*

Di Miceli discloses "a hand welding extruder (1) for welding thermoplastic materials by means of a plasticized plastic strand (26) having a plasticization worm unit (24)." Ex. 1005, at (57). "Such welding devices are . . . used for the so-called extrusion welding, i.e., surface-to-surface joining of plastic materials." *Id.* ¶ 2.

Figure 2 of Di Miceli depicts an illustrative hand welding extruder, and is reproduced below:




Fig. 2

Di Miceli's Figure 2 "shows a sectional view of the welding unit of [Di Miceli's] hand welding extruder." Ex. 1005 ¶ 23. Di Miceli's hand welding extruder heats plasticization worm unit 24 with coil heating system 25. *Id.* ¶ 29. "During the welding process, a plastic strand 26 is pulled into the plasticization worm unit 24 where it is plasticized and is then extruded by the extruder worm 23 at the welding shoe 10 via the exit nozzle 11." *Id.*

*ii. Summary of the Parties' Arguments regarding Independent claims 1 and 18*

Petitioner contends Di Miceli discloses the "housing," "first actuator," "second actuator," "motor," "gear train," and "nozzle assembly" limitations of independent claim 1. Pet. 17–28. Petitioner also contends Di Miceli discloses the "elongate housing," "gear train," "motor," "at least one actuator," and "nozzle assembly" limitations recited in independent claim 18. *Id.* at 54–60.

Regarding the preamble of "[a] three-dimensional (3D) drawing device" recited in each independent claim 1 and 18, Petitioner states Di Miceli also discloses this limitation "[t]o the extent the preamble is limiting." *Id.* at 17; *see also id.* at 54 (incorporating this assertion by reference to also apply to independent claim 18). Specifically, Petitioner indicates that "because the hand welding extruder disclosed by Di Miceli can deposit lines of thermoplastic from the nozzle of its handheld device, its structure is capable of functioning as a 3D drawing device." *Id.* at 18–19 (citing Ex. 1003 ¶ 44).

Regarding the language in the "nozzle assembly" limitations of claims 1 and 18, which requires "permit[ting] the user to draw in free space to form a three-dimensional object," Petitioner asserts that this language "is merely an intended use and is not limiting in the context of an apparatus claim." *Id.* at 28.

Patent Owner asserts that the Petition fails in four key respects:

(1) Petitioner's assertion that language in claims 1 and 18 requiring "permit[ting] the user to draw in free space to form a three-dimensional object" is an intended use is erroneous (Prelim. Resp. 5–12);

(2) Even if "permit[ting] the user to draw in free space to form a three-dimensional object" is an intended use, Petitioner fails to meet its burden of establishing that Di Miceli is capable of such intended use (*id.* at 12–16);

(3) The Petition fails to offer an express claim construction for the limitation "[a] three dimensional (3D) drawing device," ignores the construction of this limitation argued for during prosecution,

and fails to show where Di Miceli meets this limitation (*id.* at 16–21); and

(4) The Petition fails to satisfy 35 U.S.C. § 325(d) because it relies on cumulative prior art cited during prosecution (*id.* at 21–23).

*iii. Analysis*

*a. "A three-dimensional (3D) drawing device"*

As set forth in Section II.A., *supra*, we agree with Patent Owner (Prelim. Resp. 16) that the recitation of "[a] three-dimensional (3D) drawing device" appearing in the preamble of independent claims 1 and 18 is indeed a limitation.

Here, the language of the independent claims as a whole supports viewing the preamble as a limitation. Notably, each independent claim recites that the "three-dimensional (3D) drawing device" is configured so as to "permit[] the user to draw in free space to form a three-dimensional object." Ex. 1001, 10:25–27, 12:21–22. Such recitation of the phrase "three-dimensional" in both the preamble and the body of each independent claim is highly suggestive that the drafter intended to limit the claims to those "devices" capable of "drawing" in "three dimensions." Furthermore, our discussion in Section II.A., *supra*, outlines how the Specification is replete with disclosure regarding how the device is configured to construct such three-dimensional objects (*see, e.g.*, Ex. 1001, 1:17–19, 49–63; 3:32–41; 8:13–19), and how the prosecution history distinguishes between the claimed "three-dimensional (3D) drawing device" and a device that "deposit[s] material in layers over time" (Ex. 1002, 319–320).

Thus, a review of the claims as a whole, the disclosure of the patent, and the patent's prosecution history each supports treating the preamble "[a]

three-dimensional (3D) drawing device" recited in claims 1 and 18 as limiting.

Therefore, consistent with our claim construction for the limitation "[a] three-dimensional (3D) drawing device," *supra*, each of the independent claims 1 and 18 — and, by extension, each claim dependent therefrom — requires a device that will "immediately produce a freestanding 3D drawing or structure in a single, vertical stroke." Thus, for Petitioner to satisfy its burden of establishing a reasonable likelihood that at least one of challenged claims 1–20 is unpatentable as obvious over Di Miceli, the Petition must "specify where [this] element is found in" Di Miceli. 37 C.F.R. § 42.104(b)(4); 35 U.S.C. § 314(a).

The Petition fails to do so. First, Petitioner does not affirmatively treat the preamble as a limitation. *See* Pet. 17 (stating "[t]o the extent the preamble is limiting, Di Miceli discloses '[a] three-dimensional (3D) drawing device.'"); *see also id.* at 54 (incorporating this statement by reference for independent claim 18). Rather, Petitioner asserts

> [t]o the extent Patent Owner contends that Di Miceli does not expressly describe its hand welding extruder as a 3D drawing device, a person of ordinary skill in that art at the time of the invention of the [']444 patent was made . . . would have understood that, because the hand welding extruder disclosed by Di Miceli can *deposit lines of thermoplastic* from the nozzle of its handheld device, its structure is *capable of functioning as a 3D drawing device*.

Pet. 18–19 (emphases added).

This assertion, without more, does not satisfy Petitioner's burden to specify where this claim element is disclosed by Di Miceli. 37 C.F.R. § 42.104(b)(4). As set forth in Section II.A., *supra*, during prosecution, Patent Owner distinguished the recited "three-dimensional (3D) drawing

device" from devices that can "deposit material in layers over time." Ex. 1002, 318, 318 n.3, 319–320. Thus, to meet its burden, it is not enough for Petitioner to rely on Di Miceli's mere capability of depositing lines of thermoplastic from a nozzle. Pet. 18–19.

Accordingly, the Petition fails to direct us to persuasive evidence that establishes Di Miceli discloses "[a] three-dimensional (3D) drawing device" as required by each of the challenged claims.

*b. "permit[ting] the user to draw in free space to form a three-dimensional object"*

Petitioner asserts "[t]he portion of [claim 1] that recites 'for permitting the user to draw in free space to form a three-dimensional object' is merely an intended use and is not limiting in the context of an apparatus claim." Pet. 28. Petitioner fails to address with any reasonable degree of specificity the similar language appearing in claim 18 — i.e., "to permit the user to draw in free space to form a three-dimensional object." *See id.* at 58–60. Petitioner asserts this language is disclosed in Di Miceli, but neither specifically discusses where it may be found therein, nor alleges such language is not limiting as an intended use. *Id.*

Patent Owner argues that this language is limiting. Prelim. Resp. 5–12. Patent Owner relies on both "intrinsic evidence and applicable precedent" to support its argument. *Id.* at 6–12.

Thus, we must first determine whether "permit[ting] the user to draw in free space to form a three-dimensional object" appearing in each independent claim 1 and 18 is limiting, or whether such language is merely an intended use as alleged by Petitioner with respect to claim 1. Pet. 28.

Based on the record before us, we agree with Patent Owner that the "permit[ting]" language is indeed a limitation. As Patent Owner urges

(Prelim. Resp. 6–7), "permit[ting] the user to draw in free space to form a three-dimensional object" "is the very essence of the invention" and, thus, serves to limit the claims accordingly. *See In re Jasinski*, 508 F. App'x 950, 952 (Fed. Cir. 2013) (holding that, when functional language refers to "'the essence of the invention,'" it is limiting); *see also Vizio, Inc. v. Int'l Trade Comm'n*, 605 F.3d 1330, 1341 (Fed. Cir. 2010) (explaining how the "for decoding" language "is properly construed as a limitation, and not merely a statement of purpose or intended use for the invention, because 'decoding' is the essence or a fundamental characteristic of the claimed invention").

Here, we agree with Patent Owner's explanation regarding how both the Specification and the prosecution history of the '444 patent support viewing "permit[ting] the user to draw in free space to form a three-dimensional object" recited in each independent claim as a bona fide limitation, and not as a mere intended use. Prelim. Resp. 6–12. For example, the Specification makes clear that "[t]he present disclosure relates to extrusion devices and, in particular, a hand-held implement configured to extrude a material *so as to construct three-dimensional objects*." Ex. 1001, 1:18–19 (emphasis added). The Specification repeatedly refers to the drawing device as "a 3D drawing device." *See, e.g., id.* at 1:55, 64; 2:1–2, 20–21, 32, 57, 65–66; 3:55–56, 64–65; 4:4, 54–55. Also, after explaining how "an exemplary 3D drawing device" is constructed, the Specification indicates that the device's "*user can 'write' with the 3D drawing device* 100 in much the same manner as they would with a pen except they can do so *in three dimensions since the extruded material is three-dimensional*. The user can create *free-form lines, shapes or other objects*, as desired." *Id.* at 2:65–66; 3:63–4:1 (emphases added). The Specification repeatedly refers to the

extruded material 22 as a "column." *Id.* at 3:32, 35, 37, 43, 45, 63. This column of extruded material 22 is referred to as "a solid, three-dimensional 'line.'" *Id.* at 3:37–38.

The arguments Patent Owner identifies that were repeatedly made during prosecution (Prelim. Resp. 8–12) further support construing the "permit[ting]" language as a limitation. We note in particular the argument made by Patent Owner when distinguishing prior art devices such as an extrusion system, glue applicator, and a cake frosting applicator relied on in the Office Action dated December 16, 2016; namely, that the claimed three dimensional (3D) drawing device is "capable of something completely different than" such prior art devices because it "permit[s] 'the user to draw in free space to form a three-dimensional object.'" Ex. 1001, 321–322. Patent Owner repeatedly emphasized that such objects are "completely different" than those created by the prior art devices. *Id.* Patent Owner is correct (Prelim. Resp. 11) that such definitive statements made during prosecution create a prosecution disclaimer. *See Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013).

Therefore, we agree with Patent Owner that the "permit[ting]" language that appears in each independent claim is indeed limiting. Prelim. Resp. 5–12. Furthermore, because Petitioner has failed to treat this language as a limitation, let alone provide sufficient evidence demonstrating that Di Miceli discloses this limitation, we find the Petition to be deficient in this respect. *See* 37 C.F.R. § 42.104(b)(4) ("[t]he petition must specify where each element of the claim is found in the prior art patents or printed publications relied upon").

## III. CONCLUSION

For the reasons discussed above, we conclude that Petitioner has failed to demonstrate a reasonable likelihood that it would prevail in showing that at least one claim of the '444 patent is unpatentable as obvious over Di Miceli.

## IV. ORDER

In consideration of the foregoing, it is hereby

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review is denied.

PETITIONER:

P. Weston Musselman, Jr.
musselman@fr.com

Lance Wyatt, Jr.
wyatt@fr.com

PATENT OWNER:

Christopher Bright
christopher.bright@morganlewis.com

Nathan Smith
nsmith@mwe.com