MORGAN, LEWIS & BOCKIUS LLP
Brent A. Hawkins (SBN 314266)
brent.hawkins@morganlewis.com
John F. Gaustad (SBN 279893)
john.gaustad@morganlewis.com
600 Montgomery Street, Suite 2300
San Francisco, CA 94111-2725
Tel: +1.415.442.1000
Fax: +1.415.442.1001

Lisa R. Weddle (SBN 259050)
lisa.weddle@morganlewis.com
300 South Grand Ave.
Twenty-Second Floor
Los Angeles, CA 90071-3132
Tel: +1.213.612.2500
Fax: +1.213.612.2501

*Attorneys for Plaintiff*
*WOBBLEWORKS, INC.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

WOBBLEWORKS, INC.,

Plaintiff,

v.

GUANGZHOU JER EDUCATION TECHNOLOGY (d/b/a JER; GUANGZHOU JER; JER EDUCATION TECHNOLOGY CO, LTD.; GUANGZHOU ELECTRONICS COL., LTD) and MYFIRST USA INC.,

Defendants.

CASE NO.: 2:26-cv-01592-MEMF-PVC

**REPLY DECLARATION OF PETER BRESSLER IN SUPPORT OF WOBBLEWORKS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

I, Peter Bressler, hereby declare as follows:

1. I am a product design consultant and intellectual property expert witness at PBressler, LLC. I have been retained by WobbleWorks, Inc. ("WobbleWorks") to provide expert opinions in the above-captioned lawsuit.

2. I previously signed a declaration in the above-captioned lawsuit on March 3, 2026 (the "March 3, 2026 Declaration").

3. I understand that, after I signed the March 3, 2026 Declaration, Defendant MyFirst USA Inc. ("MyFirst") submitted the Declaration of Dr. Tim Osswald in Support of MyFirst USA Inc.'s Opposition to Plaintiff's Motion for Preliminary Injunction ("Osswald Declaration").

4. I have reviewed the Osswald Declaration, and provide my opinions in view of that declaration below.

## I. LEGAL STANDARDS

5. I previously recited my understanding of legal standards in Section III of my March 3, 2026 Declaration (¶¶ 21–30), including what I understand are legal standards for (1) claim construction, (2) infringement, and (3) the level of ordinary skill in the art. I incorporate those understandings of legal standards by reference.

6. I have been advised by WobbleWorks' counsel of the following additional principles of patent law applicable in this action. I have applied these principles as appropriate in arriving at the opinions set forth below. The paragraphs below summarize these legal principles, and my understanding of how these principles must be applied in forming my opinions.

### A. Indefiniteness

7. I understand that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

8. I understand that this definiteness requirement mandates clarity, while

recognizing that absolute precision is unattainable.

**B. Anticipation**

9. I understand that claims of a patent are anticipated (and therefore invalidated) by a prior art reference if each and every element of the claim, as properly construed, is found either explicitly or inherently in a single prior art reference or system, arranged in the same way, and the anticipatory reference is enabling to one of ordinary skill in the art. I understand that a limitation not explicitly present in a reference may nevertheless be inherently disclosed if one of ordinary skill in the art would recognize that the missing limitation is necessarily or implicitly present in the prior art reference.

10. Although anticipation cannot be established through a combination of references, I understand that additional references may be used to interpret an allegedly anticipating reference by, for example, indicating what the anticipating reference would have meant to one of ordinary skill in the art at the time of the claimed invention. For a patent claim to be anticipated, these other references must make clear that the missing descriptive matter in the claim is necessarily or implicitly present in the allegedly anticipating reference. I also understand that a person of ordinary skill in the art may recognize the inherent features disclosed by an anticipating reference even if the prior art does not recognize the disclosure of those inherent features. In addition, I understand that an anticipatory reference must enable one of ordinary skill in the art to make the invention without undue experimentation.

**C. Obviousness**

11. I understand that claims of a patent are invalid if it would have been obvious to one of ordinary skill in the art in view of the prior art teachings of a single reference or a combination of references.

12. I understand that, unlike anticipation, a reference need not be enabling to render a patent claim invalid for obviousness.

13. I understand that obviousness is based on the scope and content of the prior art, the differences between the prior art and the claim, the level of ordinary skill in the art, and secondary indicia of obviousness and non-obviousness to the extent they exist.

14. I understand that secondary indicia of non-obviousness should be considered when evaluating whether a claimed invention would have been obvious to one of ordinary skill at the time of invention. These secondary indicia may include, for example:

- a long-felt but unmet need in the prior art that was satisfied by the claimed invention;
- commercial success of processes covered by the patent as a result of the merits of the claimed invention, rather than the result of design needs, market pressure, advertising, or similar activities;
- unexpected results achieved by the invention;
- praise of the invention by others skilled in the art;
- the taking of licenses under the patent by others;
- whether others had tried and failed to make the invention;
- whether persons of ordinary skill in the art expressed surprise or disbelief regarding the invention;
- whether the inventor proceeded contrary to accepted wisdom; and
- deliberate copying of the invention.

I understand that there must be a relationship, or nexus, between any such secondary indicia and the claimed invention. I further understand that independent contemporaneous invention by others is a secondary consideration supporting an obviousness determination.

15. I also understand that a finding of obviousness requires that there was a motivation for a POSITA to have combined different references in the same way required by the claims, and that those motivations can include the following:

- the claimed invention is simply a combination of prior art elements according to known methods to yield predictable results;
- the claimed invention is a simple substitution of one known element for another to obtain predictable results;
- the claimed invention uses known techniques to improve similar devices or methods in the same way;
- the claimed invention applies a known technique to a known device or method that is ready for improvement to yield predictable results;
- the claimed invention would have been "obvious to try" choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;
- there is known work in one field of endeavor that may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations would have been predictable to one of ordinary skill in the art;
- there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims; and
- there is some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

## II. DR. OSSWALD ARTICULATES THE INCORRECT LEVEL OF SKILL IN THE ART

16. Dr. Osswald argues that the level of skill in the art is the following:

> "In my opinion, a POSA at the time of the Asserted Patents would have a bachelor's degree in engineering, such as mechanical engineering, biomedical engineering, chemical engineering, materials science, or other similar degree, and have completed courses in polymer engineering, such as polymer processing and rheology and polymer materials science. Additionally, the POSITA would have had at least two years of industrial experience

> in design, prototyping and 3D printing, and manufacture of polymer parts. More relevant experience could compensate for less education, and more relevant education could likewise compensate for less experience."

Osswald Decl., ¶ 81. Dr. Osswald does not explain what factors he considered to arrive at this conclusion. *See id.*

17. I, on the other hand, had provided the following level of ordinary skill in the art:

> In my opinion, the hypothetical POSITA at the time of the earliest effective priority date, December 5, 2012, would have had an associate's or bachelor's degree in industrial design, mechanical engineering, or related field, and at least 2–3 years of experience designing or manufacturing electromechanical consumer products.

Dkt. 18-3 (March 3, 2026 Declaration), ¶ 63.

18. I disagree with Dr. Osswald's opinion regarding the level of ordinary skill in the art. Although unclear, Dr. Osswald appears to base this opinion that "fused filament fabrication (FFF)[] was a well-established technology" (Osswald Decl., ¶ 72) and statements made by WobbleWorks during prosecution of the Asserted Patents (*id.*, ¶ 101).

19. The Asserted Patents, however, are not limited to fused filament fabrication. The Asserted Patents' field is "extrusion devices" generally. *E.g.*, Ex. 4 at 1:16–17. The "feed stock" that the Asserted Patents disclose utilizing is not limited to polymers: it may also be "an epoxy, a metal such as tin or lead or a mixture of metals[,]" other low temperature metals or alloys, and it "may be a single material or a mixture of materials, such as a rod having particles of a first material dispersed within a matrix of a second material." *Id.* at 2:55–64. The Asserted Patents spend almost the entirety of the specification discussing the inventive hand-held device itself, not the nuances of material science. The Asserted Patents do not claim any new material properties, of polymers or otherwise: they instead rely on the unremarkable proposition that, when certain materials are heated (like plastics or metals), they become malleable. An ordinary person would have

learned this knowledge well before obtaining the level of skill articulated by either myself or Dr. Osswald.

20. Further, WobbleWorks' comments made during prosecution were not about the nuances of material science, with respect to polymers or otherwise. WobbleWorks distinguished its inventions from one of the prior art references considered during prosecution of the '444 Patent (U.S. Patent Application Publ'n No. 2004/0232165 to Lee ("Lee")) based on the (once again unremarkable) proposition that "glue is runny":

> Applicant respectfully submits that Lee does not teach or otherwise suggest a 'three-dimensional (3D)_ drawing device" that permits 'the user to draw in free space to form a three-dimensional object,' as recited in Claim 21. Lee instead describes using a glue applicator that uses a glue stick, not a '3D drawing device' that uses 'a strand'[] of feed stock as recited in Claim 21. **The glue applicator of Lee cannot be considered a 3D drawing device any more than a bottle of craft glue, a caulking gun, a mechanical pencil, or a paintbrush. These prior art devices, after numerous repeated applications of glue, caulk, pencil lead, or paint, and with significant curing or drying time, may deposit material in layers over time.** However, these prior art devices are not in and of themselves 3D drawing devices; **unlike the claimed 3D drawing device, none of these prior art devices or materials will immediately produce a freestanding 3D drawing or structure in a single, vertical stroke**. Indeed, there is no external factor, including curing or drying time, that can be manipulated to enable these prior art devices to easily and immediately create a 3D drawing or structure in the manner made possible by using the claimed 3D drawing device. There is no manner of using the glue applicator of Lee (or any of the other prior art devices of the applied references) that allows an artist to create a complex, intricately detailed 3D drawing or structure with the speed and facility made possible by using the presently claimed 3D drawing device.
>
> Applicant submits that glue applicators, such as the glue applicator described by Lee, simply provide a manner of applying an adhesive or sealant in a molten, low-viscosity state that eventually cools and hardens to join or seal two parts together. These types of glue applicators are an alternative to using other glues, staples, tacks, or nails to join two parts together. **<u>When applied, the glue is runny, separates easily, and does not form a solid or semi-solid form when extruded from the glue applicator.</u>** Thus, Lee, whether considered alone or in combination,

> fails to teach or otherwise suggest a 'three-dimensional (3D) drawing device' that permits 'the user to draw in free space to form a three-dimensional object,' as recited in Claim 21."

Dkt. 35-5 at ECF pp.320–21 (emphasis added). At no point during this response did WobbleWorks mention anything about polymers, the specific characteristics thereof, or anything that would even require a background in material science or mechanical engineering to understand. *See id.* at ECF pp.317–25.

21. Additionally, I further disagree with Dr. Osswald's opinion regarding the level of ordinary skill in the art because it improperly elevates the level of skill by importing requirements relevant to industrial 3D printing that are not applicable to the claimed invention. The Asserted Patents relate to handheld 3D printing pens, which do not require the level of precision, speed, or accuracy associated with industrial 3D printing systems. Accordingly, person of ordinary skill in the art would not need to be limited to such specialized industrial experience proposed by Dr. Osswald.

22. Nonetheless, as a professional product designer with over 50 years of experience, I have been involved with design projects of many electromechanical devices and regularly designed for and employed 3D printing processing in those projects over the course of at least 20 of those years. Therefore, I would qualify as a POSITA under Dr. Osswald's definition.

23. Accordingly, Dr. Osswald's opinion regarding the level of ordinary skill in the art is incorrect.

## III. DEFENDANTS' PRODUCTS INFRINGE THE ASSERTED PATENTS

24. Dr. Osswald argues that I have not shown that the Accused Products practice the following claim elements:

| **Claim Elements** | **Patent(s) (Claim)** |
|---|---|
| "A three dimensional (3D) drawing device" | '444 Patent, Claim 1 |

| **Claim Elements** | **Patent(s) (Claim)** |
|---|---|
| "permitting the user to draw in free space to form a three-dimensional object" | '444 Patent, Claim 1 |
| "a three-dimensional (3D) drawing pen" | '850 Patent, Claim 1<br>'852 Patent, Claim 1<br>'819 Patent, Claim 1<br>'529 Patent, Claim 1 |
| "to permit drawing in 3D space" | '850 Patent, Claim 1<br>'819 Patent, Claim 1 |
| "to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object" | '850 Patent, Claim 1<br>'819 Patent, Claim 1<br>'529 Patent, Claim 1 |
| "to permit the user to draw in free space to form a 3D object" | ''852 Patent, Claim 1 |

Osswald Decl., ¶ 110. It is unclear whether Dr. Osswald is arguing that I merely failed to show that the Accused Products include and/or practice these limitations, or whether Dr. Osswald is arguing that the Accused Products actually fail to practice these limitations. Regardless, the Accused Products include and/or practice these limitations.

25. It is my opinion that the Accused Products still practice these elements.

26. As an initial matter, both Guangzhou JER—the Defendant manufacturer of the Accused Products—and MyFirst, the Defendant reseller of the Accused Products—admit to this fact on their websites.




Ex. 61 at 1 (highlighting added).




Ex. 62 at 3 (highlighting added).

**The Best 3D Pen for Kids**

Welcome to our global collection of the best 3D pens for kids! If you're looking for a way to spark creativity and bring imaginative ideas to life, you've come to the right place. Our carefully selected 3D pens are designed to inspire young creators everywhere, whether they're budding artists, engineers, or just love to craft.

**Benefits of 3D Pen for Kids**

**User-Friendly Design**: Our 3D pens are made with kids in mind. They're easy to use, with simple controls and quick setup, so your child can start creating right away.

**Safety Comes First**: We put safety at the top of our list. Our pens use non-toxic, eco-friendly filament and come with built-in safety features, so you can feel confident your child is safe while they create.

**Educational Value**: These pens are more than just toys. They help develop fine motor skills, boost spatial awareness, and encourage creativity and problem-solving.

*Id.* at 4 (highlighting added).

myFirst

**3D Pen for Kids Frequently Asked Questions**

**What is the best 3D pen for a young child?**

**How does a 3D pen work?**

A 3D pen works similarly to a hot glue gun, but it uses plastic filament instead of glue sticks. or on a surface.

**Are 3D pens safe for kids?**

**What can kids create with a 3D pen?**

**What's the difference between the myFirst 3dPen Make and the myFirst 3dPen Artist?**

*Id.* at 7 (highlighting added).


Tips and Tricks

1. **Speed Control:** Adjust the pen's speed to match your drawing style. Slower speeds are better for detailed work, while faster speeds are great for filling in larger areas.
2. **Layering:** Build your design layer by layer. Start with a base layer and add details on top.

Advanced Techniques


1. ***Creating Shapes:*** *Practice making basic shapes like circles and squares. Combine these* shapes to make more complex designs.

Ex. 63 at 62 & 63 (highlighting added).

27. I also purchased and used the JER RP800A / 3d Pen Artist. I used this pen in the video included as Exhibit 64, which I personally recorded. The following screenshots from this video shows the result: the JER RP800A / 3d Pen Artist immediately produces a freestanding 3D drawing or structure in a single, vertical stroke:

| | |
|---|---|
|  |  |
| **Screen shot from 2:42 of Exhibit 64 (myFirst 3DPen Artist)** | **Screenshot from 2:50 of Exhibit 64 (myFirst 3dPen Artist)** |

I have also reviewed the video prepared by WobbleWorks (Exhibit 65) showing the

JER RP 03 / MyFirst 3d Pen Make producing a freestanding 3D drawing or structure in a single, vertical stroke:

| | |
|---|---|
|  |  |
| **Screen shot from 0:09 of Exhibit 65 (myFirst 3DPen Make)** | **Screen shot from 0:35 of Exhibit 65 (myFirst 3D Pen Make)** |

28. What is shown in these videos is consistent with MyFirst's aforementioned representation from on its website: when "draw[ing] in the air," "[t]he plastic quickly cools and solidifies, **holding its shape**." Ex. 62 at 7 (emphasis added).

29. Looking at Dr. Osswald's opinions on Fused Filament Fabrication (Osswald Decl., ¶¶ 72–79) and on alleged indefiniteness (*see id.*, ¶¶ 123–34), three additional notes are warranted here.

30. **First**, Dr. Osswald opines that "extruded thermoplastic material cannot retain its shape in free space **immediately** upon exiting the nozzle." *Id.*, ¶ 74 (emphasis added). Although he does not say so explicitly, Dr. Osswald appears to imply that the statement made during prosecution of the '444 Patent that the claimed invention can "**immediately** produce a freestanding 3D drawing or structure in a single, vertical stroke" (Dkt. 35-5 at ECF pp.321) is an impossibility. But this reads a requirement into the prosecution history statement that is not there and ignores the statement's full context. When WobbleWorks used "immediately,"

it was distinguishing the inventions from the prior art devices that "after numerous repeated applications of glue, caulk, pencil lead, or paint, and with significant curing or drying time, may deposit layers over time." *Id.* WobbleWorks also noted that the glue disclosed by Lee "is runny, separates easily, and does not form a solid **or semi-solid form when extruded** . . . ." *Id.* (emphasis added). Accordingly, a POSITA would understand that WobbleWorks was distinguishing its invention from relying on significant curing or drying times to create layers. The statement made during prosecution history does not require extruded thermoplastic material to immediately be **completely solid** and immovable: the 3D pen need only be capable of "immediately produc[ing] a **freestanding** 3D drawing or structure in a single, vertical stroke," which the Accused Products (and WobbleWorks' Practicing Products) do, as shown above.

31. **Second**, Dr. Osswald opines that "immediately produc[ing] a freestanding 3D drawing or structure in a single, vertical stroke" is "a thermoplastic characteristic subject to numerous variables that are neither defined nor discussed in the specification." *Id.*, ¶ 132. Regardless of whether these points are true, they are ultimately irrelevant. My understanding of the law, is that to establish infringement under Dr. Osswald's interpretation of the claims, the Accused Products need to simply "**permit**[] the user to draw in free space to form a three-dimensional object"—*i.e.*, **permit** the user to "immediately produce a freestanding 3D drawing or structure in a single, vertical stroke." Defendants promote on their website that the Accused Products do this, and Exhibits 64 and 65 demonstrate that the Accused Products do this, irrespective of the variables recited by Dr. Osswald.

32. **Third**, Dr. Osswald opines that the term "to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object"—which is a claim limitation found only in Claim 1 of the '850, '819, and '529 Patents, and not the '444 or '852 Patents—"is inconsistent with the fundamental behavior of thermoplastic polymers, which **exit the nozzle in a**

**molten viscoelastic state and only achieve shape stability over time as they cool** and, in the case of semicrystalline materials such as PLA, crystallize." Osswald Decl., ¶ 126 (emphasis added). But the Asserted Patents recognize this fact, and a POSITA reading the specifications would also recognize this fact:

> In certain embodiments, the **feed stock 20 exists the nozzle assembly 130 in <u>essentially</u> a solid form such that the extruded column retains its shape**. In certain embodiments, freshly extruded feed stock 20 will bond to previously extruded columns 22 such that a structure may be formed by drawing a line across to onto a previously drawn column 22.

*E.g.*, Ex. 4 at 3:38–41 (emphasis added).

> Thus, as the air exits the cooling ports 118, the air passes by the tip 137 of the extruder 132, cooling both the tip 137 and the feed stock 20 that just been extruded from the extrusion passage 133. Both of these cooling effects serve to reduce the temperature of the feed stock 20 as it exits the extrusion passage 133 such that **the feed stock 20 may be <u>essentially</u> solid as it exits the extrusion passage 133**. In certain embodiments, the freshly extruded feed stock 20 may be pliable and formable into various shapes. In certain embodiments, the surface of the freshly extruded feed stock 20 may be receptive to attachment, e.g. sticky, such that the extruded material will bond to other previously extruded feed stock 20.

*Id.* at 6:19–28 (emphasis added). Accordingly, when determining whether the material is "extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object," a POSITA will consider whether the material retains its shape against gravity in free space (as the claim requires), accounting for the fact that the material is exiting the nozzle assembly in what is "essentially"—and perhaps not a perfectly—solid, continuous form.

## IV. THE ASSERTED CLAIMS ARE VALID

33. Dr. Osswald opines that (1) the Asserted Claims are indefinite, (2) the Asserted Claims are anticipated, and (3) the Asserted Claims are obvious. For the foregoing reasons, I disagree with Dr. Osswald's opinions.

### A. The Asserted Claims Are Not Indefinite

34. Dr. Osswald opines that the Asserted Claims are indefinite. Osswald

Decl., § XI.A (¶¶ 123–132).

35. I disagree with Dr. Osswald's opinions because the claims, read in light of the specification and the prosecution history, inform a POSITA with reasonable certainty about the scope of the invention.

1. <u>"to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object" (Claim 1 of the '850, '819, and '529 Patents Only)</u>

36. Dr Osswald opines that the phrase "to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object" is indefinite. *Id.*, ¶ 125. He argues that this phrase is "inconsistent with the fundamental behavior of thermoplastic polymers, which exit the nozzle in a molten viscoelastic state and only achieve shape stability over time as the cool and, in the case of semicrystalline materials such as PLA, crystallize." *Id.*, ¶ 126.

37. I disagree with Dr. Osswald's opinion. A POSITA would read these claim limitations in light of the specification and the prosecution history. As noted above, the specification recognizes that the material being extruded may not be **perfectly** solid when extrusion:

> In certain embodiments, the **feed stock 20 exists the nozzle assembly 130 in <u>essentially</u> a solid form such that the extruded column retains its shape**. In certain embodiments, freshly extruded feed stock 20 will bond to previously extruded columns 22 such that a structure may be formed by drawing a line across to onto a previously drawn column 22.

*E.g.*, Ex. 4 at 3:38–41 (emphasis added).

> Thus, as the air exits the cooling ports 118, the air passes by the tip 137 of the extruder 132, cooling both the tip 137 and the feed stock 20 that just been extruded from the extrusion passage 133. Both of these cooling effects serve to reduce the temperature of the feed stock 20 as it exits the extrusion passage 133 such that **the feed stock 20 may be <u>essentially</u> solid as it exits the extrusion passage 133**. In certain embodiments, the freshly extruded feed stock 20 may be pliable and formable into various shapes. In certain embodiments, the surface of the freshly extruded feed stock 20 may be receptive to attachment, e.g. sticky, such that the extruded material will bond to other previously extruded feed stock 20.

*Id.* at 6:19–28 (emphasis added). Accordingly, a POSITA would recognize that "solid" as used in the above phrase includes materials that are extruded in an essentially solid form. This is not inconsistent with thermoplastic polymers.

38. The specification further explains that the extruded material "retains its shape" and can form a three-dimensional line as it is deposited, including bonding to previously extruded material. *Id.* at 3:38–44. This behavior reflects that the extruded material remains intact and does not separate or deform under gravity when extrusion is paused, indicating that it is sufficiently solid to maintain its structure in free space. Thus, a POSITA would understand that the claimed "solid form" refers to a state in which the material, although potentially still cooling, is stable enough to resist gravitational deformation and enable three-dimensional drawing.

39. Dr. Osswald also argues that "how long it takes for extruded polymer 'to retains [sic] its shape against gravity in free space' can depend on factors as capricious as where and when the user is using the pen[]" and that "[a] person using the same 3D pen with the same polymer material on hot [sic] summer's day in Arizona would see something very different from a person doing the same outside in Chicago in the winter" Osswald Decl., ¶ 128. This appears to be an argument about whether a POSITA could determine whether a product is infringing and not about whether a POSITA could determine the scope of this phrase—it therefore does not appear to be an argument applicable to indefiniteness. Regardless, a POSITA would recognize that virtually all products can fail when exposed to non-optimal or harsh conditions. A POSITA, for example, would not expect their phone to continue working after leaving it in an oven set to 400 degrees, or expect their hairdryer to work underwater. But the fact that a users' results in using a 3D printing pen may vary based on external conditions does not change the fact that, if in typical conditions material can "be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object," that device

infringes.

2. Other Limitations

40. Dr Osswald also opines that the following phrases are indefinite:

| **Claim Elements** | **Patent(s) (Claim)** |
|---|---|
| "permitting the user to draw in free space to form a three-dimensional object" | '444 Patent, Claim 1 |
| "to permit drawing in 3D space" | '850 Patent, Claim 1<br>'819 Patent, Claim 1 |
| "to permit the user to draw in free space to form a 3D object" | '852 Patent, Claim 1 |
| "to draw a 3D object" | '529 Patent, Claim 1 |

*Id.*, ¶ 129. He raises several arguments, none of which demonstrate indefiniteness.

41. **First**, Dr. Osswald repeats his argument above that "[h]ow long it takes for extruded polymer 'to permit drawing in 3D space' can vary greatly depending on various unspecified and uncontrolled factors." *Id.*, ¶ 130. This argument does not demonstrate indefiniteness for the same reason I discussed above in Paragraph 39. Further, Dr. Osswald fails to appreciate that the claims require the components of the physical device itself to do the 3D construction, not an extruded polymer:

> the **extruder** being disposed between the guide tube and the exit nozzle such that rotation of the **motor** causes the strand to be extruded out of the exit nozzle for **permitting the user to draw in free space to form a three-dimensional object**.

Ex. 4, cl. 1 at 10:22–27 (emphasis added).

> the **extruder** being disposed between the gear and the exit nozzle such that the strand can be driven into and melted by the **extruder** to cause the strand to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space **to draw a 3D object**.

Ex. 5, cl. 1 at 10:22–27 (emphasis added).

> a **three-dimensional (3D) drawing pen that is configured to permit the user to draw in free space to form a 3D object**, the 3D pen comprising:

Ex. 6, cl. 1 at 10:3–5 (emphasis added).

> a **three-dimensional (3D) drawing pen that is configured to permit drawing in 3D space**, the configuration of the pen comprising:

Ex. 7, cl. 1 at 10:3–5.

> a **nozzle assembly** disposed at a distal end of the body and comprising an **extruder** and an exit nozzle, the extruder having a heating element for melting the material and permitting the material to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space **to draw a 3D object**.

Ex. 9, cl. 1 at 10:10–16.

42. **Second**, Dr. Osswald argues that (1) because WobbleWorks "argued during prosecution that the claimed invention has the ability to 'immediately produce a freestanding 3D drawing or structure in a single, vertical stroke'" and (2) "the specification does not detail how soon is 'immediate' or what constitutes 'a single, vertical stroke[,]" this phrase must be indefinite. Osswald Decl., ¶ 131. But a POSITA would already understand the plain and ordinary meaning of these terms: there is no need for the specification to define them.

**43.** **Third**, repeats his argument that "'immediately produc[ing] a freestanding 3D drawing or structure in a single, vertical stroke' is a thermoplastic characteristic subject to numerous variables that are neither defined nor discussed in the specification." *Id.*, ¶ 132. Regardless of whether that is true, the claims are not limited to any of those particular variables, and those variables do not impact whether a POSITA would understand the scope of the claim with reasonable certainty. *See supra* ¶ 31.

### B. The Asserted Claims Are Not Anticipated

44. Dr Osswald opines that the Asserted Claims are anticipated by U.S.

Patent No. 7,950,549 to Harris ("Harris"). Osswald Decl., § XI.B (¶¶ 133–136).

45. I disagree with Dr. Osswald's opinion because Harris does not disclose (1) each and every element of the Asserted Claims, or that those limitations are (2) arranged in the same way.

46. Due to the time-compressed nature of this analysis, I have not identified every reason why Harris does not anticipate the Asserted Claims. I have selected what appear to me to be the most apparent reasons. I reserve the right to offer additional opinions related to why Harris does not anticipate the Asserted Claims in the future.

3. <u>Overview of Harris</u>

47. Harris is titled "Powered Dispenser with Interchangeable Cartridges." Dkt. 35-17, Cover. One of its disclosures include a "pencil grip embodiment" (*id.* at 6:53–54 & 7:5) that is shown, for example, in Figure 2:



Fig. 2

*Id.*, Fig. 2. This pencil grip embodiment is actually composed of four main components. Three of these main components are shown below in Figures 13–15: (1) "application tip 22/24," (2) cylinder 8, and (3) "motor 2":



Fig. 13 Fig. 14 Fig. 15

*Id.*, Figs. 13-15 (annotated). The fourth main component is "plastic cartridge 10" which **is placed "[i]nside the cylinder 8"** and "can be filled with icing, glue, adhesive etc or any other semi-soft material for a particular application." *Id.* at 6:65–67 (emphasis added). Figure 9 below "shows an isometric view of the cartridge 10 and end cap 14 which is used to retain" the semi-soft material.




*Id.*, Fig. 9 (annotated).

48. Figures 10 and 11 below show Harris' motor 2. *Id.* at 7:45–54.




*Id.*, Figs. 10 & 11 (annotated). Motor 2 "drives a screw shaft . . . via reduction gears 28." *Id.* at 7:43–44. "[M]otor control switch 40 [is] used to switch the invention on

and off and also adjust the speed." *Id.* at 7:49–50."[R]everse switch 6 . . . is used to change the direction of the motor 2." *Id.* at 7:47–48.

49. Figure 2 (reproduced again below) shows screw shaft 18:




*Id.*, Fig. 2 (annotated). Again, "[t]he screw shaft 18 is driven by a motor 2 via reduction gearing 28" (annotated in pink above). *Id.* at 8:61–62. Plunger disc 16 (annotated in yellow above) travels up and down screw shaft 18 (annotated in green) and "is supported on a guide rod 20" (annotated in red above). *Id.* at 6:59–61. Motor 2 drives this plunger "through the cartridge, pushing the material to be dispensed out through the tip." *Id.* at 4:8–10.

50. Figures 16 and 17 "show a side view of the application tip 24 and the application tip retaining rim 22 which are shown separated and are connected by a screw-type thread."




*Id.*, Figs. 16 & 17 (annotated).

51. Harris also contains a "description of the prior art." *Id.* at 1:42–2:33. Specifically, Harris provides one-paragraph overviews of 10 different prior art references:

- U.S. Patent No. 6,047,858 to Romer (*see id.* at 1:47–2:3);
- U.S. Patent No. 6,101,968 to Fitzgibbons (*see id.* at 2:4–9);
- U.S. Patent No. 6,152,333 to Binder (*see id.* at 2:10–21);
- U.S. Patent No. 6,026,985 to Elliott (*see id.* at 2:22–33);
- U.S. Patent No. 5,405,050 to Walsh (*see id.* at 2:34–40);
- U.S. Patent No. 4,258,864 to Karamanolis et al. (*see id.* at 2:41–50);
- U.S. Patent No. 5,980,144 to Debourg et al. (*see id.* at 2:51–65);
- U.S. Patent No. 6,460,731 to Estelle et al. (*see id.* at 2:66–3:14);
- U.S. Patent No. 6,968,873 to Cariddi et al. (*see id.* at 3:15–27); and
- U.S. Design Patent No. D393574 to Perkins et al. (*see id.* at 3:28–33).

Harris never states or implies that these prior art teachings are in any way part of what it discloses as its own invention, particularly the pencil grip embodiment discussed above. *See generally* Dkt. 35-17.

4. <u>Harris Does Not Disclose the Limitations of the Asserted Claims Arranged in the Same Way</u>

52. As an initial matter, it is my opinion that Harris does not anticipate the Asserted Claims because—setting aside for the moment what it actually discloses—

it does not disclose each and every limitation of the asserted claims **arranged in the same way**.

53. To argue anticipation, Dr. Osswald inappropriately combined Harris' description of the prior art with Harris' pencil embodiment. I understand that—had other requirements been satisfied, such as addressing motivations to combine—Dr. Osswald could have argued obviousness based on the combination of Harris' pencil grip embodiment with Harris' descriptions of the prior art. However, Dr. Osswald did not do so. *See* Osswald Decl., § XI.B (¶¶ 133–136).

54. I have identified below exemplary claim limitations that Dr. Osswald contends Harris discloses by citing to Harris' description of the prior art, and not to Harris' disclosures for its pencil grip embodiment. This exercise was difficult in part because Dr. Osswald did not tie specific alleged disclosures of Harris to specific claim limitations and instead relied on assembling multiple block quotes as allegedly disclosing significant numbers of claim elements. In fact, even considering Dr. Osswald's reliance on Harris' description of the prior art, many elements of the Asserted Claims appear undisclosed. Accordingly, to the extent any claim limitation is not identified below, it is not my opinion that it is disclosed in any way by Harris.

| **Limitations of Claim 1** | **Dr. Osswald's Analysis** |
|---|---|
| **'444 Patent** | |
| "a port configured for introduction of a strand of feedstock into an internal volume of the housing" | The only disclosures that Dr. Osswald cites to in Harris that could even arguably suggest these limitations is to Harris' discussion of U.S. Patent No. 5,980,144 to Debourg et al. (*compare* Dkt. 35-21 at 6–7, *with* Ex. 66 at 2:51–65). |
| "the housing having a least one cooling port extending | The only disclosures that Dr. Osswald cites to in Harris that could even arguably suggest these |

| Limitations of Claim 1 | Dr. Osswald's Analysis |
|---|---|
| between the internal volume and an ambient atmosphere" | limitations is to Harris' discussion of U.S. Patent No. 6,460,731 to Estelle et al. (*compare* Dkt. 35-21 at 5–6, *with* Ex. 67 at 3:11–14). |
| "a gear train . . . disposed within the internal volume to receive the strand of feed stock, and configured to move the strand of feed stock when engaged with the gear train" | The only disclosures that Dr. Osswald cites to in Harris that could even arguably suggest these limitations is to Harris' discussion of U.S. Patent No. 6,101,968 to Fitzgibbons (*compare* Dkt. 35-21 at 5–6, *with* Ex. 68 at 2:5–9). |
| "a heating element surrounded by an insulator" | The only disclosures that Dr. Osswald cites to in Harris that could even arguably suggest these limitations is to Harris' discussion of U.S. Patent No. 5,980,144 to Debourg et al. (*compare* Dkt. 35-21 at 15 & 16, *with* Ex. 66 at 2:51–65) and U.S. Patent No. 6,152,333 to Binder (*compare* Dkt. 35-21 at 15, *with* Ex. 74 at 2:10–21). |
| **'529 Patent** | |
| "a heating element for melting the material" | The only disclosures that Dr. Osswald cites to in Harris that could even arguably suggest these limitations is to Harris' discussion of U.S. Patent No. 5,980,144 to Debourg et al. (*compare* Dkt. 35-22 at 15 & 16, *with* Ex. 66 at 2:51–65). |
| **'819 Patent** | |
| "a port that permits insertion of a strand of material into the internal volume of the pen" | The only disclosures that Dr. Osswald cites to in Harris that could even arguably suggest these limitations is to Harris' discussion of U.S. Patent |

| **Limitations of Claim 1** | **Dr. Osswald's Analysis** |
|---|---|
| | No. 5,980,144 to Debourg et al. (*compare* Dkt. 35-23 at 6–7, *with* Ex. 66 at 2:51–65). |
| "a heating element configured to melt the strand" | The only disclosures that Dr. Osswald cites to in Harris that could even arguably suggest these limitations is to Harris' discussion of U.S. Patent No. 5,980,144 to Debourg et al. (*compare* Dkt. 35-23 at 7–8, *with* Ex. 66 at 2:51–65) and U.S. Patent No. 6,152,333 to Binder (*compare* Dkt. 35-23 at 7, *with* Ex. 74 at 2:10–21). |
| **'850 Patent** | |
| "a port that permits insertion of a strand of material into the internal volume of the pen" | The only disclosures that Dr. Osswald cites to in Harris that could even arguably suggest these limitations is to Harris' discussion of U.S. Patent No. 5,980,144 to Debourg et al. (*compare* Dkt. 35-24 at 7–8, *with* Ex. 66 at 2:51–65). |
| "a motor . . . operatively coupled with the gear and configured to rotate the gear and drive motion of the strand" | The only disclosures that Dr. Osswald cites to in Harris that could even arguably suggest these limitations is to Harris' discussion of U.S. Patent No. 6,101,968 to Fitzgibbons (*compare* Dkt. 35-24 at 10, *with* Ex. 74 at 2:5–9). |
| "a heating element configured to melt the strand, the extruder being disposed between the gear and the exit nozzle such that the strand can be driven into and melted | The only disclosures that Dr. Osswald cites to in Harris that could even arguably suggest these limitations is to Harris' discussion of U.S. Patent No. 5,980,144 to Debourg et al. (*compare* Dkt. 35-24 at 17, *with* Ex. 66 at 2:51–65). |

| **Limitations of Claim 1** | **Dr. Osswald's Analysis** |
|---|---|
| by the extruder" | |
| **'852 Patent** | |
| "a heating element configured to melt the material" | The only disclosures that Dr. Osswald cites to in Harris that could even arguably suggest these limitations is to Harris' discussion of U.S. Patent No. 5,980,144 to Debourg et al. (*compare* Dkt. 35-25 at 13, *with* Ex. 66 at 2:51–65) and U.S. Patent No. 6,152,333 to Binder (*compare* Dkt. 35-25 at 12, *with* Ex. 74 at 2:10–21). |

5. Harris Does Not Disclose All Limitations of Claim 1 of the '444 Patent

55. In my opinion, Harris also does not disclose all limitations of Claim 1 of the '444 Patent.

*a. "Harris Does Not Disclose "[a] three-dimensional (3D) drawing device"*

56. In my opinion, Harris also does not disclose "[a] three-dimensional (3D) drawing device."

57. As Dr. Osswald notes in his report, WobbleWorks argued during prosecution that a "three-dimensional (3D) drawing device" is a device that will "immediately produce a freestanding 3D drawing or structure in a single, vertical stroke." *See, e.g.*, Osswald Decl., ¶ 112.

58. The only portions of Harris that Dr. Osswald identifies as allegedly satisfying this limitation is the Abstract and Figure 1. *See* Dkt. 35-21 at 1–2. The Abstract merely discloses cartridges that "are pre-filled with the material of the user's choice" and that the "dispenser can be used in many applications such as cake decorating, craft applications, woodworking and construction." The Abstract does not disclose that Harris' device can "immediately produce a freestanding 3D

drawing or structure in a single, vertical stroke."

59. Dr. Osswald also reproduces Figure 1. But Figure 1 does not show a **freestanding** 3D drawing or structure immediately produced in a single, vertical stroke. Instead, Figure 1 shows that gravity is pulling the material being extruded from the device onto the cake, and that the material is not freestanding.




*Fig. 1*

Dkt. 35-17, Fig. 1.

60. Accordingly, Harris does not explicitly or inherently disclose "[a] three-dimensional (3D) drawing device." And even if Dr. Osswald had argued that it would have been obvious to combine Harris with Debourg et al. (which he did

not), Debourg et al. does not explicitly or implicitly disclose these limitations either.

61. It is also my understanding that preamble language is limiting if is clearly relied upon in the prosecution history, if the claim relies upon or derives essential structure from the preamble, or if the preamble recites a specific characteristic for a component of an invention recited in the body of the claim. Given that WobbleWorks clearly relied on this language during the prosecution history to distinguish the claimed invention over the prior art (*see* Dkt. 35-5 at ECF pp. 320–21), it is my understanding that the preamble is limiting.

*b. "Harris Does Not Disclose "a port configured for introduction of a strand of feed stock into an internal volume of the housing"*

62. In my opinion, Harris also does not disclose "a port configured for introduction of a strand of feed stock into an internal volume of the housing."

63. As an initial matter, Dr. Osswald fails to explain how or where Harris allegedly discloses this specific "port." *See* Dkt. 35-21 at 3–7. Dr. Osswald instead argues that such a "port" is "inherently disclosed because a POSITA would understand that in order to receive a strand of feed stock longer than the housing, it would necessarily need a port to feed the strand through." *Id.* at 6–7.

64. Dr. Osswald is incorrect. A POSITA would understand that, if a strand of feed stock was longer than the housing, the POSITA could coil, twist, or otherwise bend feed stock to fit it into the housing. Accordingly, no port is "necessary" in view of this argument. And because no port is "necessary" under this analysis, it is my understanding that Harris cannot inherently disclose the required port.

65. Dr. Osswald's analysis suffers from a deeper problem, however. Dr. Osswald has not even demonstrated that Harris discloses a strand of feed stock with respect to its pencil grip embodiment—much less a port configured for the introduction of such a strand. For this disclosure, Dr. Osswald relies not on Harris'

discussion of its pencil grip embodiment, but on Harris' discussion of U.S. Patent No. 5,980,144 to Debourg et al. *Compare* Dkt. 35-21 at 6, *with* Ex. 66 at 2:51–65. This passage from Harris says nothing about receiving a strand of feed stock—it instead mentions "receiving a mass of thermoplastic in a solid state":

> U.S. Pat. No. 5,980,144 (DEBOURG) discloses a hand held dispenser for thermoplastic material including a casing forming a manual holding element and enclosing a space for **receiving a mass of thermoplastic material in a solid state**, the casing having an open outlet end communicating with the space; a component for advancing the thermoplastic material toward the open end of the casing, and a heating element for heating the thermoplastic material to a flowable state, wherein the heating element has a low thermal inertia, is arranged in a substantially homogeneous manner across a surface disposed opposite the open end and having dimensions which correspond to dimensions of the open end and wherein the heating element further acts to distribute thermoplastic material in a flowable state in the form of a sheet on a receiving surface.

Dkt. 65-17 at 2:51–65 (emphasis added). And that mass of thermoplastic that Debourg et al. actually discloses receiving is "in the form of granules, or in the form of a bar"—not in the form of a strand:

> The Space between the downstream face of piston 2 and the internal face of grid 4 constitute a reservoir intended to receive wax 11. The wax may be in the form of granules, or in the form of a bar preferably coated with a lubricant such as paraffin. In this latter form, the transverse cross-section of the wax bar corresponds substantially to the internal cross-section of casing 1.

Ex. 66 at 10:5–11.




*Id.*, Fig. 1 (annotated). As further shown by Figure 1 above, the received mass 11 (highlighted) is not in the form of a strand.

66. To try and make up for this efficiency, Dr. Osswald argues that "[a] POSITA would understand that **the most common form** of thermoplastic material in a solid state for use in this type of application is commonly a strand or pellets." Dkt. 35-21 at 6 (emphasis added). I do not necessarily agree with Dr. Osswald. However, even if a strand were one of the most common forms of thermoplastic material, it is my understanding that neither Harris nor Debourg et al. inherently disclose a strand because the material is not **necessarily** in the form of a strand.

67. Accordingly, Harris does not explicitly or inherently disclose "a port configured for introduction of a strand of feed stock into an internal volume of the housing." And even if Dr. Osswald had argued that it would have been obvious to combine Harris with Debourg et al. (which he did not), Debourg et al. does not explicitly or implicitly disclose these limitations either.

*c. Harris Does Not Disclose "a housing configured to fit in a user's hand and shaped to allow manipulation of the*

> *housing like a pen, . . . the housing having at least one cooling port extending between the internal volume and an ambient atmosphere"*

68. In my opinion, Harris also does not disclose "at least one cooling port extending between the internal volume and an ambient atmosphere, . . . the housing having at least one cooling port extending between the internal volume and an ambient atmosphere."

69. As an initial matter, Dr. Osswald fails to explain how or where allegedly discloses this specific "port." *See* Dkt. 35-21 at 3–7. Dr. Osswald instead argues that such a "port" is "inherently disclosed because "a cooling port is a **common device** to transfer or to dissipate heat." *Id.* at 5 (emphasis added). I do not necessarily agree with Dr. Osswald. However, even if a cooling port were a common device to transfer or dissipate heat, it is my understanding that Harris does not inherently disclose a cooling port because such a heat transfer device is not **necessarily** a cooling port.

70. Further, even if Dr. Osswald had demonstrated that Harris discloses "at least one cooling port extending between the internal volume and an ambient atmosphere," Dr. Osswald has not demonstrated that a "housing configured to fit in a user's hand and shaped to allow manipulation of the housing like a pen" has the "cooling port." For this disclosure, Dr. Osswald relies not on Harris' discussion of its pencil grip embodiment, but on Harris' discussion of U.S. Patent No. 6,460,731 to Estelle et al. *Compare* Dkt. 35-21 at 5, *with* Ex. 67 at 2:66–3:14. This passage from Harris says nothing about a "housing configured to fit in a user's hand and shaped to allow manipulation of the housing like a pen" having a device to transfer or dissipate heat:

> A controller includes different apparatus and methods for using the coil as a heater as well as providing other heat transfer devices on the dispensing valve to maintain a constant temperature either, during only the run mode or, during both, the run and the standby modes.

Dkt. 35-17 at 3:11–3:14. And the heat transfer devices discussed by Estelle at al.

are instead "mounted in a heat transfer relationship with [a] dispenser body" (Ex. 67 at 3:65–4:5), which is part of a "dispensing valve 33," which is "mounted on a fluid distribution manifold plate 45" (*id.* at 6:66–7:4) (highlighted below).



FIG. 1

*Id.*, Fig. 1 (annotated). In other words, Estelle does not even disclose "housing configured to fit in a user's hand and shaped to allow manipulation of the housing like a pen" having transfer or to dissipate heat—much less the required "port."

71. Accordingly, Harris does not explicitly or inherently disclose "a housing configured to fit in a user's hand and shaped to allow manipulation of the housing like a pen, . . . the housing having at least one cooling port extending

between the internal volume and an ambient atmosphere." And even if Dr. Osswald had argued that it would have been obvious to combine Harris with Estelle et al. (which he did not), Estelle et al. does not explicitly or implicitly disclose these limitations either.

*d. Harris Does Not Disclose "a gear train operatively coupled with the motor to drive the gear train, disposed within the internal volume to receive the strand of feed stock, and configured to move the strand of feed stock when engaged with the gear train"*

72. In my opinion, Harris also does not disclose "a gear train operatively coupled with the motor to drive the gear train, disposed within the internal volume to receive the strand of feed stock, and configured to move the strand of feed stock when engaged with the gear train."

73. Harris discloses that, for its pencil grip embodiment, "[t]he screw shaft 18 is driven by a motor 2 via reduction gearing 28" (annotated in pink below). *Id.* at 8:61–62. Plunger disc 16 (annotated in yellow below) travels up and down screw shaft 18 (annotated in green below) and "is supported on a guide rod 20" (annotated in red above). *Id.* at 6:59–61. **Motor 2 drives this plunger "through the cartridge, pushing the material to be dispensed out through the tip."** *Id.* at 4:8–10 (emphasis added).




*Id.*, Fig. 2 (annotated). In other words, Harris' "reduction gearing 28"—to the extent Dr. Osswald argues it is a "gear train" (with which I do not necessarily agree)—is used to turn "screw shaft 18," which pushes "plunger disc 16" down, pushing material out through the tip. Harris' "reduction gearing 28" is not "disposed within the internal volume **to receive [a] strand of feed stock**, and configured to **move the strand of feed stock when engaged with the gear train.**"

74. Dr. Osswald appears to try and cure this deficiency by—again—relying on Harris' discussion of the prior art, specifically its discussion of U.S. Patent No. 6,101,968 to Fitzgibbons (*compare* Dkt. 35-21 at 13, *with* Ex. 68 at 2:4–9). But this passage does not disclose "a gear train operatively coupled with the motor to drive the gear train, disposed within the internal volume to receive the strand of feed stock, and configured to move the strand of feed stock when engaged with the gear train":

> U.S. Pat. No. 6,101,968 (INNOVATIVE INJECTORS) discloses a motor and gear train driven by the motor, the train adapted to selectively engage a gear rack secured to the compression element to drive it down to squeeze the collapsible frosting container. When the train has moved

> into engagement, it closes a switch activating the motor.

Dkt. 35-17 at 2:4–9. What Fitzgibbons actually discloses is an electric motor 54 (highlighted below in green) that drives gear train 56 (highlighted below in pink). Ex. 68 (Fitzgibbons) at 2:17–22.




FIG.2

*Id.*, Fig. 2 (annotated). Electric motor 54 and gear train 60 can "drive[] down [] upward element 48" (highlighted below in blue) "to apply additional pressure as the pressure plate 40" (highlighted below in yellow) "lowers squeezing the container 26" (highlighted below in red) and "causing the bellows-like collapsible wall 28 to reduce in height." *Id.* at 2:62–3:8.




*Id.*, Fig. 1 (annotated). In other words, Fitzgibbons merely discloses a motor and gear train that are used to apply pressure on a plate—it does not disclose "a gear train . . . disposed within the internal volume to receive the strand of feed stock, and configured to move the strand of feed stock when engaged with the gear train."

75. Accordingly, Harris does not explicitly or inherently disclose "a gear train operatively coupled with the motor to drive the gear train, disposed within the internal volume to receive the strand of feed stock, and configured to move the

strand of feed stock when engaged with the gear train." And even if Dr. Osswald had argued that it would have been obvious to combine Harris with Fitzgibbons (which he did not), Fitzgibbons does not explicitly or implicitly disclose these limitations either.

*e. Harris Does Not Disclose "a nozzle assembly . . . at least partially within the housing"*

76. In my opinion, Harris also does not disclose "a nozzle assembly . . . at least partially within the housing."

77. Dr. Osswald argues that Harris' cylinder 8 is the housing. *See* Dkt. 35-21 at 14. Dr. Osswald also argues that Harris' tip retaining rim 22 is a nozzle assembly. *Id.* Dr. Osswald fails to explain how Harris discloses that Harris' tip retaining rim 22 is "partially within" cylinder 8." *See id.* at 14–18. This is likely because Harris does not do so.

78. I have reproduced below Figures 13 through 15 of Harris. Figures 13 and 14 show application retaining rim 22 and cylinder 8:




Dkt. 35-12, Figs. 13–15 (annotated). All that can be gleaned from these figures and the rest of Harris' disclosures is that tip retaining rim **surrounds** cylinder 8, as indicated by the green dashed lines added above—there is no disclosure that Harris' tip retaining rim 22 is "at least partially within" cylinder 8.

79. Accordingly, Harris does not explicitly or inherently disclose "a nozzle

assembly . . . at least partially within the housing."

*f. Harris Does Not Disclose "the nozzle assembly comprising an extruder, . . . the extruder having a heating element surrounded by an insulator"*

80. In my opinion, Harris also does not disclose "the nozzle assembly comprising an extruder, . . . the extruder having a heating element surrounded by an insulator."

81. Dr. Osswald appears to rely on Harris' discussion of two prior art references (Debourg et al. and Estelle et al.)—not Harris' own disclosure of its pencil grip embodiment—as allegedly disclosing these elements. *Compare* Dkt. 35-21 at 15 & 16, *with* Ex. 66 at 2:51–65 & 3:10–14. These disclosures from Harris are reproduced below:

> U.S. Pat. No. 5,980,144 (DEBOURG) discloses a hand held dispenser for thermoplastic material including a casing forming a manual holding element and enclosing a space for receiving a mass of thermoplastic material in a solid state, the casing having an open outlet end communicating with the space; a component for advancing the thermoplastic material toward the open end of the casing, and **a heating element for heating the thermoplastic material to a flowable state**, wherein the heating element has a low thermal inertia, is arranged in a substantially homogeneous manner across a surface disposed opposite the open end and having dimensions which correspond to dimensions of the open end and wherein the heating element further acts to distribute thermoplastic material in a flowable state in the form of a sheet on a receiving surface.
>
> U.S. Pat. No. 6,460,731 (ESTELLE) discloses an electrically operated fluid dispenser for dispensing a pattern of viscous fluid onto a substrate during a run mode. The dispenser is turned off and does not dispense the viscous fluid during a standby mode of operation. The dispenser includes a dispenser body having an outlet and an armature disposed in the dispenser body for movement between an opened position allowing a fluid flow from the outlet and a closed position preventing the fluid flow from the outlet. A coil is mounted adjacent the armature and selectively generates an electromagnetic field for moving the armature between the opened and closed positions. A controller includes different apparatus and methods for **using the coil as a heater** as well as providing other heat transfer devices on the dispensing valve to maintain a constant temperature either, during

> only the run mode or, during both, the run and the standby modes.

Dkt. 35-12 at 2:51–3:14 (emphasis added). Notably, these passages disclose only a "heating element" or a "heater," not an "**the nozzle assembly comprising an extruder** having a heating element **surrounded by an insulator**."

82. Accordingly, Harris does not explicitly or inherently disclose "the nozzle assembly comprising an extruder, . . . the extruder having a heating element surrounded by an insulator."

*g. Harris Does Not Disclose "[a] nozzle assembly comprising . . . a guide tube, . . . a first end of the guide tube positioned to receive the strand of feed stock from the gear train, a second end of the guide tube aligned with a chamber of the extruder such that the strand of feed stock is directed into the chamber, the extruder being disposed between the guide tube and the exit nozzle"*

83. In my opinion, Harris also does not disclose "[a] nozzle assembly comprising . . . a guide tube, . . . a first end of the guide tube positioned to receive the strand of feed stock from the gear train, a second end of the guide tube aligned with a chamber of the extruder such that the strand of feed stock is directed into the chamber, the extruder being disposed between the guide tube and the exit nozzle."

84. Dr. Osswald argues that Harris' "guide rod 20" is a "guide tube." Dkt. 35-21 at 15. As an initial matter, although a rod and tube can have the same cylindrical external shape, they are not necessarily the same: a rod is typically understood to be solid through its cross-section, while a tube has an empty cross-section.

| **Rod** | **Tube** |
| --- | --- |
|  |  |

85. Dr. Osswald's argument fails for additional reasons as well. Harris discloses that, for its pencil grip embodiment, "[t]he screw shaft 18 is driven by a motor 2 via reduction gearing 28" (annotated in pink below). *Id.* at 8:61–62. **Plunger disc 16** (annotated in yellow below) **travels up and down screw shaft 18** (annotated in green below) **and "is supported on a guide rod 20"** (annotated in red above). *Id.* at 6:59–61. Motor 2 drives this plunger "through the cartridge, pushing the material to be dispensed out through the tip." *Id.* at 4:8–10 (emphasis added).




Dkt. 35-17, Fig. 2 (annotated). Because Harris' guide rod 20 merely supports plunger disc 20, it does not satisfy the claim elements requiring "a first end of the guide tube **positioned to receive the strand of feed stock from the gear train, a second end of the guide tube aligned with a chamber of the extruder such that the strand of feed stock is directed into the chamber, the extruder being disposed between the guide tube and the exit nozzle.**"

86. Accordingly, Harris does not explicitly or inherently disclose "[a] nozzle assembly comprising . . . a guide tube, . . . a first end of the guide tube

positioned to receive the strand of feed stock from the gear train, a second end of the guide tube aligned with a chamber of the extruder such that the strand of feed stock is directed into the chamber, the extruder being disposed between the guide tube and the exit nozzle."

*h. Harris Does Not Disclose "permitting the user to draw in free space to form a three-dimensional object"*

87. In my opinion, Harris also does not disclose "permitting the user to draw in free space to form a three-dimensional object."

88. Dr. Osswald suggests that, in my opinion, the JER LP06, JER LP03 / 3D Pen Make, and JER RP800A / 3D Pen Artist satisfied these limitations "because extruded material dangles from the tip of the extruder[.]" Dkt. 35-21 at 18. That misrepresents my opinion.

89. While I agree that extruded material from the JER LP06, JER LP03 / 3D Pen Make, and JER RP800A / 3D Pen Artist may "dangle" from the tip of the extruder, this alone does not satisfy the limitation of "permitting the user to draw in free space to form a three-dimensional object." As discussed above in Section IV.A., the claim requires that the extruded material maintain its shape against gravity in free space to allow the user to create a freestanding structure.

90. WobbleWorks explicitly argued that what is disclosed by Harris does not disclose these limitations, disclaiming what Harris discloses:

> Similar to the glue applicator of Lee discussed above, the Young cake decorator 10 does not teach or otherwise suggest a "three-dimensional (3D) drawing device" that permits "the user to draw in free space to form a three-dimensional object," as recited in Claim 1. As similarly discussed with respect to Lee, **in operating Young's device cake frosting, when applied, is runny, separates easily, and does not immediately produce a freestanding 3D drawing or structure in a single, vertical stroke**.

Dkt. 35-5 at ECF p.322. Yet, what Harris discloses is precisely what WobbleWorks disclaimed, and does not disclose "immediately produc[ing] a freestanding 3D drawing or structure in a single, vertical stroke," for the same reasons discussed

above in Section IV.B.5.a for the phrase "[a] three dimensional (3D) drawing device, which I incorporate here by reference.

91. Accordingly, Harris does not explicitly or inherently disclose permitting the user to draw in free space to form a three-dimensional object."

6. <u>Harris Does Not Disclose All Limitations of Claim 1 of the '529 Patent</u>

92. In my opinion, Harris also does not disclose all limitations of Claim 1 of the '529 Patent.

*a. Harris Does Not Disclose "[a] three-dimensional (3D) drawing pen"*

93. In my opinion, Harris also does not disclose "[a] three-dimensional (3D) drawing pen" for the same reasons discussed above in Section IV.B.5.a for Claim 1 of the '444 Patent.

*b. Harris Does Not Disclose "a nozzle assembly . . . comprising an extruder having a heating element for melting the material"*

94. In my opinion, Harris also does not disclose "a nozzle assembly . . . comprising an extruder having a heating element for melting the material" for the same reasons discussed above in Section IV.B.5.f for Claim 1 of the '444 Patent.

*c. Harris Does Not Disclose "permitting the material to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object"*

95. In my opinion, Harris also does not disclose "permitting the material to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object" for the same reasons discussed above in Section IV.B.5.h for Claim 1 of the '444 Patent.

7. <u>Harris Does Not Disclose All Limitations of Claim 1 of the '549 Patent</u>

96. In my opinion, Harris also does not disclose all limitations of Claim 1 of the '549 Patent.

*a. Harris Does Not Disclose "[a] three-dimensional (3D) drawing pen that is configured to permit drawing in 3D space"*

97. In my opinion, Harris also does not disclose "[a] three-dimensional (3D) drawing pen that is configured to permit drawing in 3D space" for the same reasons discussed above in Section IV.B.5.a for Claim 1 of the '444 Patent.

*b. Harris Does Not Disclose "a port that permits insertion of a strand of material into the internal volume of the pen"*

98. In my opinion, Harris also does not disclose "a port that permits insertion of a strand of material into the internal volume of the pen" for the same reasons discussed above in Section IV.B.5.b for Claim 1 of the '444 Patent.

*c. Harris Does Not Disclose "a nozzle assembly . . . comprising an extruder . . . having a heating element configured to melt the strand such that the strand can enter into and be melted by the extruder"*

99. In my opinion, Harris also does not disclose "a nozzle assembly . . . comprising an extruder . . . having a heating element configured to melt the strand such that the strand can enter and be melted by the extruder" for the same reasons discussed above in Sections IV.B.5.f and IV.B.5.g for Claim 1 of the '444 Patent.

*d. Harris Does Not Disclose "caus[ing] the strand to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object"*

100. In my opinion, Harris also does not disclose "caus[ing] the strand to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object" for the same reasons discussed above in Section IV.B.5.h for Claim 1 of the '444 Patent.

8. <u>Harris Does Not Disclose All Limitations of Claim 1 of the '850 Patent</u>

101. In my opinion, Harris also does not disclose all limitations of Claim 1 of the '850 Patent.

*a. Harris Does Not Disclose "[a] three-dimensional (3D) drawing pen that is configured to permit drawing in 3D space"*

102. In my opinion, Harris also does not disclose "[a] three-dimensional (3D) drawing pen that is configured to permit drawing in 3D space" for the same reasons discussed above in Section IV.B.5.a for Claim 1 of the '444 Patent.

*b. Harris Does Not Disclose "a port that permits insertion of a strand of material into the internal volume of the pen"*

103. In my opinion, Harris also does not disclose "a port that permits insertion of a strand of material into the internal volume of the pen" for the same reasons discussed above in Section IV.B.5.b for Claim 1 of the '444 Patent.

*c. Harris Does Not Disclose "a rotatable gear disposed within the internal volume of the housing of the pen, the gear being configured to contact the strand when engaged with the gear within the housing of the pen"*

104. In my opinion, Harris also does not disclose "a port that permits insertion of a strand of material into the internal volume of the pen" for the same reasons discussed above in Section IV.B.5.d for Claim 1 of the '444 Patent.

*d. Harris Does Not Disclose "a motor . . . configured to . . . drive motion of the strand"*

105. In my opinion, Harris also does not disclose "a motor . . . configured to . . . drive motion of the strand." for the same reasons discussed above in Section IV.B.5.d for Claim 1 of the '444 Patent.

*e. Harris Does Not Disclose "a nozzle assembly . . . comprising an extruder . . . having a heating element configured to melt the strand, the extruder being disposed between the gear and the exit nozzle such that the strand can be driven into and melted by the extruder"*

106. In my opinion, Harris also does not disclose a nozzle assembly . . . comprising an extruder . . . having a heating element configured to melt the strand, the extruder being disposed between the gear and the exit nozzle such that the strand can be driven into and melted by the extruder" for the same reasons discussed above in Sections IV.B.5.f and IV.B.5.g for Claim 1 of the '444

Patent.

*f. Harris Does Not Disclose "caus[ing] the strand to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object"*

107. In my opinion, Harris also does not disclose "caus[ing] the strand to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object" for the same reasons discussed above in Section IV.B.5.h for Claim 1 of the '444 Patent.

9. <u>Harris Does Not Disclose All Limitations of Claim 1 of the '852 Patent</u>

108. In my opinion, Harris also does not disclose all limitations of Claim 1 of the '852 Patent.

*a. Harris Does Not Disclose "[a] three-dimensional (3D) drawing pen that is configured to permit the user to draw in free space to form a 3D object"*

109. In my opinion, Harris also does not disclose "[a] three-dimensional (3D) drawing pen that is configured to permit the user to draw in free space to form a 3D object" for the same reasons discussed above in Section IV.B.5.a for Claim 1 of the '444 Patent.

*b. Harris Does Not Disclose "a port that permits insertion of material into the internal volume of the housing"*

110. In my opinion, Harris also does not disclose "a port that permits insertion of material into the internal volume of the housing" for the same reasons discussed above in Section IV.B.5.b for Claim 1 of the '444 Patent. As discussed above, Harris discloses "plastic cartridge 10" which **is placed "[i]nside the cylinder 8"** and "can be filled with icing, glue, adhesive etc or any other semi-soft material for a particular application." *Id.* at 6:65–67 (emphasis added). Accordingly, Harris discloses placing a cartridge within cylinder 8, not the strand of material that is eventually extruded.

*c. Harris Does Not Disclose "a nozzle assembly . . . comprising . . . a heating element configured*

*to melt the material"*

111. In my opinion, Harris also does not disclose "a nozzle assembly . . . comprising . . . a heating element configured to melt the material" for the same reasons discussed above in Section IV.B.5.f for Claim 1 of the '444 Patent.

*d. Harris Does Not Disclose "permit[ting] the material to be extruded out of the exit nozzle for forming the 3D object" or "a three-dimensional (3D) drawing pen that is configured to permit the user to draw in free space to form a 3D object"*

112. In my opinion, Harris also does not disclose "permit[ting] the material to be extruded out of the exit nozzle for forming the 3D object" or "a three-dimensional (3D) drawing pen that is configured to permit the user to draw in free space to form a 3D object" for the same reasons discussed above in Section IV.B.5.h for Claim 1 of the '444 Patent.

10. <u>Conclusion on Anticipation</u>

113. In conclusion, it is my opinion that Harris does not anticipate the Asserted Claims because Harris does not disclose (1) all limitations of the Asserted Claims (*see supra* §§ IV.B.5–IV.B.9), or that such limitations are (2) arranged in the same way (*see supra* § IV.B.4).

**C. The Asserted Claims Are Not Obvious**

114. Dr. Osswald opines that the Asserted Claims are rendered obvious by the combination of Harris with U.S. Patent No. 8,663,533 to Swanson ("Swanson"). Osswald Decl., § XI.C (¶¶ 137–140).

115. I disagree with Dr. Osswald's opinion because (1) Dr. Osswald fails to explain why a POSITA would have been motivated to combine Harris with Swanson to arrive at the limitations of the Asserted Claims arranged in the same way, (2) the combination of Harris with Swanson does not disclose all limitations of the Asserted Claims arranged in the same way, and (3) Dr. Osswald failed to address secondary considerations of non-obviousness, which indicate that the

Asserted Claims were not obvious.

116. Due to the time-compressed nature of this analysis, I have not identified every reason why the combination of Harris and Swanson does not render the Asserted Claims obvious. I have selected what appear to me to be the most apparent reasons. I reserve the right to offer additional opinions related to why the combination of Harris and Swanson does not render the Asserted Claims obvious in the future.

1. Overview of Swanson

117. Swanson discloses a 3D printer, or what it calls "a fused deposition modeling system" 10. Dkt. 35-18 at 4:22–24. System 10 is used to build "3D part or model 24" (highlighted below in yellow) and "a corresponding support structure 26" (highlighted below in blue) "with part and support consumable materials (e.g., thermoplastic materials). *Id.* at 4:30–37.

*Id.*, Fig. 1.




*Id.*, Fig. 1 (annotated).

118. "Platen 14" (highlighted below in pink) "is a gantry-moveable platform on which 3D part 24 and support structure 26 are built, and moves along a vertical z-axis" (annotated below with a pink arrow) based on signals provided from a computer-operated controller . . . ." *Id.* at 4:45–48. "Gantry 16" (highlighted below in green) "is a guide-rail, gantry mechanism configured to move carriage 18" (annotated below in red) "in a horizontal x-y plane" (annotated below with green arrows) "based on signals provided from controller 28 . . . ." *Id.* at 4:59–61.



FIG. 1

*Id.*, Fig. 1 (annotated). "[C]arriage 18 is configured to receive one or more removable print heads, where the print heads are each configured to receive and melt successive portions of part and support material filaments." *Id.* at 5:19–23. "Carriage 18 is supported by gantry 16 for building 3D parts (e.g., 3D part 24) and corresponding support structure (e.g., support structure 26) on platen 14 in a layer-by-layer manner . . . ." *Id.* at 5:12–15.

2. <u>Dr. Osswald Identified No Motivation to Combine the Disclosures of Harris with Swanson in the Same Way as the Asserted Claims</u>

119. Dr. Osswald offers only the following opinion about why a POSITA would allegedly combine Harris with Swanson:

> "A person of ordinary skill in the art at the time of the invention would have been motivated to combine the teachings of Harris with the teachings of Swanson because there is explicit teaching in Harris to heat a mass of thermoplastics in a solid state and to extrude thermoplastic in flowable [sic] state out of an opening. Swanson teaches an extruder that heats thermoplastics

> and other materials and to extrude them out of an opening. Harris teaches that its handheld decorator can be used in many applications such as cake decorating, **craft applications**, woodworking, and construction. Craft application is a common application for three-dimensional printing. This combination requires no undue experimentation because the extrusion mechanism and property would be well known to a POSITA at the time of invention. Further, the combination would have yielded predictable results in light of what was known to the person of ordinary skill in the art at the time of the alleged invention claimed in the Asserted Patents."

Osswald Decl., ¶ 139 (emphasis in original). It is my understanding that obviousness requires a motivation not only to combine various disclosures from references, but to combine those disclosures in the same way as the claims. Here, Dr. Osswald (1) does not address the claim language, (2) does not identify what claim elements are missing from Harris, (3) does not identify what claim elements a POSITA would take from Swanson to apply to Harris, or (4) provide any explanation as to why a POSITA would have been motivated to take those specific claim elements from Swanson to apply them to Harris, or (5) provide any explanation as to why a POSITA would have been motivated to apply those specific elements to arrive at a combination with the same claim elements arranged in the same way.

120. In my review of the charts that supplement Dr. Osswald's opinions (*e.g.*, Dkts. 35-26–29), I identified no additional opinions from Dr. Osswald related to a POSITA's alleged motivations to combine, beyond what I identified above.

121. Accordingly, it is my opinion that Dr. Osswald has not provided a sufficient motivation for a POSITA to have combined Harris with Swanson to arrive at the Asserted Claims without application of hindsight. However, due to its importance to the obviousness inquiry, I identify specifically below how Dr. Osswald's opinions as to a POSITA's motivation to combine are deficient with respect to particular claim elements.

3. <u>Dr. Osswald Does Not (1) Identify Disclosures from Swanson that Would Allegedly Fix Disclosures Missing from Harris</u>

<u>and/or (2) Explain How Any Such Disclosures Would or Could Be Combined with Harris</u>

122. Dr. Osswald states that he has "provided limitation-by-limitation claim charts attached as Exhibits 26-29 to demonstrate how Harris in combination with Swanson teaches each and every limitation of at least Claim 1 of each of the '444 Patent, the '850 Patent, the '852 Patent, and the '819 Patent." Osswald Decl., ¶ 140. Based on my review, it appears that Dr. Osswald intended instead to refer to Exhibits 25–28.

123. I have reviewed Exhibits 25–28 (Dkts. 35-26–29). In my opinion, these exhibits fail to demonstrate how the combination of Harris and Swanson would render the Asserted Claims obvious, at least because Dr. Osswald does not (1) identify disclosures from Swanson that would allegedly fix disclosures missing from Harris and/or (2) explain how any such disclosures would or could be combined with Harris.

*a. Dr. Osswald Fails to Explain How a POSITA Would Have Been Motivated to Combine Harris with Swanson to Arrive at Claim 1 of the '444 Patent*

124. **"[a] three-dimensional (3D) drawing device".** I discussed above in Section IV.B.5.a why Harris does not disclose "[a] three-dimensional (3D) drawing device," and I incorporate that analysis here by reference.

125. Dr. Osswald fails to identify any disclosure from Swanson as allegedly meeting these elements. *See* Dkt. 35-26 at 1–3. Accordingly, Dr. Osswald failed to offer any opinion that a POSITA would have been motivated to combine Harris and Swenson to arrive at these specific limitations arranged in the same way.

126. **"a port configured for introduction of a strand of feedstock into an internal volume of the housing".** I discussed above in Section IV.B.5.b why Harris does not disclose "a port configured for introduction of a strand of feed stock into an internal volume of the housing," and I incorporate that analysis here by reference.

127. Dr. Osswald argues that Swanson discloses "a strand of feed stock (e.g., filament), and a port configured for introduction of a strand of feed stock (e.g., guide tube ports 258, 260)." Dkt. 35-26 at 7. Dr. Osswald also reproduces Figure 15, which I have reproduced below with yellow highlighting to indicate where guide tube ports 258 and 260 are located.




Dkt. 35-18, Fig. 15 (annotated).

128. Dr. Osswald offers no opinion about (1) how specifically a POSITA would have applied Swanson's disclosure of its guide tube ports 258 and 260 to Harris's pencil grip embodiment or (2) why a POSITA would have been motivated to do so. Accordingly, Dr. Osswald failed to explain why a POSITA would have been motivated to combine Harris and Swenson to arrive at these specific limitations arranged in the same way.

129. **"a housing configured to fit in a user's hand and shaped to allow manipulation of the housing like a pen, . . . the housing having at least one cooling port extending between the internal volume and an ambient atmosphere".** I discussed above in Section IV.B.5.c why Harris does not disclose "a housing configured to fit in a user's hand and shaped to allow manipulation of the housing like a pen, . . . the housing having at least one cooling port extending between the internal volume and an ambient atmosphere," and I incorporate that analysis here by reference.

130. Dr. Osswald argues that Swanson discloses "a cooling port (e.g., vents 62b) . . . ." Dkt. 35-26 at 7. Dr. Osswald also reproduces Figure 15, which I have reproduced below with yellow highlighting to indicate where vents 62b are located.



FIG. 15

Dkt. 35-18, Fig. 15 (annotated).

131. Dr. Osswald offers no opinion about (1) how specifically a POSITA would have applied Swanson's disclosure of its vents 62b to Harris's pencil grip embodiment or (2) why a POSITA would have been motivated to do so. Accordingly, Dr. Osswald failed to explain why a POSITA would have been motivated to combine Harris and Swenson to arrive at these specific limitations arranged in the same way.

132. **"a gear train operatively coupled with the motor to drive the gear train, disposed within the internal volume to receive the strand of feed stock, and configured to move the strand of feed stock when engaged with the gear train".** I discussed above in Section IV.B.5.d why Harris does not disclose "a gear train operatively coupled with the motor to drive the gear train, disposed within the internal volume to receive the strand of feed stock, and configured to move the strand of feed stock when engaged with the gear train," and I incorporate that analysis here by reference.

133. Dr. Osswald does not identify any disclosures from Swanson when discussing these particular claim limitations. See Dkt. 35-26 at 17–18. Dr. Osswald does argue elsewhere, however, that Swanson discloses that "'[g]ear 284 correspondingly engages drive mechanism 290 to feed successive portions of the part material filament through drive block 295 and liquefier assembly 294.'" Dkt. 35-26 (quoting Dkt. 35-18 at 23:41–43).

134. Dr. Osswald offers no opinion about (1) how specifically a POSITA would have applied Swanson's disclosure of its drive mechanism 290 or drive block 295 to Harris's pencil grip embodiment or (2) why a POSITA would have been motivated to do so. Accordingly, Dr. Osswald failed to explain why a POSITA would have been motivated to combine Harris and Swenson to arrive at these specific limitations arranged in the same way.

135. **"a nozzle assembly . . . at least partially within the housing".** I discussed above in Section IV.B.5.e why Harris does not disclose "a nozzle assembly . . . at least partially within the housing," and I incorporate that analysis here by reference.

136. Dr. Osswald does not argue that Swanson discloses these limitations. *See* Dkt. 35-26 at 18–23. Accordingly, Dr. Osswald also does not argue (1) how specifically a POSITA would have applied any particular disclosure from Swanson to Harris's pencil grip embodiment or (2) why a POSITA would have been

motivated to do so. Accordingly, Dr. Osswald failed to (1) show that the combination of Harris and Swanson could teach these limitations or (2) explain why a POSITA would have been motivated to combine Harris and Swenson to arrive at these specific limitations arranged in the same way.

137. **"the nozzle assembly comprising an extruder, . . . the extruder having a heating element surrounded by an insulator".** I discussed above in Section IV.B.5.f why Harris does not disclose "the nozzle assembly comprising an extruder, . . . the extruder having a heating element surrounded by an insulator," and I incorporate that analysis here by reference.

138. Dr. Osswald does not argue that Swanson discloses these limitations. *See* Dkt. 35-26 at 18–23. Accordingly, Dr. Osswald also does not argue (1) how specifically a POSITA would have applied any particular disclosure from Swanson to Harris's pencil grip embodiment or (2) why a POSITA would have been motivated to do so. Accordingly, Dr. Osswald failed to (1) show that the combination of Harris and Swanson could teach these limitations or (2) explain why a POSITA would have been motivated to combine Harris and Swenson to arrive at these specific limitations arranged in the same way.

139. **"[a] nozzle assembly comprising . . . a guide tube, . . . a first end of the guide tube positioned to receive the strand of feed stock from the gear train, a second end of the guide tube aligned with a chamber of the extruder such that the strand of feed stock is directed into the chamber, the extruder being disposed between the guide tube and the exit nozzle".** I discussed above in Section IV.B.5.g why Harris does not disclose "[a] nozzle assembly comprising . . . a guide tube, . . . a first end of the guide tube positioned to receive the strand of feed stock from the gear train, a second end of the guide tube aligned with a chamber of the extruder such that the strand of feed stock is directed into the chamber, the extruder being disposed between the guide tube and the exit nozzle," and I incorporate that analysis here by reference.

140. Dr. Osswald does not argue that Swanson discloses these limitations. *See* Dkt. 35-26 at 18–23. Accordingly, Dr. Osswald also does not argue (1) how specifically a POSITA would have applied any particular disclosure from Swanson to Harris's pencil grip embodiment or (2) why a POSITA would have been motivated to do so. Accordingly, Dr. Osswald failed to (1) show that the combination of Harris and Swanson could teach these limitations or (2) explain why a POSITA would have been motivated to combine Harris and Swenson to arrive at these specific limitations arranged in the same way.

141. **"permitting the user to draw in free space to form a three-dimensional object".** I discussed above in Section IV.B.5.h why Harris does not disclose "permitting the user to draw in free space to form a three-dimensional object," and I incorporate that analysis here by reference.

142. Dr. Osswald does not argue that Swanson discloses these limitations. *See* Dkt. 35-26 at 18–23. Accordingly, Dr. Osswald also does not argue (1) how specifically a POSITA would have applied any particular disclosure from Swanson to Harris's pencil grip embodiment or (2) why a POSITA would have been motivated to do so. Accordingly, Dr. Osswald failed to (1) show that the combination of Harris and Swanson could teach these limitations or (2) explain why a POSITA would have been motivated to combine Harris and Swenson to arrive at these specific limitations arranged in the same way.

*b. Dr. Osswald Fails to Explain How a POSITA Would Have Been Motivated to Combine Harris with Swanson to Arrive at Claim 1 of the '529 Patent*

143. Dr. Osswald did not provide any chart purporting to demonstrate that the combination of Harris with Swanson renders Claim 1 of the '529 Patent obvious. If he had, however, the following opinions should apply.

144. **"[a] three-dimensional (3D) drawing pen".** I discussed above in Section IV.B.5.a why Harris does not disclose "[a] three-dimensional (3D) drawing pen," and I incorporate that analysis here by reference. For the same reasons

discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious..

145. **"a nozzle assembly . . . comprising an extruder having a heating element for melting the material".** I discussed above in Section IV.B.5.f why Harris does not disclose "a nozzle assembly . . . comprising an extruder having a heating element for melting the material," and I incorporate that analysis here by reference. For the same reasons discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious.

146. **"permitting the material to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object".** I discussed above in Section IV.B.5.h why Harris does not disclose "**permitting the material to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object**," and I incorporate that analysis here by reference. For the same reasons discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious.

*c. Dr. Osswald Fails to Explain How a POSITA Would Have Been Motivated to Combine Harris with Swanson to Arrive at Claim 1 of the '549 Patent*

147. **"[a] three-dimensional (3D) drawing pen that is configured to permit drawing in 3D space".** I discussed above in Section IV.B.5.a why Harris does not disclose "[a] three-dimensional (3D) drawing pen that is configured to permit drawing in 3D space," and I incorporate that analysis here by reference. For the same reasons discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious.

148. **"a port that permits insertion of a strand of material into the internal volume of the pen".** I discussed above in Section IV.B.5.b why Harris

does not disclose "a port that permits insertion of a strand of material into the internal volume of the pen," and I incorporate that analysis here by reference. For the same reasons discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious.

149. **"a nozzle assembly . . . comprising an extruder . . . having a heating element configured to melt the strand such that the strand can enter into and be melted by the extruder".** I discussed above in Section IV.B.5.f why Harris does not disclose "a nozzle assembly . . . comprising an extruder . . . having a heating element configured to melt the strand such that the strand can enter into and be melted by the extruder," and I incorporate that analysis here by reference. For the same reasons discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious.

150. **"caus[ing] the strand to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object".** I discussed above in Section IV.B.5.h why Harris does not disclose "caus[ing] the strand to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object," and I incorporate that analysis here by reference. For the same reasons discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious.

*d. Dr. Osswald Fails to Explain How a POSITA Would Have Been Motivated to Combine Harris with Swanson to Arrive at Claim 1 of the '850 Patent*

151. **"[a] three-dimensional (3D) drawing pen that is configured to permit drawing in 3D space".** I discussed above in Section IV.B.5.a why Harris does not disclose ""[a] three-dimensional (3D) drawing pen that is configured to permit drawing in 3D space," and I incorporate that analysis here by reference. For

the same reasons discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious.

152. **"a port that permits insertion of a strand of material into the internal volume of the pen".** I discussed above in Section IV.B.5.b why Harris does not disclose "a port that permits insertion of a strand of material into the internal volume of the pen," and I incorporate that analysis here by reference. For the same reasons discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious.

153. **"a rotatable gear disposed within the internal volume of the housing of the pen, the gear being configured to contact the strand when engaged with the gear within the housing of the pen".** I discussed above in Section IV.B.5.d why Harris does not disclose "a rotatable gear disposed within the internal volume of the housing of the pen, the gear being configured to contact the strand when engaged with the gear within the housing of the pen," and I incorporate that analysis here by reference. For the same reasons discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious.

154. **"a motor . . . configured to . . . drive motion of the strand".** I discussed above in Section IV.B.5.d why Harris does not disclose "a motor . . . configured to . . . drive motion of the strand," and I incorporate that analysis here by reference. For the same reasons discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious.

155. **"a nozzle assembly . . . comprising an extruder . . . having a heating element configured to melt the strand, the extruder being disposed between the gear and the exit nozzle such that the strand can be driven into**

**and melted by the extruder".** I discussed above in Section IV.B.5.f why Harris does not disclose "a nozzle assembly . . . comprising an extruder . . . having a heating element configured to melt the strand, the extruder being disposed between the gear and the exit nozzle such that the strand can be driven into and melted by the extruder," and I incorporate that analysis here by reference. For the same reasons discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious.

156. **"caus[ing] the strand to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object".** I discussed above in Section IV.B.5.h why Harris does not disclose "caus[ing] the strand to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object," and I incorporate that analysis here by reference. For the same reasons discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious.

##### *e. Dr. Osswald Fails to Explain How a POSITA Would Have Been Motivated to Combine Harris with Swanson to Arrive at Claim 1 of the '852 Patent*

157. **"[a] three-dimensional (3D) drawing pen that is configured to permit the user to draw in free space to form a 3D object".** I discussed above in Section IV.B.5.a why Harris does not disclose ""[a] three-dimensional (3D) drawing pen that is configured to permit the user to draw in free space to form a 3D object," and I incorporate that analysis here by reference. For the same reasons discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious.

158. **"a port that permits insertion of material into the internal volume of the housing".** I discussed above in Section IV.B.5.b why Harris does not disclose "a port that permits insertion of material into the internal volume of the housing," and I incorporate that analysis here by reference. For the same reasons

discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious.

159. **"a nozzle assembly . . . comprising . . . a heating element configured to melt the material".** I discussed above in Section IV.B.5.f why Harris does not disclose "a nozzle assembly . . . comprising . . . a heating element configured to melt the material," and I incorporate that analysis here by reference. For the same reasons discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious.

160. **"permit[ting] the material to be extruded out of the exit nozzle for forming the 3D object"** or **"a three-dimensional (3D) drawing pen that is configured to permit the user to draw in free space to form a 3D object".** I discussed above in Section IV.B.5.h why Harris does not disclose "permit[ting] the material to be extruded out of the exit nozzle for forming the 3D object" or "a three-dimensional (3D) drawing pen that is configured to permit the user to draw in free space to form a 3D object," and I incorporate that analysis here by reference. For the same reasons discussed above in Section IV.C.3, Dr. Osswald fails to demonstrate how any combination of Harris and Swanson renders these claim elements obvious.

4. Dr. Osswald Did Not Consider Secondary Considerations of Non-Obviousness

161. I understand that, to determine whether a claim is obvious in view of the prior art, a POSITA must consider secondary considerations of non-obviousness. I observe that Dr. Osswald did not do so. *See* Osswald Decl., ¶¶ 137–40. For this additional reason, it is my opinion that Dr. Osswald has failed to demonstrate that the Asserted Claims would have been obvious in view of the combination of Harris and Swanson.

162. Analyzing secondary considerations of non-obvious based on

information already of record, however, further demonstrates that the Asserted Claims are not obvious. I discuss these considerations below. I note that, based on the Declaration of Maxwell Bogue regarding WobbleWorks' own products, there is a nexus between these considerations and the claimed inventions:

> At a high level, these claims cover 3D printing pens that a user is able to grip directly with their hand and—while holding the pen itself—use the fingers on that hand to operate actuators that control a motor/gear train within the pen. That motor/gear train pulls filament through a rear opening and—via a guide tube—pushes it to a nozzle assembly at the front of the pen that has an insulated heating element, where the heated filament is ultimately expelled from the tip of the pen. I will refer to these features as the "Claimed Features."[] Using a 3D printing pen with the claimed features, the user is able to move the pen through the air using their hand, while using that same hand to also operate the actuators to control the motor/gear train (and thus the speed at which filament leaves the tip of the pen). The pen leaves behind a trail of filament that quickly cools into a solid plastic, allowing a user to have complete control over the 3D drawing process with a single hand.

Dkt. 18-1 (Bogue Decl.), ¶ 6 (footnote omitted); *see also*, *e.g.*, ¶¶ 7–10 (discussing customer demand for the Claimed Features, the importance of the Claimed Features, and WobbleWorks' licensing policy). Additionally, as I noted in my March 3, 2026 Declaration, it is my opinion that WobbleWorks' products practice the Asserted Claims. Dkt. 18-3, § V (¶¶ 67–72).

### *a. Long-felt But Unmet Need*

163. The Asserted Patents, after describing the field and related art, note that "[i]t is desirable to provide a reliable, easily refillable hand-held device to form 2D and 3D items without the need for computerized design files" and that "[t]he present disclosure describes a hand-held device that allows a user to 'draw' a 3D structure with a feed stock that can be replenished while in continuous use." *E.g.*, Ex. 4 at 1:49–54. The Asserted Claims' solution to this long-felt but unmet need further demonstrates that the Asserted Claims are not obvious.

### *b. Commercial Success*

164. WobbleWorks has enjoyed commercial success from selling its own products covered by the Asserted Claims. *E.g.*, Dkt. 18-1 (Bogue Decl.), ¶ 8, 29.a, 29.d. The fact that the Practicing Products have generated commercial success for WobbleWorks further demonstrates that the Asserted Claims are not obvious.

*c. Praise of the Invention by Others*

165. WobbleWorks has won numerous industry awards based on its Practicing Products. *See* Dkts. 18-16–21 (Exhibits 13–18). The fact that others in the industry have praised WobbleWorks' inventions further demonstrates that the Asserted Claims are not obvious.

*d. The Taking of Licenses Under the Patent by Others*

166. WobbleWorks receives on the order of 100 requests to license its patents, including patents covering the Claimed Features, annually. Dkt. 18-1 (Bogue Decl.), ¶ 9. The fact that WobbleWorks fields so many licensing requests further demonstrates that the Asserted Claims are not obvious.

*e. Deliberate Copying of the Invention*

167. It is my understanding that Guangzhou JER began manufacturing 3D printing pens after WobbleWorks invented and brought the Practicing Products to market, and that MyFirst began reselling those 3D printing pens later. To the extent Guangzhou JER or MyFirst deliberately copied WobbleWorks' Practicing Products, this further demonstrates that the Asserted Claims are not obvious.

5. <u>Conclusion on Non-Obviousness</u>

168. In view of the foregoing, it is my opinion that the Asserted Claims are not obvious in view of the combination of Harris and Swanson.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 30, 2026.

Dated: March 30, 2026 By: ______________________