# EXHIBIT 69

Europäisches Patentamt
European Patent Office
Office européen des brevets

European Patent Office
80298 MUNICH
GERMANY

**Questions about this communication?**
Contact Customer Services at www.epo.org/contact

Keltie LLP
No. 1 London Bridge
London SE1 9BA
ROYAUME UNI

**Formalities officer**
Gibaud, Ludivine

| Date | |
|---|---|
| | 22.12.2025 |

| Reference | OPPO 02 | Application No./Patent No. |
|---|---|---|
| S79795EP/JBE | | 13861105.8 - 1014 / 2928672 |
| Applicant/Proprietor | | |
| WobbleWorks, Inc. | | |

**BRIEF COMMUNICATION**

Subject:
- ☐ Your letter of
- ☐ Our telephone conversation of
- ☐ Communication of
- ☒ Interlocutory decision in opposition proceedings (Art. 101(3)(a) and 106(2) EPC)

Enclosure(s):
- ☐ Letter from the proprietor of the patent of
- ☐ Letter from the opponent of
- ☒ Copy (copies) EPA/EPO/OEB Formblatt/Form/Formulaire 2327

Communication:

All annexes to the letter as well as the consolidated list of all opposition citations are available for inspection via the European Patent Register at **www.epo.org/register.** Should you wish to receive these documents in paper format, they will be supplied to you free of charge if specifically requested on receipt of this communication (OJ EPO 2022, A28).

☐

**For the Opposition Division**

Europäisches Patentamt • European Patent Office • Office européen des brevets

☐ **Registered letter**

Europäisches Patentamt
European Patent Office
Office européen des brevets

European Patent Office
Postbus 5818
2280 HV Rijswijk
NETHERLANDS
Tel: +31 70 340 2040

Keltie LLP
No. 1 London Bridge
London SE1 9BA
ROYAUME-UNI

**Formalities Officer**
Name: Gibaud, Ludivine
Tel: +31 70 340 - 4804
or call
+31 (0)70 340 45 00

| Application No. / Patent No. | Ref. | Date |
|---|---|---|
| 13 861 105.8 - 1014 / 2 928 672 / 02 | S79795EP/JBE | 22.12.2025 |
| Proprietor<br>WobbleWorks, Inc. | | |

**Interlocutory decision in Opposition proceedings (Art. 101(3)(a) and 106(2) EPC)**

The Opposition Division - at the oral proceedings dated 19.09.2025 - has decided:

**Account being taken of the amendments made by the patent proprietor during the opposition proceedings, the patent and the invention to which it relates are found to meet the requirements of the Convention.**

The reasons for the decision are enclosed.

Documents for the maintenance of the patent as amended:

**Auxiliary Request 1**

**Description, Paragraphs**

| | | |
|---|---|---|
| 1-8, 10-14, 16-22, 24-29, 31-42 | of the patent specification | |
| 9, 15, 23, 30 | filed during Oral proceedings on | 18-09-2025 |

**Claims, Numbers**

| | | |
|---|---|---|
| 1 | filed during Oral proceedings on | 18-09-2025 |

**Drawings, Sheets**

| | |
|---|---|
| 1/4-4/4 | of the patent specification |

**Possibility of appeal**
This decision is open to appeal according to Article 106(2) EPC. Attention is drawn to the attached text of Articles 106 to 108 and Rules 97 to 98 EPC.

**Opposition Division:**

| | |
|---|---|
| **Chairman:** | Didenot, Benjamin |
| **2nd Examiner:** | Öztürk, Serkan |
| **1st Examiner:** | Curt, Denis |
| **Legal Member:** | Kley, Britta |

Gibaud, Ludivine
**Formalities Officer**
Tel. No.: +31 70 340-4804 **Branch at The Hague**

Enclosure(s): 33 page(s) reasons for the decision (Form 2916)
Wording of Art. 106 - 108 and R. 97 - 98 EPC (Form 2019)
Documents relating to the amended text
Minutes of oral proceedings

to EPO postal service: 17.12.25

1 **Facts and Submissions**

European patent 2 928 672 having the title "HAND-HELD THREE-DIMENSIONAL DRAWING DEVICE" is based upon European patent application No. 13 861 105.8 filed on 20-09-2013. It claims priority of US 201261733689 filed on 05-12-2012 and US201313831050 filed on 2013-03-14.

The mention of the grant of the patent has been published in the European Patent Bulletin of 30-03-2022. Proprietor of the patent is
WobbleWorks, Inc.
1209 Orange Street
Wilmington DE 19801
US.

2 Notice of opposition has been filed by
Opponent 1:
Shenzhen Xinpinyi International
e-Commerce Ltd. Co.
No.39 Bulong Road, Ma'antang Neighborhood
Bantian Subt-District
Longgang District
Shenzhen Guangdong 518000
CN
on 02-01-2023 and 03-01-2023.

Opponent O1 paid the opposition fee on 02-01-2023 and requested revocation of the patent in its entirety based on Article 100(c) EPC, 100(b) EPC and 100(a) EPC.

3 On 25-10-2023, the proprietor replied to the notice of opposition and requested that the opposition be rejected as inadmissible. As an auxiliary measure it was requested (i) not to admit O1's arguments under Article 100(a) EPC in conjunction with Article 54 respectively Article 56 EPC, to reject the opposition as unallowable and to maintain the patent as granted. As a further auxiliary measure the proprietor requested oral proceedings. In support of their arguments the proprietor submitted D47 – D54.

4 On 30-04-2024,

my First Tech Asia Pte. Ltd.,

31 Woodlands Close #01-22 Woodlands Horizon Singapore

737855 Singapore

(SG)

(hereinafter O2) filed a notice of intervention, paid the opposition fee and requested the patent to be revoked in its entirety in view of Article 100(c) EPC and Article 100(a) EPC In support of their arguments O2 submitted documents D2-D46 (with the exception D40t and D46t). They also offer to hear Mr. Xun Zhang as witness to confirm that the pen described in D26 had been offered for sale and was open to inspection to members of the public before 7 March 2013. On 13-06-2024 O2 also submitted a notarised written statement by Mr. Xun Zhang and a translation thereof

5 On 5-07-2024 the opposition division was enlarged with a legally qualified member under Article 19(2) EPC.

6 On 17-09-2024, the opposition division communicated its preliminary opinion to the parties and invited them to attend oral proceedings on 18-09-2025.

7 On 22-04-2025, the proprietor confirmed their previous request and also filed fifty six (56) auxiliary requests.

8 On 22-04-2025, O2 further argued on the grounds of Article 100(c) EPC and reiterated their requests to allow Mr Xhun Zhang to testify with respect to the public availability of the 3D drawing pen described in D26.

9 On 18-07-2025, O1 further argued on Article 100(c) EPC, 100(a) ,100 (b) EPC and about admissibility.

10 On 18-07-2025, O2 gave its opinion about the auxiliary requests (more particularly about the request 1, 39, 45 and 51) and their admissibility.

11 On 18-07-2025, the proprietor filed further requests 57-62 and maintained their request to dismiss both the opposition and intervention as being inadmissible.

12 On 02-09-2025, third party observation were filed along with additional patent documents.

13 On 16-09-2025, the proprietor maintained their request to maintain the patent as granted or according to one of the auxiliary requests. The proprietor also requested not to take the third party observations into account.

14 On 17-09-2025, O1 commented on the proprietor submission of 16-09-2025

15 The oral proceedings took place on 18th and 19th of September 2025.

16 The following decision is based on the first auxiliary request filed during oral proceedings and a corresponding adapted description filed on 19-09-2025.

**Reasons for the decision**

17 **Admissibility of the opposition of O1/pending procedure**

The patent proprietor requested the opposition to be rejected as inadmissible because the opposition period lapsed at the end of 2 January 2023 and the notice of opposition was not fully received by the EPO on that day; especially the authorising signature was not submitted within the opposition period. With regard to T 858/18 the proprietor argued that it was not clear at the end of the opposition period whether a mere draft of a notice of opposition was submitted or a final document. Especially in proceedings where representation was mandatory, which is the case for O1 in the present proceedings, the authorising signature was not just a formal issue but a condition for validity.

The opposition division does not share this view. Rule 50(3) EPC provides that signatures on documents that should be signed but are not, can be submitted later on. The Rules of the EPC explicitly allow a later authorisation of such documents. According to standing case law this includes signatures on notices of opposition (see e.g. T 2317/13, T 2061/12, T 1644/10 and T 665/89; T 2307/15 pt. 2.3 of the reasons even separates T 858/18 as “isolated decision in an individual case”). However, Rule 50(3) EPC may allow to authorise submissions in the aftermath, but it does not allow to delay the lapse of the opposition period. In the present case O1’s representative explicitly authorised on 30 March 2023 also the 20 pages of the notice of opposition submitted on 2 January 2023 as a full notice of opposition. In the preliminary opinion of the opposition division these 20 pages fulfil all requirements set out in Rule 76 EPC for a valid notice of opposition. Even though only the grounds of opposition under Article 100(c) EPC in conjunction with Article 123(2) EPC and under Article 100(b) EPC in conjunction with Article 83 were raised and at least to a certain extent substantiated before lapse of the opposition period, this suffices for admissibility of the opposition on these grounds. The further grounds of opposition filed with pages 21-55 of the notice of opposition seem to have been filed late. They should only be considered by the division if their content should become relevant.

The division therefore regards the opposition of O1 as admissible and opposition proceedings pending.

18 **Admissibility of the intervention of O2**

The proprietor requested the intervention not to be admitted because the opposition proceedings were not admissibly started when the intervention was filed.

As the opposition division is of the opinion that the first part of O1's notice of opposition was duly received and authorised in accordance with Rule 50(3) EPC, opposition proceedings were pending when O2 filed their notice of intervention. After O2 had withdrawn their request to exclude Annex A1 of their notice of intervention submitted on 30-04-2024 from file inspection, the intervention also clearly complies with all requirements set out in Article 105(1)(a) EPC. The intervention of O2 is therefore admissible.

## 19 Priority

### 19.1 Formal aspects

Both opponents argue that the contested patent is formally not entitled to the priorities, because the priority applications and the PCT application from which the contested patent derives were filed in the names of different applicants and the available written assignment data does not prove that the first applicant transferred the right in the priority application to the applicant of the subsequent PCT application before the filing of the subsequent application. Meanwhile G 1/22 and G 2/22 issued and were referred to by the proprietor. G 1/22 and G 2/22 clearly state that the transfer of the priority right is to be assessed under the autonomous law of the EPC (pt. 85 of the reasons). The EPC does not impose any formal requirements for the transfer of the priority right (pt. 86 of the reasons). This means that the EPC does not require written assignment data to honour the assignment of the priority rights and that the assignment data deposited with the USPTO is incomplete is irrelevant under the EPC. In addition, there is a rebuttable presumption under the EPC that the applicant claiming priority in accordance with Article 88(1) EPC and the corresponding Implementing Regulations is entitled to claim priority (headnote 1). In the present case these requirements have not been challenged by the opponent and the division has no reason to doubt that they are fulfilled.

The parties chose not to further discuss this point during the oral proceedings.

The opposition division considers that the contested patent is formally entitled to both of its priorities.

19.2 **Substantive aspect**

Moreover, the opposition division is of the opinion that the substantive requirements of priority are automatically respected with a view to the latest priority (Document D3) because the description of D3 and of the patent as filed are identical: therefore a set of claims allowable under Article 123 (2) EPC also enjoys the priority of 14-03-2013.

For the first priority (document D2), both opponents argued that the granted claim cannot enjoy the earliest priority (D2) at least because the feature of the insulator is not mentioned in D2.

The proprietor purports that these arguments are late-filed but does not provide substantive arguments.

The opposition division is of the opinion that the granted claim 1 cannot enjoy the earliest priority date since the earliest priority D2 does not describe the feature of the insulator.

20 **Main request**

20.1 **Article 100(C) EPC**

Claim 1 as granted reads (feature in bold correspond to amendment with respect to the originally filed claim 1)

A three-dimensional (3D) drawing device comprising:

a housing (110) configured to **be held in a user's hand, the housing having a first end and a second end,**

wherein the device comprises

**a port (115) configured for introduction of a strand of feed stock (20) into an internal volume (116) of the housing (110);**

a motor (152) disposed within **the internal volume (116);**

a gear train (150) **operatively coupled with the motor (152) to drive the gear train (150)**, disposed within **the internal volume (116) to receive the strand** of feed stock (20), and configured **to move the strand** of feed stock (20) when engaged with the gear train (150);

**an actuator configured to selectably cause the motor (152) to rotate in at least a first direction that causes the feed stock (20) to be extruded out of the exit nozzle to form a three-dimensional object; and**

a nozzle assembly (130) **disposed at the first end of the housing (110)** and at least partially within the housing (110), **the nozzle assembly (130) comprising an extruder (132)**, an exit nozzle (133A), **and a guide tube (134),**

**characterized by the extruder (132) having a heating element surrounded by an insulator (131), the guide tube (134) extending between the gear train (150) and the extruder (132), a first end of the guide tube (134) positioned to receive the strand of feed stock (20) from the gear train (150), a second end of the guide tube (134) aligned with a chamber (135) of the extruder (132) such that the strand of feed stock (20) is directed from the guide tube (134) into the chamber (135), the extruder (132) being disposed between the guide tube (134) and the exit nozzle (133A).**

In their notice of opposition, the opponents argued essentially that granted claim 1 had been amended to be a 3D drawing device using a strand of feed stock . This aspect was only described in the original application in combination with the first embodiment of figure 1-4B. Since the claim 1 had only been amended to include some of the features of this embodiment while failing to include all the other features the subject matter of claim 1 constituted an unallowable intermediate generalisation in view of all these missing features.

Both in the notice of opposition and during the oral proceedings, the opponents mentioned a list of features such as the shape of the housing being "pen-like", the "cooling aspect", the transport of the feed stock, the features of the insulator, the internal volume, the features related to the motor (see the full list of the discussed features hereunder) which, according to the opponents, were only disclosed in combination with the "strand" embodiment and inextricably linked with this embodiment.

In their written and oral submission, the proprietor referred to the original claim wording, to paragraph 6 as well as paragraph 41 to justify the introduction of the features in their "general" wording and argued that the introduction of the other features were not essential or not linked inextricably with the features which had been added to claim 1.

**Opposition division**

The opposition division is of the current opinion that claim 1 as granted does not fulfil the requirement of Article 123 (2) EPC.

Claim 1 is not a combination of original claims. This does not seem to be disputed by the parties.

The question that needs to be answered is whether there is basis in the application as filed for the current feature combination in claim 1. As pointed out by the proprietor, the question is whether the skilled person would derive the current subject matter directly and unambiguously from the whole application as filed ("Gold standard")

The subject matter of claim 1 comprises many features which have been extracted from the description and in particular from the first embodiment using a strand of feed stock and described at figure 1, 2, 3A and 3B. The combination of features of claim 1 therefore constitute an intermediate generalisation of the teaching of the original application, see the Guidelines H-V, 3.2.1 "Extracting a specific feature in isolation from an originally disclosed combination of features and using it to delimit claimed subject-matter may be allowed only if there is no structural and functional relationship between the features.

When evaluating whether the limitation of a claim by a feature extracted from a combination of features fulfils the requirements of Art. 123(2), the content of the application as filed must not be considered to be a reservoir from which individual features pertaining to separate embodiments can be combined in order to artificially create a particular combination.

When a feature is taken from a particular embodiment and added to the claim, it has to be established that:

–the feature is not related or inextricably linked to the other features of that embodiment and

–the overall disclosure justifies the generalising isolation of the feature and its introduction into the claim.

These conditions are to be understood as an aid to assessing, in the particular case of an intermediate generalisation, if the amendment fulfils the requirements of Art. 123(2). In any case it has to be ensured that the skilled person is not presented with information which is not directly and unambiguously derivable from the originally filed application, even when account is taken of matter which is implicit to a person skilled in the art using the common general knowledge".

The opposition division considers that the application (in the discussion over Article 123 (2) EPC, the opposition division refers to the paragraphs of the A1 publication WO2014/088681), originally disclosed a device for 3D drawing which could be either using a strand of feed stock (see figures 1-4B and paragraphs 17-31 ) or a feed stock fed in pellets (see the second embodiment disclosed on figures 5A and 5B). There were therefore two main embodiments (one "strand" embodiment and one "pellet" embodiment)

Moreover, the original disclosure appeared to address two <u>separate</u> problems, namely a problem of <u>feeding/transporting</u> the feed stock (see the original claim 1, paragraph 6 and the last sentence of paragraph 33) and a <u>problem of cooling</u> (see original claim 11, paragraph 7 and the first two sentences of paragraph 33.).

As a general remark, contrary to what the O1 implies (see point II.3.2 of the notice of opposition of O1 on page 12), the fact that the amendment of claim 1 relies on a specific embodiment does not mean that all the features of this embodiment without exception need to be included in the subject matter of an amended claim.

Moreover, the fact that the cooling appeared to be an important aspect of the disclosure does not automatically mean that it is essential or inextricably linked with the fact that the subject matter of claim 1 had been limited to the strand embodiment.

As explained below, the opposition division considered that the subject matter of claim 1 as granted comprised amendments that are considered <u>unallowable</u> (when <u>linked to the feeding</u> of the strand stock and when generalising the presence and the location of an <u>insulator</u>) and amendments that are considered allowable (in particular the fact that the subject matter of claim 1 did not include <u>"cooling "</u> features was not considered to constitute an unallowable intermediate generalisation).

<u>Features linked to the transport of the feed stock</u>

With respect to the problem of transporting a feed stock, the opposition division considered that, the problem to move a "strand" of feed stock is inextricably linked with the general shape of the 3D Drawing device.

Therefore, the fact that the amendments of claim 1 referred to a housing with "a first end and second end" and a housing which was "configured to be held in a user's hand" without any further details on the shape constitutes an unallowable intermediate generalisation: there was no support for the transport of a strand in housing of undefined shape. In comparison, the housing of the second embodiment which was for feeding a stock in pellets was a "pistol" shaped housing with a handle separated from the main housing where the stock was fed between the two ends of the main housing part.

A similar comment applies to the feature "a port (115) configured for introduction of a strand of feed stock (20) into an internal volume (116) of the housing (110)" for which the opposition division considered that, though there was, indeed support for a port to introduce the strand of feed stock (in view of the figures in particular), this port was linked to the "pen like" structure of the housing and related to the transport of the feed stock.

Feature :Extruder, insulator, mounting tube

There is nothing in the application as filed that suggests the broadening of current claim 1, in which there is merely an insulator around the extruder without further specification. As mentioned in paragraphs 24-26 quoted hereunder, the teaching of the original application is that there is also a mounting tube and an upper and lower housing and that the elements have to be provided in a specific configuration (i.e. The extruder 132 and guide tube 134 are held in alignment by a mounting tube 138). The features of the mounting tube and the housing are therefore considered to be inextricably linked with the features of the guide tube 134 and extruder 132.

The first sentence of paragraph 25 reads: "In certain embodiments, an insulator 131 may be provided over the mounting tube 138 so as to reduce the amount of heat transferred from the extruder 132 to the upper and lower housings 1 12, 1 14.: this passage does not support the introduction of an insulator without a mounting tube.

Additionally, claim 1 comprises the feature of the guide tube 134 which is also disclosed together with the mounting tube: see par 24 : "The extruder 132 and guide tube 134 are held in alignment by a mounting tube 138."

In their submission, the proprietor also mentioned paragraph 21 as a support for the introduction of the features extruder and mounting tube: however this passage reads "At the right end, it can be seen that the nozzle assembly 130 includes an extruder 132 and a guide tube 134, which are discussed in greater detail with respect to FIG. 3B": this paragraph also refers to the further description which discloses the extruder and the guide tube together with the mounting tube.

Feature: a gear train (150) **operatively coupled with the motor (152) to drive the gear train (150)**, disposed within **the internal volume (116) to receive the strand** of feed stock (20), and configured **to move the strand** of feed stock (20) when engaged with the gear train (150);

The opposition division also agrees with O2 in that this feature appears to be an unallowable generalisation of the teaching of the original application due to the fact that the internal volume is not defined.

Pen-like housing

As already mentioned in the preliminary opinion, the opposition division also agrees with O1 and O2 that the feature combination of claim 1 is extracted from the first embodiment described in figures 1-3 and appears to be inextricably linked with the fact that the housing is pen like, or using the wording of the application "and suitably shaped to allow for manipulation like a pen or pencil."

The proprietor pointed to original claim 19 and to original claim 20 to demonstrate that there was a support for only claiming the feature that the housing is configured to be held by a user's hand.

As already mentioned, the subject matter of granted claim 1 is not merely a combination of claims but is directly linked to the "strand" embodiment. There are no passages in the original disclosure suggesting that the housing of the "strand" embodiment could be anything else than a "pen like" housing. The only other embodiment which can be held by a user is a gun shaped housing and it is linked to the "pellet" embodiment. Moreover, the opposition division is of the opinion that transporting a strand of thermoplastic material would require different elements (type of motor, location of the motor, gear, type of transporting elements and possible guides) according to the shape, simply because the strand has to follow the geometry of the housing.

The integration of the motor and the gear train within an internal volume of a 3D drawing device in order to transport this strand are inextricably linked with the geometry/shape of this device: therefore the fact that the subject matter of claim 1 as granted did not exclude any feature related to the "pen-like" aspect was an unallowable amendment.

On the following points, the opposition division did not agree with the arguments of the opponents and considered the following points raised by the opponents not to constitute convincing arguments against Article 123(2) EPC:

On the diameter of the strand being 3mm

With respect to the diameter of the strand of feed stock being 3mm, the opposition division agrees with the proprietor that the value of 3mm can be considered to be an example and the skilled person would understand that this value can be varied, see at paragraph 22 "In certain embodiments, the first chamber 135 may have a first diameter of 3 mm while the extrusion passage 133 has a diameter of 0.3 mm.". Therefore, introducing the features of the strand in granted claim 1 while failing to include the diameter of the strand was not considered to introduce an unallowable intermediate generalisation.

On the internal volume and a port

In their submission, O2 argues that the introduction of the feature "**a port (115) configured for introduction of a strand of feed stock (20) into an internal volume (116) of the housing (110)"** introduces an unallowable intermediate generalisation because the only function of this volume is to be in fluid communication with the cooling part. Additionally, O2 argues that there is either a basis for an "entrance port" 115 or for a "cooling part 118".

The opposition division considers that both in view of the figures (1, 2 and 3) and of paragraph 18-20, there is a clear and unambiguous teaching of a port for introducing the strand of feed stock: the opposition division therefore considers the wording "entrance port" to be synonymous with the wording of "a port (115) configured for introduction of a strand of feed stock (20)".

Moreover, the fact that different reference signs are used for the housing and for the internal volume merely means that the housing is the "external" shell of the 3D drawing device and that the internal volume is the whole interior volume of

the device comprised within the boundaries of the housing. In view of the general teaching of the application, it is immediately evident that the strand of feed stock is introduced inside the 3D drawing device (i.e. into an internal of the housing in the wording of claim 1).

O2 seems to be referring to the arrow 116 on figure 3A and 3B to argue that there might be different internal volumes. This interpretation could not be followed by the opposition division. Indeed, the reference sign 116 is merely used together with an arrow pointing towards the inside of the pen-like structure: this does point to another inner volume that the internal volume defined by the inner boundaries of the housing.

A motor disposed within the internal volume

O2 also argues that this feature is not supported. However, the argument appears to rely on the assumption of O2 that the housing does not equate the internal volume. As mentioned above, the opposition division does not agree with this interpretation and considers that this wording is supported by the original application. The same applies to the motor disposed within the internal volume.

The extruder having a heating element surrounded by an insulator

O2 argues that claim 1 omits the feature that the heating element is "configured to melt the feed stock" and that it melts the feed stock prior to extrusion.

Claim 1 as filed claims an extruder with a heating element and an exit nozzle: the opposition division therefore considers that the alleged missing features are at least implicitly disclosed already in claim 1 as filed.

Since the extruder is positioned "before" the exit nozzle (otherwise it would not be called an exit nozzle) and that an extruder with a heating element will necessarily have the function of melting (or at least softening as mentioned by the proprietor, referring to paragraph 27 of the application as filed " such that the feed stock 20 within the first chamber 135 softens or melts " ) the material passing through it, then the heating element is also positioned adjacent to the exit nozzle and configured to melt (or soften) the feed stock prior to extrusion.

Therefore the division considers that adding the feature of an extruder "with a heating element" without adding the feature "for melting" was not an unallowable intermediate generalisation.

Feature: First chamber

The opponent also argues that the addition of "the internal chamber" into the subject matter of claim 1 constituted an unallowable intermediate generalisation because the chamber had only been described with more details in the original application, namely its dimension as disclosed in paragraphs 24 and 22:

-Paragraph 24 reads, in particular "[0024] A guide tube 134 is aligned with the first chamber 135 of the extruder 132 such that feed stock passing through the guide tube 134 enters the first chamber 135".

-Paragraph 22 reads, in particular "The extruder 132 has a first chamber 135 formed as a cylindrical bore of approximately the same diameter as the feed stock 20 and an extrusion passage 133 of a smaller diameter, terminating in an exit nozzle 133A."

Moreover, O2 argued that these features (and in particular the change in diameter) were essential in order to extrude the material.

According to the opposition division, the fact that an extruder nozzle has a larger section on the feed side and a smaller section on the exit side does not appear to be essential but rather a common feature of an extruder nozzle. Moreover, this feature does not seem inextricably linked with the fact that the material is in strand form or with the problem of advancing the feed stock. Therefore the statement of paragraph 24 mentioning that the stock was entering the first chamber after having passed through the guide tube was considered to provide a basis for the introduction of the "first chamber" in this general form.

About the cooling features

Contrary to the opponents' argument, the opposition division was of the opinion that the problem of cooling the device was not inextricably linked with the fact that the device was transporting a strand and more generally not inextricably linked with the amendments made to claim 1. These two problems are not technically linked. Moreover, at least paragraph 25 mentions the presence of cooling ports as optional (see "In certain embodiments, one or both of the upper and lower housings 1 12, 1 14 may have cooling ports 1 18 formed therethrough such that air can flow from the interior volume 1 16 to the ambient atmosphere). In addition, the fact that paragraph 17 indicates that the device includes a fan , see "The device 100 includes a housing 1 10 in which a control

assembly 120, a nozzle assembly 130, a fan assembly 140 are provided", is not a proof that the fan is inextricably linked with the fact that the device transports a stock in strand form.

In their submission of 18-07-2025, O1 argued that the fact that the fan was disclosed in a dependent claim originally did not provide a basis to delete the fan assembly from the device and that therefore a device without strand would contravene Article 123 (3) EPC.

With respect to an alleged objection under Article 123 (3) EPC, the opposition division could not follow O1 arguments because there cannot be a problem of Article 123 (3) with the granted version of the claim. Therefore this objection appeared to be moot.

<u>About other features</u>

In the notice of opposition (page 12, point II-3.2), O1 had listed a long list of features (among others the circuit assembly, the assembly of gears and the linear movement of the strand) allegedly inextricably linked with the device of the first embodiment.

For the circuit assembly, O1 cited paragraph 29 and argued that the circuit assembly was necessary in order to provide the constant rate of extrusion.

However, the opposition division considers that this passage, on the contrary, proves that the features necessary for the feed are the motor and the gear train, which are already present in claim 1 (these features were already present in the original wording of the claim). It was not clear to the division why failing to include every single gear and the circuit assembly should lead to an unallowable intermediate generalisation.

Since at least some objections of the opponents were considered convincing by the opposition division, the requirements of Article 123 (2) EPC are not considered to be fulfilled. The grounds of Article 100(c) EPC therefore prevent the maintenance of the patent as granted.

20.2 **First auxiliary request**

The claims of the first auxiliary request (AR1) are based on the set of claims of AR33 filed on 22-04-2025. Additionally, in this request the article "the" is used in connection with the second occurrence of the term "internal volume" in the claims (features in bold are the features which have been added with respect to original claim 1. Underlined features illustrate the features which are different from claim 1 as granted).

A three-dimensional (3D) drawing device comprising:

a housing (110) configured to **be held in a user's hand, the housing having a first end and a second end,**

wherein the device comprises

**a port (115) configured for introduction of a strand of feed stock (20) into an internal volume (116) of the housing (110);**

a motor (152) disposed within **the internal volume (116);**

a gear train (150) **operatively coupled with the motor (152) to drive the gear train (150)**, disposed within **the internal volume (116) to receive the strand** of feed stock (20), and configured **to move the strand** of feed stock (20) when engaged with the gear train (150);

**an actuator configured to selectably cause the motor (152) to rotate in at least a first direction that causes the feed stock (20) to be extruded out of the exit nozzle to form a three-dimensional object; and**

a nozzle assembly (130) **disposed at the first end of the housing (110)** and at least partially within the housing (110), **the nozzle assembly (130) comprising an extruder (132)**, an exit nozzle (133A), **and a guide tube (134),**

**characterized by the extruder (132) having a heating element surrounded by an insulator (131), the guide tube (134) extending between the gear train (150) and the extruder (132),<u> wherein the extruder and the guide tube are held in alignment by a mounting tube (138)</u>, <u>wherein the insulator (131) is provided over the mounting tube (138) so as to reduce the amount of heat transferred from the extruder (132) to the upper and lower housings (112, 114),</u>**

**a first end of the guide tube (134) positioned to receive the strand of feed stock (20) from the gear train (150), a second end of the guide tube (134) aligned with a chamber (135) of the extruder (132) such that the strand of**

**feed stock (20) is directed from the guide tube (134) into the chamber (135), the extruder (132) being disposed between the guide tube (134) and the exit nozzle (133A).**

**<u>and wherein the housing comprises an upper housing (112) and lower housing (114) that together form the internal volume (116) in which is located said gear train (150), wherein the housing is sized and configured to fit in a user's hand and suitably shaped to allow for manipulation like a pen or pencil.</u>**

20.3 **Admissibility of the request**

Admissibility of RA1 was not objected to by the opponents. As RA1, by introducing the article “the”, circumvents clarity objections raised by the opponents with regard to RA33, and as RA 33 was submitted before the date set under Rule 116 EPC, the division had no reason not to admit the request, despite RA1’s late filing. It is true that O2 argued that the number of auxiliary requests submitted by the proprietor was vast and they should therefore not be admitted. However, 56 auxiliary requests do not seem to be a disproportionate number considering the number of line of argumentation used with the grounds of Article 100(c) EPC.

Moreover, after the discussion on Article 123 (2) EPC for the main request (granted claims), the proprietor directly suggested to renumber the AR33 to AR1, which was considered to be a fair attempt to circumvent the objections of Article 123 (2) EPC that had been considered relevant by the opposition division.

20.4 **Article 84 EPC**

The opponents argued that the amendments introduced with the AR1 introduced clarity issues.

O1, in particular, argued that the feature "is sized and configured to fit in a user's hand and suitably shaped to allow for manipulation like a pen or pencil" was not clear because this wording could still encompass a large plurality of shapes (as an example, O1 referred to children pen which can be in all sorts of shape such as animal shape and so on). Moreover, the wording used did not literally state that the housing was a pen like housing but the current feature merely required that the housing could be held and manipulated like a pen: this means that any device which could be held and used as a pen would have this feature.

O2 added that the size of the housing of claim 1 very much depended on the size of the user's hand and that the size of someone's hand could vary considerably from user to user.

The opposition division considered that these amendments did not introduce any unclarity.

Since the device was said to be "sized and configured to fit in a user's hand and suitably shaped to allow for manipulation like a pen or pencil", it was clear that this meant it could be used by different users regardless of the size or their hand.

Moreover, the opposition division also considered that this feature implied some restrictions to the housing. While it may be difficult to precisely define what a feature encompass, the opposition division considers that a skilled person would be able to determine which devices do not fall within the scope of the claim (for instance devices too heavy or too large to be handled by a user's hand or a "gun-shaped" device which requires a handle in addition to the main housing) because a skilled person would know that the device needs to fit in the hand of a user and that the user needs to be able to use ("manipulate") the device.

The opposition division therefore considers that the requirements of Article 84 EPC are fulfilled.

20.5 **Article 123(2) EPC**

With respect to Article 123(2) EPC, the opponents referred to their written submissions stating that many of their objections relating to the granted claims still hold true for the claims of the first auxiliary request.

Moreover, new unallowable amendments were introduced according to O1. Since the features of the lower and upper housing were now part of the subject matter of claim 1, it was not possible to exclude all the features linked to the upper and lower housing, in particular the fan assembly and fan cover but also the fact that the feed mechanism was disposed on the lower housing (referring to paragraph 20 of the original disclosure).

Additionally, O2 argued that adding the feature "**configured to fit in a user's hand and suitably shaped to allow for manipulation like a pen or pencil"** was inextricably linked with the features of the buttons. Indeed, a manipulation

of the device in a pen-like manner would require the presence of buttons in a specific position (namely close to the tip of the device) in order for the user to be able to actuate the device.

As mentioned earlier with respect to the main request, the opposition division considered the amendments made in the AR1 were fulfilling the requirements of Article 123(2) EPC for the same reasons as mentioned above for the main request.

Moreover, the opposition division was not convinced that the amendments introduced "new" unallowable extension of scope.

**About the word "linear" together with the movement of the strand**

During the proceedings, the opponents, referring in particular to original claims 10 and 18, argued that failing to include the word "linear" in combination with the transport of the strand was also an unallowable intermediate generalisation.

With respect to this point, the opposition division considered that including the features of the housing being "sized and configured to fit in a user's hand and suitably shaped to allow for manipulation like a pen or pencil" together with the features of the mounting tube/guiding made it already clear that a linear movement of the strand within the internal volume of the 3D drawing device was at least implicitly present. Not mentioning the word "linearly" was therefore not considered to introduce an unallowable amendment.

**About the features linked to the introduction of "lower and upper housing" in claim 1 of AR1**

Since the opposition division had considered for the main request that the features related to the cooling (i.e. the cooling ports and the fan and the features related to the fan such as the fan cover and fan motor) were not inextricably linked with the features of the first embodiment and not linked to the problem of transporting the strand of feed stock, it had no reasons to consider that introducing the lower and upper housing would be inextricably linked with presence of a fan and fan cover or any of the cooling related features.

With respect to the feed mechanism being attached to the upper housing, the opposition division could not follow the opponent's argument. Since the housing had two parts, the feed mechanism was necessarily either on one or the other part of the housing. Moreover, since the wording "upper and lower" are relative terms and also not linked to the problem of transporting the feed stock, it was not very clear why failing to include the feature "a feed mechanism 150 is disposed on the lower housing 1 14" would constitute an unallowable amendment.

**About the missing buttons**

The opposition division does not follow the opponent's objection. Indeed, claim 1 according to AR1 already comprises a housing which "is sized and configured to fit in a user's hand and suitably shaped to allow for manipulation like a pen or pencil." and which also comprises an actuator: therefore it is already clear from the wording of claim 1 that the device can be manipulated by hand and has an actuating mechanism to do so (being obviously somewhere on the housing).

The opposition division finds it difficult to believe that buttons are an essential feature of the device or that they would be inextricably linked with the housing or with the problem of transporting the strand of feed stock. Not providing buttons would not prevent the device from working or to be manipulated because the device of claim 1 already comprises an actuator.

Therefore, the opposition division does not consider that failing to include the buttons constitutes an unallowable intermediate generalisation.

The opposition division considered that the claims of the first auxiliary request overcome the objections of Article 123(2) EPC that were raised against the claims of the granted patent.

The opposition division considers therefore that claim 1 of AR1 fulfils the requirements of the EPC with respect of Article 123(2) EPC

20.6 **Article 100(a) EPC**

20.7 **Article 54 EPC**

In the written procedure, the opposition division expressed their preliminary opinion that none of the documents D12, D13, D25, D26, D27 or 3DDoodler (the documents D16-D22) appeared to disclose directly and unambiguously the combination of features of claim 1 as granted.

During the oral proceedings, the opponents argued that they were still of the opinion that the subject matter of claim 1 of AR1 could not be considered to be novel in view of D12, D27 and the 3D Doodler according to documents D16-D22.

20.7.1 **D12**

O1 argued that the device of D12 could still be considered to be novelty destroying to the subject matter of AR1.

The opposition division considered the subject matter of claim 1 to be novel in view of D12 for the following reasons:

Manipulated like a pen

As disclosed in figure 1 and 2 and in the description of D12 (see column 1, line 2), the device of D12 is a hand-held dispensing gun. While the device is hand-held and fits in a user's hand, it is neither pen-like nor pencil like and also not suitable to be manipulated like a pen but is held at a handle portion.

The opposition division was therefore not convinced by the opponent's argument that a user could use the device of D12 as a pen or that a skilled person, reading the disclosure of D12, would consider that the dispensing gun of D12 could be equated to the pen-like device of claim 1 of AR1.

Motor within an internal volume

The opponent argued that a housing could be understood in a very broad way and that the housing 24 surrounding the motor was a first part of the housing (which could be called lower or upper part) while the other parts (12a,12b) constituted the other parts of the housing. Since lower and upper are relative terms, it was possible to assign any parts of the device of D12 to be part of the upper and lower housing. Looking, in particular, at figure 2, it was clear that the motor (72) was inside the internal volume of the housing.

Even when taking into account the fact that "upper" and "lower" are relative terms (and that it could be possible to look at the drawing with a tilted inclination), the opposition division could not consider that D12 was disclosing a motor in the internal volume of the housing <u>of a pen-like device</u> defined by an upper and lower housing.

Since the opposition division considered that the general shape of the device of D12 is a pistol shape, it cannot disclose a pen-like housing. Moreover, the motor 72 is fully enclosed within a <u>single</u> housing 24, said housing not being part of the general body (12a, 12b) of the dispensing gun. In the view of the opposition division, it does not make sense to artificially argue that the parts 12a, 12b and 24 form a housing into which a motor is enclosed. The skilled person, reading D12, could consider that the motor is within <u>a</u> housing (namely 24) : however it is not within <u>the</u> housing formed of <u>two</u> parts (an upper and lower part), wherein said parts form a housing which fits in a user's hand and can be manipulated liked a pen.

Due to the introduction of the pen-like features, it is clear that the motor is not anymore inside any type of internal volume (as was the case for the granted claim 1) but inside the internal volume defined by a pen-like housing.

<u>About the features of the guiding tube, mounting tube and insulator</u>

O1 equated the references 106, 108 of D12 with the guiding tube and mounting tube of claim 1 of AR1. With respect to the insulator, O1 and O2 argued that the air gap (between the outer peripheral surface of 108 and the inner surface of 100 on figure 1) constituted an insulator. Alternatively, O1 argued that an insulator was implicitly present or was common general knowledge.

In the view of the opposition division, these arguments fail on many points.

The elements 106 and 108 are not <u>two separate</u> tubes as required by claim 1, one of which could be called a guiding tube and the other one a mounting tube, because 106 is merely the inner bore of the neck portion 108 of the plug 104 (see figure 1 and the passage on column 3, lines 43-50).

There is no direct and unambiguous disclosure of an insulator anywhere around the plug 104 or its neck portion 108. Moreover, the feature "wherein the insulator is provided over the mounting tube" implies a physical element and not just an air gap. The fact that a feature would be obvious is not a relevant argument for novelty but only possibly for inventive step. Finally, there is no heating portion of an extruder at the neck portion 108: therefore there would be

no need to have an insulator at this position because of the absence of a heating element: therefore the presence of an insulator cannot be considered to be implicit.

About the gear train

Both opponents argued that D12 disclosed a gear train as claimed referring to the spur gear 44, worm gear 62 and also to the gear reducer mechanism 74.

The opposition division agrees that D12 seems to disclose a gear (possibly a gear train): however none of the gears disclosed in D12 are engaging with the feed stock as required by the following feature of claim 1 "a gear train (150) operatively coupled with the motor (152) to drive the gear train (150), disposed within the internal volume (116) to receive the strand of feed stock (20), and configured to move the strand of feed stock (20) when engaged with the gear train".

This feature requires that a gear of the gear train "directly" engages with the feed stock: this is not the case in D12 because the elements engaging with the feed stock to move it in D12 are the feed roller 46 and the guide roller 66. These are rollers and not gears.

For all these reasons the subject matter of claim 1 is considered to be novel in view of D12.

20.7.2 **D26 (CN20319622)**

D26 was published on 18-09-2013, which is before the filing date of the granted patent but after the priority date of the priority document D3.

Since the claims of AR1 are considered to fulfil the requirements of Article 123 (2) EPC and because the priority document D3 has the same content as the original PCT application, this means that the priority date of 14-03-2013 is considered as being valid. Therefore the document D26, being a Chinese utility model, cannot be considered to be an Article 54(3) EPC disclosure.

This document is neither prior art under Article 54 (2) EPC nor under Article 54(3) EPC.

This document is therefore not relevant for the claims of the AR1.

### 20.7.3 **Alleged prior use of device described in D26**

Opponent 2 argued that the device described in D26 was offered for sale and was open to inspection to members of the public before 7 March 2023. In this regard the testimony of Mr. Xun Zhang is offered and a notarised written statement of Mr. Zhang is submitted. In its preliminary opinion, the opposition division explains that it was not appropriate to summon and hear Mr. Zhang as the alleged prior use of the device described in D26 did not seem to be sufficiently substantiated. For substantiation it is necessary to bring forward what was used, when it was used and the circumstances under which the allegedly used object became available to the public (see Guidelines Part D-IV, 1.2.2.1). In the present case neither Opponent 2's submission nor the statements made in the notarised written statement of Mr. Zhang allow the division to conclude that a device according to D26 was made available to the public. Mr. Zhang only states that a drawing of the device was posted as a link on Weibo on 7 Mach 2013. He also states that the prototype was to be kept secret until it was shipped. No mention of the shipment data is made, let alone the receipt of the device. Neither is the drawing allegedly posted as link on Weibo enclosed in the submission of O2. As witnesses are meant to serve for corroboration of facts brought forward, not for supplying these facts in place of the opponent (Guidelines Part E-IV, 1.2), the division cannot verify what was made available to the public or when it was made available. Likewise, the statement that a link was posted on Taobao around 10 March 2013 leaves the question open as to what was published via the link and when exactly it was published.

The alleged prior use of the device described in D26 is therefore not sufficiently substantiated and cannot be regarded to be prior art.

### 20.7.4 **D27**

O2 argued that the disclosure of D27 could still be considered to anticipate the subject matter of claim 1 of AR1.

<u>Pen-like housing</u>

For similar reasons as for D12 the opposition division finds it difficult to believe that a skilled person would qualify the device of D27 to be a pen-like device or that the device could even be manipulated like a pen.

The frame 2 and the grip portion 4 do not together form a pen-like housing (or even a device which can be manipulated like a pen or pencil). In view of the shape (see figure 1) and the trigger 56, this device could qualify as a hand-held gun dispenser but not as a pen-like device.

Insulator, mounting tube, guiding tube

With respect to the features of the guide tube, mounting tube, heating and insulator, O2 referred to the barrel 8, the element 38 and the heating element 10, stating in particular that these parts fulfilled the same functions as the elements of claim 1 of AR1. O2 argued that the part of the barrel 8 located "between the heating element 10" and the outer peripheral surface of the cylindrical barrel would be an insulator. In another line of argumentation, O2 mentioned that the air around the barrel could be considered an insulator.

The opposition division considers that there is no insulator disclosed in D27, let alone in combination with the specific arrangement of the guiding tube, mounting tube, heating device as claimed in claim 1 of AR1.

Firstly, there is no explicit disclosure of an insulator anywhere in the device of D27. For the same reasons as mentioned for D12, the air around the barrel is not an insulator as claimed in claim 1. Moreover, the barrel comprises the heating means 10 arranged inside the barrel: if there would be an implicit disclosure (see the Guidelines G-VI-2 for the requirements of implicit disclosure being of "directly and unambiguously" disclosed) of something, that would be that the barrel should be conductive of heat and not an insulator. Additionally, the barrel 6 with its inner portion 8 cannot be equated to be both a mounting tube and the insulator mounted around the mounting tube.

Gear train

In D27, the thermoplastic rod T is moved thanks to a drive wheel 22, said wheel being driven by reduction gears (see column 3, lines 4-6). In a similar reasoning as for D12, the opposition division does not consider that the drive wheel is a gear part of a gear train engaging with the stock of material. While there might be a gear in D27, it is not shown and in any case, not shown to engage the stock. The drive wheel 22 is not engaging with any other wheel and is provided on a spool 44.

Therefore, the feature of the gear train engaging with the strand of stock is also not disclosed in D27.

At least for the reasons mentioned above, the opposition division considered the subject matter of claim 1 to be novel in view of D27.

20.7.5 **Alleged prior use of 3D Doodler according to D16-D22b**

Both opponents cited documents D16-D22b which allegedly constitute a prior use of a 3D drawing pen according to claim 1.

During oral proceedings, the opponents referred also to the documents D44, D55 and D58 together with the alleged prior use of the 3D Doodler.

According to the opponents, although some features were not visible in the drawings of D16 (or D58), these features (such as the presence of a motor, a gear train, a guide tube, a mounting tube and an insulator) would inevitably need to be present.

The opponents considered also that the 3D Doodler was the exact same device as the device of the patent in suit and that it was up to the proprietor to prove that the missing features were not disclosed in D16-D22b.

The proprietor notes that D16 mentions that there were several experimental stages (see page 4 of D16 which refers to "the teacup" and the "Beast" which are part of five prototypes) in the development of the 3D Doodler which lead to something which still needed "additional tweaks". Moreover, the proprietor noted that it is not possible to consider that these documents constitute the disclosure of one and the same device. Even when considering that these documents (the one disclosing an image of the 3D Doodler and the blogs excerpts) could be seen as describing a device, there is no direct and unambiguous disclosure of what's inside the housing of the device disclosed in these documents.

The proprietor argued that the burden of proof is for the opponent and that there was no reason to reverse the burden of proof in the current case.

The opposition division considers the subject matter of claim 1 of AR1 to be novel in view of the "3D Doodler".

First, even if the external appearance of the 3D Doodler of D16 and D58 are identical, there is no evidence that the inside of the device is identical. As mentioned in D16, there were several prototypes made and the latest version still had to be improved. None of the other evidence (blog extracts) actually provide any evidence of what's inside the 3D Doodler.

The opposition division considers that D16 (or D58), indeed, disclosed a device that could be held by a user's hand and used to draw but that the following features could not be considered to be directly and unambiguously disclosed by the 3DDoodler-disclosure:

1) a gear train configured to move the strand of feed stock (20) when engaged with the gear train (150):

While the 3DDoodler undisputedly comprises a motor and a mechanism to move the strand, this does not mean that the mechanism is a gear train (i.e. an assembly holding at least two gears) and it also does not mean that the gear train should "engage" with the feed stock. Indeed, as disclosed in some of the prior art used by the opponent, some extruders use gears to move rollers or idlers rollers, however these gears do not engage directly with the strand of stock. Moreover, other solutions to move a stand with a motor could be envisaged.

As mentioned in the Guidelines G-VI-2, the requirements to consider a feature "implicitly" disclosed is that the features should be derivable directly and unambiguously from the document and "Thus, when considering novelty, it is not correct to interpret the teaching of a document as embracing well-known equivalents which are not disclosed in the documents; this is a matter of obviousness".

2)The opposition division could also not follow the opponent's reasoning that the very specific mounting of the guide tube, mounting and insulator of claim 1 was disclosed in the 3DDoodler

- the extruder having a heating element surrounded by an insulator , the guide tube extending between the gear train and the extruder, wherein the extruder and the guide tube are held in alignment by a mounting tube, wherein the insulator is provided over the mounting tube so as to reduce the amount of heat transferred from the extruder to the upper and lower housings.

The documents related to the 3DDoodler are only showing the device's exterior housing and there is neither an explicit nor an implicit disclosure of the combination of a mounting tube and guiding tube with an insulator around as

claimed. Furthermore, even if the 3DDoodler according to D16-D22b was (equivalent to) the device of the contested patent, this does not broaden the disclosure of the prior art according to D16-D22b. Neither does it shift the burden of proof for the presence of any technically relevant features from the opponents to the patent proprietor.

**Conclusion of novelty**

None of the cited prior art discloses the combination of features of claim 1 of AR1: the subject matter of claim 1 is therefore novel.

20.7.6 **Article 56 EPC**

During oral proceedings, O1 and O2 argued that the subject matter of claim 1 lacks an inventive step starting from the 3DDoodler (as disclosed in D16) in combination with the common general knowledge (CGK), with D23,D12, D27, or D31.

A first main line of argumentation of the opponents was that the skilled person would find it obvious to integrate the missing features in the 3DDoodler because all the individual features (gear train, mounting tube, guiding tube, insulator) were well-known in the art. On one hand, it would be necessary to provide means to move and guide the strand in the 3DDoodler: therefore, a gear train, a guide tube and a mounting tube were needed. On the other hand, it would be an obvious safety measure to provide an insulator in order to prevent the user from burning their hand(s).

Such measures (gear train, Bowden tube, insulator) were known from D23 which represented the common general knowledge in the field of extruder according to O1 because D23 had a revision date of 09-10-2013 a few months before the valid priority date of the patent in suit. Additionally the documents D12, D27 or D31 would also show at least that gear trains were common practice in the field of extruders to feed a strand of stock.

**Opposition division opinion on inventive step**

The opposition division agreed with the parties that the 3DDoodler (as described in D16) could be considered a suitable starting point for inventive step since it relates to a device directed to a similar use (3D "printing"/drawing of thermoplastic with a pen-like device).

The opposition division was, however, not convinced by the arguments of the opponents that starting from the 3DDoodler, it would be obvious to come to the subject matter of claim 1 of AR1 for several reasons.

Definition of the problem

With respect to the many features missing (guide tube, mounting tube, insulator, gear train), the opposition division cannot consider these features in isolation, that for each of these features a partial problem existed and that consequently, it was obvious to introduce each of these features in the known 3DDoodler.

At least the gear train and guide tube were working together to provide a feeding of the strand of stock within a pen-like housing while the insulator and its location around the mounting tube was provided for a better use of the device (improved lifetime of the housing as suggested by the proprietor). The opposition division could consider at most two partial problems but not one for each of the missing features since these features are linked with each other.

Starting from these two problems, the question arises which documents the skilled person could consult. Besides the common general knowledge, D23 relates to the extrusion of thermoplastic material in the area of Repraps (i.e. in the field also known as 3D printing) and could be said to belong to a similar field as the 3D drawing device of claim 1.

However, the opposition division finds it very unlikely that the skilled person, starting from a 3D drawing device will consult documents such as D27 (the device of D27 is called a thermoplastic cement extruder), D12 (the device of D12 is used to melt thermoplastic for using as adhesive) or D31 (the device of D31 is also a gun dispenser "Klebepistole" ).

Moreover, even if the skilled person would consult these documents, the skilled person would not arrive at the claimed subject matter because these documents do not disclose the missing features.

About the gear train

As mentioned earlier in the discussion regarding novelty, none of the extruder devices filed as prior art by the opponents use a gear train directly engaging with the feed stock. Indeed, D12 or D27 do not disclose this feature as mentioned above in the novelty discussion on these documents.

Even D23 does not directly and unambiguously describe this feature: in the same way as for D12 and D27, D23 discloses a gear (see the figure of D23 and the text) but it is actually a pinched wheel which engages with the feed stock and not any of the gears of the gear train.

Starting from the 3DDoodler according to D16-D22b, the skilled person desiring to provide a working device would need, indeed, to provide some moving mechanism. However, there is no evidence on file that he/she would be taught to use a gear train engaging with the strand of feed stock.

O2, argued that the feature of the gear train was common general knowledge and they wished to use the cited documents not only in a combination but more to illustrate the common general knowledge of the field.

In the view of the opposition division, it is worth mentioning that patent documents are not normally considered to illustrate the common general knowledge (see the Guidelines G-VII-3.1). In the present case, these documents would actually prove the opposite of what the opponent tries to demonstrate because the features of the claim are not merely claiming a gear train but a gear train engaging with the strand of feed stock. As mentioned above, none of the cited documents actually disclose this feature.

For this reason already, the subject matter of claim 1 involves an inventive step in view of the 3DDoodler

About the guide tube, mounting tube, an insulator

**3DDoodle as described in D16-D22b in view of D23**

With respect to the alleged teaching of D23, O1 argued that D23 disclosed a hot end and a cold end part of the extruder and that a Bowden tube is used. Since the Bowden tube is not visible on the figure of D23, O1 refers to figure 5 of D33 which discloses an example of a Bowden tube.

The proprietor expressed his doubts that the document D23 had been made available to the public because of the presence of a revision date. Even if it had been made available to the public, D23 does not disclose the guide tube, mounting tube and gear train as claimed.

The opposition division neither sees the missing features as disclosed in D23 nor a specific teaching to solve a problem of transport or any problem whatsoever. It is not very clear which teaching the skilled person is supposed to extract from D23 and use in combination with the 3DDoodler as described in D16-D22b.

While the opposition division could consider that a Bowden tube is a guide tube for a thermoplastic strand, D23 only makes a very brief reference (see the expression "if used") to such a tube : "the Bowden tube if used is on the cold side of this thermal break".

Moreover, the opposition division could not understand where the opponents found the features of the mounting and more specifically "wherein the extruder and the guide tube are held in alignment by a mounting tube (138), wherein the insulator (131) is provided over the mounting tube".

D23 mentions a thermal break or insulator : however, the opposition division cannot equate this disclosure with a mounting tube, let alone with a mounting tube having an insulator.

What seems to be disclosed in D23 is that there is a thermal decoupling (or insulation) between the cold end and a hot end: however this seems to be an "axial" decoupling (in the direction of transport of the filament) whereas the claimed insulator provided around the mounting tube is providing a radial insulation between the heater in the mounting tube and the housing.

The specific feature of the guide tube, mounting tube and insulator as claimed is therefore not directly and unambiguously disclosed in D23.

**3DDoodle as described in D16-D22b in view of D12**

During the oral proceedings, O1 used the second embodiment of D12 (see figures 7-9) and argued that it would be obvious to use the removable tip 160 of D12 for the extruder present in the 3DDoodler.

As mentioned above, the opposition division do not see any reasons why the skilled person, starting from the 3DDoodler drawing device, would even contemplate the document D12. The mere fact that both devices use an extruder melting a thermoplastic is not a sufficient reason for the skilled person to combine a 3D drawing device with an adhesive gun.

Moreover, if the skilled person would decide to use this tip, this would not result in the claimed subject matter because D12 does not describe an insulator, let alone an insulator provided around a mounting tube as claimed. Additionally, since the tip 160 is mounted almost completely outside of the housing, there would not be any reasons to provide an insulator since the risk of heating the housing would be inexistent. The risk of burning hands mentioned by the opponent would also not exist because the user holds the device at the housing and obviously not at the external detachable tip thereof.

**3DDoodle as described in D16-D22b in view of common technical knowledge**

Since no evidence of the alleged common general knowledge has been provided and because none of the cited documents actually discloses the combination of an insulator around a mounting tube, said tube holding in alignment a guide tube and an extruder, the opposition division did not find the reasoning of lack of inventive step in view of the 3DDoodler and common general knowledge convincing.

O1 and O2 argued that any engineer knowledgeable in the field of extrusion or rapid prototyping would contemplate using a guiding tube, mounting tube and insulator as claimed.

The opposition division considered these arguments as *ex post facto* analysis.

Obviously, an engineer trying to prevent a device, and more specifically an extruder with a heating element, from becoming hot could use an insulator. However there are other options that the skilled person could consider such as a temperature control of the extruder to prevent overheating by switching off the device or merely provide an insulator around the extruder but not around a mounting tube. Moreover, whether the housing becomes too hot to handle due to the extruder's heat would also depend on the type of stock used, and its softening temperature and how long the device is in use: for some thermoplastics, the problem might not even occur in the first place.

O1 pointed to page 17 of D58 wherein the sentence "The plastic is warm but touchable when it emerges from the tip of the 3Doodler" would mean that there is a need to cool and therefore to insulate. Additionally O1 referred to page 16 of D58 which indicates that the tip could be 270 degree.

The opposition division notes that, as pointed by the proprietor, it is not clear to which device(s) the document D58 is actually referring to since there might be different prototypes. Moreover, the sentence of page 17 indicates that the plastic is touchable: therefore there is no problem of burning hand because one can even touch the plastic. For the temperature of the tip, an engineer could indeed desire to provide a safety mechanism, be it by electronic control or insulator. Still, that would not necessarily lead to the claimed solution.

Indeed, the claimed subject matter does not merely require an insulator but an insulator in a very specific combination with a mounting tube and guide tube.

Starting from the 3D Doodler, the opposition division could therefore not follow the reasoning of the opponents that it would be obvious for a skilled person using only his/her technical knowledge to provide the claimed combination of features of the guiding tube, mounting and insulator as claimed.

**Conclusion on inventive step**

The opposition division came to the conclusion that starting from a 3DDoodler, the skilled person would not come to the solution proposed in claim 1 neither in view of any of the cited documents nor using common general knowledge and that therefore the subject matter of claim 1 of AR1 involves an inventive step.

20.7.7 **Amendment of the description**

At the end of oral proceedings the proprietor submitted an amended version of the description. The opponents requested in addition that the priority claim be changed, because the claims are not entitled to the first priority claimed. For the same reasons a further amendment of [0001] was requested. It was also requested to delete not claimed embodiments from [0031] and adapt the description of the figures [0011] to ensure exclusion of not claimed embodiments. Paragraph 10 also required amendments in order to be consistent with the new claims.

The division does not consider further amendments to be necessary to meet the requirements of the EPC. Foremost, the cover page of the patent is not part of the description. Hence, neither Article 84 EPC nor any other provision provides basis for changing the priority claim. In addition, even though the claims of AR1 are not entitled to the first priority they nevertheless claim to benefit from it. Hence, the division is of the opinion that [0001] of the description is in line with the claims.

As regards [0031], [0010] and [0011], these sections refer in a general manner to particular aspects of the device: these aspects are not described as being "part of the invention" or do not contradict the claim wording in any way in the opinion of the opposition division : therefore these passage do not need to be amended.

20.7.8 **Decision**

The opposition division therefore is of the opinion that, taking into consideration the amendments made by the patent proprietor during opposition proceedings, the patent and the invention to which it relates meet the requirements of the EPC. The patent will be maintained in amended form pursuant to Article 101(3)(a) EPC, provided that the requirements of Rule 82(2) EPC are fulfilled.

*****

**Article 106**
**Decisions subject to appeal**

(1) An appeal shall lie from decisions of the Receiving Section, Examining Divisions, Opposition Divisions and the Legal Division. It shall have suspensive effect.

(2) A decision which does not terminate proceedings as regards one of the parties can only be appealed together with the final decision, unless the decision allows a separate appeal.

(3) The right to file an appeal against decisions relating to the apportionment or fixing of costs in opposition proceedings may be restricted in the Implementing Regulations.

**Rule 97**
**Appeal against apportionment and fixing of costs**

(1) The apportionment of costs of opposition proceedings cannot be the sole subject of an appeal.

(2) A decision fixing the amount of costs of opposition proceedings cannot be appealed unless the amount exceeds that of the fee for appeal.

**Rule 98**
**Surrender or lapse of the patent**

The decision of an Opposition Division may be appealed even if the European patent has been surrendered in all the designated Contracting States or has lapsed in all those States.

**Article 107**
**Persons entitled to appeal and to be parties to appeal proceedings**

Any party to proceedings adversely affected by a decision may appeal. Any other parties to the proceedings shall be parties to the appeal proceedings as of right.

**Article 108**
**Time limit and form**

Notice of appeal shall be filed, in accordance with the Implementing Regulations, at the European Patent Office within **two months** of notification of the decision. Notice of appeal shall not be deemed to have been filed until the fee for appeal has been paid. Within **four months** of notification of the decision, a statement setting out the grounds of appeal shall be filed in accordance with the Implementing Regulations.

**Further information concerning the filing of an appeal**

(a) Notice of appeal can be filed in accordance with Rule 1 and Rule 2(1) EPC, by delivery by hand, by post, or by technical means of communication. The filing has to comply with the details and conditions and, where appropriate, any special formal or technical requirements laid down by the President of the European Patent Office (R. 99(3) EPC).

(b) The addresses of the filing offices of the European Patent Office are as follows:

(i) European Patent Office
D-80298 Munich
Germany

(ii) European Patent Office
Postbus 5818
NL-2280 HV Rijswijk (ZH)
The Netherlands

(iii) European Patent Office
D-10958 Berlin
Germany

(c) The notice of appeal must contain the name and address of the appellant in accordance with the provisions of Rule 41(2)(c) EPC, an indication of the decision impugned, and a request defining the subject of the appeal. In the statement of grounds of appeal the appellant shall indicate the reasons for setting aside the decision impugned, or the extent to which it is to be amended, and the facts and evidence on which the appeal is based (R. 99(1) and (2) EPC). The notice of appeal and any subsequent submissions stating the grounds for appeal must be signed (R. 50(3) EPC).

(d) The fee for appeal is laid down in the Rules relating to Fees. The schedule of fees and expenses of the EPO or a reference to the current version is regularly published in the Official Journal of the European Patent Office under the heading "Guidance for the payment of fees, expenses and prices". Fee information is also published on the EPO website under www.epo.org/ fees.

19.9.2025
S. Hoepfner

feed material to the nozzle at a constant rate. In addition, Froedge's system does not provide a means of cooling the extruded material.

[0006] JP S63 101887 A discloses a three-dimensional pen using paper clay.

[0007] US 3 285 475 A discloses a cement extruder and US 2003/137077 A1 discloses a plastic extruder that is used to melt plastic or acrylic raw materials.

SUMMARY

[0008] It is desirable to provide a reliable, easily refillable hand-held device to form 2D and 3D items without the need for computerized design files. The present disclosure describes a hand-held device that allows a user to "draw" a 3D structure with a feed stock that can be replenished while in continuous use.

[0009] The invention provides a three-dimensional (3D) drawing device comprising:

a housing (110) configured to be held in a user's hand, the housing having a first end and a second end,

wherein the device comprises

a port (115) configured for introduction of a strand of feed stock (20) into an internal volume (116) of the housing (110);

a motor (152) disposed within the internal volume (116);

a gear train (150) operatively coupled with the motor (152) to drive the gear train (150), disposed within the internal volume (116) to receive the strand of feed stock (20), and configured to move the strand of feed stock (20) when engaged with the gear train (150);

an actuator configured to selectably cause the motor (152) to rotate in at least a first direction that causes the feed stock (20) to be extruded out of the exit nozzle to form a three-dimensional object; and

a nozzle assembly (130) disposed at the first end of the housing (110) and at least partially within the housing (110), the nozzle assembly (130) comprising an extruder (132), an exit nozzle (133A), and a guide tube (134), **characterized by** the extruder (132) having a heating element surrounded by an insulator (131), the guide tube (134) extending between the gear train (150) and the extruder (132), wherein the extruder and the guide tube are held in alignment by a

19.9.2025
S. Hoepfner

mounting tube (138), wherein the insulator (131) is provided over the mounting tube (138) so as to reduce the amount of heat transferred from the extruder (132) to the upper and lower housings (112, 114), a first end of the guide tube (134) positioned to receive the strand of feed stock (20) from the gear train (150), a second end of the guide tube (134) aligned with a chamber (135) of the extruder (132) such that the strand of feed stock (20) is directed from the guide tube (134) into the chamber (135), the extruder (132) being disposed between the guide tube (134) and the exit nozzle (133A) and wherein the housing comprises an upper housing (112) and lower housing (114) that together form the internal volume (116) in which is located said gear train (150), wherein the housing is sized and configured to fit in a user's hand and suitably shaped to allow for manipulation like a pen or pencil

~~[0009] In certain embodiments, a 3D drawing device is disclosed that includes a housing configured for manipulation by a user's hand and to accept a feed stock, a nozzle assembly at least partially disposed within the housing and having an exit nozzle, a motor disposed within the housing, and a gear train disposed within the housing and coupled between the motor and the feed stock and configured such that rotation of the motor in at least a first direction causes the feed stock to be extruded out of the exit nozzle to form a three-dimensional object.~~

~~[0010] A 3D drawing device is disclosed that includes~~ a housing configured for manipulation by a user's hand and to accept a feed stock. The housing has an internal volume and at least one cooling port in fluid communication with the internal volume. The 3D drawing device also includes a nozzle assembly at least partially disposed within the housing proximate to the at least one cooling port and having an exit nozzle, a fan disposed within the housing and configured to draw air into the internal volume and then force the air out of the at least one cooling port, a motor disposed within the housing, and an actuator coupled to the housing. Actuation of the actuator causes the feed stock to be extruded out of the exit nozzle to form a three-dimensional object.

BRIEF DESCRIPTION OF THE DRAWINGS

[0011] The accompanying drawings, which are included to provide further understanding and ~~are incorporated in and constitute~~ a part of this specification, illustrate disclosed

19. 9. 2025
S. Hoest

[0014] As used within this disclosure, the phrase "feed stock" means any material provided in any form suitable for processing within the 3D drawing device so as to provide the desired output stream. Feed stock may be a thermoplastic such as acrylonitrile butadiene styrene (ABS), polyvinyl chloride (PVC) or a polylactic acid (PLA), a thermoset material such as an epoxy, a metal such as tin or lead or a mixture of metals. Feed stock may be a single material or a mixture of materials, such as a rod having particles of a first material dispersed within a matrix of a second material.

[0015] FIG. 1 is a perspective view of an exemplary 3D drawing device 100 according to certain aspects of the present disclosure. The device 100 includes a housing 110 in which a control assembly 120, a nozzle assembly 130, a fan assembly 140 are provided. The housing 110 ~~may~~ ~~is~~be sized and configured to fit in a user's hand and suitably shaped to allow for manipulation like a pen or pencil. An actuator, for example buttons 122 and 124 in this embodiment, may be positioned to allow the user to actuate either the actuator while holding the device 100. In this embodiment, the user may actuate one or both of buttons 122, 124 while manipulating the 3D drawing device 100. In this embodiment, the device 100 is configured to accept a feed stock 20 in the form of a strand that may be 3 mm in diameter. In certain embodiments, the feed stock 20 may be provided as a cut length, for example 30 cm in length, or as a continuous strand drawn from a spool (not shown in FIG. 1). includes an input portal 18, or other input element, such as a hopper, for example, through which a raw material 19 is provided to the implement 10. The feed stock 20 may be a thermoplastic material, for example a PVC, an ABS, or a PLA, however, other embodiments may accept other types of material, such as a thermoset plastic or a metal or combination of materials.

[0016] In an example of use of one embodiment of the device 100, the user selects a particular type and color of a thermoplastic feed stock 20 and introduces the feed stock 20 into the entrance port 115 (see FIG. 2) and connects a power cord (not shown in FIG. 1) to a power source, such as a wall outlet. In certain embodiments, the 3D drawing device 100 may include a portable power source (not shown in FIGS. 1-2), for example a lithium polymer battery, to power the device 100. After a warm-up period, the user may press button 122 while drawing a line on a surface with the device 100, for example tracing a pattern on a printed sheet, in a manner similar to drawing a line with a pencil. A column 22 of the feed stock 20 is extruded from the nozzle

19.9.2025
S. Hogth

such as copper, gold, silver or mixtures thereof, the temperature of the extruder 132 may be in the range of 1000-1200 °C. In certain embodiments, for example with a feed stock comprising a metal such as platinum, the temperature of the extruder 132 may be in the range of 1600-2000 °C. In certain embodiments, the 3D drawing device 100 may include a variable temperature controller (not shown) that is connected to the circuit assembly 126 to allow a user to select a setpoint temperature for the extruder 132. In certain embodiments, the variable temperature controller may allow the use to select a type of material, for example "thermoplastic," and the circuit assembly 126 will adjust the setpoint temperature of the extruder 132. In certain embodiments, the variable temperature controller may include a dial.

[0022] A guide tube 134 is aligned with the first chamber 135 of the extruder 132 such that feed stock passing through the guide tube 134 enters the first chamber 135. In certain embodiments, the guide tube 134 may be formed of a low-friction material, such as polytetrafluoroethylene (PTFE), so allow the feed stock 20 to slide easily while also minimizing the gap between the guide tube 134 and feed stock 20. The extruder 132 and guide tube 134 are held in alignment by a mounting tube 138. In certain embodiments, the mounting tube 138 is formed of a metal having a relatively low thermal conductivity, compared to other metals. In certain embodiments, the mounting tube 138 may be a stainless steel. In certain embodiments, an insulating film (not visible in FIG. 3B), for example a polyimide tape, may be applied over the heating element and under the mounting tube 138.

[0023] ~~In certain embodiments, an~~In all embodiments an insulator 131 is~~may be~~ provided over the mounting tube 138 so as to reduce the amount of heat transferred from the extruder 132 to the upper and lower housings 112, 114. In certain embodiments, one or both of the upper and lower housings 112, 114 may have cooling ports 118 formed therethrough such that air can flow from the interior volume 116 to the ambient atmosphere. In certain embodiments, the passages formed in the top and bottom housings 112, 114 that lead to the cooling ports 118 may be angled such that the air that emerges from the cooling ports 118 is directed inward toward the tip 137. Thus, as the air exits the cooling ports 118, the air passes by the tip 137 of the extruder 132, cooling both the tip 137 and the feed stock 20 that just been extruded from the extrusion passage 133. Both of these cooling effects serve to reduce the temperature of the feed stock 20 as it exits the extrusion passage 133 such that the feed stock 20 may be essentially solid as it

19.9.2025
S. Hoepf

[0029] It can be seen from FIGS. 4A and 4B that rotation of the motor 152, which is controlled by pressing one of the buttons 122, 124, causes the feed stock 20 to move forward or backward. The step-down from the motor 152 to the small gear 157B provides a smooth rate of motion of the feed stock, as the motor 152 may turn at a speed within a normal range of smooth operation while the step-down converts this to a low rate of linear motion of the feed stock 20.

**[0030]** The device 200 shown in FIGS. 5A-5B is not part of the invention. FIGS. 5A-5B are perspective and cutaway views of another embodiment 200 of a 3D drawing device according to certain aspects of the present disclosure. FIG. 5A shows a 3D drawing device 200 configured to accept a feed stock in the form of pellets 25 that are held in a hopper 250 attached to the body 210. A power cord 270 is attached to the body 210. FIG. 5B is a cut-away view showing a feed screw 260 that transfers the pellets 25 from the hopper 250 to the nozzle assembly 230 that melts the pellets 25 and, under pressure provided by the feed screw 260, extrudes the melted feed stock 25 in a manner similar to the nozzle assembly 130 of embodiment 100, previously discussed. Other features of the embodiment 100, such as the cooling ports 118, may also be provided in embodiment 200. In certain embodiments, the pellets may be transferred from the hopper 250 to the nozzle assembly 130 by other mechanisms, for example a reciprocating cylinder (not shown in FIGS. 5A-5B) as will be known to those of skill in the art. In certain embodiments, the feed stock may be provided as a liquid, for example an epoxy with beads of catalyst suspended in a liquid polymer, that is held in the hopper 250. In certain embodiments, passage of the liquid feed stock through an extrusion passage, similar to extrusion passage 133 of embodiment 100, may modify the liquid feed stock such that it hardens quickly after extrusion from the 3D drawing device 200.

[0031] The disclosed examples of a 3D drawing device illustrate the principles of its construction and use. The provision of a flow of cooling air at the tip to quickly solidify the extruded feed stock allows the user to work in three dimensions, rather than being forced to rely on a support surface to hold the still-fluid extruded material in place while it hardens. The use of a mechanical gear train to advance the feed stock, instead of a pressurized supply or a direct connection between a trigger and a feed rod, allows precise control of the rate of extrusion, thereby increasing the uniformity of the extruded column of material and allowing precise placement without excess material.

## Description

Cross-Reference to Related Applications

**[0001]** The present application claims benefit of and priority to U.S. Provisional Patent Application Serial No. 61/733,689 filed on December 5, 2012.

BACKGROUND

Field

**[0002]** The present invention relates to a hand-held implement configured to extrude a material so as to construct three-dimensional (3D) objects as defined in the claims.

Description of the Related Art

**[0003]** Three-dimensional printers are known which may be used to produce 3D items of all types. Certain printers operate by deposition of sequential layers of plastic while others function by sequential agglomeration or solidification of layers of a precursor material. These printers tend to be large and expensive and require the design to be provided as a computer file, for example as generated by a Computer-Aided Design (CAD) program.

**[0004]** US 2010/147465 A1 discloses a hand welding extruder for welding thermoplastic materials by means of a plasticized plastic strand having a plasticization worm unit connected to a drive motor by a gearbox, and having a hot air generation device.

**[0005]** US. Patent 3,665,158 to Froedge discloses a conventional handheld extrusion device. A chamber is filled with a granulated solid plastic material and then sealed with a cap. The contents of the chamber are heated to melt the plastic and create pressure within the chamber. A passage leads from the chamber to a rotatable nozzle that blocks flow in a first position and allows flow in a second position. A trigger is attached to the nozzle such that pulling the trigger moves the nozzle to the second position, thereby allowing the molten plastic to be expelled from the nozzle due to the pressure within the chamber. Releasing the trigger allows the nozzle to return to the first position, thereby stopping the flow of plastic. There is no provision to replenish the raw material without shutting off the device nor any mechanism to mechanically feed material to the nozzle at a constant rate. In addition, Froedge's system does not provide a means of cooling the extruded material.

**[0006]** JP S63 101887 A discloses a three-dimensional pen using paper clay

**[0007]** US 3 285 475 A discloses a cement extruder and US 2003/137077 A1 discloses a plastic extruder that is used to melt plastic or acrylic raw materials.

SUMMARY

**[0008]** It is desirable to provide a reliable, easily refillable hand-held device to form 2D and 3D items without the need for computerized design files. The present disclosure describes a hand-held device that allows a user to "draw" a 3D structure with a feed stock that can be replenished while in continuous use.

**[0009]** In certain embodiments, a 3D drawing device is disclosed that includes a housing configured for manipulation by a user's hand and to accept a feed stock, a nozzle assembly at least partially disposed within the housing and having an exit nozzle, a motor disposed within the housing, and a gear train disposed within the housing and coupled between the motor and the feed stock and configured such that rotation of the motor in at least a first direction causes the feed stock to be extruded out of the exit nozzle to form a three-dimensional object.

**[0010]** A 3D drawing device is disclosed that includes a housing configured for manipulation by a user's hand and to accept a feed stock. The housing has an internal volume and at least one cooling port in fluid communication with the internal volume. The 3D drawing device also includes a nozzle assembly at least partially disposed within the housing proximate to the at least one cooling port and having an exit nozzle, a fan disposed within the housing and configured to draw air into the internal volume and then force the air out of the at least one cooling port, a motor disposed within the housing, and an actuator coupled to the housing. Actuation of the actuator causes the feed stock to be extruded out of the exit nozzle to form a three-dimensional object.

BRIEF DESCRIPTION OF THE DRAWINGS

**[0011]** The accompanying drawings, which are included to provide further understanding and are incorporated in and constitute a part of this specification, illustrate disclosed embodiments and together with the description serve to explain the principles of the disclosed embodiments. In the drawings:

FIG. 1 is a perspective view of an exemplary 3D drawing device according to certain aspects of the present disclosure.

FIG. 2 is a cut-way view of the device of FIG. 1 with a portion of the housing removed according to certain aspects of the present disclosure.

FIGS. 3A-3B are cross-sectional and cutaway views of the device of FIG. I according to certain aspects of the present disclosure.

FIGS. 4A-4B are plan and perspective views of the feed mechanism according to certain aspects of the present disclosure.

FIGS. 5A-5B are perspective and cutaway views of another embodiment of a 3D drawing device according to certain aspects of the present disclosure.

DETAILED DESCRIPTION

**[0012]** The present disclosure describes a hand-held device that allows a user to "draw" a 2D or 3D structure and to easily refill or replace the feed stock.

**[0013]** The detailed description set forth below is intended as a description of various configurations of the subject technology and is not intended to represent the only configurations in which the subject technology may be practiced. The appended drawings are incorporated herein and constitute a part of the detailed description. The detailed description includes specific details for the purpose of providing a thorough understanding of the subject technology. However, it will be apparent to those skilled in the art that the subject technology may be practiced without these specific details. In some instances, well-known structures and components are shown in block diagram form in order to avoid obscuring the concepts of the subject technology. Like components are labeled with identical element numbers for ease of understanding.

**[0014]** As used within this disclosure, the phrase "feed stock" means any material provided in any form suitable for processing within the 3D drawing device so as to provide the desired output stream. Feed stock may be a thermoplastic such as acrylonitrile butadiene styrene (ABS), polyvinyl chloride (PVC) or a polylactic acid (PLA), a thermoset material such as an epoxy, a metal such as tin or lead or a mixture of metals. Feed stock may be a single material or a mixture of materials, such as a rod having particles of a first material dispersed within a matrix of a second material.

**[0015]** FIG. 1 is a perspective view of an exemplary 3D drawing device 100 according to certain aspects of the present disclosure. The device 100 includes a housing 110 in which a control assembly 120, a nozzle assembly 130, a fan assembly 140 are provided. The housing 110 may be sized and configured to fit in a user's hand and suitably shaped to allow for manipulation like a pen or pencil. An actuator, for example buttons 122 and 124 in this embodiment, may be positioned to allow the user to actuate either the actuator while holding the device 100. In this embodiment, the user may actuate one or both of buttons 122, 124 while manipulating the 3D drawing device 100. In this embodiment, the device 100 is configured to accept a feed stock 20 in the form of a strand that may be 3 mm in diameter. In certain embodiments, the feed stock 20 may be provided as a cut length, for example 30 cm in length, or as a continuous strand drawn from a spool (not shown in FIG. 1). includes an input portal 18, or other input element, such as a hopper, for example, through which a raw material 19 is provided to the implement 10. The feed stock 20 may be a thermoplastic material, for example a PVC, an ABS, or a PLA, however, other embodiments may accept other types of material, such as a thermoset plastic or a metal or combination of materials.

**[0016]** In an example of use of one embodiment of the device 100, the user selects a particular type and color of a thermoplastic feed stock 20 and introduces the feed stock 20 into the entrance port 115 (see FIG. 2) and connects a power cord (not shown in FIG. 1) to a power source, such as a wall outlet. In certain embodiments, the 3D drawing device 100 may include a portable power source (not shown in FIGS. 1-2), for example a lithium polymer battery, to power the device 100. After a warm-up period, the user may press button 122 while drawing a line on a surface with the device 100, for example tracing a pattern on a printed sheet, in a manner similar to drawing a line with a pencil. A column 22 of the feed stock 20 is extruded from the nozzle assembly while the button 122 is depressed. In certain embodiments, the column 22 may be 0.3 mm in diameter. If the user moves the device along the surface at approximately the same speed as the rate of extrusion of the column 22, the user will create a solid, three-dimensional "line" on the surface. In certain embodiments, the feed stock 20 exists the nozzle assembly 130 in essentially a solid form such that the extruded column retains its shape. In certain embodiments, freshly extruded feed stock 20 will bond to previously extruded columns 22 such that a structure may be formed by drawing a line across to onto a previously drawn column 22.

**[0017]** In certain embodiments, button 122 may cause the feed stock 20 to be extruded at a first rate, for example 2.6 mm/sec, while the second button 124 may cause the feed stock 20 to be extruded at a second rate, for example 5.0 mm/sec. In certain embodiments, the first rate may be in the range of 0.1-10.0 mm/sec and the second rate may be in the range of 2-50 mm/sec. In certain embodiments, the first and second rates are chosen to provide a speed appropriate for the intended user, for example a device 100 intended for use by a young child may have slower rates than a device 100 intended for an adult artist. In certain embodiments, the 3D drawing device 100 may include a variable speed control mechanism (not shown in FIG. 1-2) to allow the user to adjust one or more of the rates of extrusion. In certain embodiments, the variable speed control mechanism may include a dial. In certain embodiments, releasing either of the buttons 122, 124 may cause the internal mechanism to draw the feed stock 20 backward a certain amount, thereby breaking off the extruded column 22. In this manner, the user can "write" with the 3D drawing device 100 in much the same manner as they would with a pen except they can do so in three dimensions since the extruded material is three-dimensional. The user can create free-form lines, shapes or other objects, as desired. A user may additionally use stencils or other guides in order to create desired objects such as sculpture, jewelry, artistic pieces, etc. In addition, or in the alternative, the 3D drawing device 100 may be used to repair or enhance existing objects and structures. In certain embodiments, pressing both buttons 122, 124 at the same time may cause another action, such as expelling the unused portion of the feed stock 20 from the entrance port 115 such that the user may switch to a

different color or type of feed stock 20.

**[0018]** FIG. 2 is a cut-way view of the device 100 of FIG. 1 with a portion of the housing 110 removed according to certain aspects of the present disclosure. It can be seen that a circuit assembly 126 is positioned under the switches 122, 124 and a feed mechanism 150 is disposed on the lower housing 114, with the feed stock 20 entering through the entrance port 115 and passing over and between elements of the feed mechanism 150, which is discussed in greater detail with respect to FIGS. 4A-4B. In certain embodiments, the circuit assembly 126 may include a processor while, in certain embodiments, the circuit assembly 126 may include analog circuit elements such as mechanical switches, resistors, capacitors, and other electrical elements (not visible in FIG. 2) as known to those of skill in the art. In certain embodiments, the circuit assembly 126 may include a power conditioning circuit (not shown) that converts power from the power source to a different form, such as a direct current (DC) voltage. In certain embodiments, the circuit assembly 126 may include a portable power source (not shown in FIG. 2). In certain embodiments, the circuit assembly 126 may be connected to an external power source through a power cord (not shown in FIGS. 1-2). In certain embodiments, the 3D drawing device 100 also includes an external control interface 127 that is connected to the circuit assembly 126 and configured to accept actuation commands from a remote system, such as a computer numerical control (CNC) machine. In certain embodiments, the housing 110 may be adapted for mounting on a tool interface of a CNC machine such that the machine can manipulate the 3D drawing device 100 to create 3D objects. For example, the external control interface 127 may include three electrical pins, wherein a pin 1 is a common such as a ground, a pin 2 that is coupled to the button 122 such that provision of a DC voltage across pin 1 and pin 2 is equivalent to pressing button 122, and a pin 3 that is coupled to the button 124 such that provision of a DC voltage across pin 1 and pin 3 is equivalent to pressing button 124. In certain embodiments, the external control interface 127 may be configured to accept signals through a radio frequency (RF) or optical wireless system. In certain embodiments, the external control interface 127 may be configured to accept signals through a fiber-optic cable.

**[0019]** FIGS. 3A-3B are cross-sectional and cutaway views of the device 100 of FIG. 1 disclosure. according to certain aspects of the present . FIG. 3A is a side view of the entire 3D drawing device 100, showing how the upper housing 112 and lower housing 114 together form an internal volume 116 in which is located the feed mechanism 150. At the right end, it can be seen that the nozzle assembly 130 includes an extruder 132 and a guide tube 134, which are discussed in greater detail with respect to FIG. 3B. the fan assembly 140 includes a fan cover 142, which is stationary and attached to the upper housing 112, an impeller 14 located underneath the cover 142 and configured to draw air into the internal volume 116 through ports (not visible in FIG. 3A) in the cover 142. A motor 146 is mounted, in this example, to the lower housing 114 and drives the impeller 144 at a constant speed. The air that is drawn into the internal volume may, in certain embodiments, flow out through either cooling ports 118 in the upper and lower housings 112, 114. The cooling ports 118 are discussed in greater detail with respect to FIG. 3B. It can be seen in FIG. 3A that, in this embodiment, the feed stock 20 follows a straight path though the device 100.

**[0020]** FIG. 3B is a close-up, cutaway view of the nozzle assembly 130. The extruder 132 has a first chamber 135 formed as a cylindrical bore of approximately the same diameter as the feed stock 20 and an extrusion passage 133 of a smaller diameter, terminating in an exit nozzle 133A. In certain embodiments, the first chamber 135 may have a first diameter of 3 mm while the extrusion passage 133 has a diameter of 0.3 mm. In certain embodiments, the extruder 132 is formed of a thermally conductive material, for example a metal or a ceramic, with a heating element, for example a nichrome wire, (not visible in FIG. 3B) wound around the exterior circumference. When the device 100 is connected to a power source, the heating element raises the temperature of the extruder 132 to a temperature that may be above the melting point of the feed stock 20. In certain embodiments, the nozzle assembly 130 includes a temperature sensor that is connected to the circuit assembly 126 which may include a temperature control circuit to regulate the power to the heater element so as to maintain the temperature of the extruder 132 within a desired range of a setpoint. As systems and methods for temperature regulation are known to those of skill in the art, the details are not provided herein. In certain embodiments, an indicator (not shown), for example an LED, may be provided to indicate that the extruder 132 has reached a temperature sufficient to melt the feed stock 20.

**[0021]** In certain embodiments, for example with a feed stock comprising a plastic, the temperature of the extruder 132 may be in the range of 20-500 °C. In certain embodiments, for example with a feed stock comprising a metal, the temperature of the extruder 132 may be in the range of 1000-2000 °C. In certain embodiments, for example with a feed stock comprising a metal such as lead, tin, or mixtures thereof, the temperature of the extruder 132 may be in the range of 100-400 °C. In certain embodiments, for example with a feed stock comprising a metal such as copper, gold, silver or mixtures thereof, the temperature of the extruder 132 may be in the range of 1000-1200 °C. In certain embodiments, for example with a feed stock comprising a metal such as platinum, the temperature of the extruder 132 may be in the range of 1600-2000 °C. In certain embodiments, the 3D drawing device 100 may include a variable temperature controller (not shown) that is connected to the circuit assembly 126 to allow a user to select a setpoint temperature for the extruder 132. In certain embodiments, the variable tem-

perature controller may allow the use to select a type of material, for example "thermoplastic," and the circuit assembly 126 will adjust the setpoint temperature of the extruder 132. In certain embodiments, the variable temperature controller may include a dial.

**[0022]** A guide tube 134 is aligned with the first chamber 135 of the extruder 132 such that feed stock passing through the guide tube 134 enters the first chamber 135. In certain embodiments, the guide tube 134 may be formed of a low-friction material, such as polytetrafluoroethylene (PTFE), so allow the feed stock 20 to slide easily while also minimizing the gap between the guide tube 134 and feed stock 20. The extruder 132 and guide tube 134 are held in alignment by a mounting tube 138. In certain embodiments, the mounting tube 138 is formed of a metal having a relatively low thermal conductivity, compared to other metals. In certain embodiments, the mounting tube 138 may be a stainless steel. In certain embodiments, an insulating film (not visible in FIG. 3B), for example a polyimide tape, may be applied over the heating element and under the mounting tube 138.

**[0023]** In certain embodiments, an insulator 131 may be provided over the mounting tube 138 so as to reduce the amount of heat transferred from the extruder 132 to the upper and lower housings 112, 114. In certain embodiments, one or both of the upper and lower housings 112, 114 may have cooling ports 118 formed therethrough such that air can flow from the interior volume 116 to the ambient atmosphere. In certain embodiments, the passages formed in the top and bottom housings 112, 114 that lead to the cooling ports 118 may be angled such that the air that emerges from the cooling ports 118 is directed inward toward the tip 137. Thus, as the air exits the cooling ports 118, the air passes by the tip 137 of the extruder 132, cooling both the tip 137 and the feed stock 20 that just been extruded from the extrusion passage 133. Both of these cooling effects serve to reduce the temperature of the feed stock 20 as it exits the extrusion passage 133 such that the feed stock 20 may be essentially solid as it exits the extrusion passage 133. In certain embodiments, the freshly extruded feed stock 20 may be pliable and formable into various shapes. In certain embodiments, the surface of the freshly extruded feed stock 20 may be receptive to attachment, e.g. sticky, such that the extruded material will bond to other previously extruded feed stock 20.

**[0024]** In certain embodiments, there may be a gap between the insulator 131 and the mounting tube 138. In certain embodiments, this gap may provide a thermal break so as to further thermally isolate the upper and lower housings 112, 114 from the extruder 132.

**[0025]** As the feed stock 20 is driven toward the extrusion passage 133 by the feed mechanism 150 (not shown in FIG. 3B), the portion of the feed stock 20 that is within the extruder 132 will be heated by the extruder 132 such that the feed stock 20 within the first chamber 135 softens or melts. As the solid feed stock 20 is forced forward, the softened or molten feed stock 20 will be forced out through the extrusion passage 133 and emerge from the tip 137, where the cooling air that is flowing out of the cooling ports 118 flows over the freshly extruded feed stock 20, thereby cooling and solidifying the feed stock 20. In certain embodiments, a portion of the extruder 132 that extends outward beyond a front plane 102 may be cooled to a temperature below the temperature of the main portion of the extruder 132 by the air flowing out of the cooling ports 118. In certain embodiments, the temperature of the tip 137 may be below the melting point of the feed stock 20.

**[0026]** FIGS. 4A-4B are plan and perspective views of the feed mechanism 150 according to certain aspects of the present disclosure. FIG. 4A shows a series of gear pairs 153, 154, 155, 156, and 157 that are driven by the motor 152 through a spur gear (not visible in FIG. 4A) that is attached to the rotor of the motor 152. Each gear pair has a large gear and a small gear that are fixedly attached to each other and rotate about a common axis. The small gear of the motor 152 drives the large gear 153A, which causes the small gear 153B to drive the large gear 154A. In certain embodiments, the large gears 153A, 154A, 155A, 156A, and 157A each may have 40 teeth while the small gears 153B, 154B, 155B and 156B (not visible in FIG. 4A), and 157B may have 12 teeth, providing a 40:12 step-down ratio between each gear pair. In certain embodiments, the step-down from the motor 152 to the small gear 157B may be 5*(40:12) or approximately 17:1, *i.e.* seventeen complete rotations of the motor 152 causes only one complete rotation of the small gear 157B. In certain embodiments, the gear pairs 153, 154, 155, 156, and 157 may have a different number of teeth on the large and/or small gears. In certain embodiments, the gear pairs 153, 154, 155, 156, and 157 may not have the same number of teeth on each corresponding large or small gear.

**[0027]** In use, the use of a motor 152 to drive a stepdown gear train 150 to control the advancement of the feed stock 20 provides an improved level of control over the rate of extrusion of the feed stock 20. For example, a conventional glue gun has a direct linkage between a trigger and the glue stick, such that pressure on the trigger on the trigger is directly transferred to the rod. The rate of advancement of the glue stick, and therefore the rate of extrusion, is dependent upon the viscosity of the melted glue and therefore caries over a die range. This often results in excessive glue being dispensed. In addition, since releasing the trigger does not retract the glue stick, there is frequently a "tail" of glue drawn out of the glue gun as the nozzle is moved away from the dispensing location. In contrast, the disclosed 3D drawing device 100 provides a constant rate of extrusion, for example 3 mm/sec, due to the controlled motion provided by the motor 152 and gear train 150. In addition, the circuit assembly 126 causes the motor 152 to briefly run in reverse when the button 122 is released, thereby retracting the feed stock 20 slightly and drawing the melted feed stock 20 that is within the extrusion passage 133 back into the

extruder 132, thereby cleanly severing the extruded column 22 from the tip 137.

**[0028]** FIG. 4B shows how the teeth of the final small gear 157B engage the feed stock 20. In this embodiment, the feed stock 20 passes by a post 119 of the lower housing 114, then by the small gear 157B, and then into the guide tube 134. In certain embodiments, the gear 157B is positioned such that the teeth press against the feed stock 20, which is restrained from lateral motion away from the teeth of gear 157B by the post 119 and the guide tube 134, such that rotation of the gear 157B applies an axial force, *i.e.* directed along the length, to the feed stock 20. Rotation of the gear set 150 in a first direction will cause the feed stock 20 to move linearly forward, *i.e.* toward the tip 137. As this portion of feed stock 20 is not affected by the heating within the extruder 132, rotation of the gear set 150 in a reverse direction will cause the feed stock 20 to move linearly backward, *i.e.* away from the tip 137.

**[0029]** It can be seen from FIGS. 4A and 4B that rotation of the motor 152, which is controlled by pressing one of the buttons 122, 124, causes the feed stock 20 to move forward or backward. The step-down from the motor 152 to the small gear 157B provides a smooth rate of motion of the feed stock, as the motor 152 may turn at a speed within a normal range of smooth operation while the step-down converts this to a low rate of linear motion of the feed stock 20.

**[0030]** FIGS. 5A-5B are perspective and cutaway views of another embodiment 200 of a 3D drawing device according to certain aspects of the present disclosure. FIG. 5A shows a 3D drawing device 200 configured to accept a feed stock in the form of pellets 25 that are held in a hopper 250 attached to the body 210. A power cord 270 is attached to the body 210. FIG. 5B is a cut-away view showing a feed screw 260 that transfers the pellets 25 from the hopper 250 to the nozzle assembly 230 that melts the pellets 25 and, under pressure provided by the feed screw 260, extrudes the melted feed stock 25 in a manner similar to the nozzle assembly 130 of embodiment 100, previously discussed. Other features of the embodiment 100, such as the cooling ports 118, may also be provided in embodiment 200. In certain embodiments, the pellets may be transferred from the hopper 250 to the nozzle assembly 130 by other mechanisms, for example a reciprocating cylinder (not shown in FIGS. 5A-5B) as will be known to those of skill in the art. In certain embodiments, the feed stock may be provided as a liquid, for example an epoxy with beads of catalyst suspended in a liquid polymer, that is held in the hopper 250. In certain embodiments, passage of the liquid feed stock through an extrusion passage, similar to extrusion passage 133 of embodiment 100, may modify the liquid feed stock such that it hardens quickly after extrusion from the 3D drawing device 200.

**[0031]** The disclosed examples of a 3D drawing device illustrate the principles of its construction and use. The provision of a flow of cooling air at the tip to quickly solidify the extruded feed stock allows the user to work in three dimensions, rather than being forced to rely on a support surface to hold the still-fluid extruded material in place while it hardens. The use of a mechanical gear train to advance the feed stock, instead of a pressurized supply or a direct connection between a trigger and a feed rod, allows precise control of the rate of extrusion, thereby increasing the uniformity of the extruded column of material and allowing precise placement without excess material.

**[0032]** This application includes description that is provided to enable a person of ordinary skill in the art to practice the various aspects described herein. While the foregoing has described what are considered to be the best mode and/or other examples, it is understood that various modifications to these aspects will be readily apparent to those skilled in the art, and the generic principles defined herein may be applied to other aspects. It is understood that the specific order or hierarchy of steps or blocks in the processes disclosed is an illustration of exemplary approaches. Based upon design preferences, it is understood that the specific order or hierarchy of steps or blocks in the processes may be rearranged. The accompanying method claims present elements of the various steps in a sample order, and are not meant to be limited to the specific order or hierarchy presented. Thus, the claims are not intended to be limited to the aspects shown herein, but is to be accorded the full scope consistent with the language claims.

**[0033]** Headings and subheadings, if any, are used for convenience only and do not limit the invention.

**[0034]** Reference to an element in the singular is not intended to mean "one and only one" unless specifically so stated, but rather "one or more." Use of the articles "a" and "an" is to be interpreted as equivalent to the phrase "at least one." Unless specifically stated otherwise, the terms "a set" and "some" refer to one or more.

**[0035]** Terms such as "top," "bottom," "upper," "lower," "left," "right," "front," "rear" and the like as used in this disclosure should be understood as referring to an arbitrary frame of reference, rather than to the ordinary gravitational frame of reference. Thus, a top surface, a bottom surface, a front surface, and a rear surface may extend upwardly, downwardly, diagonally, or horizontally in a gravitational frame of reference.

**[0036]** Although the relationships among various components are described herein and/or are illustrated as being orthogonal or perpendicular, those components can be arranged in other configurations in some embodiments. For example, the angles formed between the referenced components can be greater or less than 90 degrees in some embodiments.

**[0037]** Although various components are illustrated as being flat and/or straight, those components can have other configurations, such as curved or tapered for example, in some embodiments.

**[0038]** Pronouns in the masculine (*e.g.,* his) include the feminine and neuter gender (*e.g.,* her and its) and

vice versa. All structural and functional equivalents to the elements of the various aspects described throughout this disclosure that are known or later come to be known to those of ordinary skill in the art are intended to be encompassed by the claims. Moreover, nothing disclosed herein is intended to be dedicated to the public regardless of whether such disclosure is explicitly recited in the claims. No claim element is to be construed under the provisions of 35 U.S.C. §112, sixth paragraph, unless the element is expressly recited using the phrase "means for" or, in the case of a method claim, the element is recited using the phrase "operation for."

**[0039]** A phrase such as an "aspect" does not imply that such aspect is essential to the subject technology or that such aspect applies to all configurations of the subject technology. A disclosure relating to an aspect may apply to all configurations, or one or more configurations. A phrase such as an aspect may refer to one or more aspects and vice versa. A phrase such as an "embodiment" does not imply that such embodiment is essential to the subject technology or that such embodiment applies to all configurations of the subject technology. A disclosure relating to an embodiment may apply to all embodiments, or one or more embodiments. A phrase such as an embodiment may refer to one or more embodiments and vice versa.

**[0040]** The word "exemplary" is used herein to mean "serving as an example or illustration." Any aspect or design described herein as "exemplary" is not necessarily to be construed as preferred or advantageous over other aspects or designs.

**[0041]** All structural and functional equivalents to the elements of the various aspects described throughout this disclosure that are known or later come to be known to those of ordinary skill in the art are intended to be encompassed by the claims. Moreover, nothing disclosed herein is intended to be dedicated to the public regardless of whether such disclosure is explicitly recited in the claims. No claim element is to be construed under the provisions of 35 U.S.C. § 112, sixth paragraph, unless the element is expressly recited using the phrase "means for" or, in the case of a method claim, the element is recited using the phrase "step for." Furthermore, to the extent that the term "include," "have," or the like is used in the description or the claims, such term is intended to be inclusive in a manner similar to the term "comprise" as "comprise" is interpreted when employed as a transitional word in a claim.

**[0042]** Although embodiments of the present disclosure have been described and illustrated in detail, it is to be clearly understood that the same is by way of illustration and example only and is not to be taken by way of limitation, the scope of the present invention being limited only by the terms of the appended claims.

## Claims

1. A three-dimensional (3D) drawing device comprising:

    a housing (110) configured to be held in a user's hand, the housing having a first end and a second end,
    wherein the device comprises
    a port (115) configured for introduction of a strand of feed stock (20) into an internal volume (116) of the housing (110); a motor (152) disposed within the internal volume (116);
    a gear train (150) operatively coupled with the motor (152) to drive the gear train (150), disposed within the internal volume (116) to receive the strand of feed stock (20), and configured to move the strand of feed stock (20) when engaged with the gear train (150);
    an actuator configured to selectably cause the motor (152) to rotate in at least a first direction that causes the feed stock (20) to be extruded out of the exit nozzle to form a three-dimensional object; and
    a nozzle assembly (130) disposed at the first end of the housing (110) and at least partially within the housing (110), the nozzle assembly (130) comprising an extruder (132), an exit nozzle (133A), and a guide tube (134),
    **characterized by** the extruder (132) having a heating element surrounded by an insulator (131), the guide tube (134) extending between the gear train (150) and the extruder (132), a first end of the guide tube (134) positioned to receive the strand of feed stock (20) from the gear train (150), a second end of the guide tube (134) aligned with a chamber (135) of the extruder (132) such that the strand of feed stock (20) is directed from the guide tube (134) into the chamber (135), the extruder (132) being disposed between the guide tube (134) and the exit nozzle (133A).

2. The 3D drawing device of claim 1, further comprising a mounting tube (138) having a first end and a second end, and wherein the second end of the guide tube (134) extends into the first end of the mounting tube (138), and an end of the extruder (132) opposite the exit nozzle (133A) extends into the second end of the mounting tube (138), the mounting tube (138) holding the second end of the guide tube (134) in alignment with the end of the extruder (132) opposite the exit nozzle (133A).

3. The 3D drawing device of claim 1, wherein the heating element is positioned adjacent to the exit nozzle (133A) and configured to melt the strand of feed stock (20) prior to extrusion through the exit nozzle

18.9.2025
S. Haesch

**Auxiliary Request ~~33~~1**

1. A three-dimensional (3D) drawing device comprising:

a housing (110) configured to be held in a user's hand, the housing having a first end and a second end, wherein the device comprises

a port (115) configured for introduction of a strand of feed stock (20) into an internal volume (116) of the housing (110);

a motor (152) disposed within the internal volume (116);

a gear train (150) operatively coupled with the motor (152) to drive the gear train (150), disposed within the internal volume (116) to receive the strand of feed stock (20), and configured to move the strand of feed stock (20) when engaged with the gear train (150);

an actuator configured to selectably cause the motor (152) to rotate in at least a first direction that causes the feed stock (20) to be extruded out of the exit nozzle to form a three-dimensional object; and

a nozzle assembly (130) disposed at the first end of the housing (110) and at least partially within the housing (110), the nozzle assembly (130) comprising an extruder (132), an exit nozzle (133A), and a guide tube (134),

**characterized by** the extruder (132) having a heating element surrounded by an insulator (131), the guide tube (134) extending between the gear train (150) and the extruder (132), wherein the extruder and the guide tube are held in alignment by a mounting tube (138), wherein the insulator (131) is provided over the mounting tube (138) so as to reduce the amount of heat transferred from the extruder (132) to the upper and lower housings (112, 114), a first end of the guide tube (134) positioned to receive the strand of feed stock (20) from the gear train (150), a second end of the guide tube (134) aligned with a chamber (135) of the extruder (132) such that the strand of feed stock (20) is directed from the guide tube (134) into the chamber (135), the extruder (132) being disposed between the guide tube (134) and the exit nozzle (133A) and wherein the housing comprises an upper housing (112) and lower housing (114) that together form ~~an~~the internal volume (116) in which is located said gear train (150), wherein the housing is sized and configured to fit in a user's hand and suitably shaped to allow for manipulation like a pen or pencil.

~~2. The 3D drawing device of claim 1, further comprising a mounting tube (138) having a first end and a second end, and wherein the second end of the guide tube (134) extends into the first end of the mounting tube (138), and an end of the extruder (132) opposite the exit nozzle (133A) extends into the second end of the mounting tube (138), the mounting tube (138) holding the second end of the guide tube (134) in alignment with the end of the extruder (132) opposite the exit nozzle (133A).~~

18.9.2025
S. Hagston



~~3. The 3D drawing device of claim 1, wherein the heating element is positioned adjacent to the exit nozzle (133A) and configured to melt the strand of feed stock (20) prior to extrusion through the exit nozzle (133A).~~

~~4. The 3D drawing device of claim 1, further comprising a fan configured to provide a flow cooling air at exit nozzle (133A).~~

~~5. The 3D drawing device of claim 4, wherein:~~

~~the housing (110) comprises an internal volume (116) and at least one cooling port (118) proximate to the exit nozzle (133A), the cooling port (118) in fluid communication with the internal volume (116); and the fan is disposed within the housing (110) and configured to draw air into the internal volume (116).~~

~~6. The 3D drawing device of claim 1, wherein the housing (110) comprises an upper (112) housing and a lower housing (114), at least one of the upper housing (112) and the lower housing (114) comprises a cooling port (118) proximate to the exit nozzle (133A).~~

~~7. The 3D drawing device of claim 6, wherein each of the upper housing (112) and the lower (114) housing comprises the cooling port (118).~~

~~8. The 3D drawing device of claim 1, wherein said actuator comprises a first and second button (122, 124).~~

~~9. The 3D drawing device of claim 1, wherein the actuator is configured to selectably cause the motor to rotate in a second direction that is opposite the first direction.~~

~~10. The 3D drawing device of claim 9, wherein the actuator comprises at least one button.~~

~~11. The 3D drawing device of claim 10, wherein the actuator comprises:~~

~~a first button that causes the motor (152) to rotate in the first direction at a first speed such that the strand of feed stock (20) is extruded out of the exit nozzle (133A) at a first rate; and a second button that that causes the motor (152) to rotate in the first direction at a second speed such that the strand of feed stock (20) is extruded out of the exit nozzle (133A) at a second rate that is greater than the first rate, wherein simultaneous actuation of the first and second buttons causes the motor (152) to rotate in the second direction.~~

~~12. The 3D drawing device of claim 1, wherein the gear train (150) comprises a final gear having teeth that engage the strand of feed stock (20) such that rotation of the final gear causes the strand of feed stock (20) to linearly move.~~




FIG.1




FIG.2


140
100
112
116
130
118
142
144
146
20
150
114
134
132
118

FIG.3A


102
112
118
135
20
137
134
132
133A
116
138
131
133
114
118

FIG.3B


150
153
154
156
156A
153A
154A
154B
155
155A
153B
152
157A
157B

FIG.4A


134
20
119
157B
114

FIG.4B




FIG.5A




FIG.5B

Europäisches Patentamt
European Patent Office
Office européen des brevets

European Patent Office
Postbus 5818
2280 HV Rijswijk
NETHERLANDS
Tel: +31 70 340 2040

Keltie LLP
No. 1 London Bridge
London SE1 9BA
ROYAUME-UNI

**Formalities Officer**
Name: Gibaud, Ludivine
Tel: +31 70 340 - 4804
or call
+31 (0)70 340 45 00

| Application No. / Patent No. | Ref. | Date |
|---|---|---|
| 13 861 105.8 - 1014 / 2 928 672 / 02 | S79795EP/JBE | 22.12.2025 |
| Proprietor<br>WobbleWorks, Inc. | | |

**Provision of a copy of the minutes in accordance with Rule 124(4) EPC**

The attached copy of the minutes of the oral proceedings is sent to you in accordance with Rule 124(4) EPC.

Europäisches Patentamt • European Patent Office • Office européen des brevets

Gibaud, Ludivine
**Formalities Officer**
Tel. No.: +31 70 340 - 4804

**Branch at The Hague**

Enclosure(s): Applicants not using the Mailbox can access patent literature via Espacenet
Copy of the minutes (Form 2309)

Europäisches Patentamt
European Patent Office
Office européen des brevets

European Patent Office
Postbus 5818
2280 HV Rijswijk
NETHERLANDS
Tel: +31 70 340 2040

Application No.: 13 861 105.8

Patent No.: EP-B-2 928 672

## Minutes of the oral proceedings before the OPPOSITION DIVISION

The proceedings were public.

**Proceedings opened** on 18.09.2025 at 09:00 hours

**Present as members of the opposition division:**

| | |
|---|---|
| Chairman: | Didenot, Benjamin |
| 1st member: | Curt, Denis |
| 2nd member: | Öztürk, Serkan |
| Legal member: | Kley, Britta |
| Minute writer: | Öztürk, Serkan |

**Present as or for the party or parties:**

- For the Proprietor(s): WobbleWorks, Inc.

  Dr. Sebastian Höpfner and Dr. Alexander von Homeyer representing the proprietor
- For the Opponent 1: Shenzhen Xinpinyi International e-Commerce Ltd. Co.

  Dr. Johannes Gierlich and Ms. Yanan Sun representing the first opponent
- For the Opponent 2: myFirst Tech Asia Pte. Ltd.

  Mr. Joeri Beetz representing the second opponent

The identity of the person/s (as well as, if applicable, that of the witness or witnesses) and, where necessary, the authorisation to represent/authority to act were checked.

Essentials of the oral proceedings and relevant statements of the parties:

1 At **09:00** the Chairperson (Chair) declared the proceedings opened and explained the specifics and the rules of the oral proceedings held by using ZOOM. Accordingly, recording of the proceeding is not allowed. Both parties received a separate email containing the email addresses of each division member and a phone number in case of a disconnection. The parties confirmed receiving the email.

2 Chair declared the proceedings opened and asked the parties whether they received the last submissions after the summons and third party observations and asked also to confirm their requests.

3 The proprietor (Prop) confirmed their request for the maintenance of the patent according to the main request or the maintenance of the patent according to one of the auxiliary requests on file. Furthermore, Prop requested that the opposition should not be admitted, since the notice of opposition was partially late filed via fax. The novelty and inventive step arguments were missing in the part of the fax that was received before midnight (reference was made to G9/91, G10/91, T2133/10, T683/06). Prop also requested the dismissal of the third party observations and that document D26b, filed by the second opponent, be considered as late filed and not admitted into the proceedings.

4 The first opponent (Op1) confirmed their request for revocation of the patent in its entirety on the grounds of Article 100(a),(b,(c) EPC. Furthermore, the opposition should be admitted (T858/18).

5 At **09:15** Chair ordered a break for a deliberation of the Opposition Division regarding the admissibility of the opposition.

6 At **09:28** Chair resumed the proceedings and announced that the Opposition Division came to the conclusion that the opposition is admissible at least for the parts of the fax that was received before midnight comprising the Art 123(2) and 83 EPC objections.

7 Chair asked whether the documents of Annex A can be public in order to consider the intervener as an opponent.

8 The second opponent (Op2) confirmed that the Annex A can be public.

9 At **09:30** Chair ordered a break for a deliberation of the Opposition Division regarding accepting the intervener as a valid opponent.

10 At **09:36** Chair resumed the proceedings and announced that the Opposition Division came to the conclusion that the Annex A will be available for inspection under Art. 128 EPC and the intervener is accepted as the second opponent to the proceedings.

11 Starting with Art. 100(c) for the Main Request, Chair asked Op1 why the requirements of Art. 123(2) EPC are not fulfilled.

12 Op1 argued that first of all the feature "be held in a user's hand, the housing having a first end and a second end" is not supported anywhere in the description.

13 Op2 argued that the housing should be "pen-like" shape and the housing should have "upper and lower housing". The movement of the strand of feed stock needs to be linear (reference was made to Figs. 1-4 and §31, §32).

14 Prop argued that the Gold Standard should apply when seeking support for amendments or analysing intermediate generalisation (reference was made to GL F-IV.4.5.2, T99/13 and T273/10). Prop referred to §5, 6, §7, §11, §41 of D11 (the PCT application of the patent in suit) to defend that there is no intermediate generalisation and claim 1 is supported.

15 Chair continued with the discussion of the next three features starting "a port...", "a motor ... ", "a gear train...".

16 Op1 argued that only the device 100 has a strand of feed stock so that the device 200 of the second embodiment is not in the scope of the new claim. Op2 argued the the port and internal volume features require upper and lower housing and fan features. In the description only port was a cooling port.

17 Prop argued that §6 corresponds to claim 1 of D11 and this passage support a hand-held device accepting a feed stock. §18 and Fig. 2 support a port for introducing a feed stock.

18 Op1 argued that omitting the cooling features constitutes an unallowable intermediate generalisation. Op2 argued that the strand is introduced into a tube not generically into an internal volume as the claim requires. Furthermore, the internal volume feature is linked to the upper and lower housing.

19 Prop argued that the description does not indicate these allegedly omitted features as essential or a must. §41 teaches that the embodiments can be adapted.

20 Parties did not have further comments and referred to their written submissions.

21 At **10:30** Chair ordered a break for a deliberation of the Opposition Division regarding support of claim 1 of the Main Request, Art. 123(2) and 100(c) EPC.

22 During this break a fire alarm took place in the premises of the EPO in The Hague and the division members located in The Hague needed to evacuate the building. Later on the division members returned to their offices and continued the deliberation.

23 At **11:22** Chair resumed the proceedings for further discussion of the features starting with "an actuator...", "a nozzle assembly..." of claim 1.

24 Op1 argued that these features are cherry picked from the description and raised a plurality of unallowable intermediate generalisation objections. Op2 argued also that the features like mounting tube, insulator and chamber specific features are missing. Accordingly, the heating element needs to be adjacent to the nozzle and the stock feed needs to be melted and later cooled. Moreover, the insulator needs to be around the mounting tube. The guide tube and the mounting tube need to be aligned (Fig. 1, §24, §25). Also the extruder chamber (§22, Fig. 3b) needs to be small in size and in cylindrical bore shape.

25 Prop argued that each of these features are optional by referring to original dependent claims and also Fig. 3, §21, §22, §24, §26, §27 of D11.

26 Op1 argued that different types of insulators with or without a gap are disclosed in §24-§26 together with the mounting tube. The mounting tube is essential.

27 Prop argued that §24-§26 are preferred embodiments and alternatives.

28 Op1 argued that the heating element from §22 is linked to an extruder with a thermally conductive material. This feature should not be omitted.

29 Prop argued that heating is also disclosed in §27 and also that every material has a thermal conductivity. The mounting tube is only shown in Fig. 3B but not in Fig. 3A. So that the mounting tube is optional.

30 Op2 made further arguments regarding mounting tube and its alignment function and said that Fig. 3A also shows the mounting tube without a reference number. Moreover, the insulator in the claim is very generic encompassing new embodiments where the insulator could be anywhere at the downstream or upstream side of the device.

31 Parties discussed whether the fan and cooling features are essential features. Both opponents argued that the fan and cooling features are essential and they are omitted. Op2 referred to D56 and D58 when arguing that the cooling is essential for the invention. Furthermore, many gear train features are omitted. For instance, the post 119 has been omitted, §30.

32 Prop argued that the cooling is helpful but not essential. §4 teaches that cooling is advantageous, but that the invention would still function in its absence. Originally, two independent claims were filed: one including and one excluding the cooling feature. Prop further argued that the embodiment of Fig. 5 still falls within the scope of the invention, §5. Documents D56 and D58 should not be considered suitable sources of support for amendments. Regarding post 119,

Prop emphasized that this element is optional. For optional features in the description, it is not mandatory to precede them with terms such as “example” or “may”, etc.

33 At **12:28** Chair ordered a break for a deliberation of the Opposition Division regarding support of claim 1 of the Main Request, Art. 123(2) and 100(c) EPC.

34 At **14:00** Chair resumed the proceedings and announced that the Opposition Division came to the conclusion that claim 1 does not fulfil the requirements of Art. 123(2) EPC, since the following features were found to be missing in the claim: pen-like, upper and lower housing, mounting tube - alignment of extruder and guide tube, features mentioned together with insulator.

35 Prop requested a break to consider how to proceed.

36 At **14:04** Chair granted some time to Prop for their further consideration.

37 At **14:32** Chair resumed the proceedings. Prop stated their intention to continue with Auxiliary Request 33. Prop argued that claim 1 of this request includes the allegedly missing features and indicated support from the description.

38 Chair asked whether this request will become the new Auxiliary Request 1.

39 Prop stated that they would renumber Auxiliary Request 33 to new Auxiliary Request 1 and keep all the other requests as renumbered to Aux. Request 2 to 62 on file.

40 Chair asked the opponents whether they have objections in view of the Auxiliary Request 33.

41 Op1 objected to the first end second ends of the housing and for instance that the feed mechanism 150 is attached to the lower housing, §20. A fan cover is attached to the upper housing. These features are omitted.

42 Op2 objected to Art. 84 EPC of new claim 1. Claim 1 comprises initially "an internal volume" and later on it reads that the upper and lower housing forms "an internal volume". Furthermore, it is not clear how the skilled person should interpret "housing is sized to fit in a user's hand". A user hand is not defined and can vary in size. Furthermore, the buttons on the housing are essential features that are omitted, Art. 123(2) EPC. Housing of pen-like shape requires buttons near the nozzle.

43 Prop argued that fan features were considered optional in the Main Request so that the fan cover is not essential for the Auxiliary Request. "An internal volume" feature is clearly an obvious error that can be amended to "the internal volume". "Size of a hand" objection of Op2 cannot be followed. There is no requirement about where to provide the buttons and this objection should be dismissed.

44 At **14:54** Chair ordered a break for a deliberation of the Opposition Division regarding support of claim 1 of the Auxiliary Request 33, Art. 123(2) and 100(c) EPC and also clarity of claim 1, Art 84 EPC.

45 At **15:10** Chair resumed the proceedings and announced that the Opposition Division came to the conclusion that claim 1 of the Auxiliary Request 33 fulfils the requirements of Art. 123(2) EPC. "An internal volume" is however not clear and Art. 84 EPC requirements are not fulfilled.

46 Prop prepared a new auxiliary request where "an internal volume" has been replaced to "the internal volume". This new request was then forwarded to the opponents. Prop requested to number this request sent by email to Auxiliary Request 1 and renumber all the other Aux. Reqs. 1 to 62 on file to Aux. Req. 2 to 63.

47 Chair continued with the discussion of novelty of claim 1 of the new Aux. Req. 1, Art. 54, 100(a) EPC.

48 Op1 argued that claim 1 is not novel in view of D12. Accordingly, the device of D12 can be held like a pen in the hand of a user. The motor is housed in an external part but the main housing and motor housing together constitute together a housing having upper and lower parts, Figs. 1, 3, Col. 2 Line 19. Furthermore, Col. 3 Line 47 teaches that the plug 104 includes a neck that projects into the housing, so that these parts are considered as provided in the housing.

49 Op2 did not have anything to add in view of D12.

50 Prop argued that D12 refers to quick setting adhesive that is not suitable for 3D printing. Motor is not inside the housing. The nozzle assembly is quite different from the claimed nozzle and an insulator is missing. Col. 3 Lines 35-40 teach that the heat needs to dissipate so that there is no need for an insulator. Also the gear of D12 is not a gear train as claimed and the feed stock does not engage with the gear train as in the claim. A guide tube and a mounting tube that are aligned are also missing. Pen-shape is also not present.

51 Op1 argued that any device extruding material can be considered as a 3D printing device. Motor is in the housing and the gap shown in Fig. 4 around the heater can be considered as an insulator. The two wheels of the gear train engage with the feed stock. 106 and 108 shown in Fig. 4 form a guide tube and mounting tube.

52 Op2 argued that claim 1 does not include any feature to distinguish the claimed apparatus from a glue gun. In fact, cooling features are needed to distinguish it from a glue gun.

53 At **15:42** Chair ordered a break for a deliberation of the Opposition Division regarding novelty of claim 1, Art. 100(a) EPC in view of D12.

54 At **16:00** Chair resumed the proceedings and announced that the Opposition Division came to the conclusion that claim 1 is novel over D12.

55 Op1 did not have any other novelty objections. Op2 argued that claim 1 is not novel in view of D27. Figs. 1-3 show a pen-shape device having upper and lower housing 2 and 4. A thermoplastic rod is transported by the gear train. Guide tube is 38 and the nozzle is 14. The mounting tube is provided between 14 and 38. The heating element is 10 and it is surrounded by the barrel assembly 6, Fig. 3.

56 Prop argued that the device is not suitable for 3D printing. To prevent liquid dripping a valve is provided (Col. 1, Lines 61-69, Col. 9 Lines 64-69). This is not suitable for extruding 3D printing material. Pistol like shape is not a pen like shape. In D27 the heat needs to dissipate and there is no insulator. Guiding the material is made by the guide plate 36 that is different from the guide tube of claim 1. The nozzle assembly is also not inside the housing and also the mounting tube is missing. Prop also referred to their written submissions.

57 Op2 argued that having a valve does not prevent 3D printing. The pistol shape can be also held like a pen in the hand of a user. The nozzle is formed by the assembly of 6, 8 and 14 together that is partially inside the housing. The dotted lines with the reference number 8 in Fig. 1 correspond to the mounting tube.

58 At **16:25** Chair ordered a break for a deliberation of the Opposition Division regarding novelty of claim 1 in view of D27, Art. 100(a) EPC.

59 At **16:41** Chair resumed the proceedings and announced that the Opposition Division came to the conclusion that claim 1 is novel over D27.

60 Op2 continued with referring to D16-D22a, D44, D45, D46, D58 and argued that the claimed device as 3Doodler was public before the effective filing day of the claims.

61 Legal member of the OD stated that the date of the public availability of D22 is not known.

62 Op2 stated that they will not use D22 for their objections. Op2 made several references to D16-D21, D44, D58 to indicate that features of claim 1 is known to the public.

63 Prop argued that the Op2's novelty objection was based on multiple documents. Furthermore, at that time there were multiple prototypes having different features. So it is not clear which prototype has which feature. Gear train is not

shown in any of these documents. The guide tube is not shown and without a guide tube the material may jam inside the device. Upper and lower housing is also not shown anywhere. An insulator is also not known from any of these documents.

64 Op2 referred to D58 pages 4 and 17 arguing that an insulator is disclosed (3Doodler warms up but the user can hold it). There needs to be a gear train and a motor to transport the feed stock. Op2 acknowledged that the guide tube and mounting tube features together are not disclosed anywhere.

65 Op1 argued that if the applicant of D26 could be summoned they would prove that all the features of claim 1 were already known before the filing day, as set out in the annex to the submission of 13 June 2024.

66 Prop asserted that D26 is not a prior art document.

67 At **17:16** Chair ordered a break for a deliberation of the Opposition Division regarding novelty of claims, Art. 100(a) EPC in view of the 3Doodler related documents.

68 At **17:40** Chair resumed the proceedings and announced that the Opposition Division came to the conclusion that claim 1 is novel over the 3Doodler related documents.

69 The Legal member of the OD explained the preliminary opinion of the OD regarding the statements of the inventor of D26 as set out in the annex to the submission of 13 June 2024 and the prior use allegation based thereon: These statements were too vague for the OD to verify what exactly had been available to the public before the filing date, and that witnesses could only be called upon to confirm facts but not to provide facts. The prior use allegation therefore seemed unsubstantiated. However, the division wanted to give Ops the chance to fully exercise their right to be heard in this regard before coming to a final conclusion. Op1 stated that they keep their request to summon the author of the statement as witness on file. The OD's preliminary conclusion that the prior use allegation was unsubstantiated thus became final.

70 At **17:50** Chair ordered a break to continue the oral proceedings the following day.

71 At **09:00** of the following day (19/09/2025) Chair resumed the proceedings for the discussion of the inventive step of claim 1 of the new Auxiliary Request.

72 Op1 argued that claim 1 is not inventive in view of D16 and D23 in combination. D16 shows on its figure a housing and feed stock. On page 4 it further discloses a motor, gear train, actuator, extruder and nozzles. Page 4 also makes clear

that the nozzle heats up, thereby implicitly disclosing a heater. The housing also comprises upper and lower housing. D23 teaches a gear train (3rd paragraph and the figure), The cold end and hot end taught in D23 correspond to the guide tube and the mounting tube that can be visualised with the help of D33 (the tube 111 in Fig. 5).

73 Op2 similarly argued that claim 1 is not inventive in view of D16 and D23 in combination or D16 and D58 (reference made to Page 17 of D58) in combination.

74 Prop argued that D16 as the closest prior art document does not disclose guide/ mounting tube, insulator, gear train. Prop explained the technical effects of these features by referring to §23, §27, §28 and §31 of the patent in suit. Prop further argued that D16 discloses alternative embodiments and none of them discloses or guides the skilled person to the solution. Prop further questioned whether D23 is a valid prior art document. From this document a revision date is known, however, it is not clear whether the document was available to the public on this day. Even when it was available D23 does not disclose the guide/ mounting tube and gear train features. Prop similarly argued that claim 1 is inventive in view of D16 and D58 in combination.

75 At **10:15** (19/09/2025) Chair ordered a break for a deliberation of the Opposition Division regarding the inventiveness of claim 1 of Aux. Req. 1 in view of D16, Art. 56, 100(a) EPC.

76 At **10:40** Chair resumed the proceedings and announced that the Opposition Division came to the conclusion that claim 1 is inventive in view of D16 as the cpa.

77 Op1 argued that claim 1 is not inventive in view of D16 and D12 in combination.

78 Op2 did not have any comment regarding this combination.

79 Prop argued that the gear train, insulator, guiding/mounting tube features are missing and the motor is not in the housing as claim requires.

80 Op2 made references to D44, D45 to prove that the 3Doodler is not different from a glue gun with a cooling function. However, the cooling features are not present in claim 1 and therefore the glue guns of D12 or D27 can be consulted as a starting point. The missing features are gear train, insulator, guiding/ mounting tube. These are common general knowledge.

81 Prop argued that they are hearing new objections that were not raised before. Furthermore, simply pointing to a large list of alternatives in the prior art does not automatically make every narrower selection obvious. When looking at D16

or D58 there are many different prototypes and options here. Gear train is for instance not the only option. D23 has pinions and wheels for instance. In D27 many features are unclear. The opponents fail to describe which feature is the guide/mounting tube. The insulator of D27 is different (Col. 4, Lines 28-33). Furthermore, D12 and D27 disclose wheels but no gear trains.

82 At **11:30** (19/09/2025) Chair ordered a break for a deliberation of the Opposition Division regarding the inventiveness of claim 1 of Aux. Req. 1 in view of the mentioned documents, Art. 56, 100(a) EPC.

83 At **11:57** Chair resumed the proceedings and announced that the Opposition Division came to the conclusion that claim 1 is inventive.

84 Op1 and Op2 asked for the amendment of the description. Chair suggested §15 and §23 to be amended. Op2 additionally insisted that §9, §10, Figs. 5A/5B to be removed and the priority date in §1 to be adapted.

85 Prop argued that the adaptation should only be related to the new claims and §1 does not need to be changed. Furthermore, Fig. 5 is a part of the application and does not need to be removed.

86 Op1 also asked for removal of the parts of the description related to the device 200. Also §23 "insulator" needs to be amended.

87 At **12:06** (19/09/2025) Chair ordered a break for Prop to amend the description. Prop sent a draft that is forwarded to the opponents.

88 At **12:25** Chair resumed the proceedings. Op2 objected to §1 and §10. Op2 requested to see a legal reasoning in the decision as to why §1 is not required to be amended. Op1 objected §11 which has a reference to Figs. 5A/B. Op1 also objected to the parts of §31 related to the cooling part.

89 At **12:30** (19/09/2025) Chair ordered a break for a deliberation of the Opposition Division regarding the adaptations of the description.

90 At **12:35** Chair resumed the proceedings and announced that the Opposition Division came to the conclusion that the adapted description is sufficient and the reasoning will be provided in the decision. Chair asked Prop to provide only the pages of the amended paragraphs with signature and day.

91 At **12:38** (19/09/2025) Chair ordered a break for Prop to send the amended paragraphs. Prop sent the required pages that are forwarded to the opponents.

92 At **12:47** Chair resumed the proceedings. The opponents did not have further comments.

93 Chair announced that the Opposition Division has decided to maintain the patent based on Article 101(3)(a) EPC in amended form as in the Auxiliary Request 1 filed on 18/09/2025 during the proceedings. Chair asked the parties whether they had any problems or difficulties in the oral proceeding held by video conference. The parties confirmed that they had no technical difficulties.

94 Chair announced that all parties have the right to appeal this decision within the time limit running as from the date of notification of the written decision. The minutes will follow. Chair closed the oral proceedings at **12:52** (19/09/2025).

⌘⌘⌘⌘⌘⌘⌘⌘⌘

After deliberation of the opposition division,

- the chairman announced the following **decision** :

**"Account being taken of the amendments made by the patent proprietor during the opposition proceedings, the patent and the invention to which it relates are found to meet the requirements of the European Patent Convention. The currently valid documents are those according to the first auxiliary request ."**

Regarding the reasons for the decision, the chairman referred to:

Article 101(3)(a)EPC: Account being taken of the amendments made by the patent proprietor during the opposition proceedings, the patent and the invention to which it relates are found to meet the requirements of the European Patent Convention.Patent is maintained as amended.

For the reasons see the minutes

The party/parties was/were informed that the minutes of the oral proceedings and a written reasoned decision (including an indication of the possibility of appeal) will be notified to him/them as soon as possible.

The chairman **closed the oral proceedings** on 19.09.2025 at 12:52 hours.

signed:

Didenot, Benjamin
. . . . . . . . . . . . . . . . . .
Chairman

signed:

Öztürk, Serkan
. . . . . . . . . . . . . . . . . . .
Minute Writer

Enclosure(s):
Form 2339.4

## Documents for the maintenance of the patent as amended

**Auxiliary Request 1**

**In the text for the Contracting States:**
AL AT BE BG CH CY CZ DE DK EE ES FI FR GB GR HR HU IE IS IT LI LT LU LV MC MK MT NL NO PL PT RO RS SE SI SK SM TR

**Description, Paragraphs**

| | | |
|---|---|---|
| 1-8, 10-14, 16-22, 24-29, 31-42 | of the patent specification | |
| 9, 15, 23, 30 | filed during Oral proceedings on | 18-09-2025 |

**Claims, Numbers**

| | | |
|---|---|---|
| 1 | filed during Oral proceedings on | 18-09-2025 |

**Drawings, Sheets**

| | |
|---|---|
| 1/4-4/4 | of the patent specification |