# EXHIBIT 1

MORGAN, LEWIS & BOCKIUS LLP
Brent A. Hawkins (SBN 314266)
brent.hawkins@morganlewis.com
John F. Gaustad (SBN 279893)
john.gaustad@morganlewis.com
600 Montgomery Street, Suite 2300
San Francisco, CA 94111-2725
Tel: +1.415.442.1000
Fax: +1.415.442.1001

Lisa R. Weddle (SBN 259050)
lisa.weddle@morganlewis.com
300 South Grand Ave.
Twenty-Second Floor
Los Angeles, CA 90071-3132
Tel: +1.213.612.2500
Fax: +1.213.612.2501

*Attorneys for Plaintiff*
*WOBBLEWORKS, INC.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WOBBLEWORKS, INC.,<br>Plaintiff,<br>v.<br>GUANGZHOU JER EDUCATION TECHNOLOGY (d/b/a JER; GUANGZHOU JER; JER EDUCATION TECHNOLOGY CO, LTD.; GUANGZHOU ELECTRONICS CO., LTD) and MYFIRST USA INC.,<br>Defendants. | NO.: 2:26-cv-01592-MEMF-PVC<br><br>**WOBBLEWORKS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**<br><br>**DATE:** April 16, 2026<br>**TIME:** 10:00 a.m.<br>**JUDGE:** HON. MAAME EWUSI-MENSAH FRIMPONG<br>**COURTROOM:** 8B<br>**COMPL. FILED:** FEB. 16, 2026 |

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. ARGUMENT .......... 1

A. WobbleWorks Is Likely to Succeed on the Merits .......... 1

1. There Is No Substantial Question of Infringement .......... 1

2. There Is No Substantial Question of Validity .......... 5

3. There Is More than Sufficient Foundation for Mr. Bressler's Opinions .......... 15

4. MyFirst Misunderstands WobbleWorks' Reliance on Foreign Injunctions and on the EPO's Actions as to the EP '672 Patent .......... 16

B. WobbleWorks Will Suffer Irreparable Harm in the Absence of Preliminary Relief .......... 17

1. WobbleWorks Filed Its Motion When Its Extrajudicial Efforts to Prevent Irreparable Harm in the United States Became Ineffective .......... 17

2. The Harms Faced By WobbleWorks Are Not Purely Compensable .......... 20

3. WobbleWorks Demonstration of Irreparable Harm Was Not Conclusory .......... 21

C. The Balance of Equities Favors WobbleWorks .......... 22

D. Enjoining Defendants' Infringement Is in the Public Interest .......... 23

E. MyFirst Is Not Entitled to a $4 Million Bond .......... 23

III. CONCLUSION .......... 26

CERTIFICATE OF COMPLIANCE .......... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Abbott Labs. v. Sandoz, Inc.*,
544 F.3d 1341 (Fed. Cir. 2008) .......... 20

*ActiveVideo Networks, Inc. v. Verizon Comm'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) .......... 15

*Advanced Comm'n Design, Inc. v. Premier Retail Networks, Inc.*,
46 F. App'x 964 (Fed. Cir. 2002) .......... 18, 19

*Apple Inc. v. Samsung Elecs. Co.*,
809 F.3d 633 (Fed. Cir. 2015) .......... 20

*Beyond Blond Prods., LLC v. Heldman*,
479 F. Supp. 3d 874 (C.D. Cal. 2020), *aff'd sub nom., Beyond Blond Prods., LLC v. ComedyMX, LLC*, No. 21-55990, 2022 WL 1101756 (9th Cir. Apr. 13, 2022) .......... 21

*BNSF Ry. Co. v. Float Alaska IP, LLC*,
No. 2:23-CV-03934-MCS-JC, 2023 WL 6783506 (C.D. Cal. Aug. 28, 2023) .......... 24

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012) .......... 20

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
321 F.3d 878 (9th Cir. 2003) .......... 23

*DSU Med. Corp. v. JMS Co.*,
296 F. Supp. 2d 1140 (N.D. Cal. 2003) .......... 24

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) .......... 18

*Hoist Fitness Systems, Inc. v. Tuffstuff Fitness Int'l, Inc.*,
2017 WL 5640562 (C.D. Cal. Oct. 31, 2017) .......... 21, 22

*Hybritech Inc. v. Abbott Laboratories*,
849 F.2d 1446 (Fed. Cir. 1988) .......... 18

*InSinkErator LLC v. Joneca Co.*,
No. 8:24-CV-02600-JVS-ADS, 2025 WL 250032 (C.D. Cal. Jan. 10, 2025) ........ 23

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
424 F.3d 1374 (Fed. Cir. 2005) ........ 6

*LEGO A/S v. ZURU Inc.*,
799 F. App'x 823 (Fed. Cir. 2020) ........ 23

*Metalcraft of Mayville, Inc. v. Toro Co.*,
848 F.3d 1358 (Fed. Cir. 2017) ........ 9, 13, 14, 23

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) ........ 5

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008) ........ 8, 9, 14

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
429 F.3d 1364 (Fed. Cir. 2005) ........ 21, 22

*Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*,
237 F.3d 1359 (Fed. Cir. 2001) ........ 20

*Shakey's Pizza Asia Ventures, Inc. v. PCJV USA, LLC*,
2024 WL 5051191 (C.D. Cal. Nov. 14, 2014) ........ 24, 26

*Tinnus Enters., LLC v. Telebrands Corp.*,
846 F.3d 1190 (Fed. Cir. 2017) ........ 6

*TJ BioTech, LLC v. AgroSource, Inc.*,
2025 WL 3279620 (S.D. Fla. Nov. 3, 2025) ........ 10, 14

*TQ Delta, LLC v. CISCO Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019) ........ 12, 14

*Wetzel's Pretzels, LLC v. Johnson*,
797 F. Supp. 2d 1020 (C.D. Cal. 2011) ........ 19

*Zaplp LLC v. FlyDrive Inc.*,
2017 WL 8292394 (C.D. Cal. Oct. 19, 2017) ........ 20

**Other Authorities**


Fed. R. Civ. P. 44.1 .......... 17

Fed. R. Evid. 601 .......... 22

Fed. R. Evid. 602 .......... 22

Fed. R. Evid. 701 .......... 22

Fed. R. Evid. 702 .......... 16

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

WobbleWorks' Motion established that it is likely to succeed on the merits, it will suffer irreparable harm, weighing the equities favor granting an injunction, and enjoining Defendants' willful infringement is in the public interest. MyFirst's Opposition only confirms WobbleWorks' position. WobbleWorks respectfully requests that the Court enjoin Defendants from continued willful infringement.

## II. ARGUMENT

### A. WobbleWorks Is Likely to Succeed on the Merits

1. There Is No Substantial Question of Infringement

MyFirst has failed to present a substantial question of infringement. MyFirst argues that the products it markets as 3D drawing pens are—somehow—not 3D drawing pens. *See* Dkt. 35 at 11:1–11. The Court should reject this argument out of hand.

MyFirst's argument stems from the Declaration of its technical expert, Dr. Osswald, who grasps onto a statement WobbleWorks made to the USPTO. *See* Osswald Decl., ¶ 112. WobbleWorks stated that a 3D drawing pen will "immediately produce a freestanding 3D drawing or structure in a single, vertical stroke." Dkt. 35-5 at pp. 320–21. WobbleWorks did so to distinguish its invention from the prior art, which "after numerous repeated applications of glue, caulk, pencil lead, or paint, and with significant curing or drying time, may deposit materials in layers over time." *Id.*

Dr. Osswald appears to criticize Mr. Bressler for failing to provide a picture clearly showing that Defendants' 3D drawing pens can produce such a stroke Osswald Decl., ¶¶ 112–21. It is unclear why Mr. Bressler would have needed to provide anything else, however, considering that MyFirst claims on its website (and knows) that its 3D drawing pens can do so:

myFirst

# 3D Pen for Kids Frequently Asked Questions

**What is the best 3D pen for a young child?**

**How does a 3D pen work?**

A 3D pen works similarly to a hot glue gun, but it uses plastic filament instead of glue sticks. The pen heats the filament, which then softens and can be drawn in the air or on a surface. The plastic quickly cools and solidifies, holding its shape.

**Are 3D pens safe for kids?**

**What can kids create with a 3D pen?**

**What's the difference between the myFirst 3dPen Make and the myFirst 3dPen Artist?**

Ex. 61 at 7 (highlighting added).

**Tips and Tricks**

1. **Speed Control:** Adjust the pen's speed to match your drawing style. Slower speeds are better for detailed work, while faster speeds are great for filling in larger areas.
2. **Layering:** Build your design layer by layer. Start with a base layer and add details on top.

**Advanced Techniques**

1. ***Creating Shapes:*** *Practice making basic shapes like circles and squares. Combine these* shapes to make more complex designs.
2. **Freehand Drawing:** With practice, you'll be able to draw directly into the air to create 3D sculptures.

Ex. 63 at 62 & 63 (highlighting added).

The manufacturer, Guangzhou JER, acknowledges the same in its marketing

materials:




Ex. 61 at 1 (highlighting added).



**The Best 3D Pen for Kids**

Welcome to our global collection of the best 3D pens for kids! If you're looking for a way to spark creativity and bring imaginative ideas to life, you've come to the right place. Our carefully selected 3D pens are designed to inspire young creators everywhere, whether they're budding artists, engineers, or just love to craft.

**Benefits of 3D Pen for Kids**

**User-Friendly Design**: Our 3D pens are made with kids in mind. They're easy to use, with simple controls and quick setup, so your child can start creating right away.

**Safety Comes First**: We put safety at the top of our list. Our pens use non-toxic, eco-friendly filament and come with built-in safety features, so you can feel confident your child is safe while they create.

**Versatile Fun**: Our 3D pens are perfect for a range of projects. Whether your child wants to draw in mid-air or make detailed models, these pens offer endless possibilities for school projects, hobbies, or just fun at home.

**Educational Value**: These pens are more than just toys. They help develop fine motor skills, boost spatial awareness, and encourage creativity and problem-solving.

*Id.* at 4 (highlighting added).

Regardless, Exhibits 64 and 65 shows a user "immediately produce a freestanding 3D drawing or structure in a single, vertical stroke" with the JER LP03 / MyFirst 3d Pen Make and the JER RP800A / 3d Pen Artist, respectively. The following screenshots show the result:

| | |
|---|---|
|  |  |
| **Screen shot from 2:42 of Exhibit 64 (myFirst 3DPen Artist)** | **Screenshot from 2:50 of Exhibit 64 (myFirst 3dPen Artist)** |
|  |  |
| **Screen shot from 0:09 of Exhibit 65 (myFirst 3DPen Make)** | **Screenshot from 0:35 of Exhibit 65 (myFirst 3dPen Make)** |

Finally, MyFirst argues that "[w]hen a strand is extruded vertically . . . the strand remains attached to the nozzle tip." Dkt. 35 at 11:7–9 (citing Osswald Decl., ¶¶ 117–20). This is based on Mr. Osswald's opinion that "the extruded material is deposited in a molten or semi-molten state and remains supported either by the nozzle or by immediate contact with previously deposited material." Osswald Decl.,

¶ 120. Defendants' aforementioned marketing materials, Exhibits 64 and 65, and the above screenshots, show that Dr. Osswald's opinion lacks merit.

2. There Is No Substantial Question of Validity

MyFirst has also failed to present a substantial question of the Asserted Patents' validity, when reviewed for indefiniteness, anticipation, or obviousness.

*a. MyFirst's Indefiniteness Defense Lacks Substantial Merit*

MyFirst argues that the claims are indefinite but leaves it to the Court to dig through Dr. Osswald's declaration. *See* Dkt. 35 at 10:2–3. MyFirst's reluctance to explain to the Court what Dr. Osswald's indefiniteness opinions is telling.

"[A] patent is invalid for indefiniteness only if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Dr. Osswald raises two arguments: (1) the phrase "to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object" is allegedly indefinite (*see* Osswald Decl., ¶¶ 125–28), and (2) various phrases directed to drawing in free space are allegedly indefinite (*see id.*, ¶¶ 129–31). A POSITA, however, would have been reasonably certain what these phrases meant in view of the intrinsic evidence. *See* Bressler Reply Decl., ¶¶ 35–43.

**First**, Dr. Osswald argues that the phrase "to be extruded out of the exit nozzle in a solid form that retains its shape against gravity in free space to draw a 3D object" is indefinite because it is "inconsistent with the fundamental behavior of thermoplastic polymers, which exit the nozzle in a molten viscoelastic state and only achieve shape stability over time as they cool . . . ." [1] Osswald Decl., ¶¶ 126–128. But the common specification informs a POSITA that material can emerge in an "**essentially** solid" state. *E.g.*, Ex. 4 at 3:38–41 & 6:19–28 (emphasis added).

[1] This argument applies only to the '850, '819, and '529 Patents, and not the '444 or '852 Patents.

Accordingly, a POSITA would understand that the phrase's recitation of a "solid form that retains its shape against gravity" encompasses solid forms that are essentially solid: there is no inconsistency. Bressler Reply Decl., ¶¶ 36–39.

**Second**, Dr. Osswald argues that various phrases directed to "permitting" drawing in free space are indefinite because "how long it takes for extruded polymer 'to permit drawing in free space' can vary greatly depending on various unspecified and uncontrolled factors." Osswald Decl., ¶¶ 130–131. But these claim limitations say nothing about a "polymer" doing the permitting—it is the claimed device itself or components thereof, including the "extruder," the "motor," and the "heating element" that permit drawing in free space. *See* Ex. 4, cl. 1 at 10:22–27; Ex. 5, cl. 1 at 10:22–27; Ex. 6, cl. 1 at 10:3–5; Ex. 7, cl. 1 at 10:12–19; Ex. 9, cl. 1 at 10:10–16. A POSITA would understand with reasonable certainty how these claim components permit drawing in free space. Bressler Reply Decl., ¶¶ 41–43; *see also Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1206 (Fed. Cir. 2017) ("We find it difficult to believe that a [POSITA] who had read the specification and relevant prosecution history would be unable to determine with reasonable certainty when a water balloon is 'substantially filled.'"). To the extent Dr. Osswald relies on the prosecution history (*see* Osswald Decl., ¶ 131), a POSITA would also understand with reasonable certainty what WobbleWorks conveyed to the USPTO when it stated that its claimed invention would "immediately produce a freestanding 3D drawing or structure in a single, vertical stroke" (Bressler Reply Decl., ¶ 42). Mr. Bressler demonstrated in his Declaration how the Accused Products meet this limitation. *Id.*, ¶ 27 (citing Exs. 64–65). And although various variables recited by Dr. Osswald may impact whether a certain device **infringes** under certain conditions (*see* Osswald Decl., ¶ 132), they are irrelevant to determining whether a POSITA would understand the scope of the claims with reasonable certainty (Bressler Reply Decl., ¶ 43), which is a different inquiry. *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir.

2005) ("[The infringer] is really talking about the difficulty of avoiding infringement, not indefiniteness of the claim.

### *b. MyFirst's Anticipation Defense Lacks Substantial Merit*

MyFirst's expert opines that only one reference—U.S. Patent No. 7,950,549 to Harris ("Harris")—allegedly anticipates the Asserted Claims. *See* Osswald Decl., § XI.B (¶¶ 133–46 & Exs. 21–25). But Harris discloses a "screw shaft 18 [] driven by a motor 2 via reduction gearing 28" (pink below). Dkt. 35-17 at 8:61–62. Plunger disc 16 (yellow below) travels up and down screw shaft 18 (green below) and "is supported on a guide rod 20" (annotated in red). *Id.* at 6:59–61. Motor 2 drives this plunger "through the cartridge, pushing the material to be dispensed out through the tip." *Id.* at 4:8–10. Bressler Reply Decl., ¶ 49 (quoting Dkt. 35-17 at 4:8–10).



Fig. 2

*Id.* (reproducing and annotating Dkt. 35-17, Fig. 2)). And Harris demonstrates that it is not a 3D drawing pen because it is unable to "immediately produce a freestanding 3D drawing or structure in a single, vertical stroke" (*see* dkt. 35-17). The material that Harris' plunger disc pushes out is merely pulled by gravity down onto a surface:



*Fig. 1*

*Id.*, Fig. 1.

To show anticipation, MyFirst needed to present evidence that Harris disclosed the same elements of the claims, arranged in the same way. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008). The failure to do so for even one element is fatal to presenting a substantial question of validity based on anticipation. *See BlephEx*, 24 F.4th at 1400 (finding lack of a substantial question because a reference did not show "'a swab operably connected to an electromechanical device' where the swab contacts a portion of the eyelid margin"). Harris therefore cannot anticipate Claim 1 of the '444 Patent at least because it does not disclose (1) "[a] three-dimensional (3D) drawing device" (Bressler Reply Decl., ¶¶ 56–61), (2) "a port configured for introduction of a strand of feed stock into an

internal volume of the housing" (*id.*, ¶¶ 62–67), (3) "a housing configured to fit in a user's hand and shaped to allow manipulation of the housing like a pen . . . the housing having at least one cooling port extending between the internal volume and an ambient atmosphere" (*id.*, ¶¶ 68–71), (4) "a gear train operatively coupled with the motor to drive the gear train, disposed within the internal volume to receive the strand of feed stock, and configured to move the strand of feed stock when engaged with the gear train" (*id.*, ¶¶ 72–75), (5) "a nozzle assembly . . . at least partially within the housing," "the nozzle assembly comprising an extruder . . . the extruder having a heating element surrounded by an insulator" (*id.*, ¶¶ 76–82), (6) "[a] nozzle assembly comprising . . . a guide tube, . . . a first end of the guide tube positioned to receive the strand of feed stock from the gear train, a second end of the guide tube aligned with a chamber of the extruder such that the strand of feed stock is directed into the chamber, the extruder being disposed between the guide tube and the exit nozzle" (*id.*, ¶¶ 83–86), or (7) "permitting the user to draw in free space to form a three-dimensional object" (*id.*, ¶¶ 87–91). It cannot anticipate Claim 1 of the other Asserted Patents for the same reasons. *Id.*, ¶¶ 92–112.

Dr. Osswald also improperly attempts to rectify many of these deficiencies by relying on Harris' description of other, different prior art references—not the pencil grip embodiment shown above. *See* Bressler Reply Decl., ¶¶ 54, 60, 65–67, 70, 71, 74, 75, 81 (analyzing Dkts. 35-21–26). Doing so requires an obviousness analysis; combining the disclosures from these different references is not anticipation. *Net MoneyIN*, 545 F.3d at 1371 ("[I]t is not enough that the prior art reference . . . includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention."); *see also id.* at 1369. Because Dr. Osswald failed to address whether or why a POSITA would have been motivated to combine these various prior art teachings to arrive at the same claim elements arranged in the same way (*see* Osswald Decl., ¶¶ 137–140 & Dkts. 35-22–26), this testimony fails to present a substantial question of validity. *E.g.*, *Metalcraft of*

*Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1366 (Fed. Cir. 2017) (motivation to combine); *TJ BioTech, LLC v. AgroSource, Inc.*, 2025 WL 3279620, at *7 (S.D. Fla. Nov. 3, 2025) (motivation to combine and secondary considerations). Further, these improper combinations **still** fail to yield the elements of the Asserted Claims arranged in the same way. *See* Bressler Reply Decl., ¶¶ 54, 60, 65–67, 70, 71, 74, 75, 81 (analyzing Dkts. 35-21–26).

*c. MyFirst's Obviousness Defense Lacks Substantial Merit*

MyFirst identifies two obviousness challenges. First, relying on Dr. Osswald, it argues that the combination of Harris with U.S. Patent No. 8,663,533 to Swanson et al. ("Swanson") renders four of the five Asserted Claims obvious. Dkt. 35 at 10:5–8. Second, MyFirst argues that "WobbleWorks cannot casually dismiss" a handful of prior art references that Dr. Osswald does not analyze or offer opinions on and that MyFirst did not even submit to the Court. *See id.* at 10:10–26. Both of these defenses lack substantial merit.

i. An Obviousness Defense Based on the Harris-Swanson Combination Lacks Substantial Merit

Swanson is not directed to a 3D-printing pen: it discloses a stationary 3D printer. Its system 10 is used to build "3D part or model 24" (yellow below) and "a corresponding support structure 26" (blue below) "with part and support consumable materials (e.g., thermoplastic materials). *Id.* at 4:30–37.




Bressler Reply Decl., ¶ 117 (annotating Dkt. 35-18, Fig. 1)). Swanson's "[p]laten 14" (pink below) "is a gantry-moveable platform on which 3D part 24 and support structure 26 are built, and moves along a vertical z-axis" (pink arrow below) based on signals provided from a computer-operated controller . . . ." *Id.* at 4:45–48. "Gantry 16" (green below) "is a guide-rail, gantry mechanism configured to move carriage 18" (annotated below in red) "in a horizontal x-y plane" (green arrows below) "based on signals provided from controller 28 . . . ." *Id.* at 4:59–61.




*Id.* (again annotating Dkt. 35-18, Fig. 1.

Dr. Osswald offers only the following opinion about why a POSITA would have allegedly combined Harris' pencil grip embodiment with Swanson's stationary 3D printer:

> "A person of ordinary skill in the art at the time of the invention would have been motivated to combine the teachings of Harris with the teachings of Swanson because there is explicit teaching in Harris to heat a mass of thermoplastics in a solid state and to extrude thermoplastic in flowable [sic] state out of an opening. Swanson teaches an extruder that heats thermoplastics and other materials and to extrude them out of an opening. Harris teaches that its handheld decorator can be used in many applications such as cake decorating, craft applications, woodworking, and construction. Craft application is a common application for three-dimensional printing. This combination requires no undue experimentation because the extrusion mechanism and property would be well known to a POSITA at the time of invention. Further, the combination would have yielded predictable results in light of what was known to the person of ordinary skill in the art at the time of the alleged invention claimed in the Asserted Patents."

Osswald Decl., ¶ 139. But these sorts of "'conclusory statements and unspecific testimony'" are insufficient to demonstrate a motion to combine.[2] *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1359–62 (Fed. Cir. 2019) (quoting *DSS Tech. Mgmt., Inc. v. Apple Inc.*, 855 F.3d 1367, 1376 (Fed. Cir. 2018)). A motivation to combine must "explain why a person of ordinary skill in the art would have combined elements from specific references *in the way the claimed invention does*." *Id.* (quoting *ActiveVideo Networks, Inc. v. Verizon Comm'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012)). Dr. Osswald could not offer any explanation for why a POSITA would have been motivated to take **any** specific disclosure from Swanson and apply it to Harris, to make up for any of Harris' many deficiencies (discussed

[2] Further, Harris does not disclose that its pencil grip embodiment can be used with thermoplastics: that embodiment is filled with a material that is already "semi-soft" so that it can be pushed out with a plunger, and it receives that semi-soft material into its pencil grip embodiment via a cartridge. Dkt. 35-17 at 6:65–67. Harris mentions thermoplastics only in the context of another prior art reference: U.S. Patent No. 5,980,144 to Debourg et al. ("Debourg"). *See id.* at 2:51–65. Debourg discloses a "[h]and held dispenser for thermoplastic material" that deposits the material "in the form of a sheet **on a receiving surface**"—it does not disclose drawing or building a three-dimensional object using a thermoplastic material. Ex. 66, Abstract (emphasis added).

above in Section II.A.2.b). Osswald Decl., ¶ 139; *see also* Dkts. 35-26–29 (failing to articulate any motivations to combine); Bressler Reply Decl., § IV.B (¶¶ 44–112) (identifying and responding to the multitude of deficiencies Dr. Osswald's obviousness opinions). This failure alone means that MyFirst's obviousness defense based on the Harris-Swanson combination lacks substantial merit. *Metalcraft of Mayville*, 848 F.3d at 1367.

MyFirst's obviousness defense based on the Harris-Swanson combination lacks substantial merit for two additional reasons. First, Dr. Osswald could not even identify disclosures from Swanson that could make up for all of Harris' deficiencies. He failed to identify any such disclosure for (1) "a nozzle assembly . . . at least partially within the housing" (Bressler Reply Decl., ¶¶ 135–136), (2) "the nozzle assembly comprising an extruder, . . . the extruder having a heating element surrounded by an insulator" (*id.*, ¶¶ 137–138), (3) "[a] nozzle assembly comprising . . . a guide tube, . . . a first end of the guide tube positioned to receive the strand of feed stock from the gear train, a second end of the guide tube aligned with a chamber of the extruder such that the strand of feed stock is directed into the chamber, the extruder being disposed between the guide tube and the exit nozzle" (*id.*, ¶¶ 139–140), or (4) "permitting the user to draw in free space to form a three-dimensional object" (*id.*, ¶¶ 141–142). And second, Dr. Osswald failed to account for the evidence of secondary considerations of non-obviousness already of record. *Id.*, § IV.C.4 (¶¶ 161–167).

ii. An Obvious Defense Based on the Combination of Non-Submitted References Lacks Substantial Merit

Finally, MyFirst argues that the Court should assume some unidentified combinations of references that MyFirst failed to submit—U.S. Patent Application Publ'n No. 2010/0147465 to Di Miceli ("Di Miceli"), the "Plastruder MK4," and the "Matt Wax Gun for Jewelry Design"—might render the Asserted Claims obvious. Dkt. 35 at 10:10–26. This final argument similarly lacks substantial merit,

and a brief overview demonstrates why MyFirst opted to not even submit them for the Court's consideration.

The PTAB has already rejected a prior argument that Di Miceli rendered the claims of the '444 Patent invalid. Dkt. 18-37. It recognized that Di Miceli did not disclose "[a] three-dimensional (3D) drawing device," (*id.* at 14–16) or "permit[ting] the user to draw in free space to form a three-dimensional object" (*id.* at 16–18). MyFirst identifies no errors with the PTAB's judgment and fails to explain how it can overcome Di Miceli's deficiencies. *See* Dkt. 35 at 10:10–26.

Further, the USPTO already issued several of the Asserted Patents (which are all part of the same family) despite having considered Di Miceli and materials describing the "Plastruder MK4" and "Matt Max Gun for Jewelry Design":

| **Patent** | **Di Miceli** | **Plastruder MK4** | **Matt Maxx Gun for Jewelry Design** |
|---|---|---|---|
| '444 Patent | ✓ | ✓ | |
| '850 Patent | ✓ | ✓ | |
| '852 Patent | ✓ | ✓ | ✓ |
| '819 Patent | ✓ | ✓ | ✓ |
| '529 Patent | ✓ | ✓ | ✓ |

*See* Ex. 4, pp.2 & 3 (56); Ex. 5, pp.2 & 3 (56); Ex. 6, pp.2 & 3 (56); Ex. 7, pp.2, 3 & 4 (56); Ex. 9, pp.2, 3 & 4 (56). MyFirst, again, identifies no errors committed by the USPTO and fails to explain how it can overcome these references' deficiencies. *See* Dkt. 35 at 10:10–26.

Finally, MyFirst provides no showing as to what these references allegedly teach, no evidence that a POSITA would combine these references to arrive at the elements of the asserted claims arranged in the same way, and no rebuttal of secondary considerations of non-obviousness, further demonstrating the lack of substantial merit. *See id.*; *Net MoneyIN*, 545 F.3d at 1369 & 71; *Metalcraft of Maville*, 848 F.3d at 1366; *TJ BioTech*, 2025 WL 3279620, at *7; *TQ Delta*, 942 at

1359–62; *ActiveVideo Networks*, 694 F.3d at 1328.

3. There Is More than Sufficient Foundation for Mr. Bressler's Opinions

In its attempt to demonstrate any substantial question on infringement and invalidity, MyFirst argues that Mr. Bressler's opinions lack foundation. *See* Dkt. 35 at 11:12–12:21. MyFirst is incorrect.

MyFirst argues that Mr. Bressler's testimony lacks sufficient foundation because he "lacks qualifications in polymer materials science." MyFirst argues that such qualifications are necessary because Dr. Osswald offered a conclusory opinion about the level of ordinary skill in the art, requiring advanced education and experience with polymers. Osswald Decl., ¶ 81. Dr. Osswald, however, articulates the incorrect level of skill in the art. Reply Bessler Decl., ¶¶ 17–22. The Asserted Patents' field is "extrusion devices" generally. *Id.*, ¶ 20 (quoting Ex. 4 at 1:16–17). The Asserted Patents disclose not only using polymer feed stock, but also using "a metal . . . or lead . . . ." *Id.* (quoting Ex. 4 at 2:55–64). The Asserted Patents rely on the "unremarkable proposition that, when certain materials are heated (like plastics), they become malleable[,]" and they "do not claim any new material properties, of polymers or otherwise." *Id.* Instead, "[t]he Asserted Patents spend almost the entirety of the specification discussing the inventive hand-held device itself, not the nuances of material science." *Id.* The prosecution history confirms that a POSITA does not require qualifications in material science because WobbleWorks distinguished its inventions from the prior art "based on the (once again unremarkable) proposition that 'glue is runny.'" *Id.*, ¶ 21 (quoting Dkt. 35-5 at pp. 320–21). Applying the correct level of ordinary skill, Mr. Bressler is a POSITA. Dkt. 18-3 (Mar. 3, 2026 Bressler Decl.), ¶ 65.

MyFirst also criticizes Mr. Bressler for "lack[ing] specialzed, substantive experience in the narrow field of 3D printing pens[.]" Dkt. 35 at 11:22–24. That criticism is unfounded considering that MyFirst's own expert, Dr. Osswald, lacks

such experience. *See* Osswald Decl., ¶ 24 (reciting knowledge only of 3D printing generally). Regardless, Mr. Bressler has over two decades of experience with 3D printing. Bressler Reply Decl., ¶ 22. Mr. Bressler has the requisite expertise, and his testimony on technical issues has been admitted in numerous cases (Ex. 60).

Finally, MyFirst appears to criticize Mr. Bressler for offering expert opinions. *See* Dkt. 35 at 12:1–21. But that is what experts do. *See* Fed. R. Evid. 702.

4. MyFirst Misunderstands WobbleWorks' Reliance on Foreign Injunctions and on the EPO's Actions as to the EP '672 Patent

MyFirst argues that foreign injunctions are not determinative of likelihood of success. Dkt. 35 at 12:22–13:13. WobbleWorks does not disagree, but these injunctions are supporting evidence.

MyFirst separately argues that the Court should consider a December 2025 decision by the European Patent Office ("EPO")—which MyFirst chose not to put before the Court. *See* Dkt. 35 at 13:14–14:23. MyFirst argues that the EPO "forced" WobbleWorks "to inject highly specific structural limitations" "[t]o salvage the EP '672 Patent's novelty and inventive step over the prior art." *Id.* at 14:4–10. This is a misrepresentation of what occurred in the EPO proceedings.

What the EPO **actually** decided is attached as Exhibit 69. The EPO found that, without additional limitations directed to a "mounting tube" and the insulator, the subject matter of Claim 1 of the EP '672 Patent was an "intermediate generalisation." Ex. 69 at 6. MyFirst knows that this was an "intermediate generalisation" objection because a member of the MyFirst corporate family made this argument to the EPO.[3] *Id.* at Minutes Appendix, p.3.

An "intermediate generalization" is a legal concept specific to European patent law that is based on the relationship between a patent's specification and its

---

[3] MyFirst Tech Asia Pte. Ltd was "O2." *Id.* at 1.

claims—it is **not** a rejection based on the prior art. *E.g.*, Ex. 70.[4] Accordingly, the EPO's December 2025 decision has no relevance here, and MyFirst misrepresented the EPO's decision by stating that the EPO's decision was based on "novelty and inventive step." *See* Dkt. 35 at 14:4–6.

### B. WobbleWorks Will Suffer Irreparable Harm in the Absence of Preliminary Relief

MyFirst alleges that WobbleWorks has failed to demonstrate irreparable harm based on (1) an alleged delay, (2) WobbleWorks seeking only compensable economic damages, and (3) WobbleWorks offering only conclusory reputational harm. These arguments lack merit.

#### 1. <u>WobbleWorks Filed Its Motion When Its Extrajudicial Efforts to Prevent Irreparable Harm in the United States Became Ineffective</u>

WobbleWorks demonstrated that, until shortly before filing its Motion, it had been successful in its extrajudicial efforts to minimize irreparable harm by Defendants. *See* Bogue Decl., ¶¶ 19–20. WobbleWorks filed its Motion shortly after its efforts to keep Defendants out of online storefronts began to fail (*id.*, ¶ 20), it discovered that Defendants had imported product into the United States for resale by a third-party (*id.*, ¶ 21; Reply Bogue Decl., ¶ 4), and—finally—Defendants appeared at Toy Fair 2026 in February (Bogue Decl., ¶ 27). MyFirst does not contest this timeline. MyFirst instead argues that because (1) WobbleWorks discovered that a third-party company, Ditec Solutions LLC ("Dietc") was reselling Guangzhou JER's pens in the United States 2017 or 2018 and (2) WobbleWorks engaged with MyFirst in Europe in 2023, WobbleWorks should not be able to obtain an injunction. Dkt. 35 at 7:13–18 (citing Bogue Decl., ¶¶ 15–16). These arguments do not support withholding injunctive relief in this case.

Delay is only one factor in the irreparable harm analysis and "does not

[4] To determine foreign law "the court may consider any relevant material or source . . . whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. Proc. 44.1.

preclude, as a matter of law, a determination of irreparable harm." *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1457 (Fed. Cir. 1988). "Nothing in the Patent Act indicates that Congress intended" to depart from traditions of equity (*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391–92 (2006)), and denying patent holders from obtaining injunctive relief based on "categorical rule[s]" "cannot be squared with the principles of equity adopted by Congress" (*id.* at 393). "[D]elayed requests" to issue a preliminary injunction are excused when "the movant has offered a 'good explanation' for that delay.'" *Advanced Comm'n Design, Inc. v. Premier Retail Networks, Inc.*, 46 F. App'x 964, 984 (Fed. Cir. 2002) (quoting *High Tech Med. Inst., Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995)).

There was no delay as to MyFirst. MyFirst's argument that WobbleWorks delayed by failing to seek injunctive relief **in the United States** for **U.S. Patents** when MyFirst "expanded into **Europe**" is nonsensical. *See* Dkt. 35 at 7:18–20. Different patents cover different jurisdictions; there was no reason for WobbleWorks to run to the U.S. judicial system to enjoin MyFirst from infringing U.S. patents based on MyFirst's presence in Europe. MyFirst's remaining argument of delay (addressed below) applies only to whether an injunction should issue as to Guangzhou JER, not MyFirst.

As to Guangzhou JER, WobbleWorks' largely successful extrajudicial efforts in the United States constitute a good explanation for the delay. WobbleWorks negotiated a restrictive license with Ditec, who was the only reseller of Guangzhou JER's knockoff pens known to WobbleWorks at that time. Bogue Decl., ¶ 15. With Guangzhou JER's only known reseller in the United States limited, there was no business-justifiable reason to expend additional resources seeking an injunction against Guangzhou JER. *Id.* Such strategic decisions based on a party's "particular situation and financial resources" justify alleged delays in seeking injunctive relief. *Hybritech Inc.*, 849 F.2d at 1457.

Following the successful 2017-2018 lawsuit to halt unrestricted domestic infringement, there were no infringing activities in the United States known to WobbleWorks until 2022, when it promptly resolved a discrete dispute through settlement, and none again until 2024.[5] In 2022 a third-party supplier, JLR Gear, was selling infringing products to Kohl's. WobbleWorks promptly notified both entities of their infringement and, through good-faith negotiations, reached a settlement that resulted in JLR Gear's withdrawal from the market. Even when WobbleWorks noticed infringing domestic activity in 2024, it successfully issued takedown notices to the third-party retailers. Bogue Decl., ¶¶ 19–20. As a result, litigation was unnecessary. *See Advanced Commc'n Design*, 46 F. App'x at 984 (recognizing settlement negotiations constitute valid explanation for delay); *Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1029 (C.D. Cal. 2011) (granting a preliminary injunction motion despite a one-year delay due to good faith settlement negotiations).

But the situation drastically changed in early 2026. A member of MyFirst's corporate family (and perhaps MyFirst itself) appeared at CES 2026 in Las Vegas. Bogue Decl., ¶ 24. Online retailers began rebuffing WobbleWorks' extrajudicial attempts to keep Defendants' knockoff 3D printing pens off their storefronts. *See id.*, ¶¶ 19–20. On February 5, 2026, WobbleWorks discovered that Guangzhou JER had manufactured and imported Unlicensed 3D Printing Pens into the United States for resale through PriceSmart in September 2025. Bogue Decl., ¶ 22; Reply Bogue Decl., ¶ 4; *see also* Exs. 55–56 to Reply Bogue Decl. WobbleWorks sent PriceSmart a cease-and-desist letter and further learned that Guangzhou JER and myFirst would be attending the Toy Fair in New York from February 14–17, 2026.

---

[5] Though there was a request by Guangzhou JER in August 2023 for a license to supply its infringing 3D printing pens to a third-party U.S. retailer, WobbleWorks refused and it does not appear that retailer entered into any agreement with Guangzhou JER or any myFirst entity to sell Unlicensed 3D Printing Pens in the United States. Bogue Decl., ¶ 18.

*Id.*, ¶ 27. WobbleWorks was able to finalize and file the Complaint on February 16, 2026—a federal holiday. Dkt. 1.

Accordingly, WobbleWorks has a good explanation for any alleged delay. The only case cited by MyFirst (Dkt. 35 at 7:21–8:2) is inapposite. In *Zaplp LLC v. FlyDrive Inc.*, 2017 WL 8292394, at *5 (C.D. Cal. Oct. 19, 2017), there was a fourteen-month delay. The last four months of the delay lacked any explanation. *Id.* The prior ten months were justified only by a temporary price drop. *Id.* Because the price rebounded after two months, it's "unclear how [the patentee] continue[d] to experience any harm from the price drop." *Id.* Here, there is no significant period of unexplained delay.

2. <u>The Harms Faced By WobbleWorks Are Not Purely Compensable</u>

As noted above, the situation between WobbleWorks and defendants changed drastically in early 2026. The fact that WobbleWorks was not facing significant irreparable harm prior to that point does not change the fact that WobbleWorks is suffering significant irreparable harm **now** and will continue suffering that irreparable harm unless the Court enjoins Defendants' willful infringement. Even harm that could be categorized as "economic" is irreparable when it is not quantifiable, including situations where losses of sales are difficult to calculate, involve cascading economic effects, or create competitive disadvantages that monetary damages cannot adequately remedy. *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633 (Fed. Cir. 2015); *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341 (Fed. Cir. 2008); *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359 (Fed. Cir. 2001); *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922 (Fed. Cir. 2012). Courts have recognized that all of the categories of harm identified by WobbleWorks in its Motion are irreparable (*see* Dkt. 18, § IV.B.1), and MyFirst makes no effort to address or distinguish the cases upon which WobbleWorks relies (*see* Dkt. 35 at 8:3–12).

3. <u>WobbleWorks Demonstration of Irreparable Harm Was Not Conclusory</u>

WobbleWorks submitted a detailed declaration from Mr. Bogue, supported by underlying exhibits. Such declarations are regularly relied upon to establish irreparable harm. *E.g.*, *Beyond Blond Prods., LLC v. Heldman*, 479 F. Supp. 3d 874, 888 (C.D. Cal. 2020) (relying on the declaration of Plaintiff's president to find irreparable harm), *aff'd sub nom.*, *Beyond Blond Prods., LLC v. ComedyMX, LLC*, No. 21-55990, 2022 WL 1101756 (9th Cir. Apr. 13, 2022). Mr. Bogue's declaration is a stark contrast to what a conclusory declaration actually looks like, such as the declaration submitted by Mr. Yong Guan Jer in support of MyFirst's request for a bond.

MyFirst criticizes Mr. Bogue's description of the claimed invention, comparing it to a conclusory declaration submitted in *Hoist Fitness Systems, Inc. v. Tuffstuff Fitness Int'l, Inc.*, 2017 WL 5640562, at *3 (C.D. Cal. Oct. 31, 2017). In that case, the patentee's CEO and president provided conclusory allegations about the market and the machines offered by the patentee and the alleged infringer. *See id.* Here, Mr. Bogue described at length market conditions, what his invention was, and how his invention differed from other products that were unsuccessful, and how WobbleWorks is suffering and will continue to suffer irreparable harm, supporting his statements with evidence. *E.g.*, Bogue Decl., ¶¶ 5–14 & 29–30. Further, WobbleWorks' technical expert Mr. Bressler both (1) studied certain of WobbleWorks' products and concluded that they practice the Asserted Claims (Bressler Decl., § V (¶¶ 67–72)) and (2) studied the Accused Products and concluded that they infringe the Asserted Claims (*id.*, § VI (¶¶ 73–79)). This case is therefore readily distinguishable from *Hoist Fitness*. Further, "[t]he fact that other infringers may be in the marketplace does not negate irreparable harm." *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1381 (Fed. Cir. 2005). Much of the decision in *Hoist Fitness* focuses on the patentee's conclusory allegations about a

few- or two-player market (*see Hoist Fitness Sys.*, 2017 WL 5640562, at *4), which is not a prerequisite for establishing irreparable harm (*Pfizer*, 429 F.3d at 1381).

Contrary to MyFirst's suggestion (Dkt. 35 at 8:20–9:3), Mr. Bogue did not use the term "Claimed Features" arbitrarily. He defined the term in his declaration and he acknowledged that he was describing what the claims cover "[a]t a high level." Bogue Decl., ¶ 6. Mr. Bogue is an inventor and has personal knowledge of what his inventions are: he does not need to be an expert in patent law to testify as to those inventions. *See generally* Fed. R. Evid. 601, 602 & 701.

MyFirst's unexplained arguments that WobbleWorks somehow demonstrates only "speculative" harm (*see* Dkt. 35 at 9:4–16) are similarly incorrect. Mr. Bogue explained how, when copycats were allowed to sell knockoff 3D printing pens before WobbleWorks obtained patent protection, WobbleWorks lost between 30–40% of its market share, which it resecured to nearly 100% after receiving patent protection. *E.g.*, Bogue Decl., ¶ 29.a. Allowing Defendants to sell their knockoff 3D printing pens will cause the same result—this is not speculative irreparable harm. Mr. Bogue also explains in detail how WobbleWorks' revenues, reputation, business relationships, and brand recognition are now being harmed and will continue to be harmed, in addition to harm to WobbleWorks due to ecosystem effects. *Id.*, ¶ 29.b–i. This harm is not speculative.

Finally, to the extent that MyFirst argues that WobbleWorks' demonstration of reputational injury was conclusory, MyFirst is incorrect. WobbleWorks has held itself out as the inventor of the 3D printing pen for years (*see, e.g.*, Dkt. 18-15), and allowing Defendants to flood the U.S. market with their infringing products will impugn that reputation.

### C. The Balance of Equities Favors WobbleWorks

WobbleWorks established in its Motion that balancing the equities favors an injunction. *See* Dkt. 18, § IV.C. MyFirst counters that (1) "[i]t is deeply inequitable to allow a patentee to sit on its rights for eight years and then suddenly seek to

destroy a competitor's established market presence" and (2) "WobbleWorks chose to allow Defendants for operate or years without interference." Neither of these statements are based in fact: as discussed above, WobbleWorks was successful until only recently in using extrajudicial efforts to stop Defendants from establishing a market presence in the United States. The fact that Defendants chose to establish a market presence, knowing that they were infringing WobbleWorks' patents, is a problem of Defendants own making. Further, regardless of MyFirst's opinions about competition, it is inequitable to force WobbleWorks "to compete against its own patented invention[.]" *Metalcraft of Maryville*, 848 F.3d at 1369.

**D. Enjoining Defendants' Infringement Is in the Public Interest**

MyFirst does not dispute that an injunction is in the public interest. *See* Dkt. 35 at 15.

**E. MyFirst Is Not Entitled to a $4 Million Bond**

As the party to be enjoined, it was MyFirst's burden to "establish[] the amount of bond necessary to secure against the wrongful issuance of the injunction." *LEGO A/S v. ZURU Inc.*, 799 F. App'x 823, 837–38 (Fed. Cir. 2020). It failed to do so. And because WobbleWorks has "established a strong likelihood of success on the merits, the district court has discretion to impose a 'minimal bond or no bond at all.'" *InSinkErator LLC v. Joneca Co.*, No. 8:24-CV-02600-JVS-ADS, 2025 WL 250032, at *9 (C.D. Cal. Jan. 10, 2025) (quoting *Van de Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985)).

MyFirst seeks a $4 million bond based solely on the self-serving declaration of its CEO Yong Guan Jer and provides no underlying financial records, sales data, contracts, or other documentation. Mr. Guan Jer's declaration offers only generalized and conclusory estimates. Courts routinely reject such unsupported assertions when setting bond amounts and have broad discretion to impose a minimal bond—or none at all—where, as here, the alleged harms are speculative and inadequately supported. *See Conn. Gen. Life Ins. Co. v. New Images of Beverly*

*Hills*, 321 F.3d 878, 882 (9th Cir. 2003); *Shakey's Pizza Asia Ventures, Inc. v. PCJV USA, LLC*, 2024 WL 5051191, at *17 (C.D. Cal. Nov. 14, 2014); *BNSF Ry. Co. v. Float Alaska IP, LLC*, No. 2:23-CV-03934-MCS-JC, 2023 WL 6783506, at *11 (C.D. Cal. Aug. 28, 2023) (denying plaintiff's request for a $2 million bond because plaintiff "proffered no corroborating proof beyond a declaration of its president estimating the costs."). Mr. Guan Jer alleges (1) a $3 million projection of "direct loss of gross revenue" (Guan Jer Decl., ¶¶ 5–7), (2) a $300,000 "sunk cost" of "existing inventory" (*id.*, ¶¶ 8–10), (3) "breach-of-contract penalties . . . that may exceed $300,000" (*id.*, ¶ 11), (4) a $338,560.00 investment at CES 2026 and Toy Fair 2026 (*id.*, ¶ 12), and (5) and an "at least $1,000,000" cost to "[r]egain . . . lost shelf space, repair . . . vendor relationships, and recover[] . . . market share after trial" (*id.*, ¶ 13). WobbleWorks will address each of these categories in turn.

First, MyFirst's projected $3,000,000 in lost revenues is unsupported and unreliable. Mr. Guan Jer provides no underlying sales data, projections, or methodology explaining how this figure was calculated. *See* Guan Jer Decl., ¶ 7. This is just "classic ipse dixit" consisting of "[p]icking the million dollar number[.]" *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1158 (N.D. Cal. 2003). Without evidence of actual sales history, purchase commitments, or retailer demand, myFirst's projected lost revenue is speculative and cannot support a multimillion-dollar bond.

Second, myFirst's claimed inventory losses and supply chain penalties are similarly unsupported and speculative. Mr. Guan Jer asserts that an injunction would freeze at least $300,000 in inventory and render it obsolete "[b]ecause technology products depreciate rapidly." But it does not appear that myFirst has made any material changes to its myFirst 3D Pen Make in at least the past four years (Ex. 60), and Guangzhou JER, the manufacturer of the RP800A pen, which is the same model of 3D pen as the myFirst 3D Pen Artist, has not made any material

changes to that device in almost ten years.

| | |
|---|---|
|  |  |
| PETRA CHANNELS, *Spotlight on JER's 3D Printing Pen* at 0:16 (YouTube, Mar. 1, 2017), https://www.youtube.com/watch?v=rZXkE1_Ca_U. | JER EDUCATION, *3d pen* at 0:22 (YouTube, Apr. 5, 2016), https://www.youtube.com/watch?v=4siFPT9ip1Q. |

MyFirst fails to explain how this inventory will suddenly become obsolete in 18 months.

Third, MyFirst's assertion that canceling supplier agreements "may" trigger penalties exceeding $300,000 is similarly speculative. Guan Jer Decl., ¶ 11. If such penalties exist, they should be spelled out in contracts that MyFirst could have submitted to the Court; Mr. Guan Jer's self-serving testimony is no replacement for them. Moreover, myFirst's supplier, Guangzhou JER, indemnifies its resellers against liability. Exs. 58, 59. Accordingly, even if any such penalties exist, myFirst has not shown that it will ultimately bear those costs.

Fourth, MyFirst's assertion that it invested $338,560 at CES 2026 and Toy Fair 2026 is, again, unsupported by documentation. Further, MyFirst sells a number of different products, including smart watches, audio equipment, cameras, and digital picture frames. Ex. 2. It is unclear why MyFirst believes it should be compensated for the full cost of attending these trade shows just because it is enjoined from selling one type of product. And, in any event, these are sunk, past marketing expenses—not prospective damages caused by the injunction—and thus do not justify a bond.

Fifth, MyFirst speculates that it will lose retail shelf space and vendor

relationships. Their products, however, are sold through online marketplace listings rather than in-store retail placement. *See* Exs. 71–73. WobbleWorks is unaware of any physical shelf space actually occupied by MyFirst's Accused Products in the United States, meaning that its assertion that such space will need to be "replaced" is unfounded. MyFirst also provides no evidence supporting the costs associated with a "massive marketing and promotional campaign." *Id.* Such unsupported estimates cannot form the basis for a bond. *Shakey's Pizza Asia Ventures*, 2024 WL 5051191, at *17 ("Defendants have not produced evidence of costs associated with rebranding to support their arguments at the hearing.").

Given that WobbleWorks has demonstrated a strong likelihood of success and that myFirst's evidence consists entirely of a self-serving declaration that is conclusory and speculative, the Court should exercise its discretion to impose no bond or a minimal bond.

## III. CONCLUSION

WobbleWorks respectfully requests that the Court enjoin Defendants' willful infringement and impose no or a minimal bond.

Dated: March 30, 2026

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: */s/ Brent A. Hawkins*

Brent A. Hawkins (SBN 314266)
brent.hawkins@morganlewis.com
John F. Gaustad (SBN 279893)
john.gaustad@morganlewis.com
600 Montgomery Street, Suite 2300
San Francisco, CA 94111-2725
Tel: +1.415.442.1000
Fax: +1.415.442.1001

Lisa R. Weddle (SBN 259050)
lisa.weddle@morganlewis.com
300 South Grand Ave.
Twenty-Second Floor
Los Angeles, CA 90071-3132
Tel: +1.213.612.2500
Fax: +1.213.612.2501

*Attorneys for Plaintiff*
*WOBBLEWORKS, INC*

# CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for WobbleWorks, Inc. certifies that this memorandum of points and authorities contains 6,999 words, which complies with the word limit of L.R. 11-6.1.

Dated: March 30, 2026

*/s/ John F. Gaustad*
John F. Gaustad