# EXHIBIT A

Beglaubigte Abschrift

# Landgericht Nürnberg-Fürth

Az.: 19 O 581/24

## IM NAMEN DES VOLKES

In dem Rechtsstreit

**Wobble Works Inc.**, 1209 Orange Street, Wilmington Delaware 19801, Vereinigte Staaten von Amerika
- Antragstellerin -

Prozessbevollmächtigte:
Rechtsanwälte **Peterreins Schley**, Patent- und Rechtsanwälte PartG mbB, Hermann-Sack-Straße 3, 80331 München, Gz.: 51163-0002LL2

gegen

**MYFIRST TECH ASIA PTE.LTD**, vertreten durch d. Direktor, 31 Woodlands Close #01-22 Woodlands, Horizon Singapore 737855, Singapur
- Antragsgegnerin -

Prozessbevollmächtigte:
Rechtsanwälte **avocado rechtsanwälte Berger Figgen Gerhold Kaminski Voß Rechtsanwälte Part mbB**, Thurn-und-Taxis-Platz 6, 60313 Frankfurt, Gz.: 037181-26/jmv/pe

Nebenintervenientin:
**Guanghzou JER Education Technology**, Room 301, 3/F, Building 2, 510530 Guangdong, China

Prozessbevollmächtigte:
Rechtsanwälte **avocado rechtsanwälte Berger Figgen Gerhold Kaminski Voß Rechtsanwälte Part mbB**, Thurn-und-Taxis-Platz 6, 60313 Frankfurt, Gz.: 037181-26/jmv/pe

wegen Patentverletzung

erlässt das Landgericht Nürnberg-Fürth - 19. Zivilkammer - durch die Vorsitzende Richterin am Landgericht Schroeter, die Richterin am Landgericht Mieller und die Richterin am Landgericht Bellmann aufgrund der mündlichen Verhandlung vom 02.04.2026 folgendes

# Zwischen- und Endurteil

1. Die Nebenintervention der Guanghzou JER Education Technology, Room 301, 3/F, Building 2, 510530 Guangdong, China wird zurückgewiesen.

2. Die einstweilige Verfügung vom 31.01.2024 wird aufgehoben und der Antrag auf Erlass einer einstweiligen Verfügung vom 31.01.2024 wird zurückgewiesen.

3. Die Verfügungsklägerin hat die Kosten des Rechtsstreits mit Ausnahme der ausscheidbaren Kosten der Nebenintervention und des Zwischenstreits zu tragen.

4. Das Urteil ist vorläufig vollstreckbar. Die Verfügungsklägerin kann die Vollstreckung der Verfügungsbeklagten durch Sicherheitsleistung in Höhe von 110 % des aufgrund des Urteils vollstreckbaren Betrags abwenden, wenn nicht die Verfügungsbeklagte vor der Vollstreckung Sicherheit in Höhe von 110 % des zu vollstreckenden Betrags leistet.

# Beschluss

Der Streitwert wird auf 250.000,00 € festgesetzt.

# Tatbestand

A)

Die Verfügungsklägerin begehrt von der Verfügungsbeklagten Unterlassung sowie Auskunft.

Die Verfügungsklägerin ist ein in den USA ansässiges Unternehmen, das u.a. die 3D-Stifte „3Doodler Start+“ auf dem deutschen Markt anbietet und vertreibt. Die Verfügungsbeklagte ist ein in Singapur ansässiges Unternehmen, das den 3D-Stift *„my First 3dPen“* („Verletzungsform“) auf der Spielwarenmesse in Nürnberg zwischen dem 30.01.-03.02.2024 angeboten hat.

Die Verfügungsklägerin ist Inhaberin des Verfügungspatents EP 2 928 672 („Verfügungspatent“). Hinsichtlich des ursprünglichen Inhalts wird auf Anlange AS2 ausdrücklich verwiesen. Das Verfügungspatent betrifft Geräte zum dreidimensionalen (3D) Zeichnen, insbesondere Geräte, die zur Extrusion eines Ausgangsmaterial verwendet werden können, um dieses Ausgangsmaterial auf

ein Substrat aufzutragen. Dabei kann das Material in mehreren Lagen aufgetragen werden, um ein dreidimensionales Objekt zu erzeugen. Das Gerät ist leicht wieder zu befüllen und benötigt keine computergestützten Entwurfsdateien. Das Patent wurde durch eine Entscheidung des Europäischen Patentamts im Einspruchsverfahren (Az. 1189-2 PCTEP) vom 19.09.2025 in eingeschränktem Umfang gemäß der nachfolgenden Merkmalsanalyse im Patentanspruch bestätigt. Hinsichtlich des eingeschränkten Umfangs existiert bislang keine deutsche Übersetzung, die Erteilungssprache ist Englisch:

Ein Gerät zum dreidimensionalen (3D) Zeichnen, umfassend:

M1 bis M5: Es wird auf die Anlage AS8 (Zeilen 4 bis13) ausdrücklich verwiesen.

M6: a nozzle assembly (130) disposed at the first end of the housing (110) and at least partially within the housing (110), the nozzle assembly (130) comprising an extruder (132), an exit nozzle (133A), and a guide tube (134),

characterized by

a) the extruder (132)

having a heating element

surrounded by an insulator (131))

b) the guide tube (134) extending between the gear train (150) and the extruder (132).

c) wherein the extruder and the guide tube are held in alignment by a mounting tube (138).

wherein the insulator (131) is provided over the mounting tube (138) so as to reduce the amount of heat transferred from the extruder (132) to the upper and lower housings (112. 114),

d) a first end of the guide tube (134) positioned to receive the strand of feed stock (20) from the gear train (150), a second end of the guide tube (134) aligned with a chamber (135) of the extruder (132) such that the strand of feed stock (20) is directed from the guide tube (134) into the chamber (135),

e) the extruder (132) being disposed between the guide tube (134) and the exit

nozzle (133A)

f) and wherein the housing comprises an upper housing (112) and lower housing (114) that together form the internal volume (116) in which is located said gear train (150), wherein the housing is sized and configured to fit in a user's hand and suitably shaped to allow for manipulation like a pen or pencil

Auf die Entscheidungsgründe (Anlage AS5) wird ausdrücklich verwiesen. Hiergegen legte die Verfügungsklägerin Beschwerde bei der Beschwerdekammer des Europäischen Patentsamts ein. Hierüber wurde noch nicht entschieden.

Der 3D-Stift der Verfügungsbeklagten verletzt die Merkmale M1 bis M5 sowie M6b), d) bis f) der Merkmalsanalyse des Verfügungspatents.

Bei der Verletzungsform befindet sich ein einstückiges Metallteil, das jedenfalls im vorderen Bereich den Extruder darstellt:






Die dem Führungsrohr zugewandte Seite des Metallteils ist hierbei erweitert. Das Führungsrohr kann so in das Metallteil eingeführt werden und wird durch Vercrimpen formschlüssig mit dem Extruder (vorderer Teil) verbunden:





Das Heizelement (in Form eines Drahtes) ist um den vorderen Teil (Extruder) gewickelt:



Mit Schreiben vom 01.12.2023 (AS1) mahnte die Verfügungsklägerin die Verfügungsbeklagte wegen der Verletzung von fünf US-Patenten basierend auf dem Angebot und dem Vertrieb der Verletzungsform in den USA ab. Dabei benannte die Antragstellerin zusätzlich alle weltweit relevanten Märkte wie beispielsweise auch die Europäische Union und wies auf äquivalente europäische Patente hin.

**Die Verfügungsklägerin trägt vor**, dass die Verletzungsformen den geltend gemachten Anspruch des Verfügungspatents in der nach erstinstanzlicher Einspruchsentscheidung aufrechterhaltenen Fassung wortsinngemäß auch in den Merkmalen 6a) und 6c) verletzen würden, da sie über ein mit dem Extruder (132) verbundenes Montagerohr verfügen würden, in welches ein Teil

des Führungsrohrs bis zum Beginn des Extruders eingeführt und sodann vercrimpt würde. Durch das Montagerohr würde das in das Montagerohr eingeführte Führungsrohr formschlüssig mit dem Extruder verbunden. Somit werde das Führungsrohr anspruchsgemäß mit dem Extruder in Ausrichtung gehalten. Es sei nicht erforderlich, dass das Montagerohr den Extruder umschließe. Es sei unerheblich, dass das Montagerohr mit dem Extruder einstückig verbunden sei, da der erweiterte Teil Richtung Führungsrohr ausschließlich die Funktion des Montagerohrs übernehme (Ausrichtung) und der gegenüberliegende Teil ausschließlich die Funktion des Extruders (Extrusion). Über dem Extruder, um den das Heizelement gewickelt sei, würde sich zudem ein Dämmstoff befinden, weshalb auch Merkmal 6a) erfüllt sei, egal ob man davon ausgehe, dass der Extruder von einem Dämmstoff umgeben sein müsse oder das Heizelement. Korrekterweise sei das Merkmal 6a) angesichts des im Einspruchsverfahren hinzugefügten Merkmals 6c) wie in der ersten Alternative zu verstehen. Denn nur bei einer solchen Rückbeziehung auf den Extruder, nicht auf das Heizelement erhalte die angegebene Funktion des Dämmstoffes einen sinnvollen technischen Gehalt. Da dieser Dämmstoff bis zu dem über dem Montagerohr liegendem weißen Plastikteil, welcher das Montagerohr nicht vollständig überdecke, reiche, erfülle dieser Dämmstoff kumulativ die Voraussetzungen des Merkmals 6c) und 6a). Der Dämmstoff könne nach dem Anspruchswortlaut jedoch auch mehrstückig und aus unterschiedlichem Ausgangsmaterial ausgeführt sein, solange der Extruder, der ein Heizelement umfasst, von einem Dämmstoff umgeben sei und ein Dämmstoff wenigstens an einer Stelle über dem Montagerohr vorgesehen sei und solange der (mehrstückige) Dämmstoff seine isolierende Funktion erfülle, nämlich die auf das obere und untere Gehäuse (112, 114) übertragene Wärmemenge zu reduzieren. Das weiße Plastikteil (proximaler Dämmstoff) erfülle bei den Verletzungsformen diese Dämmfunktion zusammen mit dem Dämmstoff über dem Extruder (distaler Dämmstoff). Für die Beurteilung der Patentverletzung sei es unerheblich, ob das weiße Kunststoffelement neben der Dämmfunktion noch eine weitere Funktion (Haltefunktion) erfülle. Das weiße Plastikelement der Verletzungsformen berühre jedoch das Führungsrohr nicht und könne somit auch das Führungsrohr nicht mit dem Extruder in Ausrichtung halten. Außerdem sei das weiße Plastikrohr über dem Montagerohr vorgesehen.
Hilfsweise macht sie geltend, es sei eine Patentverletzung mit äquivalenten Mitteln gegeben. Die Verletzungsformen bewegten sich noch im Schutzbereich des Anspruchs.

Am 31.01.2024 erließ das Gericht auf Antrag der Verfügungsklägerin ohne mündliche Verhandlung folgende einstweilige Verfügung:

1. Der Antragsgegnerin wird untersagt, Geräte zum dreidimensionalen Zeichnen in der Bundesrepublik Deutschland anzubieten, in Verkehr zu bringen, zu gebrauchen oder zu den genannten Zwecken einzuführen oder zu besitzen, welche jeweils die

folgenden Merkmale aufweisen:

Ein Gerät zum dreidimensionalen (3D) Zeichnen, umfassend:

ein Gehäuse, das so konfiguriert ist, dass der Nutzer es in der Hand halten kann, wobei das Gehäuse ein erstes und zweites Ende aufweist, wobei das Gerät eine Eingangsöffnung umfasst, die so konfiguriert ist, dass es ein Strang an Ausgangsmaterial in ein internes Volumen des Gehäuses aufnimmt;

einen Motor der innerhalb des internen Volumens angeordnet ist;

ein Zahnradgetriebe, das mit dem Motor operativ gekoppelt ist, um das Zahnradgetriebe anzutreiben, das innerhalb des internen Volumens angeordnet ist, um den Strang an Ausgangsmaterial aufzunehmen, und das so konfiguriert ist, dass es den Strang an Ausgangsmaterial bewegt, wenn er von dem Zahnradgetriebe erfasst wird;

einen Aktuator, der so konfiguriert ist, dass er den Motor wahlweise zur Rotation in mindestens eine erste Richtung veranlasst, so dass das Ausgangsmaterial aus der Austrittsdüse extrudiert wird, um ein drei-dimensionales Objekt zu bilden, und

eine Düsenanordnung, die am ersten Ende des Gehäuses und wenigstens teilweise innerhalb des Gehäuses angeordnet ist, wobei die Düsenanordnung einen Extruder, eine Austrittsdüse und ein Führungsrohr umfasst;

wobei der Extruder ein Heizelement umfasst, das von einem Dämmstoff umgeben ist;

wobei sich das Führungsrohr zwischen dem Zahnradgetriebe und dem Extruder erstreckt, wobei ein erstes Ende des Führungsrohrs so positioniert ist, dass es den Strang an Ausgangsmaterial von dem Zahnradgetriebe aufnimmt, und ein zweites Ende des Führungsrohrs so auf eine Kammer des Extruders ausgerichtet ist, dass der Strang an Ausgangsmaterial von dem Führungsrohr in die Kammer geführt wird;

wobei der Extruder zwischen dem Führungsrohr und der Austrittsdüse angeordnet ist.

2. Der Antragsgegnerin wird für jeden Fall der Zuwiderhandlung gegen die unter Ziffer I.

genannten gerichtlichen Verbote als Zwangsvollstreckungsmaßnahme ein Ordnungsgeld bis zu EUR 250.000 EUR, ersatzweise Ordnungshaft, oder eine Ordnungshaft bis zu sechs Monaten, im Falle wiederholter Zuwiderhandlung bis zu insgesamt zwei Jahren, zu vollstrecken an ihrem gesetzlichen Vertreter, angedroht.

3. Die Antragsgegnerin hat der Antragstellerin darüber Auskunft zu erteilen, in welchem Umfang sie die unter Ziffer I. bezeichneten Handlungen seit dem 30. März 2022 begangen hat, und zwar unter Angabe

   a) der Namen und Anschriften der Hersteller, Lieferanten und anderer Vorbesitzer,

   b) der Namen und Anschriften der gewerblichen Abnehmer sowie der Verkaufsstellen, für die die Erzeugnisse bestimmt waren

   c) der Menge der ausgelieferten, erhaltenen, und bestellten Erzeugnisse sowie der Preise, die für die betreffenden Erzeugnisse bezahlt wurden;

   wobei

- die Aufstellung mit den Daten der Auskunftserteilung zusätzlich in einer mittels EDV auswertbaren, elektronischen Form zu übermitteln ist; und

- zum Nachweis der Angaben die entsprechenden Kaufbelege (nämlich Rechnungen, hilfsweise Lieferscheine, höchst hilfsweise Zollpapiere) in Kopie vorzulegen sind, wobei geheimhaltungsbedürftige Details außerhalb der auskunftspflichtigen Daten geschwärzt werden dürfen;

4. Der Antragsgegnerin wird aufgegeben, die unter Ziffer I. bezeichneten Produkte, die sich in der Bundesrepublik Deutschland im Besitz der Antragsgegnerin befinden, insbesondere alle unter Ziffer I. bezeichneten Produkte, die sich auf dem Messestand der Antragsgegnerin auf der Nürnberger Spielwarenmesse (Halle 4A, Stand A-18) befinden, an einen Gerichtsvollzieher zum Zwecke der Verwahrung herauszugeben, die andauert, bis über das Bestehen eines Vernichtungsanspruchs zwischen den Parteien rechtskräftig entschieden oder eine einvernehmliche Regelung herbeigeführt worden ist, insbesondere 3D-Stifte mit der Bezeichnung „my First 3dPen“ wie beispielsweise nachfolgend wiedergegeben:






5. Wegen eines Betrages in Höhe der Verfahrens- und Gerichtskosten basierend auf einem Streitwert von EUR 250.000 (Verfahrens- und Terminsgebühr Patent- und Rechtsanwalt, Gerichtsgebühr, Auslagenpauschale) wird der dingliche Arrest in das bewegliche und unbewegliche Vermögen der Antragsgegnerin in Höhe von EUR 12.455,00 angeordnet;

6. Die Antragsgegnerin hat die Kosten des Verfahrens zu tragen.

Die Zustellung an die Verfügungsbeklagte erfolgte am 01.02.2024 auf der Nürnberger Spielwarenmesse.

Mit Schreiben vom 23.01.2026 bestellte sich die Verfügungsbeklagtenvertreter und forderten die Verfügungsklägerin im Hinblick auf die zwischenzeitlich erfolgte Beschränkung des Patents auf, hinsichtlich der einstweiligen Verfügung zu erklären, auf die daraus folgenden Rechte zu verzichten. Mit Schreiben vom 26.01.2026 erklärte die Verfügungsklägerin einen Teilverzicht auf die Rechte aus der einstweiligen Verfügung, und zwar insoweit, als die Verfügung Rechte betrifft, die über die aufrechterhaltene Anspruchsfassung des Patents hinausgehen. Gleichzeitig wies die Verfügungsklägerin darauf hin, dass das seinerzeit beanstandete Verletzungsprodukt weiterhin von dem eingeschränkten Patentanspruch erfasst sei.

Mit anwaltlichem Schriftsatz vom 19.02.2026 legte die Verfügungsbeklagte hiergegen Widerspruch ein.

Die Verfügungsklägerin beantragt nunmehr:

> Die einstweilige Verfügung des Landgerichts Nürnberg-Fürth vom 31. Januar 2024 (Az. 19 O 581/24) wird mit der Maßgabe aufrechterhalten, dass der Urteilsausspruch nunmehr wie folgt gefasst wird:
>
> Der Antragsgegnerin wird es bei Meidung eines für jeden Fall der Zuwiderhandlung vom Gericht festzusetzenden Ordnungsgeldes bis zu EUR 250.000,00, ersatzweise Ordnungshaft, oder einer Ordnungshaft bis zu sechs Monaten, im Falle wiederholter Zuwiderhandlung bis zu insgesamt zwei Jahren, wobei die Ordnungshaft hinsichtlich der Antragstellerin an ihrem jeweiligen gesetzlichen Vertreter zu vollziehen ist, untersagt,
>
> Geräte zum dreidimensionalen Zeichnen in der Bundesrepublik Deutschland anzubieten, in Verkehr zu bringen, zu gebrauchen und/oder zu den genannten Zwecken einzuführen und/oder zu besitzen, welche jeweils die folgenden Merkmale aufweisen:
>
> Ein Gerät zum dreidimensionalen (3D) Zeichnen, umfassend:
>
> ein Gehäuse, das so konfiguriert ist, dass der Nutzer es in der Hand halten kann, wobei das Gehäuse ein erstes und zweites Ende aufweist, wobei das Gerät eine Eingangsöffnung umfasst, die so konfiguriert ist, dass es ein Strang an Ausgangsmaterial in ein internes Volumen des Gehäuses aufnimmt;
>
> einen Motor der innerhalb des internen Volumens angeordnet ist;
>
> ein Zahnradgetriebe, das mit dem Motor operativ gekoppelt ist, um das Zahnradgetriebe anzutreiben, das innerhalb des internen Volumens angeordnet ist, um den Strang an Aus-

gangsmaterial aufzunehmen, und das so konfiguriert ist, dass es den Strang an Ausgangsmaterial bewegt, wenn er von dem Zahnradgetriebe erfasst wird;

einen Aktuator, der so konfiguriert ist, dass er den Motor wahlweise zur Rotation in mindestens eine erste Richtung veranlasst, so dass das Ausgangsmaterial aus der Austrittsdüse extrudiert wird, um ein drei-dimensionales Objekt zu bilden,

und eine Düsenanordnung, die am ersten Ende des Gehäuses und wenigstens teilweise innerhalb des Gehäuses angeordnet ist, wobei die Düsenanordnung einen Extruder, eine Austrittsdüse und ein Führungsrohr umfasst;

der Extruder, der ein Heizelement umfasst, von einem Dämmstoff umgeben ist,

wobei sich das Führungsrohr zwischen dem Zahnradgetriebe und dem Extruder erstreckt, wobei der Extruder und das Führungsrohr durch ein Montagerohr in Ausrichtung gehalten werden, wobei der Dämmstoff über dem Montagerohr vorgesehen ist, um die von dem Extruder auf das obere und untere Gehäuse übertragene Wärmemenge zu reduzieren, wobei ein erstes Ende des Führungsrohrs so positioniert ist, dass es den Strang des Ausgangsmaterials von dem Zahnradgetriebe aufnimmt, und ein zweites Ende des Führungsrohrs so auf eine Kammer des Extruders ausgerichtet ist, dass der Strang des Ausgangsmaterials von dem Führungsrohr in die Kammer geführt wird;

wobei der Extruder zwischen dem Führungsrohr und der Austrittsdüse angeordnet ist,

wobei das Gehäuse ein oberes Gehäuse und ein unteres Gehäuse umfasst, die zusammen das interne Volumen bilden, in dem sich das genannte Getriebe befindet, wobei das Gehäuse so dimensioniert und gestaltet ist, dass es in die Hand eines Benutzers passt und entsprechend geformt ist, um eine Handhabung wie bei einem Stift oder Bleistift zu ermöglichen,

<u>Hilfsweise:</u>

Die einstweilige Verfügung des Landgerichts Nürnberg-Fürth vom 31. Januar 2024 (Az. 19 O 581/24) wird mit der Maßgabe aufrechterhalten, dass der Urteilsausspruch nunmehr wie folgt gefasst wird:

Der Antragsgegnerin wird es bei Meidung eines für jeden Fall der Zuwiderhandlung vom Gericht festzusetzenden Ordnungsgeldes bis zu EUR 250.000,00, ersatzweise Ordnungshaft, oder einer Ordnungshaft bis zu sechs Monaten, im Falle wiederholter Zuwiderhand-

lung bis zu insgesamt zwei Jahren, wobei die Ordnungshaft hinsichtlich der Antragstellerin an ihrem jeweiligen gesetzlichen Vertreter zu vollziehen ist, untersagt,

Geräte zum dreidimensionalen Zeichnen in der Bundesrepublik Deutschland anzubieten, in Verkehr zu bringen, zu gebrauchen und/oder zu den genannten Zwecken einzuführen und/oder zu besitzen, welche jeweils die folgenden Merkmale aufweisen:

Ein Gerät zum dreidimensionalen (3D) Zeichnen, umfassend:

ein Gehäuse, das so konfiguriert ist, dass der Nutzer es in der Hand halten kann, wobei das Gehäuse ein erstes und zweites Ende aufweist, wobei das Gerät eine Eingangsöffnung umfasst, die so konfiguriert ist, dass es ein Strang an Ausgangsmaterial in ein internes Volumen des Gehäuses aufnimmt;

einen Motor der innerhalb des internen Volumens angeordnet ist;

ein Zahnradgetriebe, das mit dem Motor operativ gekoppelt ist, um das Zahnradgetriebe anzutreiben, das innerhalb des internen Volumens angeordnet ist, um den Strang an Ausgangsmaterial aufzunehmen, und das so konfiguriert ist, dass es den Strang an Ausgangsmaterial bewegt, wenn er von dem Zahnradgetriebe erfasst wird;

einen Aktuator, der so konfiguriert ist, dass er den Motor wahlweise zur Rotation in mindestens eine erste Richtung veranlasst, so dass das Ausgangsmaterial aus der Austrittsdüse extrudiert wird, um ein drei-dimensionales Objekt zu bilden,

und eine Düsenanordnung, die am ersten Ende des Gehäuses und wenigstens teilweise innerhalb des Gehäuses angeordnet ist, wobei die Düsenanordnung einen Extruder, eine Austrittsdüse und ein Führungsrohr umfasst;

der Extruder, der ein Heizelement umfasst, von einem Dämmstoff umgeben ist,

wobei sich das Führungsrohr zwischen dem Zahnradgetriebe und dem Extruder erstreckt, wobei der Extruder und das Führungsrohr durch ein Montagerohr, welches mit dem Extruder einstückig ausgeführt ist, in Ausrichtung gehalten werden, wobei ein weiterer Dämmstoff über dem Montagerohr vorgesehen ist, um die von dem Extruder auf das obere und untere Gehäuse übertragene Wärmemenge zu reduzieren, wobei ein erstes Ende des Führungsrohrs so positioniert ist, dass es den Strang des Ausgangsmaterials von dem Zahnradgetriebe aufnimmt, und ein zweites Ende des Führungsrohrs so auf eine Kammer des Extruders ausgerichtet ist, dass der Strang des Ausgangsmaterials von dem Füh-

rungsrohr in die Kammer geführt wird;

wobei der Extruder zwischen dem Führungsrohr und der Austrittsdüse angeordnet ist,

wobei das Gehäuse ein oberes Gehäuse und ein unteres Gehäuse umfasst, die zusammen das interne Volumen bilden, in dem sich das genannte Getriebe befindet, wobei das Gehäuse so dimensioniert und gestaltet ist, dass es in die Hand eines Benutzers passt und entsprechend geformt ist, um eine Handhabung wie bei einem Stift oder Bleistift zu ermöglichen,

Die Verfügungsbeklagte beantragt,

die einstweilige Verfügung vom 31.01.2024 aufzuheben und den Antrag auf Erlass einer einstweiligen Verfügung zurückzuweisen

**Die Verfügungsbeklagte meint**, den angegriffenen Ausführungsformen (Verletzungsformen) fehle es an einem Montagerohr und einem Dämmstoff, welcher gleichzeitig (kumulativ) das Heizelement umgebe und auf dem Montagerohr angebracht sei, um die von dem Extruder (132) auf das obere und untere Gehäuse (112, 114) übertragene Wärmemenge zu reduzieren. Sie würden auf wesentliche Merkmale und den damit angestrebten technischen Erfolg des Verfügungspatents verzichten, sodass keine wortsinngemäße Patentverletzung vorliege.

Ein Montagerohr müsse rohrförmig sein. Nicht jedes Element, das zum Ausrichten und Halten von zwei Rohren konfiguriert sei, sei ein Montagerohr im Sinne des Verfügungspatents. Wenn das Bauteil nicht rohrförmig sei, handele es sich lediglich um ein Befestigungselement, etwa einen Flansch oder eine Kupplung. Darüber hinaus müsse das Montagerohr ein separates drittes Teil sein, das dazu diene, zwei andere Teile auszurichten und zusammenzuhalten. Um das Führungsrohr und den Extruder ausrichten und zusammenhalten zu können, müsse das Montagerohr so angeordnet sein, dass es mindestens die Enden beider Teile umschließe und halte.

Das von der Verfügungsklägerin so bezeichnete Montagerohr der Verletzungsformen sei Teil des Extruders. Ein Montagerohr sei nicht nötig, vielmehr werde bei den angegriffenen Ausführungsformen auf ein Montagerohr vollständig verzichtet, da Extruder und Führungsrohr durch einfaches Crimpen (plastische Verformung) unmittelbar miteinander verbunden seien.

Der beanspruchte Dämmstoff sei als ein Dämmstoff definiert, der das Heizelement umgebe, nicht den Extruder. Unterschiedliche und separate Materialien, die das Heizelement nicht umgäben, könnten den beanspruchten Dämmstoff nicht ersetzen oder Teil davon sein. Dies gehe allein aus dem Wortlaut des Anspruchs hervor, aber auch aus der Auslegung des Anspruchs anhand der Beschreibung und der Zeichnungen. Der einzige Grund, warum das Verfügungspatent einen

Dämmstoff um das Montagerohr herum vorsehe, sei, dass in dem einzigen insoweit offenbarten Ausführungsbeispiel das Heizelement innerhalb des Montagerohrs liege.
Ferner verlange der Anspruch auch, dass der Dämmstoff (131) über dem Montagerohr vorgesehen sei. Gemeint sei derselbe Dämmstoff, der auch das Heizelement umgebe. Selbst wenn der Dämmstoff aus mehreren Teilen bestünde, müsse jeder Teil die anspruchsgemäße Doppelfunktion erfüllen (funktionale Einheit). Eine Aufteilung der Funktionen auf zwei verschiedene Dämmstoffe, die jeweils nur eine Teilfunktion erfüllten, genüge nicht. Ein Dämmstoff finde sich in den Verletzungsformen ausschließlich um das Heizelement des Extruders herum, während das weiße Kunststoffelement in den Verletzungsformen über einem Teil des Extruders angebracht sei und keinen Teil des Heizelements umgebe. Darüber hinaus isoliere das weiße Kunststoffelement das obere und untere Gehäuse nicht von der durch das Heizelement erzeugten Wärme, sondern schirme allenfalls nach hinten ab. Die Funktion des weißen Kunststoffelements bestehe zudem allein darin, die Düse im Gehäuse zu positionieren und sie während des Gebrauchs in ihrer Position im Gehäuse zu halten (Positionierungs- und Halteelement): Ein rechteckiger Teil des weißen Kunststoffelements raste hinter einer Leiste des Gehäuses ein, wodurch eine Vorwärtsbewegung der Düse und auch ein Verrutschen der Bauteile im Gehäuse während des Gebrauchs verhindert werde.

Die Kammer hat in mündlicher Verhandlung 3D-Stifte hinsichtlich des einstückigen Metallteils (u.a. Extruder), des Dämmmaterials und des Heizelements in Augenschein genommen.

B)

Mit Schriftsatz vom 19.02.2026 erklärte die Nebenintervenientin, welche Herstellerin und Lieferantin der streitgegenständlichen 3D-Stifte für die Verfügungsbeklagte ist, dem Rechtsstreit auf Seiten der Verfügungsbeklagten beizutreten.

Mit Schriftsatz vom 20.03.2026 beantragte die Verfügungsklägerin, die Nebenintervention zurückzuweisen.

Sie meint, die bloße Behauptung der Nebenintervenientin, sie sei Herstellerin der Verletzungsform, genüge insoweit nicht. Vielmehr bedürfe es der Darlegung eines eigenen rechtlichen Interesses aufgrund etwaiger Auswirkungen der Entscheidung auf die Nebenintervenientin. Ferner liege keine ordnungsgemäße Erklärung des Beitritts vor.

Wegen des weiteren Vorbringens wird auf die gewechselten Schriftsätze nebst Anlagen Bezug genommen.

# Entscheidungsgründe

Die Nebenintervention ist zurückzuweisen.

Auf den zulässigen Widerspruch hin ist die einstweilige Verfügung vom 31.01.2024 aufzuheben und der Antrag - auch im Umfang des beschränkt aufrechterhaltenen Anspruchs - zurückzuweisen.

A)

Der Antrag auf Zulassung der Nebenintervention ist zulässig, aber unbegründet (§§ 71 Abs. 1 S. 1, 66 Abs. 1 ZPO).

Der Beitritt der Nebenintervenienten erfolgt nach § 70 ZPO, indem die Nebenintervenienten einen Schriftsatz bei dem Prozessgericht einreichen, indem die Parteien bezeichnet werden, ein Interesse an der Nebenintervention dargelegt und der Beitritt erklärt wird. Diese Voraussetzungen liegen nicht vor.

I.

Die Nebenintervention setzt gemäß § 66 Abs.1 ZPO voraus, dass ein Rechtsstreit zwischen anderen Personen anhängig ist. Der Nebenintervenient darf daher nicht selbst schon Partei des Rechtsstreits sein. Diese Voraussetzung ist erfüllt.

II.

Mit Schriftsatz vom 19.02.2026 wurde der Beitritt ausdrücklich erklärt.

III.

Die Nebenintervenientin hat jedoch kein rechtliches Interesse i.S.d. § 66 Abs. 1 ZPO dargelegt, dem Rechtsstreit beizutreten.

Ein solches liegt vor, wenn die Entscheidung des Rechtsstreits (durch Inhalt oder Vollstreckung) mittelbar oder unmittelbar auf ihre privat- oder öffentlich-rechtlichen Verhältnisse rechtlich – nicht unbedingt vermögensrechtlich - günstig oder ungünstig einwirkt. Der Begriff ist weit auszulegen. Jedoch muss es sich stets um ein eigenes Interesse aufgrund möglicher Rechtswirkungen handeln (Münchener Kommentar ZPO/Schultes, 7. Aufl. 2025, ZPO § 66 Rn. 7f, Zöller, 35. Auflage, § 66 Rn. 8).

Als ausreichendes Interesse wurde angesehen, dass die im Prozess unterlegene Partei den Nebenintervenienten in Haftungsregress nehmen könnte, etwa wenn sich der wegen Sach- oder Rechtsmangels einstandspflichtige Verkäufer an seinen Lieferanten wendet. Ein rechtliches Interesse des Lieferanten kann in dieser Konstellation nur verneint werden, wenn der Regress sicher aussichtslos ist (OLG Karlsruhe, NJW 2018, 1103 Rn. 16 m.w.N.).

Jedoch muss der Nebenintervenient die Voraussetzungen für die Zulässigkeit seines Beitritts darlegen. Er muss insbesondere zu seinem rechtlichen Interesse am Obsiegen der unterstützten Partei vortragen und die Tatsachen, aus denen sich dieses Interesse ergibt, i.S.d. § 294 glaubhaft machen (vgl. § 71 Abs. 1 S. 2) (BeckOK ZPO/von Selle, 60. Ed. 1.3.2026, ZPO § 71 Rn. 7, beck-online). Dies hat die Nebenintervenientin nicht getan. Denn es reicht allein nicht aus, dass die Nebenintervenientin behauptet, Herstellerin und Lieferantin der streitgegenständlichen Verletzungsform zu sein. Dies ist zwar unstreitig (vgl. zur nicht erforderlichen Glaubhaftmachung BeckOK ZPO, 60. Edition, Stand. 01.03.2026, § 294 Rn. 4). Jedoch hat die Nebenintervenientin nicht dargelegt, inwieweit die Verfügungsbeklagte im Falle ihres Unterliegens Regress nehmen könnte. Zwar besteht im Fall des Unterliegens der Verfügungsbeklagten grundsätzlich die Möglichkeit, dass diese bei der Nebenintervenientin Regress nehmen könnte (vgl. für den Regress als rechtliches Interesse Zöller, 35. Auflage, § 66 Rn. 13). Dies hätte die Nebenintervenientin jedoch näher darlegen und zudem glaubhaft machen müssen (vgl. OLG Frankfurt a.M., NJW-RR 2000, 348 zur Darlegung eines rechtlichen Interesses durch Konkursgläubiger). Unterlagen zu den Verträgen zwischen Nebenintervenientin und Verfügungsbeklagter, aus denen sich Ansprüche der Verfügungsbeklagten gegen die Nebenintervenientin ergeben, oder andere Mittel der Glaubhaftmachung wurden seitens der Nebenintervenientin zudem nicht vorgelegt.

Daher war die Nebenintervention zurückzuweisen.

B)

Der Antrag ist zulässig (§§ 936, 920 ZPO).

Insbesondere ist das Landgericht Nürnberg-Fürth sachlich und örtlich zuständig (§ 143 PatG, §§ 3, 32 ZPO, § 38 Nr. 2 BayGZVJu).

C)

Der Widerspruch ist zulässig (vgl. §§ 936, 924 ZPO) und nicht verwirkt.

I.

Der Widerspruch kann unbegrenzt eingelegt werden. Eine Frist hierfür sieht das deutsche Recht nicht vor.

II.

Der Widerspruch ist auch nicht verwirkt.

1.

Die Annahme, der Arrestschuldner verzichte dauerhaft auf das Widerspruchsrecht aus § 924 Abs. 1 ZPO, wenn er nicht zeitnah nach Zustellung des Arrestes Widerspruch einlegt, ist wegen der besonderen Bedeutung des Anspruchs auf rechtliches Gehör, dessen Gewährleistung das Widerspruchsrecht dient, nur unter besonderen Umständen gerechtfertigt (OLG Dresden BeckRS 2016, 19045).

Die Verwirkung setzt neben einem langen Zuwarten des Schuldners Verhältnisse voraus, unter denen vernünftigerweise etwas zur Wahrung des Rechts unternommen zu werden pflegt. Bezüglich des Rechts, Widerspruch zu erheben, ist Verwirkung anzunehmen, wenn der Gläubiger sich auf das Ausbleiben des Widerspruchs einstellen durfte und wenn dieses sein Vertrauen schutzwürdig ist (Zöller, 35. Auflage, § 924 Rn. 10; OLG Saarbrücken, NJW-RR 1989, 1512).

Damit setzt Verwirkung voraus, dass sich der Antragsteller wegen der Untätigkeit des Antragsgegners über einen gewissen Zeitraum hinweg (Zeitmoment) bei objektiver Beurteilung darauf einrichten durfte und eingerichtet hat, dieser werde sein Recht nicht mehr geltend machen (Umstandsmoment) und deswegen die verspätete Geltendmachung gegen Treu und Glauben verstieße (BeckOK ZPO/Elzer, 59. Ed. 1.12.2025, ZPO § 924 Rn. 62, beck-online; OLG Dresden, BeckRS 2016, 19045).

2.

Diese Voraussetzungen liegen nicht vor.

Zugunsten einer Verwirkung könnte zwar sprechen, dass die Verfügungsbeklagte über einen Zeitraum von zwei Jahren keinen Widerspruch eingelegt hat und zudem auch einen Ordnungsmittelbeschluss zu ihren Ungunsten hat ergehen lassen, ohne hiergegen vorzugehen.

Jedoch kann der Antragsteller auch über einen Zeitraum von 2 Jahren nicht davon ausgehen, der

Antragsgegner werden nicht mehr gegen die erlassene einstweilige Verfügung vorgehen und sie sei allein deshalb verwirkt (vgl. hierzu z.B. OLG Dresden, BeckRS 2016, 19045, vergangener Zeitraum: 2 Jahre). Solange die Hauptsache noch anhängig ist, muss der Antragsteller zudem stets mit einem Widerspruch rechnen (BeckOK ZPO/Elzer, 59. Ed. 1.12.2025, ZPO § 924 Rn. 63).

Der Widerspruchsführer kann auch einwenden, es gebe neue Tatsachen, die die Voraussetzungen für den Arrestbefehl nachträglich haben entfallen lassen. Denn maßgeblich ist, ob die formalen und materiellen Voraussetzungen des Arrestes bei Schluss der mündlichen Verhandlung vorliegen. Ob sie bereits zum Zeitpunkt der Anordnung vorlagen, kann offenbleiben (BeckOK ZPO/Elzer, 59. Ed. 1.12.2025, ZPO § 924 Rn. 47). Diese Voraussetzungen liegen hier vor, sodass eine Verwirkung mangels Umstandsmoments ausscheidet.

Insofern besteht hier die Besonderheit, dass bislang noch keine Hauptsache anhängig war. Das Einspruchsverfahren war zudem schon im Januar 2024 (Zeitpunkt des Erlasses der einstweiligen Verfügung) und im Februar 2025 (Zeitpunkt des Ordnungsmittelverfahrens) anhängig (siehe Antragsschrift). Ferner wurde durch die Entscheidung vom 19.09.2025 der Patentanspruch nur in eingeschränktem Umfang aufrechterhalten. Nachdem die Gründe im Dezember 2025 vorlagen, tauschten sich die Parteien darüber aus, ob die Verfügungsklägerin auf die Rechte aus der einstweiligen Verfügung verzichten wolle, was diese ablehnte (vgl. AG1, AS6). Jedenfalls seit September 2025 musste die Verfügungsklägerin nach Auffassung der Kammer mit einem Widerspruch rechnen, d.h. konnte sich nicht mehr auf den unbegrenzten Fortbestand der einstweiligen Verfügung einrichten, zumal ihr bereits spätestens Anfang 2025 bekannt war, dass die Verfügungsbeklagte auch Einspruch gegen das Patent erhoben hatte, über den zu entscheiden war. Insofern fehlt es am Umstandsmoment, weshalb der Widerspruch nicht verwirkt ist.

D)

Die einstweilige Verfügung ist jedoch im Umfang des beschränkt aufrechterhaltenen Anspruchs aufzuheben und der Antrag zurückzuweisen, nachdem die Verletzungsform das Verfügungspatent, soweit es im eingeschränkten Umfang aufrechterhalten wurde, nicht verletzt.

I.

Die Aktivlegitimation der Verfügungsklägerin und die Passivlegitimation der Verfügungsbeklagten sind unstreitig.

II.

Der Rechtsbestand des Patents ist durch die Einspruchsentscheidung vom 19.09.2025 im eingeschränkten Umfang, in dem das Verfügungspatent aufrechterhalten wurde, hinreichend gesichert. Daraus, dass noch zwei Beschwerdeverfahren vor dem EPA anhängig sind und zudem die Verfügungsklägerin gegen die Entscheidung des EPA Beschwerde eingelegt hat, folgt nicht, dass der Rechtsbestand nicht hinreichend gesichert ist. Es ist nicht erkennbar, dass die Entscheidung vom 19.09.2025 auf falschen Annahmen (zu Lasten des Verfügungsbeklagten) beruht, welche in den zwei weiteren Beschwerdeverfahren mit hoher Wahrscheinlichkeit dazu führen werden, dass das Verfügungspatent in der bislang aufrechterhaltenen Form auch aufgehoben oder abgeändert werden wird. Insbesondere kann nicht dem Argument gefolgt werden, wonach der Dämmstoff (131), der über dem Montagerohr vorgesehen ist, in der Anmeldung nur als Folie (film) offenbart gewesen sei: Die zitierte Stelle (0022) bezieht sich auf eine Folie (insulating film) die über dem Heizelement und <u>unter</u> dem Montagerohr, nicht darüber angebracht wird. Der folgende Abschnitt (0023) behandelt dagegen einen Dämmstoff der <u>über</u> dem Montagerohr angebracht wird (vgl. auch Fig. 3B), ohne sich zur Art näher zu positionieren.

Zudem ist nicht erkennbar, welchen Inhalt die zwei noch offenen Beschwerdeverfahren haben, die zu einer Abänderung zugunsten der Verfügungsbeklagten führen könnten. Ein Sachvortrag hierzu erfolgte nicht. Die Einwände sind der Kammer auch nicht bekannt, sodass sie aufgrund der Entscheidung vom 19.09.2025 von einem hinreichend gesicherten Rechtsbestand ausgeht.

III.

Das Verletzungsmuster verletzt nicht das Merkmal 6c).

Das Verletzungsmuster verfügt zwar über einen Dämmstoff, welcher den Extruder und das darum gewickelte Heizelement umgibt (Merkmal 6a)), jedoch befindet sich dieser Dämmstoff nicht über dem bzw. einem Montagerohr, um die Hitze, die vom Extruder ausgeht, vom oberen und unteren Gehäuse abzuschirmen, wie es Merkmal 6c) verlangt. Darüber hinaus verfügt das Verletzungsmuster über kein Montagerohr, welches das Führungsrohr und den Extruder in Ausrichtung hält.

1.

a)

Die Kammer legt das Merkmal „Montagerohr“ (mounting tube) dahingehend aus, dass es einen

länglichen Hohlkörper (Rohr) beschreibt, der aus einem unflexiblen Material gefertigt ist und dessen Länge in der Regel wesentlich größer als sein Durchmesser ist (Definition nach Wikipedia). Rohre weisen zudem einen kreisrunden Querschnitt auf (zylinderförmig).

Das Wort „Montage" beschreibt demgegenüber die Funktion des Rohres, d.h. dass es konstruktiven Zwecken (als Stab/Balken) dient. Diese Funktion ergibt sich auch aus dem im Patent in Merkmal 6c) selbst beschriebenen Funktion: „wherein the extruder and the guide tube are held in alignment by a mounting tube (138)". „in alignment" heißt auf Deutsch „in Ausrichtung", in Bezug auf physische Ausrichtung kann es auch „in einer Linie" oder „gerade" bedeuten. Daraus ergibt sich, dass das Montagerohr der Positionierung oder Justierung von Extruder und Führungsrohr dient, insbesondere dass Extruder und Führungsrohr durch das Montagerohr so zueinander positioniert und gehalten werden müssen, dass das (feste) Ausgangsmaterial vom Führungsrohr in den Extruder gelangen kann. Diesbezüglich müssen die Öffnungen von Führungsrohr und Extruder so justiert sein, dass sie einander gegenüber liegen bzw. in einer Linie liegen und der Übertritt des (festen oder zumindest weitgehend festen) Ausgangsmaterials vom Führungsrohr in den Extruder möglich ist. Dies hat nach dem Patentanspruch das Montagerohr sicherzustellen. Diese Funktion des Montagerohrs ist auch technisch nachvollziehbar, als das (feste) Ausgangsmaterial von dem Führungsrohr in den Extruder gelangen muss, wo es nach der Beschreibung, die auch der üblichen Funktion eines Extruders entspricht, erhitzt und durch Aufweichen bzw. Schmelzen formbar gemacht wird. Die Ausführung mit Montagerohr soll mithin sicherstellen, dass das Ausgangsmaterial ohne Hindernisse, insbesondere auch ohne sich zu verkanten und ohne zu brechen, in den Extruder gelangt.

Diese Auslegung steht auch im Einklang mit der ursprünglichen (nunmehr gestrichenen Passage der) Patentbeschreibung unter Ziffer 2 (vgl. AS2 bzw. AS8), wo es heißt: „The 3D drawing device of claim 1, further comprising a mounting tube (138) having a first end and a second end, and wherein the second end of the guide tube (134) extends into the first end of the mounting tube (138), and an end of the extruder (132) opposite the exit nozzle (133A) extends into the second end of the mounting tube (138), the mounting tube (138) holding the second end of the guide tube (134) in alignment with the end of the extruder (132) opposite the exit nozzle (133A)." Hiermit wird die Position der Enden (i.S.v. Öffnungen) von Führungsrohr und Extruder zueinander beschrieben, also dass das eine Ende des Führungsrohrs in die erste Öffnung („end") des Montagerohrs hineinreicht, während die Öffnung („end") des Extruders – die gegenüber der Austrittsdüse liegt – bis in das andere Ende des Montagerohrs hineinreicht („extends into").

Der Übergang von Führungsrohr zu Extruder muss zudem stabil sein, d.h. Führungsrohr und Ex-

truder müssen nicht nur in Ausrichtung gebracht, sondern auch in Ausrichtung gehalten werden („held in alignment"). In dem Verfügungspatent übernimmt diese Funktion das Montagerohr, was sich schon aus dem Wortlaut des Merkmals 6c) ergibt („wherein the extruder and the guide tube are held in alignment by a mounting tube (138)").

b)

In der Verletzungsform existiert ein einstückiges Metallteil. Dieses verfügt an dem einen Ende über eine Austrittsdüse. Dann folgt eine (hohle) Kammer. Das andere Endstück ist kreisförmig rund und verfügt über eine erweitere Öffnung, in die das Führungsrohr eingeführt wird, bis es auf die Kammer des Metallteils triff. Dieses Teil des Metallteils ist kürzer als der Teil mit Kammer und Austrittsdüse:








Ein loses, insbesondere separates Montagerohr, welches das Führungsrohr und den Extruder jeweils zumindest in Teilen umgibt, mit diesem also nicht fest verbunden ist, existiert unstreitig

nicht.

Dies ist jedoch nach Auslegung des Merkmals 6c) durch die Kammer nicht erforderlich. Der Anspruch legt die jeweiligen Mittel in Bezug auf ihre funktionalen Eigenschaften fest, womit es dem Fachmann unbenommen bleibt, zwei Funktionen (hier: Extruder und Montagerohr) durch ein Mittel, ggf. in einem logischen Schritt, zu verknüpfen und zu verwirklichen. Solange die Funktionen gewahrt bleiben, ist es mithin möglich, Montagerohr und Extruder in einer festen Verbindung, d.h. durch ein einstückiges Metallteil, auszubilden.

In der Verletzungsform ist ein Draht um die Kammer gewickelt, der sodann die Kammer erhitzt, damit das Ausgangsmaterial schmilzt und über die Austrittsdüse extruiert werden kann:



Der vordere Teil dieses Metallteils übernimmt mithin unstreitig die Funktion des Extruders, der ein Heizelement umfasst. Demgegenüber ist der hintere Teil mit der runden Öffnung nicht von dem Heizelement umgeben, auch wenn er sich – bedingt durch die Verbindung und der Ausgestaltung als Metallteil – auch erhitzt. Das Ausgangsmaterial wird in diesem Teil vom Führungsrohr aus, welches in den erweiterten Endbereich des Metallteils eingeführt ist, in die Kammer gepresst. Dafür ist es erforderlich, dass das Führungsrohr und die Kammer des Extruders in Ausrichtung gehalten werden, damit der Übertritt des Ausgangsmaterials in den Extruder möglich ist. Die Erweiterung am Metallteil in Richtung Führungsrohr übernimmt folglich ausschließlich die Montagefunktion, welche dem Montagerohr im Verfügungspatent zukommt. Die Form der Erweiterung ist auch kreisrund, mithin rohrförmig und aus festem Material.

Jedoch ist das Teilstück in der Länge im Verhältnis zum Extruder wesentlich kürzer und zudem auch im Verhältnis zum Durchmesser nicht wesentlich länger, weshalb kein „Rohr“ im technischen Sinne vorliegt.

Hinzu kommt, dass dieses Teilstück nach Einführen des Führungsrohrs vercrimpt wird, damit dieses - nachdem es mit dem Extruder in Ausrichtung gebracht wurde - auch in Ausrichtung mit dem Extruder gehalten wird, wie die Kammer auch im Rahmen des Augenscheins feststellen

konnte:



Demgegenüber beschreibt das Verfügungspatent weder im Anspruch noch in der zugehörigen Beschreibung, dass das Führungsrohr mit dem Extruder oder Montagerohr zu vercrimpen ist. Ein Vercrimpen ist aus technischer Sicht hierfür nicht erforderlich, als Extruder und Führungsrohr allein durch das (lange) Montagerohr in Ausrichtung und auch in gerader Linie gehalten werden („held in alignment by"). Demgegenüber kann in der Verletzungsform die Funktion des In-Ausrichtung-Haltens nicht durch das Teilstück erfolgen. Hierfür ist es zu kurz mit der Folge, dass ein Vercrimpen erforderlich wird, um die Verbindung zwischen Führungsrohr und Extruder zu halten sowie auch das Führungsrohr in einer Linie mit dem Extruder zu halten:



Mit dieser Auslegung im Einklang steht auch das in der Beschreibung aufgeführte Ausführungsbeispiel Fig. 3B:




FIG.3B

Hierin ist das Montagerohr ein Rohr, welches den Extruder vollständig und zumindest Teile des Führungsrohrs umfasst. Die Kammer hat nicht verkannt, dass die Heranziehung von Ausführungsbeispielen und Zeichnungen weder zu einer inhaltlichen Erweiterung noch zu einer sachlichen Einengung des durch den Wortsinn des Patentanspruchs festgelegten Gegenstands führen darf (BGH GRUR 2011, 701 - Okklusionsvorrichtung). Der Wortlaut des Verfügungspatents verhält sich nicht hierzu, inwieweit das Montagerohr Führungsrohr und Extruder umschließen muss (siehe hierzu aber D)III.2c)). In der Verletzungsform wäre es jedoch zur Verletzung des Verfügungspatents zumindest erforderlich, dass das Führungsrohr von dem „Montagerohr“ von der Länge her mehr umschlossen wird als es tatsächlich der Fall ist. Je mehr es sich bei dem Montagerohr um ein „Rohr“ handelt, desto stabiler werden Führungsrohr und Extruder gehalten, sodass ein Vercrimpen nicht erforderlich ist.

Insgesamt gesehen fehlt es aus Sicht der Kammer damit an zwei wesentlichen Elementen des Merkmals 6c): einem Montagerohr (1), das Führungsrohr und Extruder in Ausrichtung hält (2). Somit ist das Merkmal 6c) nicht erfüllt.

2.

Selbst wenn man annehmen würde, dass das Metallstück in der Verletzungsform die Funktion von Extruder und Montagerohr übernimmt und das Merkmal 6c) in dieser Hinsicht erfüllt ist, fehlt es jedoch noch zur Verwirklichung des ganzen Merkmals 6c) an einem Dämmstoff, der die im Verfügungspatent genannten Voraussetzungen erfüllt.

Die Kammer legt das Verfügungspatent in den Merkmalen 6a) und 6c) im Hinblick auf den Dämmstoff dahingehend aus, dass dieser beide Merkmale kumulativ erfüllen muss, nämlich:

- Ein Dämmstoff (131) muss den Extruder, der ein Heizelement enthält, umgeben (Merkmal 6a)).

- Der Dämmstoff (131) muss über dem Montagerohr sein, um die Hitze, die vom Extruder auf das obere und untere Gehäuse ausgeht, zu reduzieren (Merkmal 6c)).

Dies ist bei der Verletzungsform jedoch nicht der Fall, da sich der Dämmstoff direkt um Extruder und Heizelement befindet und zudem nicht vollständig über das von der Verfügungsklägerin so bezeichnete Montagerohr (Endstück des Metallteils in Richtung Führungsrohr) ragt.

a)

Im Rahmen der Auslegung sind der Sinngehalt des Patentanspruchs in seiner Gesamtheit und der Beitrag, den die einzelnen Merkmale zum Leistungsergebnis der Erfindung liefern, zu bestimmen. Die Bestimmung des Sinngehalts eines einzelnen Merkmals muss stets in diesem Kontext erfolgen, aus dem sich ergeben kann, dass dem Merkmal eine andere Bedeutung zukommt als einem entsprechenden Merkmal in einer zum Stand der Technik gehörenden Entgegenhaltung. Denn für das Verständnis entscheidend ist zumindest im Zweifel die Funktion, die das einzelne technische Merkmal für sich und im Zusammenwirken mit den übrigen Merkmalen des Patentanspruchs bei der Herbeiführung des erfindungsgemäßen Erfolgs hat. Dabei sind Beschreibung und Zeichnungen heranzuziehen, die die technische Lehre des Patentanspruchs erläutern und veranschaulichen und daher nach ständiger Rechtsprechung nicht nur für die Bestimmung des Schutzbereichs (Art. 69 Abs. 1 EPÜ, § 14 PatG), sondern ebenso für die Auslegung des Patentanspruchs heranzuziehen sind, unabhängig davon, ob diese Auslegung die Grundlage der Verletzungsprüfung oder der Prüfung des Gegenstands des Patentanspruchs auf seine Patentfähigkeit ist (BGH GRUR 2012, 1124 Rn. 27 – Polymerschaum).

Grundlage der Auslegung ist allein die Patentschrift (hier AS8). Ein Vergleich mit der Veröffentlichung der Patentanmeldung kommt allenfalls dann in Betracht, wenn dies bei Widersprüchen zwischen Beschreibung und Patentanspruch zur Klärung des Umfangs einer bei der Erteilung des Patents oder im Einspruchsverfahren vorgenommenen Beschränkung des geschützten Gegenstands beitragen kann (BGH GRUR 2012, 1124 Rn. 28 – Polymerschaum).

b)

Die Kammer legt das Merkmal 6a) dahingehend aus, dass der Dämmstoff sich über dem Extruder befindet, der wiederum ein Heizelement enthält.

(i)

Die ursprüngliche Fassung des Verfügungspatents wurde in der deutschen Fassung dahinge-

hend ausgelegt, dass „*der Extruder (132) ein Heizelement umfasst, **das** von einem Dämmstoff (131) umgeben ist*" (siehe AS2, Hervorhebung durch das Gericht). Entsprechend wurde der Antrag seitens der Verfügungsklägerin gestellt und entsprechend hat die Kammer den Beschluss am 31.01.2024 antragsgemäß erlassen. Hinsichtlich der aufrechterhaltenen Form existiert nur die englische Fassung, welche in Bezug auf Merkmal 6a) jedoch der ursprünglichen Fassung entspricht, nämlich: „the extruder (132) having a heating element surrounded by an insulator (131)", wobei allein aus der englischen Fassung unklar ist, ob sich „surrounded by" auf den Extruder ("the extruder") oder das Heizelement ("a heating element") bezieht.

Die Verfügungsklägerin möchte nunmehr den Bezug des Dämmstoffs auf den Extruder herstellen, nachdem unter 6c) ein weiteres Merkmal hinzugefügt wurde, nämlich: „wherein the insulator (131) is provided over the mounting tube (138) so as to reduce the amount of heat transferred from the extruder (132) to the upper and lower housings (112. 114)".

Demgegenüber geht die Verfügungsbeklagte nach wie vor davon aus, dass der Bezug zwischen Dämmstoff und Heizelement besteht, wie in der ursprünglichen deutschen Übersetzung.

Dafür, dass sich der Dämmstoff auf den Extruder bezieht und nicht allein auf das Heizelement, spricht nach Ansicht der Kammer die Beschreibung des Verfügungspatents.

Die Beschreibung eines Patents (vgl. Art. 84 S. 2 EPÜ) muss wenigstens einen Weg zum Ausführen der beanspruchten Erfindung im Einzelnen, ggf. erläutert durch Beispiele und anhand der Zeichnungen unter Verwendung der entsprechenden Bezugszeichen enthalten. Die Beschreibung und die Zeichnungen sind nach Art. 69 Abs. 1 S. 2 EPÜ zur Auslegung der Patentansprüche heranzuziehen, da diese der Erläuterung der Patentansprüche dienen. Beschreibung und Zeichnungen sind mithin heranzuziehen, um den Sinngehalt des Patentanspruchs zu ermitteln. Der Fachmann versucht dabei, den Wortsinn der Patentansprüche mit der Beschreibung und den Zeichnungen derart in Einklang zu bringen, dass sich ein sinnvolles Ganzes ergibt. Der Beschreibung und den Zeichnungen kommt im Rahmen der funktionsorientierten Auslegung insbesondere die Rolle zu, den Beitrag, den die einzelnen Merkmale zum Leistungsergebnis der patentierten Erfindung leisten, zu ergründen (Haedicke/Timmann PatR-HdB/Timmann, 2. Aufl. 2020, § 3. Rn. 112, beck-online). Die Heranziehung darf aber weder zu einer inhaltlichen Erweiterung noch zu einer sachlichen Einengung des durch den Wortsinn des Patentanspruchs festgelegten Gegenstands führen (BGH GRUR 2011, 701 - Okklusionsvorrichtung).

Zum Dämmstoff hieß es in der zugehörigen Beschreibung des Patents in Abschnitt (0023) (siehe AS2) schon in der ursprünglichen Fassung: „In certain embodiments, an insulator 131 may be

provided over the mounting tube 138 so as to reduce the amount of heat transferred from the extruder 132 to the upper and lower housings 112, 114." (nunmehr „In all embodiments, an insulator 131 is provided over the mounting tube 138 so as to reduce the amount of heat transferred from the extruder 132 to the upper and lower housings 112, 114.", siehe AS8) (vgl. Merkmal 6c)). Aus technischer Sicht ist damit klargestellt, dass es darum geht, die Hitze, welche vom Extruder ausgeht, zu reduzieren. Dass der Extruder erhitzt werden muss, ergibt sich insofern zwingend, als das Ausgangsmaterial, welches durch das Führungsrohr in den Extruder gelangt, zum Zwecke der Extrusion geschmolzen werden muss. Denn andernfalls ist eine Extrusion durch die Austrittsdüse nicht möglich. Insofern ist auch zu berücksichtigten, dass es in Abschnitt (0020) der Patentschrift (AS8) heißt: „When the device 100 is connected to a power source, the heating element raises the temperature of the extruder 132 to a temperature that may be above the melting point of the feed stock 20." In Abschnitt (0025) heißt es weiter: „the portion of the feed stock 20 that is within the extruder 132 will be heated by the extruder 132". Auch hierin zeigt sich die weitere Funktion des Extruders, dass in diesem das Ausgangsmaterial unmittelbar vor dem Austritt aus der Austrittsdüse geschmolzen wird. Ferner heißt es im Abschnitt (0020) weiter: „In certain embodiments, the extruder 132 is formed of a thermally conductive material, for example a metal or a ceramic, with a heating element, for example a nichrome wire (not visible in FIG. 3B) wound around the exterior circumference". Damit stellt sich das Heizelement (Draht) schon im ursprünglichen Patent in einer möglichen beschriebenen Ausführungsform als Teil des Extruders dar bzw. ist um den Extruder gewickelt, damit dieser erhitzt werden kann.

In dem offenbarten Ausführungsbeispiel Fig. 3B umgibt der Dämmstoff nicht nur das Heizelement isoliert, sondern gleichzeitig den Extruder. Dass das Heizelement (Draht) in Fig. 3B (vgl. AS2) nicht sichtbar ist, ergibt sich auch aus dem Patent zugehörigen Beschreibung (AS8, Abschnitt 0020):



FIG.3B

Die Auslegung von Merkmal 6a) ergibt mithin für den Fachmann nachvollziehbar, dass der Dämmstoff den Extruder, der vom Heizelement aufgeheizt wird, um das Ausgangsmaterial zu schmelzen, umgibt und nicht isoliert das Heizelement.

(ii)

Im Ergebnis kommt es jedoch nicht darauf an, wie letztlich die deutsche Übersetzung des Patents in der Endfassung lauten wird, da in der Verletzungsform der Dämmstoff - bestehend aus einer Folie und einer Art Dämmwolle - sich sowohl über dem Extruder als auch über dem Heizelement in Form eines Drahtes, das um den Extruder gewickelt ist, befindet bzw. diese umgibt und damit das Merkmal 6a) wortsinngemäß verletzt:



Die Kammer hat dies auch so im Rahmen des Augenscheins feststellen können.

Damit ist das Merkmal 6a) nach Ansicht der Kammer wortsinngemäß erfüllt, sofern man es isoliert betrachtet (siehe aber D)III.2c)).

Soweit die Verfügungsbeklagte angibt, der Dämmstoff (131), der über dem Montagerohr vorgesehen ist, sei in der Anmeldung nur als Folie (film) offenbart gewesen, kann die Kammer dem nicht folgen: Die zitierte Stelle (0022) bezieht sich auf eine Folie (insulating film) die über dem Heizelement und <u>unter</u> dem Montagerohr, nicht darüber angebracht wird. Der folgende Abschnitt (0023) behandelt dagegen einen Dämmstoff, der <u>über</u> dem Montagerohr angebracht wird (vgl. Auch Fig. 3B), ohne sich zur Art des Dämmstoffs näher zu positionieren. Es bleibt vielmehr dem Fachmann überlassen, welchen bekannten Dämmstoff er verwenden möchte. Denn das technische Prinzip, dass heiße Bereiche von Werkzeugen wie z.B. auch Heißklebepistolen dort isoliert werden müssen, wo sie bestimmungsgemäß angefasst und bei der Verwendung gehalten werden, war im Zeitpunkt der Patentanmeldung schon allgemein bekannt und Stand der Technik. Die Verwendung einer Folie unter dem Montagerohr stellt somit nur eine mögliche Ausführungsform dar, die aber nicht Gegenstand des Verfügungspatents ist (vgl. hierzu BGH GRUR 2016, 1031 - Wärmetauscher), zumal sie in der aktuell gültigen Patentschrift (AS8) gestrichen wurde.

Nicht zwingend ist ferner die Verwendung von nur einem Dämmstoff, sodass auch die Verwendung von zwei Dämmstoffen – Folie und Dämmwolle – den Patentanspruch im Merkmal 6a) erfüllt. Wie bereits erwähnt, verhält sich der Patentanspruch in seinen Merkmalen nicht zu dem Material, welches zur Ausführung des Dämmstoffs verwendet werden soll, sondern stellt vielmehr nur auf die Dämmwirkung/Isolationswirkung ab („an insulator“). Die Beschränkung auf die Verwendung eines einzigen Dämmstoffs über dem Extruder lediglich aufgrund des gezeichneten Ausführungsbeispiels und der Verwendung einer Bezugsnummer würde daher den durch den Wortsinn des Patentanspruchs festgelegten Gegenstand sachlichen einengen (vgl. BGH GRUR 2011, 701 - Okklusionsvorrichtung).

c)

Die Merkmale 6a) und 6c) stehen allerdings inhaltlich miteinander im Zusammenhang, da sie beide die Position des Dämmstoffs betreffen. Dabei ergibt sich aus einer Zusammenschau der Merkmale des Anspruchs, dass der Dämmstoff („the insulator“) über dem Montagerohr geeignet sein muss, die Hitze, welche vom Extruder auf das obere und untere Gehäuse ausstrahlt, zu reduzieren. Zugleich soll ein Dämmstoff („an insulator“) den Extruder umgeben.

(i)

Dass die Hitze des Extruders auf die Gehäuseteile ausstrahlt, ergibt sich zwangsläufig daraus, dass sich der Extruder beim Verfügungspatent – wie auch bei der Verletzungsform – im Inneren des Gehäuses, d.h. des 3D-Stifts befindet. Sofern hierbei der Dämmstoff schon direkt über dem Extruder angebracht wird (Merkmal 6a)) und damit seine isolierende Wirkung entfaltet, stellt sich für den durchschnittlichen Fachmann die Frage, wie sich nunmehr Merkmal 6c) diesbezüglich verhält, um dem Patentanspruch einen Sinngehalt zu geben.

(ii)

Das Verfügungspatent beschreibt den einzusetzenden Dämmstoff dahingehend, dass *ein* Dämmstoff („an insulator“) (131) den Extruder umgibt (Merkmal 6a)). Weiter heißt es, dass *der* Dämmstoff („the insulator“) über dem Montagerohr angebracht ist (Merkmal 6c)) Der durchschnittliche Fachmann versteht daher den Patentanspruch dahingehend, dass der einzusetzende Dämmstoff kumulativ die in Merkmal 6a) und 6c) genannten Kriterien erfüllen muss: es ist zunächst *ein* Dämmstoff auszuwählen, der den Extruder umgibt. Gleichzeitig muss *dieser* („der“) Dämmstoff über dem Montagerohr sein. Der Patentanspruch verwendet hierbei unterschiedliche Artikel, nämlich im Merkmal 6a) den unbestimmten („an“/„ein“) und im Merkmal 6c) den bestimm-

te („the“/„der“). Soweit in Merkmal 6c) der bestimmte Artikel verwendet wird, schließt der Fachmann, dass der in Merkmal 6c) erwähnte Dämmstoff auf den im Merkmal 6a) erwähnten Dämmstoff bezieht, mithin mit diesem identisch ist. Ein bestimmter Artikel begleitet Nomen, die spezifisch bekannt oder bereits erwähnt sind. Folglich bezieht sich „der Dämmstoff“ in Merkmal 6c) auf einen vorher in dem Patentanspruch erwähnten Dämmstoff, nämlich den in Merkmal 6a) mit der Folge, dass der einzusetzende Dämmstoff die Merkmale 6a) und 6c) kumulativ erfüllen muss.

(iii)

Diese Auslegung wird auch gestützt durch die in der Beschreibung enthaltene Zeichnung zum Ausführungsbeispiel (Fig. 3B).

Eine mögliche Ausführungsform der Patentschrift zeigt ein Montagerohr, das den gesamten Extruder und mindestens einen Teil des Führungsrohrs umgibt und somit eine kompakte und gut ausgerichtete Anordnung bietet. Über dem Montagerohr (138) befindet sich in dem Bereich, in dem sich der Extruder (132) innerhalb des Montagerohrs (138) befindet, ein Dämmstoff (131):




FIG.3B

Die Merkmale 6a) und 6c) sind also kumulativ erfüllt. Hierbei handelt es sich zwar lediglich um ein Ausführungsbeispiel, bei dem sich der Extruder innerhalb des Montagerohrs befindet, weshalb die Dämmung über dem Montagerohr die vom Extruder ausgehende Hitze reduzieren kann.

Dies wird jedoch auch an weiteren Stellen der Beschreibung vorausgesetzt:

Im ursprünglich in der Patentschrift enthaltenen Abschnitt (0022) heißt es: „In certain embodiments, an insulating film (not visible in FIG. 3B), for example a polyimide tape, may be applied over the heating element and under the mounting tube 138.“ Auch hier zeigt sich ein räumlicher Bezug zwischen dem Montagerohr und dem Heizelement (das den Extruder umgibt).

In Abschnitt (0024) heißt es: „In certain embodiments, there may be a gap between the insulator 131 and the mounting tube 138. In certain embodiments, this gap may provide a thermal break so as to further thermally isolate the upper and lower housings 112, 114 from the extruder 132.“ Auch hierin zeigt sich die räumliche Verbindung zwischen Extruder, Montagerohr und Dämmstoff.

(iv)

Ferner wird diese Auslegung auch durch die Entscheidung vom 19.09.2025 gestützt (vgl. AS5). So heißt es insbesondere auf S. 31: „The opposition division considered these arguments as ex post facto analysis. Obviously, an engineer trying to prevent a device, and more specifically an extruder with a heating element, from becoming hot could use an insulator. However there are other options that the skilled person could consider such as a temperature control of the extruder to prevent overheating by switching off the device or merely provide an insulator around the extruder **but not around a mounting tube**.“ (Hervorhebung durch das Gericht)

Abweichend vom ursprünglichen Patent stellt das Verfügungspatent in der aufrechterhaltenen Form in der Beschreibung folglich darauf ab, dass in **allen** Ausführungen der Dämmstoff (131) über dem Montagerohr vorgesehen ist, um die Hitze, die vom Extruder auf das obere und untere Gehäuse ausgeht, zu reduzieren (vgl. AS8, Abschnitt 0023: In all embodiments an insulator 131 is provided over the mounting tube 138). Dies drückt sich im neu hinzugenommenen Merkmal 6c) aus, das folglich zwingend vorliegen muss, um eine Patentverletzung annehmen zu können.

d)

In der Verletzungsform ist ein Dämmstoff über dem Extruder (sowie dem Heizelement) angebracht und umschließt diesen (Merkmal 6a)). Dieser Dämmstoff reicht bis zu dem erweiterten Teil des Metallstücks, d.h. dem Montagerohr, bis zu dem Punkt, an dem dieses von einem weißen Kunststoffteil überdeckt wird. Der Dämmstoff ist nicht über dem kompletten „Montagerohr“ angebracht, sondern allenfalls über einem Teil. Das „Montagerohr“ wird überwiegend von einem weißen Plastikteil bedeckt:




Damit erfüllt der Dämmstoff nicht kumulativ die Merkmale 6a) und 6c), weil er nicht über dem Montagerohr liegt, um die vom Extruder ausstrahlende Wärme zu reduzieren. Denn über dem Extruder liegt kein Montagerohr. Selbst wenn man der Argumentation der Verfügungsklägerin folgen würde, dass das weiße Plastikteil auch eine isolierende Wirkung hat und daher als Dämmstoff i.S.d. Verfügungspatents gilt, erfüllt das weiße Plastikteil nicht das Merkmal 6a), nämlich den Extruder zu umschließen, der sich im vorderen Teil des Metallstücks befindet, während der Bereich, um den das Plastikstück sich befindet, ausschließlich die Funktion des Montagerohrs übernimmt.

Aufgrund dessen, dass die Merkmale 6a) und 6c) auf den Dämmstoff bezogen nach der Auslegung des Gerichts aus dem Verfügungspatent kumulativ vorliegen müssen, weil sich Merkmal 6c) auf Merkmal 6a) bezieht, kann das Gericht auch nicht dem Argument der Verfügungsklägerin folgen, dass die Funktion des Dämmstoffs bezogen auf die Merkmale 6a) und 6c) zusammen durch dem Dämmstoff um den Extruder sowie durch das weiße Plastikteil erfüllt werden, wonach durch beide die vom Extruder ausstrahlende Hitze auf das obere und untere Gehäuse reduziert wird, einmal um den Extruder selbst und einmal über dem Montagerohr. Denn wie bereits ausgeführt müssen die Merkmale aus 6a) und 6c) kumulativ erfüllt sein. Dem würde es widersprechen, wenn man bei zwei unterschiedlichen Dämmstoffen eine Verletzung des Verfügungspatents annehmen würde, wobei der eine Merkmal 6a) und der andere Merkmal 6c) erfüllt. Da der Dämmstoff über dem Extruder nur geringfügig über das „Montagerohr" reicht, erfüllt auch dieser allein nicht das Merkmal 6c): Er kann gerade dadurch, dass er nicht komplett über das „Montagerohr" reicht, nicht verhindern, dass die Hitze, die vom Extruder über das „Montagerohr" auf das Gehäuse ausstrahlt, reduziert wird. Dies erfüllt vielmehr nur das weiße Plastikrohr, wie die Verfügungsklägerin selbst hat messen lassen:



Das Merkmal 6c) ist mithin nicht erfüllt.

IV.

Soweit die Verfügungsklägerin geltend macht, im Einspruchsbeschwerdeverfahren werde eine Wiederherstellung des geltend gemachten Anspruchs im ursprünglich erteilten Umfang (d.h. insbesondere ohne das Merkmal 6c)) erfolgen, folgt die Kammer dem nicht.

Im Einspruchsverfahren wurden die Entgegenhaltungen ausführlich geprüft, was zu der Aufrechterhaltung des Verfügungspatents in einschränkten Umfang führte. Die Begründung der Entscheidung vom 19.09.2025 sowie die vorgebrachten Argumente (vgl. AS8) sind für die Kammer technisch nachvollziehbar, weshalb sich die Kammer der Entscheidung des Europäischen Patentamts vollumfänglich anschließt.

V.

Es liegt auch keine äquivalente Patentverletzung vor.

1.

Damit eine vom Wortsinn des Patentanspruchs abweichende Ausführung in dessen Schutzbereich fällt, muss regelmäßig dreierlei erfüllt sein. Die Ausführung muss erstens das der Erfindung zu Grunde liegende Problem mit zwar abgewandelten, aber objektiv gleichwirkenden Mitteln lösen. Zweitens müssen seine Fachkenntnisse den Fachmann befähigen, die abgewandelte Ausführung mit ihren abweichenden Mitteln als gleichwirkend aufzufinden. Die Überlegungen, die der Fachmann hierzu anstellen muss, müssen schließlich drittens am Sinngehalt der im Patentanspruch unter Schutz gestellten Lehre orientiert sein. Sind diese Voraussetzungen erfüllt, ist die abweichende Ausführung mit ihren abgewandelten Mitteln aus fachmännischer Sicht als der wortsinngemäßen Lösung gleichwertige (äquivalente) Lösung in Betracht zu ziehen und damit nach dem Gebot des Art. 2 des Protokolls über die Auslegung des Art. 69 EPÜ bei der Bestimmung des Schutzbereichs des Patents zu berücksichtigen. Der Schutzbereich des Patents wird auf diese Weise nach Maßgabe dessen bestimmt, was der Fachmann auf der Grundlage der er-

findungsgemäßen Lehre als äquivalent zu erkennen vermag und damit an dem Gebot des Art. 1 des Auslegungsprotokolls ausgerichtet, bei der Bestimmung des Schutzbereichs einen angemessenen Schutz für den Patentinhaber mit ausreichender Rechtssicherheit für Dritte zu verbinden (stRspr des BGH; vgl. BGHZ 150, 161 = GRUR 2002, 511 – Kunststoffhohlprofil; BGH, GRUR 2007, 510 – Kettenradanordnung; BGH, GRUR 2007, 1059 – Zerfallzeitmessgerät; BGH, GRUR 2011, 313 – Crimpwerkzeug IV; BGH, GRUR 2015, 361 – Ggefäß; vgl. OLG Düsseldorf, Urt. v. 21.3.2013 – I-2 U 73/09, BeckRS 2013, 12504 Chipkarte, unter B. 3.; OLG Düsseldorf, GRUR-RR 2014, 185 – WC-Sitzgelenk; OLG Düsseldorf, Urt. v. 14.8.– 15 U 16/14, BeckRS 2014, 21711, OLG Düsseldorf Urt. v. 17.9.2015 – I-15 U 139/14, GRUR-RS 2015, 16405 Rn. 75)

2.

Es fehlt jedenfalls am dritten Merkmal.

a)

Die für die Bejahung der Gleichwertigkeit (Äquivalenz) erforderliche Orientierung der Überlegungen des Fachmanns am Patentanspruch setzt zwar nicht voraus, dass die Beschreibung des Patents Ausführungen enthält, die den Fachmann gerade zu dieser Ausgestaltung hinlenken (BGH, GRUR 2014, 852 – Begrenzungsanschlag). Sie verlangt jedoch, dass die Überlegungen, die der Fachmann zum Auffinden eines äquivalenten Ersatzmittels anstellen muss, derart am Sinngehalt der im Patentanspruch unter Schutz gestellten Lehre orientiert sind, dass der Fachmann die abweichende Ausführung (Ausrichtung von Führungsrohr und Extruder mittels Crimpen; Verwendung von einem Dämmstoff über dem Extruder und einem weiteren Dämmstoff über dem Bereich der Montage) mit ihren abgewandelten Mitteln als der gegenständlichen Lösung (Ausrichtung von Führungsrohr und Extruder mittels Montagerohrs; Verwendung eines Dämmstoffs, der den Extruder umfasst und gleichzeitig über dem Montagerohr liegt) gleichwertige Alternative in Betracht zieht. „Orientierung am Patentanspruch“ setzt voraus, dass der Patentanspruch in allen seinen Merkmalen nicht nur den Ausgangspunkt, sondern die maßgebliche Grundlage für die Überlegungen des Fachmanns bildet. Es ist insofern nicht ausreichend, dass der Fachmann aufgrund seines Fachwissens die abgewandelte Lehre als technisch sinnvoll und in gleicher Weise zielführend wie die im Patentanspruch formulierte Anweisung erkennt. Es reicht auch nicht aus, die Orientierung am Patentanspruch isoliert für das abgewandelte Mittel festzustellen; vielmehr muss die angegriffene Ausführungsform in ihrer für die Merkmalsverwirklichung relevanten Gesamtheit eine auffindbar gleichwertige Lösung darstellen (BGH, GRUR 2007, 959 – Pumpeneinrichtung). Bei allem ist der Patentinhaber an die technische Lehre gebunden, die er unter Schutz hat stellen lassen (BGHZ 150, 161 = GRUR 2002, 511 – Kunststoffrohrteil). Die vom Patent gegebene technische Lehre muss von ihm als sinnhaft hingenommen und darf bei der Su-

che nach einem gleichwirkenden Ersatzmittel in ihrer sachlichen Berechtigung nicht infrage gestellt werden (OLG Düsseldorf Urt. v. 17.9.2015 – I-15 U 139/14, GRUR-RS 2015, 16405 Rn. 77)

b)

Daran fehlt es hier: Das Verfügungspatent stellt nicht nur einen 3D-Stift mit bestimmter Funktionsweise und bestimmten Komponenten (Extruder, Heizelement, Austrittsdüse, Führungsrohr, Montagerohr) unter Schutz, sondern gibt eine bestimmte technische Lösung vor, mittels derer die vom Extruder auf das Gehäuse ausstrahlende Hitze reduziert werden soll. Hierfür erteilt es unter anderem in Merkmal 8a) und 6c) die Anweisung, dass der Dämmstoff, der den Extruder (mit Heizelement) umgibt, über dem Montagerohr angebracht wird sowie dass Führungsrohr und Extruder mittels Montagerohr in Ausrichtung gehalten werden. Der Anspruch vermittelt dem Fachmann damit die Einsicht, dass (1) die haltende Funktion eines (Montage)Rohres genutzt werden soll und zudem (2) zur Reduzierung der Hitze ein Dämmstoff über dem Montagerohr genutzt werden soll.

Von diesen konkreten Vorgaben löst sich die Ausführungsform der Verfügungsbeklagten: Mittels Crimpen wird das Führungsrohr zwar so in Ausrichtung gehalten, dass die Verbindung zwischen dem Führungsrohr und dem Extruder während der Nutzung stabil bleibt. Jedoch ist das Crimpen nicht im Patentanspruch angelehnt, da dort gerade keine Verformung erforderlich ist, um das Führungsrohr zu halten/zu fixieren. Ferner werden das Führungsrohr und der Extruder durch das Crimpen nicht in einer Linie/in Ausrichtung gehalten, wie sich das Gericht im Wege des Augenscheins selbst überzeugen konnte:



Darüber hinaus ist die Anbringung eines Dämmstoffs direkt um den Extruder kein gleichwertiges Ersatzmittel des Patentanspruchs: dieser zeichnet sich gerade dadurch aus, dass der Dämmstoff nicht direkt um den Extruder angebracht ist, sondern auf dem Montagerohr. Dies stellt die eigentliche Besonderheit dar, während der durchschnittliche Fachmann von Anfang an in Betracht gezogen hätte, den Extruder selbst zu isolieren und nicht das Montagerohr (vgl. AS5, S. 31). Die Ausführungsform weicht damit von der konkreten Vorgabe ab, indem sie ignoriert, dass der

Dämmstoff den Extruder zwar umgeben muss, jedoch über dem Montagerohr anzubringen ist.

Angesichts dessen wird der Fachmann die angegriffene Ausführungsform mit ihren abgewandelten Mitteln nicht als am Sinngehalt der im Patentanspruch unter Schutz gestellten Lehre orientiert ansehen.

Diese Sichtweise wird der Fachmann vorliegend auch nicht aus Gerechtigkeitsgesichtspunkten revidieren. Derartige Erwägungen spielen im Rahmen der Äquivalenzprüfung zwar insoweit eine Rolle, als dass der erfinderischen Leistung ein angemessener Schutz geboten werden soll, was mittels der genannten drei Kriterien gewährleistet wird. Sie haben indes nicht zur Konsequenz, dass Umgehungslösungen, die außerhalb des Schutzbereichs des Patents liegen und nicht am Sinngehalt des Anspruchs orientiert sind, trotzdem als gleichwertige (äquivalente) Lösung anzusehen sind. Derartige Umgehungslösungen stellen vielmehr keine rechtswidrige Benutzung des Patents dar; auch dann nicht, wenn sie erst anlässlich eines Verletzungsverfahrens aufgefunden wurden.

E)

Die Kostenentscheidung beruht auf §§ 92 Abs. 1, 101 ZPO. Die Nebenintervenientin hat die Kosten der Nebenintervention sowie die ausscheidbaren Kosten des Zwischenstreits zu tragen.

Die Entscheidung zur vorläufigen Vollstreckbarkeit beruht auf §§ 708 Nr. 6, 711 ZPO.

**Rechtsbehelfsbelehrung:**

Gegen die Entscheidung, mit der der Streitwert festgesetzt worden ist, kann Beschwerde eingelegt werden, wenn der Wert des Beschwerdegegenstands 300 Euro übersteigt oder das Gericht die Beschwerde zugelassen hat.

Die Beschwerde ist binnen **sechs Monaten** bei dem

Landgericht Nürnberg-Fürth
Fürther Str. 110
90429 Nürnberg

einzulegen.

Die Frist beginnt mit Eintreten der Rechtskraft der Entscheidung in der Hauptsache oder der anderweitigen Erledigung des Verfahrens. Ist der Streitwert später als einen Monat vor Ablauf der sechsmonatigen Frist festgesetzt worden, kann die Beschwerde noch innerhalb eines Monats nach Zustellung oder formloser Mitteilung des Festsetzungsbeschlusses eingelegt werden. Im Fall der formlosen Mitteilung gilt der Beschluss mit dem vierten Tage nach Aufgabe zur Post als bekannt gemacht.

Die Beschwerde ist schriftlich einzulegen oder durch Erklärung zu Protokoll der Geschäftsstelle des genannten Gerichts. Sie kann auch vor der Geschäftsstelle jedes Amtsgerichts zu Protokoll erklärt werden; die Frist ist jedoch nur gewahrt, wenn das Protokoll rechtzeitig bei dem oben genannten Gericht eingeht. Eine anwaltliche Mitwirkung ist nicht vorgeschrieben.

Rechtsbehelfe können auch als **elektronisches Dokument** eingereicht werden. Eine einfache E-Mail genügt den gesetzlichen Anforderungen nicht.

Rechtsbehelfe, die durch eine Rechtsanwältin, einen Rechtsanwalt, durch eine Behörde oder durch eine juristische Person des öffentlichen Rechts einschließlich der von ihr zur Erfüllung ihrer öffentlichen Aufgaben gebildeten Zusammenschlüsse eingereicht werden, sind **als elektronisches Dokument** einzureichen, es sei denn, dass dies aus technischen Gründen vorübergehend nicht möglich ist. In diesem Fall bleibt die Übermittlung nach den allgemeinen Vorschriften zulässig, wobei die vorübergehende Unmöglichkeit bei der Ersatzeinreichung oder unverzüglich danach glaubhaft zu machen ist. Auf Anforderung ist das elektronische Dokument nachzureichen.

Elektronische Dokumente müssen
- mit einer qualifizierten elektronischen Signatur der verantwortenden Person versehen sein oder
- von der verantwortenden Person signiert und auf einem sicheren Übermittlungsweg eingereicht werden.

Ein elektronisches Dokument, das mit einer qualifizierten elektronischen Signatur der verantwortenden Person versehen ist, darf wie folgt übermittelt werden:
- auf einem sicheren Übermittlungsweg oder
- an das für den Empfang elektronischer Dokumente eingerichtete Elektronische Gerichts- und Verwaltungspostfach (EGVP) des Gerichts.

Wegen der sicheren Übermittlungswege wird auf § 130a Absatz 4 der Zivilprozessordnung verwiesen. Hinsichtlich der weiteren Voraussetzungen zur elektronischen Kommunikation mit den Gerichten wird auf die Verordnung über die technischen Rahmenbedingungen des elektronischen Rechtsverkehrs und über das besondere elektronische Behördenpostfach (Elektronischer-Rechtsverkehr-Verordnung - ERVV) in der jeweils geltenden Fassung sowie auf die Internetseite www.justiz.de verwiesen.

gez.

| Schroeter | Mieller | Bellmann |
| --- | --- | --- |
| Vorsitzende Richterin am Landgericht | Richterin am Landgericht | Richterin am Landgericht |

Verkündet am 07.05.2026

gez.
Maar, JAng
Urkundsbeamtin der Geschäftsstelle

Für die Richtigkeit der Abschrift
Nürnberg, 08.05.2026

Maar, JAng
Urkundsbeamtin der Geschäftsstelle