Certified copy

# Nuremberg-Fürth Regional Court

File no.: 19 O 581/24

## IN THE NAME OF THE PEOPLE

In the legal dispute

**Wobble Works Inc.**, 1209 Orange Street, Wilmington, Delaware 19801, United States of America
- Applicant -

Attorneys of record:
Attorneys **Peterreins Schley**, Patent Attorneys and Attorneys at Law PartG mbB, Hermann-Sack-Straße 3, 80331 Munich, ref. no.: 51163-0002LL2
against

**MYFIRST TECH ASIA PTE.LTD**, represented by the Director, 31 Woodlands Close #01-22 Woodlands, Horizon, Singapore 737855, Singapore - Respondent -

Attorneys of record:
Attorneys **avocado rechtsanwälte Berger Figgen Gerhold Kaminski Voß Rechtsanwälte Part mbB**, Thurn-und-Taxis-Platz 6, 60313 Frankfurt, ref.: 037181-26/jmv/pe

Intervenor:
**Guanghzou JER Education Technology**, Room 301, 3/F, Building 2, 510530 Guangdong, China

Attorneys of record:
Attorneys **avocado rechtsanwälte Berger Figgen Gerhold Kaminski Voß Rechtsanwälte Part mbB**, Thurn-und-Taxis-Platz 6, 60313 Frankfurt, ref.: 037181-26/jmv/pe due to patent infringement

The Nuremberg-Fürth Regional Court - 19th Civil Chamber - by Presiding Judge Schroeter, Judge Mieller, and Judge Bellmann, on the basis of the oral hearing of April 2, 2026, as follows:

# Interlocutory and final judgment

1. The intervention of Guanghzou JER Education Technology, Room 301, 3/F, Building 2, 510530 Guangdong, China, is rejected.

2. The preliminary injunction dated January 31, 2024, is vacated, and the application for a preliminary injunction dated January 31, 2024, is rejected.

3. The injunction plaintiff must bear the costs of the legal dispute, with the exception of the separable costs of the intervention and the interlocutory dispute.

4. The judgment is provisionally enforceable. The injunction plaintiff may avert enforcement by the injunction defendant by providing security in the amount of 110% of the amount enforceable under the judgment, unless the injunction defendant provides security in the amount of 110% of the amount to be enforced prior to enforcement.

# Order

The value in dispute is set at €250,000.00.

# Facts

A

The injunction plaintiff seeks injunctive relief and information from the injunction defendant.

The Plaintiff is a U.S.-based company that, among other things, offers and distributes the 3D pens "3Doodler Start+" on the German market. Defendant is a Singapore-based company that offered the 3D pen "*my First 3dPen*" ("infringement form") at the toy fair in Nuremberg between January 30 and February 3, 2024.

The injunction plaintiff is the owner of European Patent EP 2 928 672 ("injunction patent"). With regard to the original content, reference is expressly made to Annex AS2. The injunction patent relates to devices for three-dimensional (3D) drawing, in particular devices that can be used to extrude a starting material in order to apply this starting material to a substrate. The material may be applied in multiple layers to create a three-dimensional object. The device is easy to refill and requires no computerized design files. The patent was confirmed, to a limited extent, by a decision of the European Patent Office in the opposition proceedings (Ref. 1189-2 PCTEP) dated September

19, 2025, in accordance with the following feature analysis in the patent claim. With regard to the limited scope, there is no German translation so far; the language of grant is English:

A three-dimensional (3D) drawing device comprising:

M1 to M5: Express reference is made to Annex AS8 (lines 4 to 13).

M6: a nozzle assembly (130) disposed at the first end of the housing (110) and at least partially within the housing (110), the nozzle assembly (130) comprising an extruder (132), an exit nozzle (133A), and a guide tube (134),

characterized by

a) the extruder (132)

having a heating element

surrounded by an insulator (131))

b) the guide tube (134) extending between the gear train (150) and the extruder (132).

c) wherein the extruder and the guide tube are held in alignment by a mounting tube (138).

wherein the insulator (131) is provided over the mounting tube (138) so as to reduce the amount of heat transferred from the extruder (132) to the upper and lower housings (112. 114),

d) a first end of the guide tube (134) positioned to receive the strand of feed stock (20) from the gear train (150), a second end of the guide tube (134) aligned with a chamber (135) of the extruder (132) such that the strand of feed stock (20) is directed from the guide tube (134) into the chamber (135),

e) the extruder (132) being disposed between the guide tube (134) and the exit

nozzle (133A)

f) and wherein the housing comprises an upper housing (112) and lower housing (114) that together form the internal volume (116) in which is located said gear train (150), wherein the housing is sized and configured to fit in a user's hand and suitably shaped to allow for manipulation like a pen or pencil

Express reference is made to the reasons for the decision (Exhibit AS5). The plaintiff filed an appeal against this with the Board of Appeal of the European Patent Office. This has not yet been decided.

The 3D pen of the defendant violates features M1 to M5 as well as M6b), d) to f) of the feature analysis of the injunction patent.

In the infringing embodiment, there is a one-piece metal part that, at least in the front area, constitutes the extruder:






The side of the metal part facing the guide tube is expanded. The guide tube can thus be inserted into the metal part and is connected to the extruder (front part) in a form-fitting manner by crimping:





The heating element (in the form of a wire) is wrapped around the front part (extruder):



In a letter dated 12/01/2023 (AS1), the Plaintiff warned the Defendant about the infringement of five U.S. patents based on the offering and distribution of the infringing embodiment in the United States. In addition, the Petitioner named all globally relevant markets, such as the European Union, and pointed out equivalent European patents.

**The injunction plaintiff submits** that the infringing embodiments would literally also infringe features 6a) and 6c) of the asserted claim of the injunction patent in the version maintained after the first-instance opposition decision, because they would have a mounting tube connected to the extruder (132), into which a part of the guide tube would be inserted up to the beginning of the extruder and then crimped. By means of the mounting tube, the guide tube inserted into the

mounting tube would be connected to the extruder in a form-fitting manner. Thus, the guide tube is held in alignment with the extruder as required. It is not necessary for the mounting tube to enclose the extruder. It is irrelevant that the mounting tube is integrally connected to the extruder, since the extended part in the direction of the guide tube assumes only the function of the mounting tube (alignment) and the opposite part assumes only the function of the extruder (extrusion). There would also be an insulating material above the extruder, around which the heating element is wound, which is why feature 6a) is also fulfilled, regardless of whether one assumes that the extruder must be surrounded by an insulating material or the heating element. Correctly, feature 6a) should be understood, in light of feature 6c) added in the opposition proceedings, as in the first alternative. This is because only in the case of such a reference back to the extruder, not to the heating element, does the specified function of the insulating material have meaningful technical content. Since this insulating material extends up to the white plastic part located above the mounting tube, which does not completely cover the mounting tube, this insulating material cumulatively meets the requirements of feature 6c) and 6a). According to the wording of the claim, however, the insulating material can also be multi-piece and made of different starting materials, as long as the extruder, which comprises a heating element, is surrounded by an insulating material and an insulating material is provided at least at one location above the mounting tube, and as long as the (multi-piece) insulating material fulfills its insulating function, namely to reduce the amount of heat transferred to the upper and lower housing (112, 114). In the infringing embodiments, the white plastic part (proximal insulating material) performs this insulating function together with the insulating material over the extruder (distal insulating material). For the assessment of patent infringement, it is irrelevant whether the white plastic element fulfills another function (holding function) in addition to the insulating function. However, the white plastic element of the infringing embodiments does not touch the guide tube and thus cannot hold the guide tube aligned with the extruder. In addition, the white plastic tube is provided above the mounting tube.
Alternatively, it argues that there is patent infringement by equivalent means. The infringing embodiments were still within the scope of protection of the claim.

On January 31, 2024, the Court issued the following preliminary injunction, without an oral hearing, upon the Plaintiff's request:

1. The Respondent is prohibited from offering devices for three-dimensional drawing in the Federal Republic of Germany, offering for sale, placing on the market, using, importing, or possessing them for the aforementioned purposes, each of which has the following features:

   A three-dimensional (3D) drawing device comprising:

a housing configured to be held by the user, the housing having first and second ends, the device comprising an input opening configured to receive a strand of starting material into an internal volume of the housing;

a motor disposed within the internal volume;

a gear train operatively coupled to the motor to drive the gear train, the gear train being disposed within the internal volume to receive the strand of starting material and configured to move the strand of starting material when engaged by the gear train;

an actuator configured to selectively cause the motor to rotate in at least a first direction such that the starting material is extruded from the exit nozzle to form a three-dimensional object, and

a nozzle assembly disposed at the first end of the housing and at least partially within the housing, the nozzle assembly comprising an extruder, an outlet nozzle, and a guide tube;

wherein the extruder comprises a heating element surrounded by an insulating material;

wherein the guide tube extends between the gear train and the extruder, wherein a first end of the guide tube is positioned to receive the strand of starting material from the gear train, and a second end of the guide tube is aligned with a chamber of the extruder such that the strand of starting material is guided from the guide tube into the chamber;

wherein the extruder is disposed between the guide tube and the outlet nozzle.

The Respondent shall, for each case of infringement of the

2. court prohibitions mentioned as an enforcement measure, a fine of up to EUR 250,000.00, or, alternatively, detention, or detention for up to six months; in the event of repeated violations, up to a total of two years, to be enforced against its legal representative, is threatened.

3. The Respondent must provide the Petitioner with information about the extent to which it has committed the actions described under Clause I since March 30, 2022, namely, stating

   a) the names and addresses of manufacturers, suppliers, and other previous owners;

   b) the names and addresses of the commercial buyers and the sales outlets for which the products were intended

   c) the quantity of products delivered, received, and ordered and the prices paid for the relevant products;

   where

- the list with the data of the information provided must also be transmitted in a electronically processable, electronic form; and

- to prove the information, the corresponding purchase receipts (namely invoices, alternatively delivery notes, and, in the further alternative, customs papers) must be submitted in copy, whereby details requiring confidentiality outside of the data subject to disclosure may be redacted;

4. The Respondent is ordered to hand over the products referred to under Clause I that are in the Respondent's possession in the Federal Republic of Germany, in particular all products referred to under Clause I that are located at the Respondent's booth at the Nuremberg Toy Fair (Hall 4A, Stand A-18), to a court bailiff for the purpose of safekeeping, which continues until the existence of a claim for destruction between the parties has been finally decided or an amicable settlement has been reached, in particular 3D pens with the designation "my First 3dPen," as shown below, for example:






5. Because of an amount in the amount of the procedural and court costs based on a disputed value of EUR 250,000 (procedural and hearing fee for patent attorney and attorney-at-law, court fee, flat-rate expenses), attachment is ordered against the Respondent's movable and immovable assets in the amount of EUR 12,455.00;

6. The Respondent must bear the costs of the proceedings.

Service on the Respondent was effected on February 1, 2024, at the Nuremberg Toy Fair.

By letter dated January 23, 2026, counsel for the Respondent entered an appearance and, in view of the interim limitation of the patent, requested that the Petitioner declare that it waives the resulting rights with regard to the preliminary injunction. By letter dated January 26, 2026, the Petitioner declared a partial waiver of the rights arising from the preliminary injunction, to the extent that the injunction concerns rights that go beyond the maintained version of the patent claims. At the same time, the Petitioner pointed out that the infringement product complained of at the time was still covered by the restricted patent claim.

By attorney's brief dated February 19, 2026, the defendant in the injunction proceedings filed an objection to this.

The Plaintiff now requests:

> The preliminary injunction of the Regional Court of Nuremberg-Fürth dated January 31, 2024 (Ref. 19 O 581/24) is maintained with the proviso that the operative part of the judgment is now drafted as follows:
>
> The Respondent is prohibited, on pain of an administrative fine to be set by the court for each case of infringement of up to EUR 250,000.00, or, alternatively, administrative detention, or administrative detention of up to six months, in the case of repeated infringement up to a total of two years, whereby the administrative detention, with regard to the Applicant, is to be enforced against its respective legal representative,
>
> to offer, place on the market, use, and/or import and/or possess, for the aforementioned purposes, devices for three-dimensional drawing in the Federal Republic of Germany, each of which has the following features:
>
> A three-dimensional (3D) drawing device comprising:
>
> a housing configured to be held by the user, the housing having first and second ends, the device comprising an input opening configured to receive a strand of starting material into an internal volume of the housing;
>
> a motor disposed within the internal volume;
>
> a gear transmission operatively coupled to the motor to drive the gear transmission disposed within the internal volume to receive the strand of starting material and configured to move the strand of starting material when engaged by the gear transmission;

an actuator configured to selectively cause the motor to rotate in at least a first direction such that the starting material is extruded from the outlet nozzle to form a three-dimensional object,

and a nozzle assembly disposed at the first end of the housing and at least partially within the housing, the nozzle assembly comprising an extruder, an outlet nozzle, and a guide tube;

the extruder comprising a heating element is surrounded by an insulating material,

wherein the guide tube extends between the gear transmission and the extruder, wherein the extruder and the guide tube are held in alignment by a mounting tube, wherein the insulating material is provided above the mounting tube to reduce the amount of heat transferred from the extruder to the upper and lower housings, wherein a first end of the guide tube is positioned to receive the strand of starting material from the gear transmission, and a second end of the guide tube is aligned with a chamber of the extruder such that the strand of starting material is guided into the chamber by the guide tube;

wherein the extruder is disposed between the guide tube and the outlet nozzle,

wherein the housing comprises an upper housing and a lower housing collectively forming the internal volume in which said gear transmission is located, said housing being sized and shaped to fit in the hand of a user and shaped accordingly to allow handling as with a pen or pencil,

<u>In the alternative:</u>

The preliminary injunction of the Regional Court of Nuremberg-Fürth dated January 31, 2024 (Ref. 19 O 581/24) is maintained with the proviso that the operative part of the judgment is now drafted as follows:

The Respondent is prohibited, on pain of an administrative fine to be set by the court for each case of infringement of up to EUR 250,000.00, or, alternatively, administrative detention, or administrative detention of up to six months, in the case of repeated infringement up to a total of two years, whereby the administrative detention, with regard to the Applicant, is to be enforced against its respective legal representative,

to offer, place on the market, use, and/or import and/or possess, for the aforementioned purposes, devices for three-dimensional drawing in the Federal Republic of Germany, each of which has the following features:

A three-dimensional (3D) drawing device comprising:

a housing configured to be held by the user, the housing having first and second ends, the device comprising an input opening configured to receive a strand of starting material into an internal volume of the housing;

a motor disposed within the internal volume;

a gear transmission operatively coupled to the motor to drive the gear transmission disposed within the internal volume to receive the strand of starting material and configured to move the strand of starting material when captured by the gear transmission;

an actuator configured to selectively cause the motor to rotate in at least a first direction such that the starting material is extruded from the outlet nozzle to form a three-dimensional object,

and a nozzle assembly disposed at the first end of the housing and at least partially within the housing, the nozzle assembly comprising an extruder, an outlet nozzle, and a guide tube;

the extruder comprising a heating element is surrounded by an insulating material,

wherein the guide tube extends between the gear transmission and the extruder,
wherein the extruder and the guide tube are held in alignment by a mounting tube integrally formed with the extruder, wherein additional insulating material is provided above the mounting tube to reduce the amount of heat transferred from the extruder to the upper and lower housings, wherein a first end of the guide tube is positioned to receive the strand of starting material from the gear transmission, and a second end of the guide tube is aligned with a chamber of the extruder such that the strand of starting material is guided from the guide tube into the chamber;

wherein the extruder is disposed between the guide tube and the outlet nozzle,

wherein the housing comprises an upper housing and a lower housing collectively forming the internal volume in which said gear transmission is located, said housing being sized and shaped to fit in the hand of a user and shaped accordingly to allow handling as with a pen or pencil,

The respondent requests

to set aside the injunction dated 01/31/2024 and to reject the application for a preliminary injunction

**The respondent in the injunction believes** that the contested embodiments (infringing embodiments) lack a mounting tube and an insulating material that simultaneously (cumulatively) surrounds the heating element and is mounted on the mounting tube in order to reduce the amount of heat transferred from the extruder (132) to the upper and lower housings (112, 114). They would waive essential features and the technical result sought by the injunction patent, so that there is no literal patent infringement.

A mounting tube must be tubular. Not every element configured for aligning and holding two tubes is a mounting tube within the meaning of the injunction patent. If the component is not tubular, it is merely a fastening element, such as a flange or a coupling. In addition, the mounting tube must be a separate third part that serves to align and hold two other parts together. In order to align and hold the guide tube and the extruder together, the mounting tube must be arranged so that it encloses and holds at least the ends of both parts.

The mounting tube of the infringing embodiments, so designated by the plaintiff, is part of the extruder. A mounting tube is not necessary; rather, the contested embodiments completely omit a mounting tube, since the extruder and the guide tube are directly connected to one another by simple crimping (plastic deformation).

The claimed insulating material is defined as an insulating material surrounding the heating element, not the extruder. Different and separate materials that do not surround the heating element could not replace or be part of the claimed insulating material. This is apparent not only from the wording of the claim, but also from the interpretation of the claim based on the description and the drawings. The only reason why the injunction patent provides for an insulating material around the mounting tube is that, in the only exemplary embodiment disclosed in this respect, the heating element lies within the mounting tube.

Furthermore, the claim also requires that the insulating material (131) be provided over the mounting tube. This refers to the same insulating material that also surrounds the heating element. Even if the insulating material consists of several parts, each part must fulfill the claimed dual function (functional unit). A division of the functions between two different insulating materials, each of which fulfills only one partial function, is not sufficient. An insulating material is found in the infringing embodiments exclusively around the heating element of the extruder, while the white plastic element in the infringing embodiments is mounted over a part of the extruder and does not surround any part of the heating element. In addition, the white plastic element does not insulate the upper and lower housings from the heat generated by the heating element, but at most shields them toward the rear. The function of the white plastic element is also solely to position the nozzle in the housing and to hold it in its position in the housing during use (positioning and retaining element): A rectangular portion of the white plastic element snaps into place behind a rail of the housing, thereby preventing forward movement of the nozzle and also preventing the components from slipping in the housing during use.

In the oral hearing, the chamber examined 3D pens with regard to the one-piece metal part (including the extruder), the insulating material, and the heating element.

B

By written pleading dated February 19, 2026, the secondary intervener, which is the manufacturer and supplier of the disputed 3D pens for the respondent, declared that it was joining the legal dispute on the respondent's side.

By written pleading dated March 20, 2026, the injunction plaintiff requested that the secondary intervention be rejected.

She believes that the secondary intervener's mere assertion that it is the manufacturer of the alleged infringing embodiment is not sufficient in this respect. Rather, it would require the presentation of its own legal interest due to any effects of the decision on the secondary intervener. Furthermore, there is no proper declaration of joinder.

For further submissions, reference is made to the exchanged pleadings and appendices.

# Reasons for the Decision

The secondary intervention must be rejected.

Following the admissible opposition, the preliminary injunction dated January 31, 2024, must be set aside and the application—also to the extent of the limited claim maintained—must be rejected.

A

The application for admission of the secondary intervention is admissible, but unfounded (Sections 71(1) sentence 1, 66(1) ZPO).

The joinder of the secondary interveners is effected pursuant to Section 70 ZPO by the secondary interveners submitting a pleading to the trial court in which the parties are designated, an interest in the secondary intervention is set out, and the joinder is declared. These requirements are not met.

I

In accordance with Section 66(1) ZPO, secondary intervention requires that a legal dispute between other persons is pending. The secondary intervener may therefore not itself already be a party to the legal dispute. This requirement is met.

II.

In a pleading dated February 19, 2026, the joinder was expressly declared.

III.

However, the intervenor has not demonstrated a legal interest within the meaning of § 66(1) ZPO in joining the legal dispute.

Such a situation exists if the decision in the legal dispute (by its content or enforcement) has a direct or indirect legal effect on its private-law or public-law relations—not necessarily property-related—either favorable or unfavorable. The term should be interpreted broadly. However, it must always be the party's own interest due to possible legal effects (Munich Commentary on the ZPO/Schultes, 7th ed. 2025, ZPO § 66 para. 7f; Zöller, 35th ed., § 66 para. 8).

Sufficient interest was deemed to exist where the party losing the case could seek recourse against the intervenor, for example if the seller liable for defects in title or quality turns to its supplier. In this constellation, a legal interest of the supplier can be denied only if recourse is certainly hopeless (OLG Karlsruhe, NJW 2018, 1103 para. 16 with further references).

However, the intervenor must set out the requirements for the admissibility of its intervention. In particular, it must state its legal interest in the success of the supported party and make the facts from which this interest arises credible within the meaning of § 294 (cf. § 71(1) sentence 2) (BeckOK ZPO/von Selle, 60th ed., 3/1/2026, ZPO § 71 para. 7, beck-online). The intervenor did not do so. Because it is not sufficient that the intervenor merely claims to be the manufacturer and supplier of the challenged embodiment. This is undisputed (cf., on the lack of need for substantiation, BeckOK ZPO, 60th ed., as of 3/1/2026, § 294 para. 4). However, the intervenor did not explain to what extent the defendant could seek recourse in the event it were to lose. While, in the event the defendant loses, there is in principle the possibility that it could seek recourse against the intervenor (cf., on recourse as a legal interest, Zöller, 35th ed., § 66 para. 13). However, the intervenor should have explained this in more detail and also made it credible (cf. OLG Frankfurt a.M., NJW-RR 2000, 348 on substantiating a legal interest by bankruptcy creditors). In addition, the intervenor did not submit documents regarding the contracts between the intervenor and the defendant from which the defendant’s claims against the intervenor would arise, or other means of substantiation.

Therefore, the intervention was to be rejected.

B

The application is admissible (§§ 936, 920 ZPO).

In particular, the Regional Court of Nuremberg-Fürth has subject-matter and local jurisdiction (§ 143 PatG, §§ 3, 32 ZPO, § 38 No. 2 BayGZVJu).

C

The objection is permissible (cf. §§ 936, 924 ZPO) and not forfeited.

I

The objection may be filed without time limit. German law does not provide for a deadline for this.

II.

The objection is also not forfeited.

1.

The assumption that the attachment debtor permanently waives the right to object under § 924 para. 1 ZPO if he does not file an objection promptly after service of the attachment is justified only under special circumstances due to the particular importance of the right to be heard, which the right to object serves to guarantee (OLG Dresden BeckRS 2016, 19045).

In addition to a long delay by the debtor, forfeiture requires circumstances under which reasonable steps are typically taken to preserve the right. With regard to the right to raise an objection, forfeiture must be assumed if the creditor was entitled to rely on the absence of an objection and if that reliance is worthy of protection (Zöller, 35th edition, § 924 margin no. 10; OLG Saarbrücken, NJW-RR 1989, 1512).

Forfeiture therefore requires that, due to the respondent's inaction over a certain period of time (time element), the applicant was entitled, on an objective assessment, to assume and did assume that the respondent would no longer assert his right (circumstances element) and that the late assertion would therefore be contrary to good faith (BeckOK ZPO/Elzer, 59th ed. Dec. 1, 2025, ZPO § 924 margin no. 62, beck-online; OLG Dresden, BeckRS 2016, 19045).

2.

These requirements are not met.

In favor of forfeiture, it could be said that the defendant did not file an objection over a period of two years and also allowed an enforcement order to be issued against it, to its detriment, without taking action against it.

However, even over a period of 2 years, the applicant cannot assume that the

respondent will no longer proceed against the issued preliminary injunction and that it was forfeited solely for this reason (cf., e.g., Dresden Higher Regional Court, BeckRS 2016, 19045, elapsed period: 2 years). As long as the main proceedings are still pending, the applicant must also always expect an objection (BeckOK ZPO/Elzer, 59th ed., Dec. 1, 2025, ZPO § 924 margin no. 63).

The party filing the objection may also argue that there are new facts that have subsequently eliminated the prerequisites for the attachment order. This is because it is decisive whether the formal and substantive prerequisites for the attachment are present at the conclusion of the oral hearing. Whether they were already present at the time of the order may be left open (BeckOK ZPO/Elzer, 59th ed., Dec. 1, 2025, ZPO § 924 margin no. 47). These prerequisites are present here, so that forfeiture is ruled out for lack of the circumstances element.

In this respect, the special feature here is that no main proceedings have been pending to date. The opposition proceedings were also pending in January 2024 (time of issuance of the preliminary injunction) and in February 2025 (time of the enforcement proceedings) (see application). Furthermore, the patent claim was only maintained to a limited extent by the decision dated September 19, 2025. After the reasons were available in December 2025, the parties discussed whether the plaintiff in the injunction proceedings wanted to waive the rights under the preliminary injunction, which it rejected (cf. AG1, AS6). In any case, in the Chamber's view, since September 2025 the plaintiff in the injunction proceedings had to expect an objection, i.e., could no longer prepare for the preliminary injunction to continue indefinitely, especially since it was already aware by the beginning of 2025 at the latest that the defendant had also filed an opposition to the patent, which still had to be decided. In this respect, the circumstances element is lacking, which is why the objection is not forfeited.

D)

However, the preliminary injunction must be lifted to the extent of the limited maintained claim and the application must be dismissed, since the accused embodiment does not infringe the patent in suit to the extent it has been maintained in limited form.

I

The standing of the plaintiff in the injunction proceedings and the status of the defendant in the injunction proceedings as the proper defendant are undisputed.

II.

The legal validity of the patent is sufficiently secured by the opposition decision dated September 19, 2025, to the limited extent to which the patent in suit was maintained. The fact that two appeal proceedings are still pending before the EPO and that the plaintiff also filed an appeal against the EPO's decision does not mean that the legal validity is not sufficiently secured. It is not discernible that the decision dated September 19, 2025 is based on incorrect assumptions (to the detriment of the defendant), which, in the two further appeal proceedings, are highly likely to lead to the patent in suit also being revoked or amended in the form maintained to date. In particular, it cannot accept the argument that the insulating material (131), which is provided above the mounting tube, was disclosed in the application only as a film: The cited passage (0022) refers to a film (insulating film) that is placed above the heating element and <u>under</u> the mounting tube, not above it. On the other hand, the following section (0023) deals with an insulating material that is mounted <u>over</u> the mounting tube (see also Fig. 3B), without specifying the type in more detail.

In addition, it is not discernible what the two appeal proceedings that are still pending concern, which could lead to a change in favor of the Respondents. No submission was made in this regard. The Chamber is also not aware of the objections, so it assumes a sufficiently secure legal position based on the decision dated 09/19/2025.

III.

The accused embodiment does not infringe feature 6c).

Although the accused embodiment has an insulating material surrounding the extruder and the heating element wound therearound (feature 6a)), this insulating material is not located over a mounting tube to shield the heat emitted from the extruder from the upper and lower housings, as required by feature 6c). In addition, the accused embodiment does not have a mounting tube that keeps the guide tube and the extruder in alignment.

1.

a)

The Chamber interprets the “mounting tube” (mounting tube) feature to describe an elongated hollow body (tube) made of an inflexible material, the length of which is typically much larger than its diameter (Wikipedia definition). Tubes also have a circular cross section (cylindrical shape).

The word "assembly," by contrast, describes the function of the tube, i.e., that it serves structural purposes (as a bar/beam). This function also follows from the function described in the patent itself in feature 6c): "wherein the extruder and the guide tube are held in alignment by a mounting tube (138)". "in alignment" means "in Ausrichtung"; in terms of physical alignment, it can also mean "in one line" or "straight". As a result, the mounting tube serves to position or adjust the extruder and guide tube, in particular that the extruder and guide tube must be positioned and held relative to each other by the mounting tube in such a way that the (solid) starting material can pass from the guide tube into the extruder. In this regard, the openings of the guide tube and extruder must be adjusted such that they are opposite each other or in line with each other and the transfer of the (solid or at least largely solid) starting material from the guide tube into the extruder is possible. According to the patent claim, this must be ensured by the mounting tube. This function of the mounting tube is also technically comprehensible, since the (solid) starting material must pass from the guide tube into the extruder, where, according to the description—which also corresponds to the usual function of an extruder—it is heated and made formable by softening or melting. The version with a mounting tube should therefore ensure that the starting material enters the extruder without obstacles, in particular without jamming and without breaking.

This interpretation is also consistent with the original (now deleted passage of the) patent description under Section 2 (cf. AS2 or AS8), where it says: “The 3D drawing device of claim 1, further comprising a mounting tube (138) having a first end and a second end, and wherein the second end of the guide tube (134) extends into the first end of the mounting tube (138), and an end of the extruder (132) opposite the exit nozzle (133A) extends into the second end of the mounting tube (138), the mounting tube (138) holding the second end of the guide tube (134) in alignment with the end of the extruder (132) opposite the exit nozzle (133A).” This describes the position of the ends (in the sense of openings) of the guide tube and the extruder relative to each other, i.e., that the one end of the guide tube is inserted into the first opening ("end") of the mounting tube

while the opening ("end") of the extruder—which is opposite the outlet nozzle—

extends into the other end of the mounting tube ("extends into").

The transition from the guide tube to the extruder must also be stable, i.e. The guide tube and extruder must not only be aligned, but also held in alignment ("held in alignment"). In the injunction patent, this function is performed by the mounting tube, as is already apparent from the wording of feature 6c) ("wherein the extruder and the guide tube are held in alignment by a mounting tube (138)").

b)

In the infringing embodiment, there is a single-piece metal part. This has an outlet nozzle on one end. This is followed by a (hollow) chamber. The other end piece is circular and has an expanded opening into which the guide tube is inserted until it hits the chamber of the metal part. This part of the metal part is shorter than the part with the chamber and outlet nozzle:








A loose, in particular separate mounting tube, which surrounds the guide tube and the extruder at least in parts, i.e., is not firmly connected to it, undisputedly does not exist.

However, this is not necessary according to the construction of feature 6c) in view of the chamber. The claim specifies the respective means with regard to their functional properties, whereby the person skilled in the art is free to link and implement two functions (here: extruder and mounting tube) by means of one means, possibly in a logical step. As long as the functions are maintained, it is therefore possible to form the mounting tube and extruder in a fixed connection, i.e., by means of a single-piece metal part.

In the infringing embodiment, a wire is wrapped around the chamber, which then heats the chamber so that the feedstock can melt and be extruded via the outlet nozzle:



The front part of this metal part thus undisputedly assumes the function of the extruder, which comprises a heating element. In contrast, the rear part with the round opening is not surrounded by the heating element, even if it is also heated due to the connection and the design as a metal part. In this part, the feedstock is pressed into the chamber from the guide tube, which is inserted into the expanded end region of the metal part. This requires that the guide tube and chamber of the extruder be held in alignment to allow the feedstock to pass into the extruder. The expansion on the metal part in the direction of the guide tube thus assumes exclusively the mounting function, which in the injunction patent is performed by the mounting tube. The shape of the extension is also circular, thus tubular and made of solid material.

However, the section is significantly shorter in length in relation to the extruder and also not significantly longer in relation to the diameter, which is why there is no "pipe" in the technical sense.

In addition, this section is crimped after insertion of the guide tube so that it is held in alignment with the extruder after it has been aligned with the extruder, as the chamber was also able to determine during the inspection:



In contrast, the injunction patent does not describe, either in the claim or in the associated description, that the guide tube must be crimped with the extruder or mounting tube. From a technical point of view, crimping is not necessary for this, as the extruder and guide tube are held in alignment and in a straight line by the (long) mounting tube alone ("held in alignment by"). In contrast, in the accused embodiment, the function of holding in alignment cannot be performed by the section. For this, it is too short, with the result that crimping becomes necessary in order to maintain the connection between the guide tube and the extruder and also to keep the guide tube in line with the extruder:



The embodiment example Fig. 3B mentioned in the description is also consistent with this interpretation:




FIG. 3B

Here, the mounting tube is a tube that completely encloses the extruder and at least parts of the guide tube. The chamber has not failed to recognize that the use of embodiment examples and drawings may neither lead to an expansion of the content nor to an objective narrowing of the subject matter defined by the wording of the claim (BGH GRUR 2011, 701 - Occlusion Device). The wording of the injunction patent does not address the extent to which the mounting tube must enclose the guide tube and extruder (see, however, D)III.2c)). In the accused embodiment, however, for infringement of the injunction patent it would at least be necessary for the guide tube to be enclosed by the "mounting tube" over a greater length than is actually the case. The more the mounting tube is a "tube," the more stably the guide tube and extruder are held, so that crimping is not required.

Overall, from the perspective of the chamber, two essential elements of feature 6c) are therefore missing: a mounting tube (1) that holds the guide tube and extruder in alignment (2). Thus, feature 6c) is not fulfilled.

2.

Even if one were to assume that, in the accused embodiment, the metal piece assumes the function of the extruder and mounting tube and feature 6c) is fulfilled in this respect, an insulating material that meets the requirements specified in the injunction patent is still missing for realization of the entire feature 6c).

The chamber interprets the injunction patent in features 6a) and 6c) with regard to the insulating material to mean that it must cumulatively fulfill both features, namely:

- An insulating material (131) must surround the extruder containing a heating element (feature 6a)).

- The insulating material (131) must be over the mounting tube to reduce the heat from the extruder to the upper and lower housing (feature 6c)).

However, this is not the case with the infringing embodiment, since the insulating material is located directly around the extruder and the heating element and also does not project completely over the mounting tube so designated by the plaintiff in the injunction (end piece of the metal part in the direction of the guide tube).

a)

Within the framework of claim construction, the meaning of the patent claim in its entirety and the contribution that the individual features make to the performance result of the invention must be determined. The determination of the meaning of a single feature must always take place in this context, from which it may follow that the feature has a different meaning than a corresponding feature in a prior-art reference. This is because, at least in case of doubt, what is decisive for understanding is the function that the individual technical feature has, by itself and in cooperation with the other features of the patent claim, in achieving the success according to the invention. In doing so, the description and drawings must be consulted, which explain and illustrate the technical teaching of the patent claim and, therefore, according to established case law, must be used not only for determining the scope of protection (Art. 69(1) EPC, § 14 PatG), but also for construing the patent claim, regardless of whether this construction is the basis for the infringement analysis or the examination of the subject matter of the patent claim for patentability (BGH GRUR 2012, 1124 para. 27 - Polymer foam).
The basis for the construction is solely the patent specification (here AS8). A comparison with the publication of the patent application is at most to be considered if, in the event of contradictions between the description and the patent claim, this can contribute to clarifying the scope of a limitation of the protected subject matter made upon grant of the patent or in opposition proceedings (BGH GRUR 2012, 1124 para. 28 - Polymer foam).

b)

The chamber construes feature 6a) to mean that the insulating material is above the extruder, which in turn contains a heating element.

I

The original version of the injunction patent was construed in the German version as follows: *"the extruder (132) comprises a heating element, **which** is surrounded by an insulating material (131)"* (see AS2, emphasis added by the court). Accordingly, the application was filed by the injunction plaintiff, and accordingly the chamber issued the order on January 31, 2024, in accordance with the application. With regard to the maintained version, only the English version exists, which,

however, corresponds to the original version with respect to feature 6a), namely: "the extruder (132) having a heating element surrounded by an insulator (131)", whereby it is unclear from the English version alone whether "surrounded by" refers to the extruder ("the extruder") or the heating element ("a heating element").

The injunction plaintiff now wishes to establish that the insulating material refers to the extruder after another feature has been added under 6c), namely: “wherein the insulator (131) is provided over the mounting tube (138) so as to reduce the amount of heat transferred from the extruder (132) to the upper and lower housings (112. 114)“.

In contrast, the defendant continues to assume that the relationship between the insulating material and the heating element exists, as in the original German translation.

In the opinion of the chamber, the description of the injunction patent supports the view that the insulating material refers to the extruder and not solely to the heating element.

The description of a patent (cf. Art. 84 sentence 2 EPC) must contain at least one way of carrying out the claimed invention in detail, possibly explained by examples and with reference to the drawings using the corresponding reference numerals. The description and the drawings are to be used in accordance with Art. 69(1) sentence 2 EPC for construing the patent claims, since these serve to explain the patent claims. The description and drawings must therefore be used to determine the meaning of the patent claim. In doing so, the person skilled in the art attempts to reconcile the literal meaning of the patent claims with the description and the drawings in such a way that a meaningful whole results. In the context of function-oriented construction, the description and the drawings play a particular role in determining the contribution that the individual features make to the performance result of the patented invention (Haedicke/Timmann PatR-HdB/Timmann, 2nd ed. 2020, § 3, para. 112, beck-online). However, their use may not lead either to an expansion of content or to a substantive narrowing of the subject matter specified by the literal meaning of the patent claim (BGH GRUR 2011, 701 - occlusion device).

The corresponding description of the patent in section (0023) (see AS2) already stated the following in the original version: “In certain embodiments, an insulator 131 may be provided over the mounting tube 138 so as to reduce the amount of heat transferred from the extruder 132 to the upper and lower housings 112, 114.” (now “In all embodiments, an insulator 131 is provided over the mounting tube 138 so as to reduce the amount of heat transferred from the extruder 132 to the upper and lower housings 112, 114.”, see AS8) (cf. Feature 6c)). From a technical point of view, it is therefore clarified that it is about reducing the heat that comes from the extruder. The fact that the extruder must be heated is imperative in that the starting material that enters the extruder through the guide tube must be melted for the purpose of extrusion. Otherwise, extrusion through the outlet nozzle is not possible. In this respect, it must also be taken into account that section

(0020) of the patent specification (AS8) states: “When the device 100 is connected to a power source, the heating element raises the temperature of the extruder 132 to a temperature that may be above the melting point of the feed stock 20.” Section (0025) further states: “the portion of the feed stock 20 that is within the extruder 132 will be heated by the extruder 132”. This also shows the further function of the extruder, namely that the starting material is melted in it immediately before exiting the outlet nozzle. Furthermore, section (0020) states: “In certain embodiments, the extruder 132 is formed of a thermally conductive material, for example a metal or a ceramic, with a heating element, for example a nichrome wire (not visible in FIG. 3B) wound around the exterior circumference”. Thus, the heating element (wire) is already shown in the original patent, in a possible described embodiment, as part of the extruder or is wrapped around the extruder so that it can be heated.

In the disclosed exemplary embodiment Fig. 3B, the insulating material not only surrounds the heating element, but also the extruder. That the heating element (wire) in Fig. 3B (cf. AS2) is not visible is also apparent from the description associated with the patent (AS8, section 0020):




FIG. 3B

The interpretation of feature 6a) thus reveals to those skilled in the art that the insulating material surrounds the extruder, which is heated by the heating element to melt the starting material, and does not insulate the heating element.

II.

As a result, however, it does not matter what the German translation of the patent will ultimately be in the final version, since in the infringing embodiment the insulating material—consisting of a film and a type of insulating wool—is located both over the extruder and over the heating element in the form of a wire that is wrapped around the extruder, or surrounds them, and thus literally infringes feature 6a):



The chamber was also able to determine this in the course of the inspection.

Thus, in the opinion of the chamber, feature 6a) is literally fulfilled, provided that it is viewed in isolation (see, however, D)III.2c)).

Insofar as the respondent states that the insulating material (131) provided above the mounting tube was only disclosed as a film in the application, the chamber cannot follow this: The cited location (0022) refers to a film (insulating film) that is not mounted over the heating element and <u>under</u> the mounting tube, but rather under it. In contrast, the following section (0023) covers an insulating material that is mounted <u>over</u> the mounting tube (see also Fig. 3B), without further specifying the type of insulating material. Rather, it is up to the person skilled in the art to decide which known insulating material to use. This is because the technical principle that hot areas of tools such as hot glue guns must be insulated where they are handled as intended and held during use was already generally known and part of the prior art at the time of the patent application. The use of a film under the mounting tube thus represents only one possible embodiment, but it is not the subject of the injunction patent (cf. BGH GRUR 2016, 1031 - Heat Exchanger), especially since it was deleted in the currently valid patent specification (AS8).

Furthermore, the use of only one insulating material is not mandatory, so that the use of two insulating materials—film and insulating wool—also fulfills the patent claim in feature 6a). As already mentioned, the patent claim does not, in its features, relate to the material that is to be used for the insulating material, but rather only focuses on the insulating effect ("an insulator"). The restriction to the use of a single insulating material above the extruder solely on the basis of the illustrated embodiment and the use of a reference number would therefore unduly narrow the subject matter defined by the wording of the claim (cf. BGH GRUR 2011, 701 - Occlusion Device).

c)

However, features 6a) and 6c) are related in terms of content, since they both relate to the position of the insulating material. In this regard, a reading of the claim features as a whole shows that the insulating material ("the insulator") over the mounting tube must be suitable for reducing the heat radiating from the extruder to the upper and lower housing. At the same time, an insulating material ("an insulator") is intended to surround the extruder.

I

The fact that the heat of the extruder radiates to the housing parts inevitably follows from the fact that, in the injunction patent—as also in the accused embodiment—the extruder is located inside the housing, i.e., the 3D pen. If the insulating material is already mounted directly over the extruder (feature 6a)) and thus develops its insulating effect, the average person skilled in the art will ask how feature 6c) relates to this, in order to give the patent claim meaning.

II.

The injunction patent describes the insulating material to be used in that *a* insulating material ("an insulator") (131) surrounds the extruder (feature 6a)). It further states that *the* insulating material ("the insulator") is mounted over the mounting tube (feature 6c)). The average person skilled in the art therefore understands the patent claim to mean that the insulating material to be used must cumulatively meet the criteria specified in features 6a) and 6c): first, *an* insulating material must be selected that surrounds the extruder. At the same time, *this* ("the") insulating material must be above the mounting tube. The patent claim here uses different articles, namely the indefinite article ("an"/"ein") in feature 6a) and the definite article ("the"/"der") in feature 6c). Insofar as the definite article is used in feature 6c), the person skilled in the art concludes that the insulating material mentioned in feature 6c) refers to the insulating material mentioned in feature 6a) and is therefore identical to it. A definite article accompanies nouns that are specifically known or already mentioned. Consequently, "the insulating material" in feature 6c) refers to an insulating material previously mentioned in the patent claim, namely that in feature 6a), with the consequence that the

insulating material to be used must cumulatively fulfill features 6a) and 6c).

III.

This interpretation is also supported by the drawing for the exemplary embodiment contained in the description (Fig. 3B).

One possible embodiment of the patent specification shows a mounting tube that surrounds the entire extruder and at least a portion of the guide tube, thus providing a compact and well-aligned arrangement. Above the mounting tube (138), in the area where the extruder (132) is inside the mounting tube (138), there is an insulating material (131):




FIG. 3B

Features 6a) and 6c) are thus cumulatively met. While this is merely an exemplary embodiment in which the extruder is located within the mounting tube, the insulation above the mounting tube can reduce the heat emitted by the extruder.

However, this is also assumed elsewhere in the description:

The section (0022) originally contained in the patent specification states: “In certain embodiments, an insulating film (not visible in FIG. 3B), for example a polyimide tape, may be applied over the heating element and under the mounting tube 138.” Here, too, there is a spatial relationship between the mounting tube and the heating element (which surrounds the extruder).

Section (0024) states: “In certain embodiments, there may be a gap between the insulator 131 and the mounting tube 138. In certain embodiments, this gap may provide a thermal break so as to further thermally isolate the upper and lower housings 112, 114 from the extruder 132.” Here, too, the spatial relationship between the extruder, the mounting tube, and the insulating material is shown.

IV.

Furthermore, this interpretation is also supported by the decision of September 19, 2025 (cf. AS5). In particular, p. 31 states: “The opposition division considered these arguments as ex post facto analysis. Obviously, an engineer trying to prevent a device, and more specifically an extruder with a heating element, from becoming hot could use an insulator. However, there are other options that the skilled person could consider, such as temperature control of the extruder to prevent overheating by switching off the device or merely providing an insulator around the extruder **but not around a mounting tube**.” (emphasis by the court)

In deviation from the original patent, the injunction patent in the maintained form consequently bases the description on the fact that in **all** embodiments, the insulating material (131) is provided above the mounting tube in order to reduce the heat emitted from the extruder to the upper and lower housings (cf. AS8, section 0023: In all embodiments an insulator 131 is provided over the mounting tube 138). This is expressed in the newly added feature 6c), which therefore must be present in order to assume patent infringement.

d)

In the infringing embodiment, an insulating material is attached over the extruder (as well as the heating element) and encloses it (feature 6a)). This insulating material extends to the widened part of the metal piece, i.e., the mounting tube, up to the point at which it is covered by a white plastic part. The insulation material is not installed over the entire "mounting tube", but at most over a part of it. The “mounting tube” is predominantly covered by a white plastic part:




Thus, the insulation material does not cumulatively meet features 6a) and 6c) because it does not lie over the mounting tube in order to reduce the heat emitted by the extruder. There is no mounting tube above the extruder. Even if one were to follow the injunction plaintiff's argument that the white plastic part also has an insulating effect and therefore constitutes insulation material within the meaning of the injunction patent, the white plastic part does not fulfill feature 6a), namely enclosing the extruder, which is located in the front part of the metal piece, while the area around which the plastic part is located exclusively performs the function of the mounting tube.

Because, under the court's construction of the injunction patent, features 6a) and 6c) relating to the insulation material must be met cumulatively, since feature 6c) refers to feature 6a), the court also cannot follow the injunction plaintiff's argument that the function of the insulation material with respect to features 6a) and 6c) is fulfilled jointly by the insulation material around the extruder as well as by the white plastic part, according to which the heat emitted by the extruder is reduced to the upper and lower housing, once around the extruder itself and once over the mounting tube. As already stated, features 6a) and 6c) must be fulfilled cumulatively. This would be contradictory if one were to assume an infringement of the injunction patent with two different insulating materials, whereby one fulfills feature 6a) and the other fulfills feature 6c). Since the insulation material over the extruder extends only slightly over the "mounting tube", this alone does not fulfill feature 6c): Precisely because it does not extend completely over the “mounting tube,” it cannot prevent the heat emitted by the extruder via the “mounting tube” from radiating to the housing from being reduced. Rather, this is fulfilled only by the white plastic tube, as the injunction plaintiff herself had measured:



Feature 6c) is therefore not fulfilled.

IV.

Insofar as the injunction plaintiff argues that, in the opposition appeal proceedings, the asserted claim will be restored in the scope originally granted (i.e., in particular without feature 6c)), the Chamber does not follow this.

In the opposition proceedings, the prior art references were examined in detail, which led to the maintenance of the injunction patent in a limited scope. The reasoning for the decision dated 09/19/2025, as well as the arguments presented (cf. AS8), are technically comprehensible to the Chamber, which is why the Chamber fully concurs with the decision of the European Patent Office.

V.

There is also no equivalent patent infringement.

1.

For an embodiment that deviates from the literal meaning of the patent claim to fall within its scope of protection, three requirements must generally be met. First, the embodiment must solve the problem underlying the invention with modified but objectively equivalent means. Second, his expertise must enable the person skilled in the art to identify the modified embodiment, with its different means, as having the same effect. Finally, the considerations that the person skilled in the art must make in this regard must be based on the meaning of the teaching protected in the patent claim. If these requirements are met, the deviating embodiment, with its modified means, must be considered from the perspective of the person skilled in the art as an equivalent solution to the one that corresponds to the literal meaning, and thus must be taken into account in determining the scope of protection of the patent pursuant to the requirement of Art. 2 of the Protocol on the Interpretation of Art. 69 EPC. The scope of protection of the patent is thus determined in accordance with what the person skilled in the art is able to recognize as equivalent on the basis of the teaching according to the invention and thus aligned with the requirement of Art. 1 of the Protocol on Interpretation to combine appropriate protection for the patent holder with sufficient legal certainty

for third parties in determining the scope of protection (stRspr of the BGH; cf. BGHZ 150, 161 = GRUR 2002, 511 - Kunststoffhohlprofil; BGH, GRUR 2007, 510 - Kettenradanordnung; BGH, GRUR 2007, 1059 - Zerfallzeitmessgerät; BGH, GRUR 2011, 313 - Crimpwerkzeug IV; BGH, GRUR 2015, 361 - Ggefäß; cf. OLG Düsseldorf, judgment dated 3/21/2013 - I-2 U 73/09, BeckRS 2013, 12504 Chipkarte, under B. 3.; OLG Düsseldorf, GRUR-RR 2014, 185 - WC-Sitzgelenk; OLG Düsseldorf, judgment dated 8/14/2014 - 15 U 16/14, BeckRS 2014, 21711; OLG Düsseldorf, judgment dated 9/17/2015 - I-15 U 139/14, GRUR-RS 2015, 16405 para. 75)

2.

In any case, the third feature is missing.

a)

The orientation of the person skilled in the art's considerations to the patent claim required for the affirmation of equivalence does not require that the description of the patent contain statements that direct the person skilled in the art precisely to this embodiment (BGH, GRUR 2014, 852 - Begrenzungsanschlag). However, it requires that the considerations that the person skilled in the art must make in order to find an equivalent substitute be oriented to the meaning of the teaching protected in the patent claim in such a way that the person skilled in the art considers the deviating embodiment (alignment of the guide tube and extruder by means of crimping; use of an insulating material over the extruder and another insulating material over the area of the assembly) with its modified means as an equivalent alternative to the solution at issue (alignment of the guide tube and extruder by means of a mounting tube; use of an insulating material that surrounds the extruder and simultaneously lies over the mounting tube). "Orientation to the patent claim" requires that the patent claim, in all its features, form not only the starting point, but also the decisive basis for the considerations of the person skilled in the art. In this respect, it is not sufficient for the person skilled in the art, based on his expertise, to recognize the modified teaching as technically sensible and as equally expedient as the instruction set out in the patent claim. It is also not sufficient to determine the orientation to the patent claim in isolation for the modified means; rather, the challenged embodiment must represent an equivalently identifiable solution in its entirety relevant to the realization of the features (BGH, GRUR 2007, 959 - Pumpeneinrichtung). In all cases, the patent holder is bound by the technical teaching that he has had placed under protection (BGHZ 150, 161 = GRUR 2002, 511 - Kunststoffrohrteil). The technical teaching given by the patent must be accepted by him as meaningful and may not be questioned in its substantive justification in the search for a substitute with the same effect (OLG Düsseldorf judgment dated 9/17/2015 - I-15 U 139/14, GRUR-RS 2015, 16405 para. 77).

b)

This is lacking here: The injunction patent not only places under protection a 3D pen with a certain mode of operation and certain components (extruder, heating element, outlet nozzle, guide tube, mounting tube), but also specifies a certain technical solution by means of which the heat emitted by the extruder onto the housing is to be reduced. For this purpose, among other things, in features 8a) and 6c), it provides the instruction that the insulating material surrounding the extruder (with heating element) is mounted over the mounting tube and that the guide tube and extruder are held in alignment by means of the mounting tube. The claim thus conveys to the person skilled in the art the insight that (1) the holding function of a (mounting) tube is to be used and, moreover, (2) to reduce the heat, an insulating material is to be used over the mounting tube.

The defendants' embodiment departs from these specific requirements: Crimping keeps the guide tube in alignment so that the connection between the guide tube and the extruder remains stable during use. However, the crimping is not based on the patent claim, since no deformation is required there to hold/fix the guide tube. Furthermore, the crimping does not keep the guide tube and the extruder in line/alignment, as the court was able to convince itself by way of a visual inspection:



In addition, attaching an insulating material directly around the extruder is not an equivalent substitute under the patent claim: this is characterized in particular by the fact that the insulating material is not attached directly around the extruder, but rather on the mounting tube. This represents the actual peculiarity, whereas the average person skilled in the art would have considered insulating the extruder itself from the beginning and not the mounting tube (cf. AS5, p. 31). The embodiment thus deviates from the concrete specification by ignoring that the

insulating material must indeed surround the extruder, but must be installed over the mounting tube.

In view of this, the person skilled in the art will not consider the contested embodiment, with its modified means, to be oriented to the meaning of the teaching protected in the patent claim.

In the present case, the person skilled in the art will also not revise this point of view on grounds of fairness. Such considerations play a role in the equivalence test insofar as the inventive achievement is to be provided with adequate protection, which is ensured by means of the three criteria mentioned. However, they do not have the consequence that workaround solutions that are outside the scope of the patent and are not oriented to the meaning of the claim are nevertheless to be regarded as equivalent solutions. Rather, such workarounds do not constitute unlawful use of the patent, even if they were only found in the course of an infringement proceeding.

E

The decision on costs is based on Sections 92(1) and 101 of the German Code of Civil Procedure (ZPO). The intervenor must bear the costs of the intervention as well as the separable costs of the interlocutory dispute.

The decision on provisional enforceability is based on Sections 708 No. 6 and 711 of the German Code of Civil Procedure (ZPO).

**Instructions on remedies:**

A complaint may be filed against the decision setting the amount in dispute if the value of the subject matter of the complaint exceeds 300 euros or if the court has allowed the complaint.

The complaint must be filed within **six months** with the

Nuremberg-Fürth Regional
Court Fürther Str. 110
90429 Nuremberg

filed.

The period begins when the decision on the merits becomes final and binding or when the proceedings are otherwise concluded. If the amount in dispute has been determined later than one month before the expiration of the six-month period, the appeal may still be filed within one month after service or informal notification of the order determining the amount in dispute. In the event of informal notification, the decision shall be deemed to have been notified on the fourth day after being sent by mail.

The appeal must be filed in writing or by a statement made for the record at the clerk's office of the named court. It may also be made for the record at the clerk's office of any local court; however, the deadline is met only if the record is received by the above-mentioned court in a timely manner. Attorney involvement is not required.

Legal remedies may also be submitted as **an electronic document** . A simple email does not meet the legal requirements.

Legal remedies submitted by an attorney, by a public authority, or by a legal entity under public law, including the associations formed by it to fulfill its public tasks, must be submitted **as an electronic document** , unless this is temporarily not possible for technical reasons. In this case, transmission in accordance with the general provisions remains permissible, whereby the temporary impossibility must be substantiated at the time of the replacement submission or immediately thereafter. Upon request, the electronic document must be submitted subsequently.

Electronic documents must be

- be provided with a qualified electronic signature of the responsible person or - be signed by the responsible person and submitted by a secure transmission method.

An electronic document that is provided with a qualified electronic signature of the responsible person may be transmitted as follows:

- via a secure means of transmission or
- to the court's Electronic Court and Administrative Mailbox (EGVP) set up for the receipt of electronic documents.

With regard to the secure means of transmission, reference is made to Section 130a(4) of the Code of Civil Procedure. With regard to the further requirements for electronic communication with the courts, reference is made to the Regulation on the Technical Framework Conditions for Electronic Legal Communication and on the Special Electronic Public Authority Mailbox (Elektronischer-Rechtsverkehr-Verordnung - ERVV), as amended, as well as to the website www.justiz.de.

signed

| | | |
|---|---|---|
| Schroeter | Mieller | Bellmann |
| Presiding Judge at the Regional Court | Judge at the Regional Court | Judge at the Regional Court |

Pronounced on May 7, 2026

signed

Maar, JAng
Clerk of the Registry

For the accuracy of the copy
Nuremberg, May 8, 2026

Maar, JAng
Clerk of the Registry